UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOM DELANEY

     Plaintiff

v.

TOWN OF ABINGTON, DAVID
MAJENSKI, CHRISTOPHER J. CUTTER,
AND KEVIN F. SULLIVAN,

     Defendants

DOCKET NO. 1:15cv-13130-RGS

**PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

I.     **FACTS**

Delaney incorporates the Statement of Additional Undisputed Facts and Concise

Statement of Disputed Facts into this Memorandum.

II.     **STANDARDS**

Delaney incorporates the standards from his Opposition to Motion for Summary

Judgment into this Memorandum of Law.

III.     **ARGUMENT**

A. **Delaney Satisfies His Burden of Production that there is Sufficient Evidence for
Trial on all of His Claims.**

The issues raised by the Town in their Motion concern Delaney's "state of mind" which

are not resolvable on summary judgment. While conceding this issue in their brief, the Town

still attempts summary judgment on forbidden ground where the task of deciding what

constitutes a reasonable belief that the law has been violated is for a jury. Notwithstanding these

obstacles to summary judgment, the record is replete with evidence from which jurors can

conclude that Delaney reasonably believed that the Town violated the law by removing police

1

officers' discretion to issue tickets in the manner that they deemed appropriate in violation of the law.  Facts also exist confirming that Delaney submitted his AG Complaint to the Attorney General's Office for the purpose of having that institution investigate violations of M.G.L. c. 268A, § 2, and 268, § 13B and that he was retaliated against as a result.  Delaney carries his burden of production as to every claim in the Seconded Amended Complaint and the Defendants have no shield on account of qualified immunity.

> **1.     Genuine issues of material fact preclude summary judgment as to issues of "state of mind", the credibility of witnesses, and motive for the Town to commit the numerous adverse actions that it took against Delaney.**

Primarily, genuine issues of material fact exist regarding what was discussed between Delaney and Chief Majenski on April 9, 2014 during their meeting right after the AG Complaint was filed.  Delaney claims that Majenski made forceful, direct threats to him in the meeting for filing the AG Complaint.  **DF  147-148.**  Majenski disputes that the meeting ever happened notwithstanding Delaney's phone logs confirming that he spoke with Owings right before and after the meeting.  Genuine issues of material facts exist as to whether the Defendants created the Money Ticket Quota System as they deny the allegation in the face of chalk boards that track the "$" generated on certain Abington Streets, longstanding directives to issue money tickets only for seat belt violations, and the Defendants having destroyed documents related to the Money Ticket Quota System existing before July 19, 2014–after Majenksi foreshadowed the destruction of the documents on April 9, 2014. These genuine issues of material fact and the others cited in the Concise Statement of Disputed Facts doom the Defendants' efforts on summary judgment as issues of motive and credibility predominate.

2.      **Facts exist in the record from which jurors can conclude that Delaney reasonably believed the Town violated the law.**

An employee's reasonable belief is determined on a case by case basis.  Various facts exist upon which jurors can conclude that Delaney reasonably believed that the Town violated the law and committed crimes.  *Larch v. Mansfield Mun. Elec. Dept.*, 272 F.3d 63, 67 (1st Cir. 2001).   Delaney, just like several other officers at the Department, were trained that the officer issuing the citation decides when to issue a Money Ticket.  **DF 144.**  He is aware that the *Newton* case clarified that the officer issuing the citation decides when to issue a citation and not a Chief of Police for any particular town.  He is aware of M.G.L. c. M.G.L. c. 90C, §§ 2 and 3, 268A, § 2, and 268, § 13B.  After joining the Abington Police Department, he learned of the Traffic Enforcement Policy which further reinforced his understanding of the law–that officers (not their superiors) decide when to issue a citation, a fine, or a warning and those citations should not be issued to generate revenue for the Department.  **DF 148.**   Delaney also knew that the Department had a long-standing practice of issuing Money Tickets for seat belt violations during "click or ticket" mobilizations as the mobilization emails were certainly directed towards him. Owings told Delaney that he also believed that the orders were illegal and, as such, he could not direct Delaney to follow them.  **SAF 94**.  Kevin Cuter told both Delaney and Paige that he was performing overtime traffic enforcement to issue only citations fines at the command of the Deputy Chief.  **DF 145.**

When Deputy Chief and Chief Majenksi began holding meetings with their supervisors, Delaney learned of the emails that were being exchanged and reviewed them.  Some of these emails (those that are in suit) show that the Deputy Chief and Chief removed statutorily conferred discretion of officers by directing that the majority of citations are to be for fines, not warnings; threatened supervisors with insubordination for not enforcing these orders; set

standards that remaining on patrol for an hour without issuing citation for a fine was unacceptable; encouraged supervisors that they should take action against their subordinates to ensure that fine citations were issued; flatly stated that officers should conform their issuance of citations to more than **ALL** warnings; that they wanted proactive officers on the road and then confirmed the scheme by openly praising those officers through email. **SAF 114-116**. Furthermore, the climate that Delaney endured at the police station was one where supervisors during rolls calls made condemning statements such as "I can't tell you to write money tickets, but write money tickets" and also developed charts tallying the results of their illicit methods to track the rate at which Money Tickets were issued. **Ex. 86, Kevin Cutter Memo; SAF 112-113.** The Town's arguments regarding its interpretations of Deputy Chief's emails are unavailing because it merely shows that opposite inferences can be drawn from the same email strings.  The capability of drawing opposite inferences on the same facts only highlights more that Delaney's "state of mind" is a jury issue.  *See Flesner v. Tech. Commun. Corp.,* 575 N.E.2d 1107, 1111 (Mass. 1991) (citing *Anderson v. Liberty Lobby, Inc*., supra, 477 U.S. at 248–250, 106 S.Ct. at 2510–2511).   Events occurring personal to Delaney further provide facts from which jurors can conclude that his possessed reasonable beliefs that the Town violated the law.

