**EX. 46**

```
                                       Volume:      I
                                       Pages    1-190
                                       Exhibits:   14
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                          DOCKET NO. 1:15cv13130-RGS
- - - - - - - - - - - - - - - - x
```

TOM DELANEY,

                Plaintiff

V.

TOWN OF ABINGTON,
DAVID MAJENSKI,
CHRISTOPHER J. CUTTER, AND
KEVIN F. SULLIVAN

```
                    Defendants
- - - - - - - - - - - - - - - - x
```

        DEPOSITION of DAVID G. MAJENSKI, called on

behalf of the Plaintiff, taken pursuant to the

provisions of the Massachusetts Rules of Civil

Procedure, before Michele DeCoste, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at 90 Pleasant Street,

Suite 12, Randolph, MA 02368, on Tuesday, January 26,

2016, commencing at 9:28 a.m.

        - - - - - - - - - - -
        A AND C COURT REPORTING
        AND TRANSCRIPTION
        PO BOX 850070
        Braintree, MA  02185
        (781) 985-1347

1      the same point in time?

2   A   I believe we did, but I'm not 100 percent

3      sure of that.

4   Q   What is your current salary, sir?

5   A   Current salary, I think my base salary is

6      roughly 133,000, I believe, somewhere around

7      there.  I'm not 100 percent sure.

8   Q   What are your duties as the Chief for the

9      town of Abington?

10   A   My duties as the Police Chief would be -- I

11      think I overall steer the ship, I guess that

12      would be the easiest way.  I don't do the

13      day-to-day operations.  I have a staff that

14      does the day-to-day operations, but I would

15      be sort of the person that oversees and kind

16      of sets the direction of the police

17      department as a whole.

18   Q   So when you say "sets the direction," you

19      make executive decisions in terms of policy

20      for the police department?

21   A   Ultimately, yes, that would be true, but a

22      lot of the policies and procedures are

23      delegated down to my staff because we are an

24      accredited police agency.


MICHELE C. DECOSTE

1        I'm not sure.

2    Q    Did you receive any training to the effect

3         that your superiors could dictate when you

4         had issued a citation for a fine versus a

5         citation for a warrant?

6    A    No.

7    Q    Why are you so sure of that?

8    A    I have no idea why I'm sure of it, but I

9         don't recall it.

10   Q    If you did receive that type of training, do

11        you think you'd be able to recall it as you

12        sit here today?

13   A    I don't know if I could or I couldn't.  I

14        don't know how to answer that question.

15             MR. HIGHTOWER:  Can you mark this

16        as Exhibit 1?

17

18             (**Exhibit Number 1**, Selectmen

19             Meeting Note, was Marked for

20             Identification.)

21

22   Q    Sir, I handed to you what has been marked as

23        Exhibit 1 for the purpose of today.

24   A    Okay.

1    assistant town manager for?

2    A    I do not.

3    Q    Do you recall seeing Ms. Jamison at the

4         meeting that you were at in 2014?

5    A    I don't recall it.  I assumes she was there

6         because she took notes.  It looks like it.

7    Q    Was this meeting recorded?

8    A    I don't know.

9         MR. HIGHTOWER:  You can mark this

10        as 2.

11

12        **(Exhibit Number 2**, Handwritten

13        Statement by Wayne Paige, was

14        Marked for Identification.)

15

16   Q    Take a moment to look at Exhibit Number 2,

17        which is a statement from a Mr. Wayne Paige.

18   A    All right.

19   Q    Perhaps you have seen it before.  If you

20        have, I --

21   A    I saw it a long time ago, I believe.

22   Q    Are you aware of who Wayne Paige is?

23   A    I am.

24   Q    Who is he?

1    A    He is a police officer in the town of

2         Abington.

3    Q    So looking towards the bottom of Exhibit

4         Number 2, it appears that Mr. Paige in the

5         statement is summarizing a meeting that he

6         had between yourself and him, do you agree

7         with that?

8    A    I'm sorry?

9    Q    It appears that he is starting to summarize

10        a meeting that he had between you and

11        himself?

12            MS. ECKER:  At the bottom of the

13        page or the whole page?

14   A    I'm not sure where you are.

15   Q    So looking at Exhibit 2 --

16   A    I'm looking at Exhibit 2.

17   Q    -- we will start with the first page.

18   A    Okay.

19   Q    And then going over towards the second page.

20   A    Okay.

21   Q    Would you agree that Mr. Paige is making

22        reference to a conversation that he and you

23        had regarding several different topics at

24        some point in time?

40

A    Yes, he is making note of a conversation that was -- it's his record- -- I'm going to say this word wrong -- recollection -- oh, I said it right -- on a meeting as he saw it.

Q    So one of the comments that he makes on Page 2 is that you told him, in that second paragraph, that Mr. Delaney is crazy and suffering from PTSD.

A    Okay.

Q    Did you make that statement?

A    Absolutely not.

Q    Do you have any idea why Mr. Paige would make the statement that he did here in summarizing what he thought you said in terms of Mr. Delaney being crazy and suffering from PTSD?

A    I have no idea why he would say that because to me Mr. Delaney or Officer Delaney in no way, shape, or form is suffering from posttraumatic stress syndrome at all.  Never has.  I don't understand where he would even come up with that.

Q    So Officer Susan Manning, is she an officer or was she an officer with the police

1        department as of March of 2015?

2  A   She was a police officer.  She has since

3        retired.

4  Q   And Shannon Reeves, was she an officer as of

5        March 2015?

6  A   I assume so.

7  Q   And obviously Tom Delaney was an officer?

8  A   Okay, where are we at?

9  Q   Here (indicating).

10  A   I'm sorry.  Thank you.

11  Q   Tom Delaney was an officer as of March 2015,

12        correct?

13  A   I assume so, yes.

14  Q   On occasion, when Mr. Paige was the acting

15        sergeant, would you meet him to discuss the

16        day-to-day operations of the Abington Police

17        Department?

18  A   On occasion?  It wouldn't be a scheduled

19        thing, but certainly, I would discuss things

20        with him, sure.

21  Q   Why would you want to have those types of

22        discussions with him?

23  A   Because he was an acting sergeant and he was

24        a supervisor.

1    Q    On the first page, Mr. Paige makes a

2         reference to a Shannon Reeves filing a union

3         grievance.

4    A    Okay.

5    Q    Can you tell me what that grievance was

6         about?

7    A    That was about Officer Reeves at the time was

8         a student officer and she filed a grievance

9         looking for uniform allowance.  And that was

10        basically it.

11   Q    Do you remember having that conversation with

12        Mr. Paige in reference to the grievance that

13        was filed by Shannon Reeves?

14   A    I don't recall specifically having this

15        conversation, but it's certainly consistent.

16        I don't --

17   Q    Consistent with what?

18   A    Consistent with it's true.  I mean, I would

19        say that she filed a grievance.  The only

20        thing I'm interested in is that he says -

21             MS. ECKER:  All he asked is if you

22        recall having a conversation.

23             THE WITNESS:  Okay, thank you.

24   A    Yes, sure.


MICHELE C. DECOSTE

43

1   Q   On the second page, the second paragraph

2       talks about you having arrested Mr. Delaney's

3       father at some point in time, do you see

4       that?

5   A   I do.

6   Q   Did you arrest Mr. Delaney's father at some

7       point in time?

8   A   I believe I did with Sergeant McCollem.

9       Sergeant McCollem is -- well, I'm not sure

10      who the actual arresting officer was.  It

11      would be Sergeant Shawn McCollem.

12          MR. HIGHTOWER:  I need to take a

13      potential emergency phone call.  Let's take a

14      quick break.

15

16          (Short break.)

17

18  Q   So you and Officer McCollem arrested Officer

19      Delaney's father at some point in time?

20  A   Me and, I believe, Sergeant McCollem.

21  Q   Correct, Sergeant McCollem, okay.

22          And do you know what year that

23      was?