For example, Delaney was told by Owings (from Sullivan) in March 2014 that he had to increase the amount of citations for fines that he issued to rest in the area of 30%  because his numbers were below the Departmental average of 33% or he would find himself on desk job. **DF 146.**  Majenski questioned Owings as to why Delaney was not being a "Good Marine" and following orders to issue Money Tickets.  **DF 147**.  After Delaney filed his AG Complaint, Delaney and other officers were assigned to schools for portions of their shifts where they "watched Geese" for two hours, were told to do nothing, and then were expected to perform

community policing in additional to their other assigned tasks.**DF 160.**  Delaney met with the

highest ranking officer in his organization (Chief Majenksi) who threatened his career for filing

the AG Complaint, for not following orders to issue citations, and commented to Delaney that

emails related to the directives to issue Money Tickets were destroyed.  **DF 148.**  Carini warned

Delaney not to get into trouble with the "Chief"  when Delaney was conducting a traffic stop on

July 4, 2013 because, Delaney, in the exercise of his discretion, failed to issue a citation for a

fine to citizens.  **DF 162**.  Delaney has personally viewed Carini send emails to the Deputy Chief

documenting the total warnings v. fines for their shift. **DF 162.**   Delaney then became victim of

a host of retaliatory acts at the hands of the Town as discussed below in response to the AG

Complaint being filed and his not following orders to issue more fines to citizens.  **DF  144; SAF**

**121-142**  *See Larch v. Mansfield Mun. Elec. Dept*., 272 F.3d 63, 69 (1st Cir. 2001) (jury could

reasonably conclude that the persistent criticism of and interference with Larch's management

after his decision not to hire Forbes was evidence that Larch had disobeyed an order rather than

merely neglecting to adopt a recommendation). All of these facts are those upon which jurors

could conclude that Delaney reasonably believed that Town violated the law by implementing

the Money Ticket Quota System.

### 3.   Under Section 185 (5)(b)(C)(2) facts exist upon which jurors can conclude that Delaney submitted the AG Complaint as part of a criminal investigation into whether the Town violated M.G.L. c. 268A, § 2 and 268, § 13B.

M.G.L. c. 268A, § 2 is a criminal statute that prohibits persons from providing anything

of value to public employees in exchange for the public employees performing their duty or

refraining from performing duties.  Section 268A is  interpreted broadly to encompass various

prohibited acts from the giving of gifts, money, favors, or providing anything of value to

influence the acts of public officials in the performance of their official duties.  *See* M.G.L. c. 268A, § 2.  *Com. v. Downey*, 192 N.E. 512, 512 (Mass. 1934).

The Chief and Deputy Chief ordered municipal employees to perform overtime traffic enforcement and to issue money tickets only during such assignments in exchange for receiving overtime compensation.  The Chief and Deputy Chief, reinforced by Lt. Sullivan, ordered municipal employees to issue Money Tickets to generate revenue for the Town in violation of the Town's Traffic Policy not to do so and M.G.L. c. 90, §§ 2 and 3.  The individual defendants caused municipal employees to violate their official duties of exercising their independent judgment to issue a fine or not to issue a fine in exchange for receiving money for themselves (overtime) and the Town (Equipment Fund).  **DF 45; SAF 98-105**.  *U.S. v. Devin*, 918 F.2d 280, 282 (1st Cir. 1990) (improper uses of ticket process and police department rules by police officer in exchange for favors consisted criminal offense in violation of 268A, § 2).  **DF 145**.  The acts resulted in Delaney filing his AG Complaint (twice) for the purpose of having the AG's Office investigate what Delaney believed were crimes. **Ex. 103, Delaney Affidavit; Ex. 105, AG Phone Numbers**; **Ex. 98, Delaney Phone Logs**.  Delaney eventually filed suit in state Superior Court in April 2015, but not before personally providing the Town with a copy his AG Complaint on October 14, 2014, the same day that he filed the AG Complaint for the second time.  *See Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 98 (D. Mass. 2003).   By April 2014, Delaney knew of the Department's 2009 Arrest Incentive where the Deputy Chief and Chief compensated an employee with paid time-off to arrest citizens as well as other rumors that the Chief allegedly covered-up officer sexual assaults. Ex. 74, Police Report.

The Town's argument that Delaney could not reasonably believe that the Town violated M.G.L. c. 268A, § 2 when he already suspected that his superiors were corrupt ignores the

material facts.  The Town supplies no analysis as to how Delaney's reasonable beliefs are limited to what he mentioned in the AG Complaint rather than as to all of the information known to Delaney when he filed his AG Complaint.[1]  In any event, the thrust of the Town's argument-what Delaney knew versus what he wrote-concerns "state of mind" is unresolvable on summary judgment.

### 4. Delaney provided written notice to the Town of the Money Ticket Quota System even before he filed his AG Complaint.

Notwithstanding the validity of the arguments made above, Delaney also provided both oral and written disclosures to the Town that clearly advised that the orders to issue citations for fines were illegal.  Rule 7.0 is a Rule of the Police Department used when officers do not want to follow "illegal" orders.  Delaney provided written disclosure to Carini during roll call on May 29, 2013 that the orders to issue citations were illegal pursuant to the *Newton* case by providing him with a copy of Abington Police Department Rule 7.0, and telling him that he would not follow the orders to issue citations for fines to citizens as promulgated through Deputy Chief's Cutter's emails:

> Q.  If you could turn to Page 6 and in Paragraph 22.  I'm going to have to refer to one of your complaint exhibits attached to your complaint.  You write "A true and accurate copy of the unlawful order protocol Delaney provided to Carini on May 29, 2013, is attached as Exhibit 4."  So it's attached as Exhibit 4 to your complaint.  If you can turn to that.  So when you say you attach Exhibit 4, the unlawful order, are you referring to -- This is part of, what, the police manual?
> **A.  I believe it's the Abington Police rules and regulations.**
> Q.  So in the paragraph I just sent to you, you write, "At that time, Delaney provided Carini with a copy of Abington Police Rule 7.0 concerning unlawful orders, discussed the Newton cases with Carini at the time, and told Carini he no longer desired to follow the Money Ticket Quota System because he felt it was in violation of the law."  When you were speaking with Sergeant Carini -- was it Sergeant Carini at the time?
> **A.  Yes.**

---

[1] The Town never asked Delaney to chronical all of the facts known to him about the corruption in the Department when he filed his AG Complaint despite utilizing all available deposition time.

Q.  -- Sergeant Carini, did you use the term Money Ticket Quota System?

**A.  I said that -- No, I didn't say the term Money Ticket Quota System.**

Q.  What did you specifically say to Sergeant Carini?

**A.  I said that him ordering us to write more money tickets than warnings was going against the officer's discretion which is part of law based on that Newton Police Association case as well as what's written in the law itself.**

Q.  What law are you referring to?

**A.  Chapter 90, Section 2, and I believe also Section 3.**

**DF. 162.** Carini's testimony on the issue is that Delaney did not supply him with Rule 7.0, but that Delany discussed with him his "dislike" of the orders.  Carini; however, admitted that, if he received information form Delaney that the orders were illegal, he would have passed the information to the Chief or Deputy Chief to follow-up.  **DF 162.**  Delaney did in fact subsequently meet with Chief Majenksi on April 9, 2014 after Majenski instructed Owings to send him to his office because he was not being a "Good Marine" in following his orders to issue citations for fines in *April 2014*:

Q:      All right.  So where did this discussion take place between you and the chief; was it at his office?