24  A   I do not.

MICHELE C. DECOSTE

44

1  Q Was it ten years ago?

2  A I would think ten years ago, maybe more.  I'm

3   not sure.

4  Q Did the arrest happen at some point in time

5   when Officer Paige was not a police officer

6   with the Abington Police Department?

7  A Officer Paige?

8  Q Yes, sir.

9  A I'm not sure.  I don't know if he was or he

10   wasn't.  I assume he was.

11  Q Why do you assume that he was?

12  A Because if it's ten years ago, then Officer

13   Paige has been on a lot longer than that.

14  Q Last page, it talks about -- the last

15   paragraph of that page talks about "Chief

16   Majenski then talked about recent union

17   activities, that the union was extremely

18   weak," and then it stops on Page 3.

19  A Okay.

20  Q First paragraph talks about "We need to find

21   a new leader.  If Officer Delaney gets voted

22   in, things are going to be difficult," do you

23   see that?

24  A I do.

Q    Do you remember making those statements to Officer Paige?

A    I do not.

Q    Why are you so sure you didn't make those statements to Officer Paige?

A    Well, because if you were to go to -- first of all, I didn't say them.  Second of all, if you were to go to get the notes from the hearing on this prohibited practice hearing, he claims that -- I remember there was different -- he said something completely different in that hearing, so the notes to what he testified to in that hearing, in the prohibited practice, and this hearing were different.

Q    What --

A    The other thing to expand on -- the other thing would be I would never use the word "extremely weak."  The only time I've heard that word used describing a union, I wouldn't describe a union as "weak."  That just goes against my fiber because I believe that you need both.  You need both a good strong union and a good strong management and we have to

MICHELE C. DECOSTE

1    Q    Do you have any thoughts?

2                   MS. ECKER:   Objection.

3    A    I really don't.

4    Q    Do you recall having conversations with

5         Mr. Paige at some point in time about outside

6         detail modification?

7    A    I recall having conversations with him about

8         outside detail, not modification, if that

9         helps.

10   Q    And what was the essence of that conversation

11        between the two of you?

12   A    The essence of it was I wanted him to send an

13        email with the contract language out to

14        everyone to remind everybody of the contract

15        language.   I never asked him to modify

16        anything.

17   Q    But you do recall having a conversation about

18        the outside details?

19   A    I do.

20   Q    Is there something about this statement in

21        terms of when Mr. Paige speaks to you

22        requesting that he modify aspects of the

23        contract that are concerning to you?

24                   MS. ECKER:   Objection.

48

A    I'm not sure what that means.

Q    Sure.  So you mentioned in your last response and part of what you said was that you never asked him to modify anything in regards to the union contract, correct?

A    Correct.

Q    Why are you so sure of that?

        MS. ECKER:  Objection.  You keep asking him "Why are so sure."  If he said something, what do you want him to say?  If he doesn't recall, he doesn't recall.

        MR. HIGHTOWER:  That objection is noted.

Q    So why are you so sure of that?

A    Because a modification would say that I am trying to ask him to change a contract.  I would never ask an officer to change a contract.  The contract is the contract.  I wouldn't ask him to change language in a contract.  It just doesn't even make sense to me.

Q    Would you agree with me that Mr. Paige wouldn't have the ability to modify the contract himself?

49

1    A    Neither of us would.

2    Q    Looking down on Page 4, did you provide

3         Mr. Paige with any writings -- well, actually

4         -- I'll ask it anyway.  Did you provide

5         Mr. Paige with any writings regarding changes

6         that you wanted to occur to the union

7         contract?

8    A    No.

9    Q    Did you tell Mr. Paige that, quote, unquote,

10        "Things were going to get difficult around

11        here if Mr. Delaney was voted in as union

12        president"?

13   A    Where is that?  I'm sorry.

14   Q    If you go to Page 3, the top of it, do you

15        see where it says -- it was continued from

16        Page 2.

17   A    No.

18   Q    Hold on one second.  Continued from Page 2,

19        it says, "We need to find a new leader.  If

20        Officer Delaney gets voted it, things are

21        going to get extremely difficult."  Did you

22        make that statement to Officer Paige?

23   A    No.

24   Q    Do you recall Mr. Paige telling you to have a

1          face-to-face meeting with Mr. Delaney

2          regarding union issues?

3     A    I believe he did say that.

4     Q    Let's go to Page 5.

5     A    (Witness complies.)

6     Q    So part of what Mr. Paige references,

7          starting on that second paragraph of Page 5,

8          is that prior to the union vote installing

9          Officer Delaney as union president, that you

10         Chief Majenski used to praise him, telling

11         him what a good job he was doing as a

12         sergeant."  Do you see that statement?

13    A    I do.

14    Q    Is that accurate, from your perspective?

15    A    I would say that is accurate to the first few

16         weeks that he was acting sergeant.  I would

17         say that would be accurate, the first couple

18         weeks, yes, making normal mistakes that a new

19         sergeant would make.

20    Q    How long was Mr. Paige the acting sergeant?

21    A    I don't know, off the top of my head.  Not

22         very long.

23    Q    Going past that two-week period that you just

24         referenced, what type of problems did you

1    shouldn't be an acting sergeant anymore.

2    Q    What issues were those?

3    A    Well, there were two major issues.  One is
4    Acting Sergeant Paige took out his weapon
5    after being in a car chase.  Again, he was a
6    supervisor and a person that I trusted.  He
7    got in a car chase, ended up in another
8    community, took his weapon out, pointed it at
9    a suspect, and he never filed a Use of Force
10   Report.  His reasoning, when asked, was that
11   he didn't feel that the policies and
12   procedures of the Abington Police Department,
13   you know, should have been upheld because he
14   was out of town.  That's one issue.

15        The other issue I had that really
16   set up a big flag for me was he was
17   overseeing some auxiliary police officers and
18   one of the auxiliary police officers I found
19   out wasn't trained, had not been trained, had
20   not been to the training, yet he was working
21   in the capacity of a police officer.  When I
22   further asked about that, I found out, quite
23   by accident, that this particular officer
24   supposedly and rumoredly had issues that he

53

liked to sneak up -- these guys work
weekends.  They are unpaid -- sneak up on
people that were parked on the roadway in
various places around town parking and sneak
up on them and try to catch them having sex.
When I asked Sergeant Paige if he had heard
that, brought that to his attention, he said
yes, he had heard it but never passed that on
to me, never passed it on to the Deputy, and
I believe the lieutenant was there.  My jaw
dropped.  I couldn't believe that I didn't
know this and none of my command staff knew
this or at least this rumor.  So those are
the two things that kind of really put me
over the edge, but certainly prior to that,
Deputy Chief Cutter had administrative issues
and whatever issues, but those are the two
things that, for me, that was it.

Q    So let's break down that response.

A    Please.

Q    So when did the incident with Mr. Paige
allegedly pulling out his firearm on someone,
a suspect, occur?

A    I'm not sure.

MICHELE C. DECOSTE

54

Q    What town did it occur in?

A    It occurred in the town of Rockland.

Q    So you're not sure if it happened after April 1, 2014, or before April 1, 2015?

A    I'm not sure when it happened and I'm not sure when I found out about it.  It took some time before I found out about some of this stuff, so it might have happened one spot and I'd find out later.

Q    And the person, the suspect, were they arrested?

A    I'm not sure.  I would assume so.

Q    Okay.  And that arrest probably would have been effectuated by the Rockland Police Department?

A    I'm not sure.

Q    And the problem that you had was that he didn't complete a Use of Force Form to document that he had drawn his firearm on a suspect?

A    Yes.