**A:      I believe it was his office.**

Q: Okay.  So did the chief express to you that he had concerns that Delaney was not following orders in issuing more citations or fines versus warnings?

**A:   Yes.   I think that's what the conversation was geared towards.**

Q: Okay.  And that's when the good marine reference came about?

**A: Sure.  But I think it was more of Delaney-you know, he was concerned that Delaney was pushing back more.**

Q: On what?

**A: On issuing the citations.  Why he was so stern, you know, against it.  I guess that's-**

Q: Okay.  Did the chief express to you during that conversation that he disagreed with the push back he was receiving from Delaney regrading those money citations being issued or not?

**A: Yeah.  I mean, that was part of his concern, sure.**

**DF. 147.**  Per Delaney:

Q.   What made you think that the Chief knew you had filed a complaint with the attorney general's office?

**A.   I had never gone into the Chief's office.  I never had a discussion with him at, like, alone.  I've never been called in there ever.  Even during my interview, I think that was the only time I actually was sitting in a room with him.  And I ended up going in there, and the first thing he said to me was that, you know, "I don't think you have the heart for giving money citations."  Then I explained to him the, I explained to him that I felt that it was illegal that he was taking away the discretion.  And then he explained to me that, he said that it was, oh, it was a miscommunication and the Deputy Chief sent out some crazy e-mails a while back, which I believe were the e-mails I had given to the attorney general's office.  And he said, he said, "The Deputy Chief deleted those e-mails.  I told him that that was crazy, that we couldn't do that, and I got rid of them."  So.**

Q.   What did you say in response to the Chief saying that?

**A.  I said, "Okay," and then I just wanted to leave at that point.**

Q.   Do you have any information that the Chief actually did know about the attorney general's, your filing with the attorney general at that time?

A.   Based on that meeting, I'd say that, that he definitely knew.

Q.   Just based on what you told me?

**A.   Based on that and his demeanor of how he seemed  angry and how he made statements to me that some people come against me, people have come against me and they may win the battle but I always win the war.  *And, obviously, collated with all the statements of what I wrote in the affidavit as well as including the e-mails*, I got the feeling and I knew that he knew about the complaint, that I dropped it off.**

**DF 148.**   It should be noted that Carini is the same supervisor who claimed that he did not verbally warn Delaney to issued citations for fines when the two met during one of Delaney's motor vehicle stops in July 2013 by telling Delaney that he did not want to see him "get into trouble with the Chief".  **DF 162**.

**B.   The Town Retaliated Against Delaney by Taking Numerous Adverse Acts Against Delaney Which are Actionable Individually and Collectively Under the Whistleblower Statute.**

A retaliatory act under the Whistle Blower Statute (the "Statute") includes "any" action that adversely impacts the employees condition as well as suspensions, demotions, verbal and written warnings, and terminations.  The retaliatory acts inflicted on Delaney are actionable

individually or collectively as part of an ongoing pattern of harassment, and each serve as admissible background evidence as to all of his claims. *See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,* 50 N.E.3d 778, 801 (Mass. 2016); *Diaz v. Jiten Hotel Mgt., Inc.,* 671 F.3d 78, 85 (1st Cir. 2012); *see also Reyes-Orta v. Puerto Rico Hwy. and Transp. Auth.*, 811 F.3d 67, 75 (1st Cir. 2016).   There is no need for the Court to conduct a *McDonnell-Douglas* balancing test because there is strong direct evidence that Delaney was retaliated against by the individual defendants (each decision makers) through: (1) Majenksi's threats to Delaney on April 9, 2014; (2) Deputy Chief Cutter's statements to Paige about "punching back" if Delaney was re-elected; (3) Lt. Sullivan telling Owings that Delaney would be placed on a desk job if he did not issue more fines; and (4) Delaney not issuing more citations for fines and being removed from patrol while he stands in Court not conducing arrest or investigations.  **DF 146-153**. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803 (1973); *see also DeCaire v. Mukasey*, 530 F.3d 1, 21 (1st Cir. 2008), <u>as corrected</u> (July 10, 2008) (statement of supervisor that employee could lose her job if she did not go along is "quite retaliatory"); *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000).   In any event, taking the direct evidence into account with the circumstantial evidence, facts exist in the record from which jurors could conclude that the reasons offered by the Town for the acts against Delaney are pretext to conceal its real motives:

### 1.   School Assignments

Prior to making his internal complaints about the orders to issues citations for fines, Delaney had never been assigned to perform patrol at the Abington Highschool on a regular basis.  Delaney was never ordered to perform any desk work and certainly was not a court prosecutor prior to that time.  Furthermore, he's a good employee that the Chief decided to

punish with school assignments to do nothing for two hours each shift. In addition to wasting

two hours each day, Delaney was still required to perform CP time making for longer work days

and more paperwork to process.  The Town's retaliatory intent can be inferred not only from

circumstantial evidence, but also from the Chief himself who admitted to assigning Delaney and

his shift this assignment as a "second priority" because Delaney refused to perform traffic

enforcement by issuing citations for fines consistent with his orders.  **SAF  96-97.**  These

assignments were modified on April 18, 2014.  **SAF 97.**  *See Noviello v. City of Boston*, 398 F.3d

76, 86 (1st Cir. 2005) (proximity).

### 2.   Detective Type Overtime Assignments

The Town conflates the issue of Delaney's general overtime assignments with the issue

of his detective-type overtime assignments.  Before filing the AG Complaint, Delaney regularly

received investigative overtime as assigned by the Deputy Chief and Lt. Sullivan.  Overtime is

also a component of investigative work generated by an officer from working on cases when

they conduct arrest.  The individual defendants stopped assigning him detective-type overtime

assignments and made him a Court prosecutor where he works 8-4 not performing any

investigative work.  Meanwhile, officers Kevin Cutter and Sweeney, who issue citations for fines

at a much higher rate receive detective-type overtime assignments.  Delaney solved cases which

they could not solve independent of his efforts.[2]  **DF 144.**   Delaney lost approximately $500.00

per month as a result.  **DF 144, Ex. 102, Delaney, p. 43-52, 56-57, 60-61, 63-66.**   The

Defendants' spurious, post-discovery produced Affidavit and other materials not previously

---

[2] Posted overtime is different and is available on a seniority basis.  Delaney now only has overtime opportunities
when his turn comes around on a list of several other officers.

produced at **Exhibit 3** do not change Delaney's recollection of what he earned and his placement into the Court Prosecution role.