Q    And his explanation was that he didn't believe that he had to because he stopped the suspect in the town of Rockland and not the

56

1    Q    This other incident that you mentioned --
2         well, actually, going back to this firearm
3         incident, did you issue a written warning to
4         Mr. Paige regarding the fact that he didn't -
5         -
6    A    I don't believe we did.
7    Q    Did you issue any type of discipline at all
8         towards him regarding this car stopping in
9         Rockland?
10   A    I don't believe that we did.
11   Q    So this incident with the individual that was
12        sneaking up on -- well, do people call him --
13        for purposes of today, we will refer to him
14        as "Tom." So regarding Tom that you briefly
15        alluded to, did you discipline Mr. Paige in
16        reference to Officer Tom sneaking up on
17        citizens?
18   A    No.
19   Q    Were there ever any formal complaints made by
20        citizens concerning this particular police
21        officer that was monitoring other citizens in
22        their cars?
23   A    Not that I know of.
24   Q    What was Mr. Paige's explanation for not

1    telling you beforehand about this individual

2    that was trying to watch individuals have

3    sex, I guess?

4  A   I don't believe he gave me one.

5  Q   And you're not sure if that incident

6    regarding that officer with you being upset

7    with Mr. Paige allegedly not reporting to you

8    what he knew if that happened before April

9    1st or after April 1st?

10 A   I'm not sure when that happened.

11 Q   Now, let's go back to the other parts of the

12    answer that you previously gave.  You

13    referenced that Deputy Cutter had

14    memorialized complaints as to Mr. Paige's job

15    performance that you essentially agreed with,

16    correct?

17 A   Correct.

18 Q   Were you unhappy with the way that Mr. Paige

19    -- I'm sorry, were you unhappy with the rate

20    that Mr. Paige issued citations for fines

21    versus issuing citations for warnings?

22 A   No.

23 Q   So when the Deputy Chief sends an email to

24    someone and cc's you on the email, fair to

1     say you've got the ability to respond to

2     everyone in that email chain if you disagree

3     with what the Deputy Chief is saying in that

4     email message?

5  A    Yes, I could.

6  Q    Have you done that in the past?

7  A    I don't believe I have.

8  Q    Has Officer Paige been removed from the

9     acting sergeant position?

10 A    He has.

11 Q    Who took his position?  Who assumed it?

12 A    Well, I believe it was Sergeant Sweeney --

13    Acting Sergeant Sweeney, I should say.

14         MR. HIGHTOWER:  Let's mark this as

15    3.

16

17                **(Exhibit Number 3**, Citation

18                Statistics, was Marked for

19                Identification.)

20

21         MS. ECKER:  What are the page

22    numbers?

23         MR. HIGHTOWER:  So 980 to 1031.

24   For the record, those are the beginning and

MICHELE C. DECOSTE

1      of citations that it issues?

2   A    Through the computer system, yes.

3   Q    And that is the Tribec system?

4   A    It's TriTech.  Whatever, it's TriTech.

5   Q    What is your understanding in terms of the

6      rate at which Sergeant Sweeney issues civil

7      citations for fines versus civil citations

8      for warnings?

9   A    I haven't got the faintest clue what he does.

10      I know he is an active guy, but I have no

11      idea.

12   Q    So when you say that you know he is an active

13      guy, how do you know that?

14   A    Because you can hear him out making car stops

15      quite a bit on the road.  I can hear him.  He

16      likes to make car stops.

17   Q    So the Community Policing Reports that we

18      heard Deputy Chief testify to, Deputy Chief

19      Cutter testified that he sends you the

20      Community Police Reports?

21   A    Yes.

22   Q    And he sends them to you on a regular basis,

23      correct?

24   A    Correct.

MICHELE C. DECOSTE

1    complaint," speaks to a meeting that you had

2    with sergeants, okay?

3  A  Okay, yes.

4  Q  And it's been admitted to over here in the

5    Answer (indicating) that that meeting

6    happened?

7  A  Sorry, was this 37?

8  Q  Right.

9  A  Okay, what's the question?

10  Q  So there was a sergeants' meeting between you

11    and your sergeants?

12  A  (No verbal response.)

13  Q  Is that a yes?

14  A  Yes.

15  Q  And part of that meeting you told the

16    sergeants that the funds from the citations

17    go to the equipment budget for the Abington

18    Police Department?

19  A  Yes, that would be something that is done at

20    town meeting every year.

21  Q  When you say "done at town meeting every

22    year," what do you mean by that?

23  A  It's a revolving account and it's been in

24    place for many, many years. Every year, the

1          monies that come in from citations, motor

2          vehicle citations, go in specifically to

3          purchase equipment for the police

4          department.

5    Q    But as far as that town process, fair to say

6          the town has never told your department,

7          including yourself, to issue more citations

8          for fines strictly for the purpose of

9          generating more revenue for the equipment

10         budget?

11   A    That is absolutely true.  They wouldn't.

12   Q    The town has never said that to you?

13   A    Right.

14   Q    However, if the police department does issue

15        more citations for fines, that money does go

16        into the equipment budget?

17   A    Yes.

18   Q    And the more citations for fines that you

19        issue, the more money that there is in the

20        equipment budget?

21   A    To a point, yes.

22   Q    What do you mean by "to a point"?

23   A    Because there is a cap on it.

24   Q    Has the cap been reached every year?

1    Q    If you look at the second page and look at B,

2         it talks about "Traffic Law enforcement will

3         not be used to generate revenue for the

4         department."

5    A    Okay.

6    Q    Do you agree with that statement?

7    A    Sure.

8    Q    Can you just put your initials next to that?

9              MS. ECKER:  You want him to write

10        on the exhibit?

11             MR. HIGHTOWER:  Yes.

12   Q    Just put your initials next to it.

13   A    Okay.  (Witness complies.)

14   Q    Going back to Exhibit 3, for the time period

15        of 3/1 of 2014 to 3/1 of 2015, Officer

16        Sweeney issued a total of 587 citations and

17        it says that 261 were civil, and in terms of

18        warnings, there were 288 warnings that were

19        issued.

20             MS. ECKER:  Are you asking him a

21        question or are you just reading it?

22             MR. HIGHTOWER:  I'm just reading

23        it.

24   Q    For the time -- and this is Officer Sweeney,

MICHELE C. DECOSTE

1      you tell the sergeants that the money that

2      the officers generate from the citations or

3      fines goes back into the equipment budget?

4  A   I'm trying to remember back to how that got

5      brought up.  I think the problem was is that

6      I had spoken about -- the Deputy Chief and I

7      or whatever, we had a meeting and it was --

8      in the sergeants' meeting it got brought up.

9      We were talking about safety.  We were

10     talking about public safety.  I had issue

11     with some officers writing multiple warnings

12     to residents or non-residents over and over

13     again, and we'd go to the same streets over

14     and over again.  I had concerns on public

15     safety.  We seemed to be spending way too

16     much time going to the same streets over and

17     over again, and then there were times when I

18     would observe, you know, people getting three

19     or four warnings, and to me, that was

20     concerning from a public safety standpoint.

21          I think at some point somebody

22     brought up something to the effect of, you

23     know,  some of the officers don't want to

24     write it, and I said, "Listen, it's a public

1   safety issue," and at some point, I said,

2   "You know, you guys" -- if it helps them with

3   public safety, the money goes back to the

4   general fund -- well, not to the general fund

5   -- to the equipment to help purchase them, to

6   help keep them safe.  That was my -- so to

7   me, it wasn't about money.  It's never been

8   about money.  In 20-something years as either

9   Deputy Chief or Chief, I have never cared

10  about money.  What I do care about is public

11  safety.  What I do care about is going to the

12  same spot over and over again and not solving

13  issues when we have traffic problems and

14  sometimes when we are giving people who

15  obviously aren't getting it to slow down, you

16  know, not refusing I guess to give them a

17  citation.  If that answers your question.

18  Q   So as part of your answer, you said in one

19      line --

20  A   What line is that?

21  Q   -- quote, unquote, "If it helps them, the

22      money from the citation goes back to the

23      equipment budget to keep them safe."

24  A   Yes.

1    Q    What you meant by that is, correct me if I'm

2         wrong, the money from the citations goes back

3         into the equipment budget for the police

4         officers, correct?

5    A    Correct.

6    Q    Which can then be used to purchase equipment

7         for the police officers, right?

8    A    Correct, that is public knowledge.  It's

9         voted in town meeting every year.