### 3.   Loss of Shift Differential

Delaney earned a shift differential of approximately $2.00 dollars on the 12:00-0800 shift and was forced to forego that differential due to the punishment duty of standing around and doing nothing.  Under the anti-retaliation statutes such as the Statute, employees are not required to make the Hobson's choice between violating the law and retaining the benefits of their employment, including wages or shift differentials.  *See, e.g, Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 293 (1960)*; Figueroa v. J.C. Penney Puerto Rico, Inc*., CIV. 07-1258 JAG, 2010 WL 4861497, at *6 (D.P.R. Nov. 29, 2010); *Doyle v. U.S. Sec. of Lab*., 285 F.3d 243, 251 (3d Cir. 2002).  The law treats the employment benefits forfeited as lost and recoverable on account of the retaliation.  Here, the issue of "voluntariness" is a jury issue as Delaney was faced with the inevitability of issuing citations for fines or being retaliated against for not following orders–which is what happened.  *See Id.*  While promising Delaney that the assignments at the school would stop, Chief Majenksi did not stop the assignment until *after* Delaney was forced to change his shift which resulted in Delaney losing his shift differential.

### 4.   Desk Duty Assignment/Police Prosecutor Assignment

The argument made by the Town that Delaney cannot make out a causal connection between his receiving a desk assignment and police procedure assignments are not adverse actions are unsupported by both facts and law.  Changing assignments in retaliation for an employee exercising their rights have long been recognized as pretext to conceal retaliatory conduct.  *DeCaire*, 474 F.Supp.2d at 254, 258 ("[D]iscretion may be exercised in ways which are

. . . retaliatory").  Desk assignments are given to officers that are not "proactive" in issuing

citations for fines to citizens and Deputy Chief Cutter has the final approval as to desk

assignment. **Ex. 89, March 9, 2015 Desk Assignment Approval Letter; DF 146, 162.**

Reasonable jurors can draw the casual connection from: All of Defendant Cutter's orders to issue

citations for fines to citizens and rewards to those that follow the directives **(SAF 86-105,107,**

**108-120)**; Delaney being a "good" employee with investigative skills **(DF 121)**; Delaney never

being mandated to perform any desk duties prior to his complaints about issuing citations for

fines to citizens; the Town demoting those that support Delaney **(DF 152-153)**; from Chief

Majenksi's threats about Delaney's job future prospects on April 9, 2014 **(DF 148)**; Owings

(through Lt. Sullivan) telling Delaney that he would be placed on a desk job if he did not

increase the amount of citations for fines that he issued **(DF 146)**; Carini warning Delaney that

he would "get into trouble" with the Chief for not issuing citations for fines **(DF 162)**; and

Delaney being assigned to desk duty and police prosecution duty with virtually no investigative

responsibilities or duties even through the present day.  *See Verdrager v. Mintz, supra,*  50

N.E.3d 778, 801.

### 5.  Pretext-Implausible Allegations of Insubordination

The Town retaliated against Delaney when he attended a Union meeting between

himself, the Chief, and another police officer.  The indefensible basis of the accusation of

insubordination was that Delaney took a deep breath and repeated Deputy Chief Cutter's words

"be careful" during the Union meeting.  **SAF 131.**  The email was sent to all of Delaney's

supervisors although it pertained to a Union meeting attended by a select few.  The Town has no

legal or factual support for its argument that the email is not a written warning, but simply has a

different  position on the emails than Delaney. Delaney is the only person who was ever accused

of insubordination during a Union meeting and the only person who ever complained both internally and externally about illegal orders to issue citations for fines to citizens.  **Ex. 12, Cutter Int. Ans. No. 11.**  *See Bainbridge v. Acme Markets, Inc.,* CIV.A. 09-4683, 2012 WL 876744, at *8 (E.D. Pa. Mar. 15, 2012) (selective application of employer policies can be equated to animus improper against employee); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (same).  Reasonable jurors can conclude from these facts that Delaney was retaliated against by the Town and that the Town's explanation for its conduct is pretext to conceal its motives.

### 6.  Pretext-Written Warnings

As with Cutter's email, the email from Kilgour is a written warning too.  Delaney is trained to be as descriptive as possible to assist responding police officers with protecting themselves and citizens. The written training materials contain absolutely no prohibitions against an officer being descriptive for safety reasons.  Kilgour discussed the matter with Delaney and was satisfied; however, he issued Delaney a written warning *after* speaking with Deputy Chief Cutter where he was prompted by Deputy Chief Cutter to take further action against Delaney. Not only is the written warning casually connected directly to Deputy Chief Cutter and his motive to retaliate against Delaney, but the written warning would not have issued but for Deputy Chief Cutter prompting Kilgour to take further action**. SAF 136.**[3]  The written warning falls so closely (days) on the heels of LaFond *formally* receiving the AG Complaint that the Town's only recourse is to misconstrue the date when it received the AG Complaint despite the answers to its own clarifying questions at Delaney's deposition that he delivered the AG

---

[3] Regarding the date that the AG Complaint was delivered to the Town by Delaney himself, Delaney delivered the AG Complaint to LaFond on October 14, 2014 "the same day" that he delivered a copy for the second time to the AG's Office.

Complaint to Lafond on **October 14, 2014**.  No other officer has ever been cited for repeating the words of a 911 caller for safety purposes consistent with the written training materials.  **Ex. 12, Cutter Int. Ans. No. 5; SAF 136.**  And Delaney is the only person who complained internally and externally about the Money Ticket Quota System.  Reasonable jurors can conclude from these facts that Delaney was retaliated against by the Town and that the Town's explanation for its conduct is pretext to conceal its true motives.

### 7.  Delaney's December 2015 Suspension

Delaney properly withdrew his challenge to the December 2015 suspension under the Civil Service Law and made it a part of this suit.  *Bennett v. City of Holyoke,* 230 F. Supp. 2d 207, 220 (D. Mass. 2002), aff'd, 362 F.3d 1 (1st Cir. 2004).  Deputy Chief Cutter suspended Delaney on December 9, 2015 for using the holdover procedure.  This suspension occurred within days after Delaney communicated with Plymouth county prosecutors about the Town's history of compensating police officers through the 2009 arrest incentive program–a communication that Delaney advised Deputy Chief Cutter of on December 3, 2015. **SAC 137**. The Town argues that Delaney should have been suspended for arriving late at work on December 8, 2015.  The argument is unavailing because the reasons offered by the Town for the suspension are implausible, shifting, and inconsistent.