10   Q    Now, the money going into the equipment

11        budget to purchase equipment doesn't have

12        anything to do with public safety, does it?

13   A    It does.

14   Q    From your perspective, it does?

15   A    Radios, tasers, computers.  It's all public

16        safety.  Every bit of it is public safety.

17        It keeps these officers safe and it keeps the

18        public safe.

19   Q    As for radio, tasers, and what other

20        equipment?

21   A    Whatever other equipment we purchased through

22        that system.

23   Q    And that is equipment, right?

24   A    Just equipment.


MICHELE C. DECOSTE

87

Q      So that's not keeping neighborhoods safe --

MS. ECKER:   Objection.

Q      -- in terms of issuing citations in certain areas for safety purposes, correct?

A      I don't understand that question.  It's not about -- it keeps neighborhoods safe in the computer -- for instance, if you have a computer in the car that works, you can then run somebody through, run warrants through, find out if they have a license, find out if they have -- whatever they -- so yes, it does keep neighborhoods safe in that it gives you access to a criminal database that ultimately keeps neighborhoods safe.  It keeps hopefully -- yes.

Q      But you're speaking to safety by virtue of equipment that police can use to be safe, correct?

MR. HIGHTOWER:   Objection.

A      I'm not sure I understand that.

Q      So you just mentioned computer terminals, tasers, other equipment that police officers can use to be more safe in their jobs as policemen, correct?

88

1   A    In their jobs as policemen, correct.  Yes, it

2        keeps them safe and it keeps the community

3        safe.

4   Q    The other safety aspect that I wanted to

5        mention, which -- well, actually, I don't

6        have to ask that question.  Let's move on.

7   A    Okay.

8   Q    So with the equipment budget for the town, is

9        it prefunded at the beginning of the year or

10       do the funds have to go into that account?

11  A    The funds go into that account.

12  Q    And they go in on a monthly basis?

13  A    I'm not sure.  I would think they go in

14       whenever the Department of Revenue pays it.

15       I don't know what they do -- how they do it

16       or what they do.

17  Q    But the funds that go into the equipment

18       budget for the town of Abington Police

19       Department, are they funds that are solely

20       generated by the Abington Police Department?

21  A    That revolving account?

22  Q    Yes, sir.

23  A    Yes.

24  Q    So Exhibit 3 speaks for itself.  Sergeant

MICHELE C. DECOSTE

1    Q   Do you know what he did while he was

2       intoxicated?

3    A   He acted like an idiot.

4    Q   Did you receive calls from citizens about

5       what he did?

6    A   Did I personally?  No.

7    Q   Do you know of anyone who did at the Abington

8       Police Department?

9    A   I'm not sure.

10   Q   So did you issue any discipline towards him?

11   A   I did.

12   Q   What discipline did you issue?

13   A   I suspended him.

14   Q   For how long?

15   A   I'm not sure.

16   Q   Was it a day, a week?

17   A   It was somewhere in between there.  I'm

18      guessing like four days or three days, maybe

19      somewhere around there.

20   Q   Subsequent to that suspension, fair to say he

21      was promoted to sergeant in the Abington

22      Police Department?

23   A   Was he promoted after that suspension?

24   Q   Yes.

93

1    A    Yes.

2    Q    Now, with Mr. Paige, you didn't issue any

3         discipline to him for drawing his gun, for

4         the Rockland incident, and you didn't issue

5         any discipline to him for allegedly not

6         telling you about the officer that was going

7         around spying on citizens having sex.  You

8         did issue discipline to Mr. Sweeney, right?

9    A    Correct.

10   Q    And you demoted Mr. Paige to patrolman from

11        sergeant, correct?

12   A    I took away his acting sergeant spot, yes.

13   Q    And promoted Mr. Sweeney into that position,

14        correct?

15   A    Correct.

16   Q    According to Exhibit 3, Mr. Sweeney is near

17        the top of -- for officers at the Abington

18        Police Department, he issues more citations

19        than any other police officer in the Abington

20        Police Department?

21   A    If you say so.

22   Q    For fines and for warnings?

23             MS. ECKER:  Objection.

24   A    If that's what it says, then that's what it

MICHELE C. DECOSTE

94

```
 1              says.

 2       Q    I have some questions about

 3              Christopher Cutter.

 4       A    Deputy Chief Cutter?

 5       Q    Oh, sorry.  Yes, Kevin Cutter.  Thank you.

 6       A    You're welcome.

 7       Q    What is his position at the police

 8              department?

 9       A    Currently, he was just demoted from acting

10              sergeant to detective.

11       Q    Were you involved in the Internal Affairs

12              investigation regarding Kevin Cutter issuing

13              tickets to citizens in exchange for drug

14              information?

15       A    Was I involved in it?

16       Q    Yes.

17       A    No.

18       Q    Do you know of it?

19       A    I do.

20       Q    What is your understanding of that?

21       A    My understanding was that Kevin thought it

22              would be okay that he, in lieu of giving

23              citations, could elicit drug information from

24              people.  When that came across our desk, at
```

MICHELE C. DECOSTE

95

some point, I know the lieutenant, I believe,

handled it and it was -- I think he was under

the lieutenant's command at the time, and

that was immediately stopped.  I think he

thought he could do it.  For some reason, he

thought that that was okay.  It wasn't okay.

Q   Can you give me a little bit better of a

breakdown in terms of what you mean by what

you just described?  I didn't get it clearly

in my head.

A   I'm not sure how to answer that.

Q   You said that Kevin thought that he could --

it's the term where you said "in lieu of

giving them a citation" -- I guess get

information from them, drug information?

A   Yes, he thought it was acceptable, that it

was something that he could do, which

obviously he can't.  In lieu of giving

somebody a citation, a money citation, he

thought he could elicit drug information

because he is one of those guys that really

has a knack and a disdain for drugs.  He

thought that that would be okay.  Once we

found out about that, obviously that is not

1       okay and he was immediately told he can't do

2       that.

3   Q   So let me ask you some follow-up questions.

4   A   Please.

5   Q   Was he issuing citations for fines to

6       citizens and then taking them back if he

7       received drug information in exchange, or was

8       he --

9   A   I'm not sure about that.

10  Q   Or was he telling citizens that they would

11      not get a money citation if they gave him

12      drug information?

13  A   I'm not sure how he was doing it, but just

14      the whole idea of it was wrong regardless.

15      I'm not sure what he was doing, but I know

16      that once we found out about it it was

17      stopped immediately.

18  Q   But you do know that he was using the money

19      citations somehow improperly?

20  A   Yes.

21  Q   Now, was there a report that was compiled by

22      the Abington Police Department?

23  A   I'm sure there was an internal investigation

24      somewhere.

MICHELE C. DECOSTE

1    Q    Let me ask you this question.

2    A    Sure.

3    Q    Was there any discipline issued to

4         Mr. Kevin Cutter?

5    A    I believe there was.

6    Q    What was the discipline?

7    A    I don't recall.  I think some sort of

8         discipline, some sort of written disciplinary

9         action taken against him.

10   Q    Okay.  When did you find out about how he was

11        using the money citations?

12   A    I'm not sure.

13   Q    Was it in 2015?

14   A    I'm not sure.  I think it was a while ago.  I

15        think when he first came out of the academy,

16        I thought.

17   Q    I'm sorry, repeat that?

18   A    I think it was when he first came out of the

19        academy, I think.

20   Q    How long has he been with the Abington Police

21        Department?

22   A    I'm going to say three years, maybe a little

23        less.  I'm not sure.

24             MS. ECKER:  Can we take a quick

MICHELE C. DECOSTE

1    break?

2              MR. HIGHTOWER:  Sure.

3

4              (Short break.)

5

6              MR. HIGHTOWER:  What was my last

7    question and answer?

8

9              (Whereupon, the court reporter read

10   back the last question and answer.)

11

12              A    "How long has he been

13                   with the Abington Police

14                   Department?"

15

16              Q    "I'm going to say three

17                   years, maybe a little

18                   less.  I'm not sure."