First, after employing Paige to holdover, Lt. Sullivan, in Deputy Chief's Cutter's presence, released Paige as Delaney's presence during the roll call was unnecessary because he was assigned to be the Court prosecutor and no emergencies existed to warrant Paige holding over for Delaney.  **SAF 138-141.**  The reasons offered by the Town through Cutter are implausible given Lt. Sullivan's actions.  *See Sherman v. AI/FOCS, Inc*., 113 F.Supp.2d 65 (D.

Mass. 2000); *see also, e.g., Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir.

2000) ("[W]hen a company, at times, gives different and arguably inconsistent explanations, a

jury may infer that the articulated reasons are pretextual."); *see also Valez, supra,*  585 F.3d 441,

449-50 (employer shifting explanations is evidence of pretext).

Moreover, Carini confirmed on direct examination during his deposition that Delaney

made legitimate use of the holdover procedure pursuant to the past practices in the Department:

> Q: What time does roll call start typically?
> **A: Typically, 16:05.**
> Q: Why do you say 16:05 as opposed to 16:00?
> **A: Give the guys five minutes to get there.**
> Q: Sometimes you have officers hold over for other officers who are running late?
> **A: Sometimes.**
> Q: Can you tell me how that process would work?
> **A: What do you mean?**
> Q: The holdover process.
> **A: If someone was running late, they typically call the station and ask if someone can hold over and they sit there until they get there.**
> Q: Are there different people that the office[r] could call such as yourself or other supervisor?
> **A: They try to call the superior on the shift prior.**
> Q: What about Dispatch?  Could Dispatch be contacted?
> **A: Yes.**
> Q: What about other officers who are not supervisors?  Could they be contacted as well?
> **A: Yes.**

**SAF 140.**  *See Brennan v. GTE Govt. Sys. Corp.,* 150 F.3d 21, 29 (1st Cir. 1998) (Deviation

from past policy or practice is evidence of pretext.)   Assuming *arguendo* that the Town had

legitimate reasons to suspend Delaney, Delaney was the only person ever suspended for using

the holdover procedure and he was treated more harshly than any other officer in that regard.  **DF

157.**  Former officer Januzeseski had a known reputation for tardiness in the police department

such as that officers were required to retrieve him from his home to bring him to work on

numerous occasions yet he never faced any known discipline from the Town whatsoever for

being tardy.  **DF 157.**  Last, reasonable jurors could conclude that the "peppering" of Delaney's previously unblemished disciplinary record with invalid incidents of discipline is the true motive behind Deputy Chief Cutter suspending Delaney as revealed at his deposition.  *See Verdrager, supra,* 50 N.E.3d 778, 801.

For example, when asked why he suspended Delaney, Cutter explained that he was concerned with Delaney's accumulating incidents of not appearing for shifts.  Cutter was then shown his December 2015 email to Delaney where he referred to the events of July/August of 2015 as Delaney having received a **written** reprimand and August 3, 2015 as having received a **written warning**.  He was confronted with rules 9.5 of the Abington Police Department that prove that Delaney violated no rules of on either July/August or August 3, 2015 because Delaney: (1) could not work as he was out sick on July 28, 2015 and the shift that he was purportedly due to cover on July 29, 2015 was an **overtime shift;** (2) there was no proof that he was ever posted a shift to cover in July 2015 because Lt. Sullivan sent an email on **_June 3, 2015_** telling him that all July shifts were posted; and (3) no written rules exist mandating that an officer call in sick again after they have already provided notice that they will be out sick due to illness.  **SAC 132-135, DF 156.**  Deputy Cutter's only remedy for being caught blatantly relying on improperly issued written warnings to support his December 2015 suspension of Delaney was to try to claim that he was unsure of weather Owings meant to issue a written warning by sending the August 3, 2015 email to Delaney despite Cutter's December 2015 letter referring to both prior incidents as written warnings:

> Q: Are there any written rules at the Abington Police Department that says that an officer who's out sick can come back to work and within 24 hours work an overtime shift?
> Ms. Ecker: Objection.
> **A: No. There were no written rules on that.**

Q: In fact, the rules say the exact opposite, don't they?
**A: Yes.**

**SAF 135**.  Under Rule 9.5, Delaney could not receive written warnings for the events of August or July 2015.  Deputy Cutter knowingly suspended Delaney in December 2015 based on a false history of Delaney not appearing for appearing for shifts.  Furthermore, Lt. Sullivan had a practice of advising officers by telephone or email if they were to cover a shift; however, Lt. Sullivan never advised Delaney that he was to cover any shifts for which he was suspended and even stated that all shifts were posted as of June 2015.  Less than a week prior to being disciplined, Delaney wrote to the Deputy Chief advising him that he had contact with Plymouth County DA's Office regarding the arrest incentive.

Reasonable jurors can conclude that Delaney was retaliated against by the Town with the suspension based on the proximity between when Delaney discussed with prosecutors and the date of the suspension occurred, the implausibility of the explanations provided for the suspension, Deputy Chief Cutter's shifting and false explanations regarding what constitutes a written warning, the Town violating Section 9.5 of its own policies (Delaney could not even work an overtime shift on July 29, 2015 per the Department's own written rules), and Lt. Sullivan's email that all shifts were posted sent on June 30, 2015, where no evidence exist that *Delaney* personally was to cover any shifts on that date.   *See Sherman v. AI/FOCS, Inc*., 113 F.Supp.2d 65 (D. Mass. 2000); *see also, e.g., Dominguez-Cruz v. Suttle Caribe, Inc*., 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); *see also Valez, supra*, 585 F.3d 441, 449-50 (employer shifting explanations is evidence of pretext).

### 8.  Programming Fax Machines

The Town's argument is flawed primarily because it cites the wrong date as to when Delaney initially filed his AG Complaint.[4]  The Defendants' statement of undisputed facts acknowledge that the AG Complaint was filed on April 7, 2014, but they contest that fact as April 7th is the same day that Delaney was strangely asked to program fax machines purportedly based on his employment application submitted almost 5 years earlier.  Delaney's testimony, bank records, telephone records, and the AG's own intake sheet corroborate the filing of AG Complaint on April 7th.  IT staff are tasked with programming fax machines–not patrolmen like Delaney.  Notwithstanding this fact, Deputy Chief Cutter made this unusual assignment on the same date that Delaney initially filed his AG Complaint which was followed swiftly by the meeting between Delaney and Chief Majenksi where Delaney's livelihood was threatened by the Chief.   Reasonable jurors can conclude from the proximity of the filing of the AG Complaint, the April 9, 2014 meeting, and the unusual fax assignment that the assignment was made for retaliatory purposes.  Reasonable jurors can also conclude, based on the same facts, the fax machine assignment is a component of the larger hostile work environment towards Delaney as a result of his complaining internally and externally about the manner in which the Department issued citations for fines.