19

20              MR. HIGHTOWER:  Thank you.  Let's

21   mark another exhibit.

22              (**Exhibit Number 8**, Affidavit

23                   from Kevin Cutter, was Marked

24                   for Identification.)


                MICHELE C. DECOSTE

1    Q    I'm handing you Exhibit 8, which is an
2         affidavit from Kevin Cutter.  Just take a
3         moment and tell me if you've seen it before.
4    A    I'd seen it a long time ago.
5    Q    Did you talk with Mr. Cutter about this
6         affidavit?
7    A    No.
8    Q    I'm not going to take this from you.  I'm
9         going to keep it in front of you.
10   A    Okay.
11   Q    I'm going to go to my corresponding set.
12   A    Okay.
13   Q    So looking at Exhibit Number 8, do you see
14        the second and the third and the fourth
15        paragraphs here?
16   A    Yes.
17   Q    If you go to the third paragraph, there's
18        some statement in there regarding --
19        Mr. Cutter makes statements in reference to
20        Sergeant McCollem stating, quote, unquote, "I
21        can't tell you to write money tickets, but
22        write money tickets."
23   A    Okay.
24   Q    Then he goes on to that next paragraph and he

MICHELE C. DECOSTE

1      says, "Due to my immediate supervisor more or

2      less telling me to issue money citations, I

3      spoke with Deputy Chief about it."

4  A   Okay.

5  Q   It goes on to say that he advised Deputy

6      Chief Cutter, who is here today, you know,

7      that he didn't agree with Sergeant McCollem

8      ordering us to write money tickets.

9  A   Yes.

10  Q   So after you reviewed this affidavit from

11      Kevin Cutter, did you follow up with Sergeant

12      McCollem to talk to him about the statements

13      Kevin Cutter was making here, that, quote,

14      unquote, "Due to my immediate supervisor

15      more or less telling me to issue money

16      citations"?

17  A   I read this affidavit the first time probably

18      three weeks ago, so no.

19  Q   You haven't?

20  A   I haven't.

21  Q   And you're still receiving your Community

22      Police Reports from Deputy Chief Cutter?

23  A   Yes.

24  Q   And in the same paragraph, that fourth

1    paragraph, it talks about "I advised Deputy

2    Chief Cutter that I would often use traffic

3    citations as leverage to gain information

4    about the town such as drug activity in the

5    community," that sentence.  What Kevin Cutter

6    is referencing in this affidavit in that

7    particular sentence, "I advised Deputy Cutter

8    that I would often use traffic citations as

9    leverage to gain information about the town

10   such as drug activity in the community," is

11   that a reference to what he was doing, the

12   conduct that he was engaging in which he was

13   ultimately disciplined for?

14   A    I'm not sure.  I'm not sure what it is.

15   Q    So the court prosecutor position, did you

16       have the ability as Chief to assign

17       Kevin Cutter to be the court prosecutor

18       around the point in time that you discovered

19       that he was using money citations

20       improperly?

21   A    I have the right to assign anyone at any

22       time.

23   Q    Why didn't you assign him to be a court

24       prosecutor at the point in time that you

MICHELE C. DECOSTE

1    Q   He was a detective at some point in time,

2         right?

3    A   He was.

4    Q   When he was promoted to acting sergeant due

5         to a temporary absence, was that due to

6         Sergeant Owings not being there?

7    A   Yes.

8    Q   So wouldn't you consider the position of a

9         detective being a promotion?

10    A   No.

11    Q   No?

12    A   It is not.

13    Q   Is it a higher rank than patrolman?

14    A   No, it is not.

15    Q   Does it carry different responsibilities than

16         a patrolman?

17    A   No, it's a person who is a police officer or

18         patrolman that doesn't wear a uniform.  It's

19         a patrolman.  A detective is nothing more

20         than a fancy patrolman.

21    Q   Do you give detectives at the Abington Police

22         Department unmarked cars?

23    A   To take home?  Is that the question?

24    Q   To operate while they are on duty?

1    A   Yes.

2    Q   And patrolman don't get unmarked cars to

3        operate while they are on duty, right?

4    A   No.  Well, I shouldn't say that.  Sometimes

5        they do if they ask.

6    Q   Okay.  If they ask, but a detective doesn't

7        have to ask, right?

8    A   Correct.

9    Q   Is the pay the same for detective versus a

10       patrolman?

11    A   It is.

12    Q   Is there a certain position next after

13       someone serves as detective?

14    A   What does that mean, the next high rank?

15    Q   Right.

16    A   Yes, sergeant.

17    Q   Fair to say typically patrolman don't go

18       straight to being sergeant or do they?

19    A   They do.

20    Q   Can you give me an example?

21    A   I think every patrolman, every sergeant we

22       currently have, or acting sergeant we

23       currently have went from patrol to sergeant,

24       every one of them.  I went from patrol to

1    hard time, I guess, being a supervisor.  He

2    just had a hard time with it for whatever

3    reason.

4    Q    What shift was he supervising?

5    A    He at the time was supervising the

6    midnight-to-8 shift.

7    Q    As part of that shift, the midnight-to-8 --

8    one of the members of the midnight-to-8

9    shift, that was Mr. Delaney, correct?

10   A    During the time, if I remember right, it was

11   Officer Paige at that time,

12   Officer Julien-Suarez, and I believe that

13   Officer Delaney had maybe just transferred

14   into that shift.  I'm not sure.

15   Q    As part of the midnight-to-8 shift duties,

16   they were assigned to patrol the Abington

17   High School?

18   A    Yes.  As part of the shift, what happened was

19   Sergeant Owings came in and said that he

20   could not get his -- he couldn't get them to

21   do community policing, couldn't get them to

22   do -- I'm trying to remember now -- anything.

23   They didn't want to write citations.  They

24   didn't want to go out and do traffic.  So as

MICHELE C. DECOSTE

1    part of that, officers were put up as an

2    assignment up at the Abington High School,

3    you know, I think in the mornings.  That

4    shift was put up I want to say it was from

5    maybe 6:30 to 8 or 6 to 8 to be there when

6    teachers came in.  Again, it was something

7    that he couldn't get -- he couldn't get his

8    officers to come up with his own ideas.  They

9    had a problem writing citations, which is

10   fine.  I didn't much care about that.  But I

11   wanted them to do something, whether it -- I

12   didn't care what it was, but they were going

13   to do something for community policing, if

14   that helps.  That kind of sets the tone.

15  Q    Did you make the assignment of that shift,

16       the midnight-to-8 shift, for the Abington

17       Police Department?

18            MS. ECKER:  Abington High School.

19  Q    I'm sorry, to the Abington High School.

20  A    I did because he -- it was -- if they didn't

21       want to go out and do traffic, that's fine.

22       If they didn't want to go out and come up

23       with their own ideas, to me, an important

24       thing was I wanted to get school resource

MICHELE C. DECOSTE

1    officers in.  There was a lot going on at the

2    high school at the time.  There is, you know,

3    a big -- it took ten years for me to finally

4    -- I finally have school resources and

5    officers in.  To have them up certainly with

6    the time period of that time, I know there

7    was certainly angst at the school, so to

8    certainly come up and be present to be seen

9    at the high school, not to do traffic at the

10   high school.  I didn't want them to do

11   traffic at the high school, but I wanted them

12   to be there and just be present so that when

13   people came in they had a feeling of safety,

14   a feeling of us being out there and keeping

15   their children safe.

16   Q    So let me ask you some question about that

17        answer.

18   A    Please.

19   Q    What portion of the midnight-to-8 shift were

20        the officers supposed to be at the Abington

21        High School?

22   A    I can't recall, off the top of my head.  I

23        want to say it was maybe when the students

24        and teachers got in, which would be like 6,

MICHELE C. DECOSTE

come through, the sensitive issues that come
through the high school.  I get them
constantly from the school.  There is a
memorandum of understanding that I get
information on issues that are handled at the
school that other officers, other people
wouldn't see because it's kind of an
agreement between the schools and the
police.