### 9.  Isolation from Peers

"A plaintiff who claims a hostile work environment . . .  will often have to establish a continuing violation.  A hostile work environment is one that is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, and that poses a

---

[4] **No exhibit cited by the Defendants in SOF 30 support the claim that Delaney filed his AG Complaint on April 8, 2016.**

formidable barrier to the full participation of an individual in the workplace. Incidents of . . . harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and many incidents in isolation may not be serious enough for complaint.).  However, when linked together, the seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable . . . conditions." *Cuddyer v. Stop & Shop Supermarket Co*., 434 Mass. 521, 750 N.E.2d 928 (2001) (citations omitted; internal quotation marks omitted); *see also Ruffino v. State Street Bank & Trust Co.*, 908 F.Supp. 1019, 1038 (D.Mass.1995) ("hostile environment discrimination . . . is a composite of workplace action and inaction").

The Town literally isolated Delaney by changing the location of his desk where he was situated adjacent to other officers and by placing him in a hot office called the "sweat box" where he works alone, unassociated with any other officers for long stretches of time.  **SAF 86.** Those that eventually support Delaney, for instance Paige and Owings, were demoted. Delaney's co-workers have blamed him for the Chief's retaliatory assignments.  *See Id.*  Chief Majenski makes personal attacks on Delaney to his peers telling them that he is "crazy" and has PTSD that the Union which he heads is weak, and attempted to get other officers to alter the Union contract.  **DF 151.**  Deputy Chief Cutter sends emails to Delaney's supervisors disparaging him with allegations of insubordination for taking a deep breath and repeating his words.  The Town suspends Delaney and either ignores its own policies or make false statements regarding the same.  When Delaney writes in his AG Complaint that his fellow officers are being intimidated by Chief Majenksi through conversations that he has with them to squelch their discontent, Deputy Chief Cutter assigns the officers to racial profiling training for an unprecedented second time in the same year.  **DF 150.**  The clear retaliatory message of the

Town is that if you support Delaney you too will face retaliation.  The result of these and other retaliatory acts in the record is that Delaney was left isolated from his peers due to a quintessential hostile work environment on account of his making internal and external complaints about the Money Ticket Quota System.  **SAF 86, DF 152-153.**

### 10.      The Town Ignoring its Own Harassment Policies

A proven means of showing retaliatory animus is by demonstrating that an employer failed to follow its own policies in dealing with the employee.  The Town has a harassment policy that applies to all of its employees.  The Town admitted pursuant to Rule 36 that Chief Majenski and Deputy Chief Cutter are its employees.  **SAF 124-130**.  The plain words of the Harassment Policy state that it applies to the Chief and Deputy Chief as employees of the Town whose acts are subject to review by the Board of Selectmen.  The Town's pleadings employ shifting explanations trying to tackle the obvious problem that Delaney's complaints about the Money Ticket Quota System were ignored by the Selectmen by changing the position from that the Selectmen have not yet responded (firmly implying that the Town will respond) to that the Selectmen has not responded (admitting that they did not respond).[5]  *See* Answer, ¶ 95 and Answer, ¶ 91 respectively.  LaFond's claim to look to "the Town Charter", which does not refute the fact that the Selectmen must respond under the Harassment Policy, solidifies the pretextual nature of the reasons given by the Town for the Selectmen not further investigating Delaney's allegations.   *See Lipchitz, surpa*, 434 Mass. 500-1; *see also Valez v. Thermo King De Puerto Rico, Inc*. 585 F.3d 441, 449-50 (1st Cir. 2009) (employer claiming policy is ambiguous is evidence of pretext).   Reasonable jurors can find that the shifting and implausible explanations

---

[5] In any event, the Selectmen are beyond the time period specified in the Harassment Policy for responding if they intended to respond.

provided by the Town for failing to respond to Delaney's harassment complaint appeal are

pretexual. Likewise, reasonable jurors can infer from the same facts that the Town promoted

further retaliatory treatment of Delaney by ignoring the appeal because it knew that Delaney

would be left at the mercy of the individual defendants who constantly retaliated against

Delaney.

### 11. LaFond's Sham Investigation into Delaney's Harassment Complaint

Equally well-known is that retaliatory animus can be shown through facts showing a

"sham" investigation.  Here, it is undisputed that LaFond has the ability to discipline Chief

Majenksi.  The Harassment Policy required LaFond to investigate Delaney's allegations by

speaking with all people possessing pertinent information to Delaney's claims.  He failed to do

so speaking only with Chief Majenski and Deputy Chief Cutter (both of which are senior to

everyone else in the police department) who are the two main antagonists.  Reasonable jurors can

infer that the Town did not take Delaney's complaints seriously and that the sham investigation

was intended to cover-up the illegal directives to issue citations for fines that were issued and

enforced by the individual defendants.[6]  *Haddad v. Wal-Mart Stores, Inc.*, 914 N.E.2d 59, 73

(Mass. 2009) (appropriate for jury to conclude that sham investigation was evidence of unlawful

employer acts toward employee); *see also Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633,

653 (D. Mass. 2015); *Davis v. Cumberland County*, 04-143-P-S, 2005 WL 1412419, at *14 (D.

Me. June 16, 2005).

---

[6] The Town also receives 10% from each Money Ticket which is good motive not to stop the scheme and to ignore Delaney.  *See* SAF 99.  There are no surprises here as to why the Selectmen remained silent.

**12. Pretext-the Town Destroyed Documents Related to the Length that it Ordered Officers to Issue Citations for Fines.**

The Town contends that it only issued orders for two weeks to officers to issue citations for fines to citizens. Evidence in the records shows otherwise.  Again, per Owings, Chief Majenksi met with Delaney on **April 9, 2014** (well after May 2013) regarding Delaney not issuing citations for fines to citizens.  Per Delaney, he was threatened during the same meeting for not following the orders to issue citations to citizens for fines and for filing the AG Complaint. Chief Majenski admitted to Delaney that emails related to the scheme were destroyed.  **DF 148**.  In July 2014, emails of the Abington Police Department were destroyed consistent with the representations made by the Chief to Delaney.