Q    So did the high school staff send you written
reports complaining about a need for police
presence?

A    No.

Q    So what information did you receive around
May of 2013 that prompted you to send
individuals from the Abington Police
Department on the midnight-to-8 shift to the
school?

A    Well, again, Sergeant Owings came to me and
he couldn't -- there was no other
alternative.  His guys couldn't come up with
any other ideas, any other ideas for issues
that they might want to take on as community
policing.  I certainly think that those times

1       couldn't.  And I had communication with him.

2       I remember at one point him saying, you know,

3       "I don't want to give you" -- because I kind

4       of hounded him and said, "Sarge, these guys

5       have to come up with something," and I

6       remember him saying something to the effect

7       to me one time, "I don't want to give you" --

8       not garbage, but something to that effect,

9       and he just couldn't come up with -- he

10      couldn't get his guys to come up with any

11      ideas and that was how that ended up there.

12  Q   Did he specifically tell you that his

13      officers did not want to conduct traffic to

14      issue money citations to citizens?

15  A   Did he say that?  He indicated to me that

16      they did not want to do that, yes, that would

17      be correct, which was fine.

18  Q   In around May of 2013, Deputy Chief Cutter

19      -- actually, you know, what?  I'm not going

20      to speculate.  I'm going to give you

21      something.

22  A   Okay.

23  Q   Alex Kokoros, did he ever come to you and

24      express that he felt being assigned to --

1        actually, strike that.

2             I'm going to show you Exhibit

3   Number 3 to the -- well, part of Exhibit

4   Number 4 is Exhibit Number 3, which I'm going

5   to flip right to.  It's an email dated June

6   13th.  It's from Deputy Chief Cutter to a

7   number of people.  Following that, there is

8   another email dated November 18, 2014, Deputy

9   Chief Cutter to a number of people as well.

10  Following that, is an email from Deputy Chief

11  Cutter dated March 10, 2014, to Mr. Owings.

12  I want to sit here and discuss those emails

13  with you.

14  A    Okay.

15  Q    So I'm going to go ahead and -- I'm going

16       to dog ear it so I know what I want to go

17       over.

18            MS. ECKER:  Which ones do you want

19       him to look at first?

20  Q    Let's go to that first one here.  So looking

21       at that first email, it's dated

22       June 11, 2013.

23  A    Okay.

24  Q    You appear in the "To" line.

MICHELE C. DECOSTE

1   A   Okay.

2   Q   Was this sent around the time that you had

3       your discussion with Mr. Owings about his

4       shift?

5   A   No.

6   Q   So when did you have your discussion with

7       Mr. Owings about his shift?

8   A   That was a lot later than this.  That was

9       around maybe April, somewhere around there.

10  Q   April of 2014 or 2013?

11  A   So 2014 it would be, somewhere around there.

12  Q   So this email here from Deputy Chief Cutter,

13      you received the email, right?

14  A   I'm looking for my name.  I don't -- where is

15      it?  Am I missing it?  Oh, there it is.  Yes,

16      I did.

17  Q   All right.  Did you talk to Deputy Chief

18      Cutter about this email after you received

19      it?

20  A   No.

21  Q   So you didn't have any disagreement with what

22      he was saying in this email?

23  A   This email pertains to a two-week period.

24      No, I don't think at the time, no, I didn't

1    really have an issue with it, no.

2    Q    So the question that I have was, you didn't

3    have any issue with him sending this email on

4    June 11, 2013?

5    A    No.

6    Q    And do you see in here where it says -- the

7    next page -- November 18, 2014, that email?

8    A    Okay.

9    Q    And you appear in this email as well I think

10    in the third "To" line, toward the end?

11    A    I see it.

12    Q    So you received this email as well, correct?

13    A    It looks like I did, yes.

14    Q    And the subject is "Traffic enforcement

15    efforts"?

16    A    Yes.

17    Q    And you didn't have any issue with this email

18    as well?

19    A    No, I don't have a problem with that.  It's

20    talking about using discretion and all that.

21    Yes, no problem with that.

22    Q    You didn't have any problems with this email

23    at all?  That is my question.

24    A    No.

MICHELE C. DECOSTE

122

1    Q    Next page, March 10, 2014, you see on the CC

2         line, is that you M-a-j-I-c at Abington?

3    A    Yes, Majic.

4    Q    So you received this email from Deputy Cutter

5         as a cc and it was directed towards

6         Mr. Owings, correct?

7    A    It looks that way, yes.

8    Q    And you didn't have any problem with

9         Deputy Chief Cutter sending this email to

10        Mr. Owings?

11   A    I don't know that I necessarily read this

12        email, so -- I'd have to read it through.

13   Q    Do you have recollection of reading the

14        previous two emails that we just went over?

15   A    I really don't.

16   Q    Do you have any reason to doubt that you --

17        well, let's just go back.

18   A    I don't read a lot of this stuff, to be

19        honest with you.

20   Q    So you don't have any reason to doubt that

21        you received any of these three emails,

22        correct, because your name is in the cc?

23   A    I'm sure I received them.  Whether or not I

24        read them is another story.


MICHELE C. DECOSTE

Q    So as the Chief of the Abington Police Department, do you have a habit of not reading emails that are sent to you that concern traffic enforcement in the town of Abington?

A    As the Chief of the Abington Police Department, I typically don't read what Deputy Chief writes because typically we have conversations, so there is no need for me to read.  His office is next to mine and if there's communication, we have it.

Q    Did you have communications with Deputy Chief Cutter regarding these three emails that we just went over?

A    I don't recall.

                    (**Exhibit Number 9**, Records, was Marked for Identification.)

Q    One of the allegations of Mr. Delaney, as we have in Exhibit Number 9 marked, is that he met with you in your office and that you mentioned to him that emails related to what

1    Mr. Delaney perceived to be a money-ticket

2    quota system in the town of Abington were

3    sent out by Deputy Chief Cutter and were --

4    well, were sent out by Deputy Chief Cutter at

5    some point in time.  Do you remember that

6    allegation?

7         MS. ECKER:  Objection.

8    A    I don't.

9    Q    Do you remember having a meeting at some

10   point in time with Officer Delaney in your

11   office regarding what he perceived to be a

12   money-ticket quota system where it's alleged

13   that officers at the Abington Police

14   Department were instructed to issue more

15   citations for fines than warnings for

16   citizens?

17   A    I do not.

18   Q    Do you remember having a conversation with

19   Mr. Delaney in your office regarding his

20   filing of a complaint with the Attorney

21   General's office regarding what he perceived

22   to be a money-ticket quota system in the town

23   of Abington?

24   A    I do not.

MICHELE C. DECOSTE

Q   Now, when you say you do not, you mean that you do not remember the meeting happening or that you don't remember the details of the meeting?

A   I don't believe the meeting ever happened.

Q   Have you ever met with Mr. Delaney in your office for anything since he has been a patrolman?

A   I have.

Q   For what?

A   I met with him on a grievance -- I'm trying to remember what the grievance was. I think we met for about an hour to discuss a grievance. It had to do with shift assignment. It was the new shift assignments. It had to do with this whole shift thing, that he felt that there should be more shift openings for the officers or the recruits coming in from the academy, and I said, "No, no, we will give you the assignments, but first, they are going to go to field training and they need to get through probation, and then we can open the shift up, and the full-time people would do

1  it, but while they are in training." So it

2  was a long conversation regarding

3  disagreement  in language and maybe the

4  absence of some of the language in the

5  contract regarding this.  So that is what I

6  met with Officer Delaney on.

7  Q  Did you ever tell Mr. Delaney that, quote,

8  unquote, "He did not have the heart to issue

9  money citations"?

10  A  No.

11  Q  Did you ever tell him that he was not cut out

12  for a job in the Abington Police Department?

13  A  No.  Quite contrary, I think he is a good

14  police officer.

15  Q  Why do you think he is a good police officer?

16  A  He does good investigatory work.

17  Q  What types of investigations have you seen

18  him do?