The Town, a municipal entity, has an obligation to preserve documents including emails, but certainly should not destroy documents to cover-up evidence of a ticket quota scheme. While the Town did not produce documents related to scheme in 2015, Owings; however, certainly did pursuant to Fed. R. Civ. P. 45 confirming that the Town destroyed or lost documents related to the illegal directives.  Those emails revealed that the Town was pressuring supervisors such as Owings to have their subordinates issue citations for fines well-into 2014 with such comments made as Marquardt did not issue a "$" in 4 to 5 months and that officers on Owings shift were performing below the department average for "$" citations versus warnings. **SAF 86-105**, **DF 148**.  *See Pelletier v. Magnusson*, 195 F. Supp. 2d 214, 241 (D. Me. 2002); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) ("We need not decide whether this mixed bag of evidence is by itself sufficient to defeat summary judgment, however, because we conclude that Cromwell's destruction of evidence, in combination with the evidence undermining Cromwell's justification is adequate to defeat summary judgment."). Viewing the loss of evidence in the light most favorable to Delaney, reasonable jurors can

conclude that the Town deleted or lost documents to cover-up for the full-extent of time that it

forced officers to issue citations for fines and to further cover-up the motives that it has to

retaliate against Delaney for blowing the whistle on their corruption.

**B.     Delaney's Claims Under the Massachusetts Civil Rights Act are Actionable Based on the Threats, Intimidation, and Coercion Abundant in the Facts of the Case.**

Count II of the Second Amended Complaint provides that the individual defendants: **By**

**threats, coercion, or intimidation, the individual Defendants have acted to violate Delaney's**

**rights to complain to authorities about the Money Ticket Quota System, to speak freely**

**about the Money Ticket Quota System, to associate freely as a Union member and**

**president with the Union, and to participate in an investigation by the AG's Office.**  SAC, ¶

110.  Supervisors cannot threaten, coerce, and intimidate their subordinates' career prospects and

economic livelihood in the manner that the individual defendants have and, when they do, their

transgressions are actionable under the MCRA.  **DF 148**.  *See Kennie v. Nat. Res. Dep't of*

*Dennis*, 451 Mass. 754, 763, 889 N.E.2d 936 (2008) (concluding that defendant's conduct could

reasonably be viewed as coercive where defendant's statements were coupled with actions taken

as part of defendant's official position); *see also Rinsky*, 2010 WL 5437289, at *8 (finding that

decision to assign plaintiff to work with a client who behaved inappropriately towards her

constituted threats, intimidation or coercion where defendant retained control over the

assignment and retained authority to evaluate and direct the plaintiff).   A "reasonable person

would recognize that [the individual defendants'] alleged conduct could have impacted

[Delaney's] job prospects and therefore plausibly comprised economic coercion." *Cabi v. Boston*

*Children's Hosp*., 15-CV-12306, 2016 WL 593495, at *7 (D. Mass. Feb. 12, 2016).

Here, the individual defendants all retained and exercised control over Delaney. Each individually and collectively acted through threats, coercion, and intimidation to interfere with Delaney's rights to associate freely with the Union, to participate in an AG investigation, and to complain to authorities about the Money Ticket Quota System. Majenksi's harsh statements made in response to Delaney's internal and external complaints during the April 9, 2015 meeting certainly qualify as threats, intimidation, and coercion under the MCRA. Those threats were carried out in the form of Delaney being assigned to desk duty and a Court prosecutor by Lt. Sullivan and Majenski. At a minimum, Deputy Chief Cutter threatened, intimidated and coerced Delaney during a meeting to discuss Union issues with an improper written warning that Delaney was insubordinate because he took a deep breath and repeated Cutter's words for clarity purposes. The individual defendants have taken numerous other actions against Delaney in violation of the MCRA as already addressed herein. All of the individual defendants' transgressions occurred in their official capacities and are actionable under the MCRA. *See Cabi v. Boston Children's Hosp*., 15-CV-12306, 2016 WL 593495, at *7 (D. Mass. Feb. 12, 2016).

### C.     The Individual Defendants Do Not Have Qualified Immunity.

"Qualified immunity provides government officials with breathing room to make reasonable but mistaken judgments by shielding officials from liability for civil damages for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. N.H. 2014). "The First Circuit "appl[ies] a two-prong test in determining whether a defendant is entitled to qualified immunity." *Id*. That test is: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Id*. It is well established that claims

of retaliation for the exercise of First Amendment rights of freedom of speech and freedom to associate with a Union are cognizable under 42 U.S.C. § 1983.  *Id.*  The *Newton* case and M.G.L. c. 90C, § 2 and 3 were both well-established at the time of the individual defendants issued their directives starting in January 2013 going at least through November 2014.  The MCRA and the First Amendment was also well established in that Town and the individual defendants could not retaliate against Delaney in the way they have.  *Ruhlman v. Hankinson*, 461 F. Supp. 145, 150 (W.D. Pa. 1978) (ticket quota; retaliation under Section 1983)

### D.     Delaney Engaged in Speech Protected Under the First Amendment by Filing his AG Complaint.

The Defendants sole claim to Delaney's speech not being protected is that he purportedly had "special knowledge" that precludes his First Amendment Claim.  This incomplete argument citing solely *Garcietti* and *Foley* is untenable because it cast aside the comprehensive, fact intensive test for determining when a police officer's speech is protected.[7]  *See Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 27 (1st Cir. 2010) ("[t]he relevant question is whether those complaints were made pursuant to her official responsibilities"). The *Pickering* standards are surely known to the Court are helpful in this regard:  "Under *Pickering*, the court must proceed in four steps.  **First**, the court must consider whether the employee was speaking as a citizen upon matters of public concern.  Garden variety employment beefs do not, in general, qualify for constitutional protection.  **Second**, if the speech was a matter of public concern, the court must balance the strength of the employee's First Amendment interest, and any parallel public interest in the information against the strength of the countervailing governmental interest in promoting efficient performance.  **Third**, if the court finds the balance tips towards the employee's First

---

[7] *Mercado-Berrios,* where the plaintiff was retaliated against due to their speech, makes clear that alleged special knowledge is but one of the factors analyze.