19  A  Any type of follow-up investigation.  I can

20  remember one, off the top of my head, that we

21  had an armed robbery.  I think they tied him

22  up at a nail salon, and the kid did an

23  unbelievable job.  He is great at doing

24  investigatory work.  He is good with reports.

He's a good police officer, good follow-up investigator.  He really is.

Q    Did you ever tell him that "People come against you and may win the battle, but I always win the war"?

A    No.

Q    Did you ever tell him that the Abington High School assignments for the 12:00-to-8:00 shift would end at some point in time?

A    No.

Q    Did you, in fact, end the assignments for the 12-to-8 shift at the Abington Police Department at some point in time in 2014?

A    I'm sure I did, yes.

Q    Why?  Why do you say you're sure you did?

A    Because they are not there anymore.  I'm sure at some point it ended and moved on to something else.

Q    Going back to the meeting that you described regarding union issues, Deputy Chief Cutter was at that meeting, correct?

A    The union meeting?

Q    Yes.

A    I'm sorry, which union meeting are we talking

MICHELE C. DECOSTE

1     about?

2   Q   Well, you mentioned that -- and correct me if

3       I'm wrong.  From your perspective, you met

4       one time with Officer Delaney in your office

5       regarding a union issue?

6   A   Yes.

7   Q   All right.  So during that one meeting, was

8       Deputy Chief Cutter there?

9   A   No.

10  Q   Who was present?

11  A   Officer Delaney and myself.

12  Q   How long did that meeting last?

13  A   It lasted a while.  A half hour, hour, right

14      around there.  It was a while.  It was a long

15      discussion.

16  Q   Was it a cordial discussion?

17  A   Yes.  I don't think we resolved anything, but

18      it was cordial.

19  Q   What was your position towards the union

20      issues of the meeting?  Just so I can try to

21      understand.

22  A   My position is that I don't mind shifts being

23      put out there, but when officers come out of

24      the academy and are on probation or are being

Q    And that was the only explanation that he provided?

A    I believe so.

Q    Are you aware Mr. Kokoros has filed a complaint with the town of Abington regarding your treatment of him as the Chief of Police?

A    I am.

Q    What is your understanding of that complaint?

A    My understanding is that he filed that, I guess.

Q    What did he complain about in terms of what you were doing, from his perspective, towards him?

A    I'm not sure.  I would have to go back through and read it specifically.

Q    Do you think that his transfer request had anything to do with the fact that he had filed a complaint against you?

A    I do.

Q    Did Mr. Kokoros complain that he felt that you were harassing him?

A    I'm not sure.  I think it's a harassment complaint, so one would imagine so.

MICHELE C. DECOSTE

Q    So regarding the 7/4/2015 entry, there is a reference there that Sergeant Owings also stated that he had been instructed to enforce retaliatory actions against officers in the past for filing complaints and grievances.

A    Okay.

Q    Do you know anything about that?

A    I don't.

Q    Do you know anything about an authorized list of people to work with Kevin Cutter?

A    No.

Q    And then the last thing is "General retaliatory actions:  Since Delaney filed complaints with the Chief through the AG's office and town manager of ticket quotas being opposed by the Chief, we have had court time changed," etcetera.

A    Okay.

Q    So can you tell me about the court time being changed?  Do you know what that is in reference to?

A    Yes, I do.

Q    What is it in reference to?

A    It is in reference to when officers go to

court, we pay them four hours to go to court.
Many times they get out early, and when they
get out early, we are still paying them the
four hours.  It was my belief that, as the
town is still paying them, that, you know,
they were under the town's employment during
that time period, and as such, if they get
out early, so if they had a ticket appeal or
it was 15 minutes and they came back, that I
would then use them to supplement the police
force or catch up on their reports or
whatever they had to do.

Q    So essentially, did you implement a new
practice for officers?

A    Essentially, we tried to sit down and impact
bargain that with the union and --

Q    Can I take a step back for a minute?

A    Please.

Q    So just the question is, because you
described a process where officers were
getting out early and being compensated, I
think, right?

A    Correct.

Q    So along those lines, how long was that

1   process in place at the Abington Police

2   Department?

3   A   It had been in place a long time.

4   Q   Ten years?

5   A   Yes, 19 years plus.

6   Q   The change that you wanted to make to that

7   process, according to Mr. Kokoros, it

8   happened after Delaney filed the AG

9   complaint, correct?

10  A   If that is what he is saying, I guess.

11  Q   And there is also reference to three hours of

12  traffic assignments per officer per shift, do

13  you see that?

14  A   I do see that.

15  Q   Is that the community policing time?

16  A   I'm not sure what he is referencing there.

17  Q   Did you assign officers three hours of

18  traffic assignments per shift?

19  A   Not to my knowledge.

20  Q   Do you know if Deputy Chief Cutter did?

21  A   I don't know.

22  Q   About new officers being required to pay a

23  constant tuition for the police academy, is

24  that a change that you made to the policies

MICHELE C. DECOSTE

145

1    A   Okay.

2    Q   And I'll just give you a heads up.  They're

3        regarding racial profile training.

4    A   Okay.

5    Q   So the racial profile training, is it --

6        well, can you tell me about the racial

7        profile training that the Abington Police

8        Department has if it does have one?

9    A   It does.  And that would be under the purview

10       of the Deputy Chief's.  I couldn't tell you

11       what exactly the training is.  It's online.

12       I think it's mandated.

13    Q   And you're saying that that is something that

14       Deputy Chief Cutter would control?

15    A   Correct.

16    Q   Did the training happen once a year?

17    A   I believe it happens annually, once a year.

18    Q   After the officers complete the training, are

19       they supposed to touch base with their

20       supervisors to confirm that?

21    A   I believe the process is, once they complete

22       that, they speak with Deputy Chief or

23       Lieutenant -- I'm not sure -- either

24       Lieutenant Sullivan or the Deputy Chief.  I'm

146

1       not sure of exactly how that goes.

2    Q    I'll show you part of Exhibit Number 10.

3       There is one email on here in particular that

4       I want to discuss.  It has a date on here of

5       January 1-0-0-0-1, do you see that?

6    A    Is that 2001?  It must be, right?

7    Q    Well, it says, "0-0-0-1," would you agree?

8    A    It does.

9    Q    Do you have any idea why the email would read

10      that?

11   A    I have no idea.

12   Q    Have there been problems in the past that

13      you're aware of with the dates and times of

14      emails at the Abington Police Department such

15      as what I'm showing you that is part of

16      Exhibit Number 10?

17          MS. ECKER:  If I could, my bet

18      would be because it had just turned the

19      following year.  So if you look at this, it's

20      January 1st, whatever the year is, 12 a.m.

21      It had just struck midnight, so perhaps the

22      computer hadn't changed the year.

23   A    I'm not aware of issues.  That's

24      interesting.


MICHELE C. DECOSTE

1          MS. ECKER:  I don't know that.

2     That would just be my guess.

3     Q    Officers Gerard and Suarez, there is an

4     allegation that you approached them regarding

5     the need to conduct racial profiling training

6     after Mr. Delaney filed a complaint with the

7     Attorney General's office.  At some point in

8     time, did you have discussions with Officers

9     Suarez and Gerard about your desire to have

10    and complete racial profiling training after

11    Mr. Sweeney filed his complaint with the AG's

12    office?

13    A    If you could show me what you are referring

14    to, that would be helpful.

15    Q    Sure, absolutely.  Let's go back to the

16    complaint.

17    A    Please.

18    Q    So it's going to be at Paragraph 78 of the

19    complaint, or in that area.

20    A    Okay.

21    Q    So I guess the question was, did you instruct

22    Officer Kilgour to speak to Suarez or Sweeney

23    about racial profiling training after

24    Mr. Delaney filed his complaint at the AG's

MICHELE C. DECOSTE

1      office.

2    A    I don't believe I've ever spoken -- I don't

3         deal with racial profiling.  That would be

4         the Deputy Chief.  I'm going off the top of

5         my head here.  What are we referring to?