Amendment interests, the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision. **Fourth**, if the plaintiff meets that test, the defendant governmental entity must be afforded an opportunity to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 90 (D. Mass. 2003) (citations omitted; emphasis added; internal quotation marks omitted); *see also Connick v. Myers*, 461 U.S. 138, 143, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). The first two factors can be decided by the Court; however, the last two factors are generally factors for the jury. *See, e.g., Bass v. Richards*, 308 F.3d 1081, 1088 (10th Cir. 2002).

One form of protected speech at issue in Count III is Delaney filing his AG Complaint. The Defendants acknowledge that he claims retaliation for <u>filing</u> the AG Compliant. *See Mercado-Berrios, surpa,* 611 F.3d 18, 27 (1st Cir. 2010). Delaney was off-duty as a citizen when he filed his AG Complaint with the AG's public corruption unit concerning a matter of police corruption and community policing. *See Campbell v. Towse*, 99 F.3d 820, 828 (7th Cir. 1996) (community policing is a matter of public concern). He was not on-duty speaking for the Abington Police Department neither was he ever in a position due to filing the AG Complaint for members to believe that Delaney was speaking on behalf of the police department as part of his official duties. *cf. Foley v. Town of Randolph*, 598 F.3d 1, 9 (1st Cir. 2010).[8] He was not paid or commissioned to prepare and file the AG Complaint. He did not forward the AG Complaint through the chain of command; rather, Majenksi somehow discovered that the AG Complaint was filed. Any citizen can file a complaint with the AG's Office upon review of the *Newton*

---

[8] *Foley* is quite inapposite where the First Circuit could not have been more clear as to the unique facts of that case: "[W]e emphasize that our holding is limited to the particular facts of this case. Under the circumstances of the press **conference discussed above**, there could be no doubt that Foley was speaking in his official capacity and not as a citizen."

case.  The filing was done at the AG's Office.  *See McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 171 (D. Mass. 2015).  Delaney's First Amendment claim for filing the AG Complaint is protected speech.

Next, the smooth operation of the police department is easily outweighed by the public's interest in knowing that improper directives are behind their receiving citations for fines as opposed to the citations they received was issued solely in the exercise of the officers' discretion.  *See Fabiano v. Hopkins*, 352 F.3d 447 (1st Cir. Mass. 2003) (summary judgment denied where defendants cited no evidence of disruption as to their operations by the disclosure of public employee's statements).  The individual defendants do not argue otherwise and reasonable jurors can conclude the same based on the facts in the record.  Even more, aspects of Delaney's AG Complaint that the Town had a quota system to issue more citations for fines are undeniably true making them proper considerations for the Court on summary judgment in assessing Delaney's citizen speech.  *See O'Connor v. Steeves*, 994 F.2d 905, 916, n.8 (1st Cir. Mass. 1993).

This case concerns a ticket quota scheme.  By year, the Department issued: 1) **2012**: 15.2% civil citations to 73.6% warnings, 2) **2013**: 17.5% civil citations to 72.0% warnings; (3) **2014**: 26.6% civil citations to 64.0% warnings; and 4) **2015**: 35.6% civil citations to 54.8% warnings.  This represents a doubling of the amount of citations issued from the 2012 figures. **SAF 98**.  That Officers Sweeney and Kevin Cutter issued hundreds of fine citations per year doing traffic enforcement generating money for the Town is true.  **SAF 117.**  *See O'Connor, supra,*  994 F.2d 905, 916, n.8.

**E.     Delaney's Union Speech and Right to Associate with the Union is Protected Under the First Amendment.**

The Defendants attack the First Amendment Claim based on Delaney's Union Speech; however, the same arguments made in the preceding sections undercut the individual defendants', Cutter and Majenksi, argument. Supervisors cannot retaliate against Union members for exercising their right to advocate for their Union. *See, e.g, Fuerst v. Clarke*, 454 F.3d 770, 773 (7th Cir. 2006); *see also* M.G.L. c. 150E, § 10[9].  Cutter and Majenksi have no qualified immunity for retaliating against Delaney because he disagreed with their views during a Union meeting.  This point of law was well-established when they took their actions against Delaney. *See Id.*  GPS devices, body cameras, overtime, and racial profiling training, are all matters of community policing and, as such, are matters of public concern. *See Campbell v. Towse*, 99 F.3d 820, 828 (7th Cir. 1996).  There are also matters that definitely affected the Union which Delaney is allowed to advocate for.  The issues raised during the meeting were also issues of community policing which are matters of public concern.   Delaney was warned orally and in writing the day of the meeting so it is clear that his speech and the adverse action (the warnings) are casually related to one another.  As previously stated, no other employee has ever been accused of insubordination for conduct occurring during a Union meeting with the Deputy Chief except for Delaney.  On these facts, a jury is entitled to decide if repeating the words of your supervisor to "be careful" after being shocked to hear those words uttered to you during a Union meeting constitutes insubordination or if the allegation of insubordination this context was meant to chill Delaney's First Amendment Rights.

---

[9] Section 150E of the Massachusetts General Laws prohibits employers from retaliating against Union Members for engaging in union activity on parallel with the state statute discussed in *Clarke.*

**F.     Delaney's Intentional Infliction of Emotional Distress Claim is actionable Based on the Facts Produced in this Case.**

The individual defendants have engaged in a concerted effort to either terminate Delaney or to make him quit. *See Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 652 (D. Mass. 2015). They have altered his job responsibilities, given him menial task at times, isolated him from his peers by calling him "crazy" and intimidated those that want to assist him at work by demoting them.   At every twist and turn, they seek means to undue Delaney's relationship as a police officer with the Department by violating their own rules.  Adding insult to injury, they attack his honorable Marine service for this country questioning why he will not follow their criminal ticket scheme. Delaney has even undergone therapy for the depression and anxiety caused by the defendants' reckless acts.  *Armano v. Fed. Reserve Bank of Boston*, 468 F. Supp. 674, 676 (D. Mass. 1979); *see also Cuddyer v. Stop & Shop Supermarket Co*., 434 Mass. 521, 750 N.E.2d 928 (2001) (discussing intolerable working conditions).

## IV.     CONCLUSION

Deny the Motion for Summary Judgment for all of the reasons set forth in this Opposition.

| CERTIFICATE OF SERVICE | PLAINTIFF,<br>DELANEY, |
|---|---|
| I hereby certify that on this day a true copy of the within document was served upon all defense counsel attorney of record for each party through the Federal Court ECF system on July 16, 2016. | By his Attorney,<br><br>s/ John J. Hightower, Esq.<br>John J. Hightower, Esq. (661679)<br>90 Pleasant St., #12<br>Randolph, MA 02368<br>John_j_hightower@yahoo.com |