6         What number or what --

7    Q    It's 78.

8    A    No, I wouldn't have had anything to do with

9         it.

10   Q    Would you have spoken to the Deputy Chief

11        about having Kilgour tell Suarez and Gerard

12        to conduct racial profiling training?

13   A    I think everybody went under racial profiling

14        training.  I don't think it's any different

15        than -- every member of the department does,

16        so I'm not sure.

17   Q    Okay.  Officer Todd Cantalupo, are you aware

18        of who he is?

19   A    Yes, I am.

20   Q    How do you know him?

21   A    He worked for the Abington Police.

22   Q    When did he stop working for the Abington

23        Police Department?

24   A    I'm not sure.  A couple of years ago, I

MICHELE C. DECOSTE

1        you're actually talking about?

2    A   Exactly, yes.

3    Q   So I won't ask those questions again.

4    A   Okay.

5    Q   When you got this complaint -- well, actually

6        -- so you were made aware of it through

7        Mr. Lafond, the town manager?

8    A   Correct.

9    Q   When did you first physically put your hands

10       on the complaint, the AG complaint?

11    A   I assume it was that day through the town

12       manager.

13    Q   Did he bring it over to you?

14    A   I can't recall how I got it.

15    Q   Do you think he would have emailed it to you?

16    A   He wouldn't have emailed something like this.

17       He would have given it to me or I would have

18       gone up there, one or the other.  I assume I

19       would have gone up there because I don't have

20       any remembrance of him coming down.

21    Q   So did the two of you discuss the complaint

22       at that point in time?

23    A   No.

24    Q   Was he there when you picked up the

MICHELE C. DECOSTE

1          complaint?

2     A    I don't recall, but it wouldn't have been

3          something that I would have even looked at,

4          so it wouldn't have been something we would

5          have discussed.

6     Q    Why is it something you say you wouldn't have

7          looked at?

8     A    I mean, I would have just gotten it, so it

9          would have been the first time I ever.

10    Q    Okay.  Before we broke, I asked you some

11         questions about a meeting that you had with

12         Mr. Delaney and discussions that you may or

13         may not have had with him.  I think you

14         identified one meeting that took place

15         between the two of you in your office,

16         correct?

17    A    Correct.

18    Q    And part of -- this is from Exhibit 1, from

19         the January 13, 2016, Deputy Chief Cutter

20         complaint.  It's a CD-rom that we put in,

21         which was the 859-page production of

22         documents.  This was given to us by you guys,

23         the Defendants.  Part of those materials,

24         there is an entry from April -- let me draw

MICHELE C. DECOSTE

1      2014 and in October of 2014?

2                MS. ECKER:   Objection.

3   A   I have no idea what he's...

4   Q   See the very first date here, it says, "On

5       this date, October 14, 2014"?

6   A   Yes.

7   Q   "I, Thomas Delaney, have returned to the

8       Attorney General's office once again to drop

9       off information involving this issue."

10  A   Okay.

11  Q   And then that last sentence appears to say,

12      "I was informed in June of this year over the

13      telephone by a criminal investigator,

14      John Keating, that there was no record of my

15      complaint and that my 118-page affidavit had

16      been lost by the Attorney General's office

17      from being previously dropped off in March,"

18      do you see that?

19  A   I do.

20  Q   With me reading that to you upside down, is

21      it still your testimony that there was no

22      conversation between you and Mr. Delaney

23      shortly after March of 2014 regarding this

24      Attorney General complaint?

MICHELE C. DECOSTE

1   A   It is.

2   Q   If someone has a meeting with you, would they

3        indicate that that meeting was overtime, by

4        any chance?

5   A   I have no idea.

6   Q   So do you normally tell people to indicate

7        that they are to perform overtime for the

8        meetings that they have with you?

9   A   Do I normally?  No.

10   Q   If someone does have a meeting with you that

11        they deem as overtime, who approves that

12        overtime for that meeting?

13   A   Who would approve it?  I suppose it would be

14        me if they are meeting with me.

15   Q   So for this entry here for April 9, 2014,

16        for Delaney's assignment, would this be an

17        overtime assignment for meeting with Chief

18        that you approved?

19   A   I have no idea what it is.  I don't know who

20        put it in and I don't know what it is.

21   Q   Do you have any information to believe that

22        the entry that is reflected in these records

23        produced to the Plaintiff by the Defendants

24        is wrong?

1   A    This is the first time I have ever seen it

2        and the first time I have ever seen a log

3        that would specifically say "Meeting with

4        Chief."  I have never seen anything like that

5        before, so that is unique.

6   Q    Why do you think you have never seen an entry

7        like the April 9, 2014, entry before?

8   A    I don't think it has ever been done, that I

9        know of.

10  Q    So this particular entry, as it presents on

11       this material that is part of Exhibit 1 to

12       the Cutter deposition, you have never seen

13       another entry like this before since you've

14       been a Chief?

15  A    I have not.

16  Q    If a meeting takes place with you and the

17       Deputy Chief, should the officer indicate

18       that in the assignment?  In other words --

19       strike that.

20            If there is a meeting between an

21       officer, you, or someone else, should the

22       officer indicate all the people that were

23       part of the meeting in the assignment log?

24  A    I don't know.


                    MICHELE C. DECOSTE

1    Q   Would you sign off on an overtime assignment

2         regarding a meeting with yourself if that

3         meeting, in fact, did not occur?

4    A   I don't know.  I would hope not.

5    Q   Exhibit Number 9, we never talked about that.

6         This is a Newton case.  Have you seen it

7         before?

8    A   I have.

9    Q   When is the first time you saw that case?

10    A   Deputy Chief Cutter.

11    Q   How was the case presented to you by Deputy

12         Chief Cutter?

13    A   Deputy Chief Cutter, I believe, came in my

14         office and said that he had spoken with

15         Sergeant Owings.

16    Q   Specifically what was said in reference to

17         the case between you and Deputy Chief Cutter?

18    A   Basically, the Deputy said that it was not

19         comparing the same thing.  I think he used

20         something like "not comparing apples to

21         apples" or "not comparing the same thing" in

22         that what this case the Chief was trying to

23         take away discretion and that furthermore

24         that the court said that the town could have

1     argued that the Police Chief could have

2     limited discretion but certainly can't

3     completely take away discretion.  That was my

4     understanding of the case.

5   Q  All right.  Did you seek any legal advice on

6     the case?

7   A  I did not.

8   Q  What did the Deputy Chief tell you about his

9     conversations with Officer Owings in regards

10    to the case?

11  A  I don't think he said anything in particular,

12    that I can remember.

13  Q  Did Deputy Chief Cutter tell you where the

14    case came from in terms of who gave it to

15    Mr. Owings?

16  A  No.

17  Q  Mr. Delaney has alleged that he has a

18    diagnosis of a mild traumatic brain injury.

19  A  Okay.

20  Q  Have you discussed this diagnosis with him at

21    any point in time?

22  A  No.

23  Q  Not even when he was in the police academy?

24  A  No.


**MICHELE C. DECOSTE**

```
 1          I've been doing this for 20 years and I

 2          haven't changed my philosophy, so the whole

 3          concept of having some sort of a money-ticket

 4          quota system is just foolish to me.

 5     Q    So looking at some of the allegations that

 6          were made by Mr. Delaney, one of the

 7          allegations that he made in the complaint was

 8          that it was passed on to officers of the

 9          Abington Police Department that "Any money

10          from civil citations would be placed into the

11          equipment budget and would in turn come back

12          to us."

13     A    Yes.

14     Q    So you've testified consistent with that

15          statement from Mr. Delaney today, correct?

16     A    Yes.  Did I say that?  Yes.

17     Q    And that is part of his AG complaint, right?

18               MS. ECKER:  Objection.

19               Do you want to take a look?

20               THE WITNESS:  Sure.

21               MS. ECKER:  Is there any particular

22          page that you would like him to look at of

23          this?

24               MR. HIGHTOWER:  The page that is
```

MICHELE C. DECOSTE