**EX. 47**

Volume: II
Pages: 1-90
Exhibits: 1-15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:15cv13130-RGS

* * * * * * * * * * * * * * *
                                    *
TOM DELANEY,                        *
                  Plaintiff         *
                                    *
v.                                  *
                                    *
TOWN OF ABINGTON, DAVID             *
MAJENSKI, CHRISTOPHER CUTTER,       *
AND KEVIN F. SULLIVAN,              *
                  Defendants        *
                                    *
* * * * * * * * * * * * * * *



    DEPOSITION of DAVID MAJENSKI, a witness called on behalf
of the plaintiff, taken pursuant to the Federal Rules of Civil
Procedure, before Alanna K. Sheils, a Professional Court
Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of John J. Hightower, 90
Pleasant Street, Randolph, Massachusetts on Thursday, March
10, 2016, commencing at 9:32 a.m.

**A&C Court Reporting and Transcription**
**72 Holbrook Avenue**
**Braintree, Massachusetts 02184**
**(617) 650-5666**

side, but you also see them running a basketball program or at the fishing derby or running a Halloween program or whatever it might be. So I mean there is more than one facet it isn't just law enforcement, you know, there's a community relations as well and community outreach.  So what we thought we'd make -- and I stand behind it, is to recognize the officers because again what happens is if you are an officer that goes out there and does your job and not that money's the drive, but if you see an officer that does nothing and you're out there in your doing the job in you're both make in the same amount of money, at some point you go what the heck am I doing.  You know I'm out here day and night, out there doing my job and this person is not really giving it their all, you know, some would say, you know I'm burnt out and I would say so that might be true but some of the officers were never lit to begin with an order to be burnt out.

But with that said, we said you know what let's recognize, let's give people recognition and again you know using the perimeters of this particular thing a little bit of a contest where people would you no compete for a month for a weekend off to see who could make the most of arrest, the most criminal complaints and the most warrant arrests. So, if you look at it if you look in the paper and we'll

18

1    elements are there and make sure it's a good arrest.   Then

2    it goes to the court prosecutor for review.

3         So the sergeant reviews it and then the court

4    prosecutor reviews it, you know, before it goes before a

5    judge for arraignment and all that stuff. And the court

6    prosecutor looks at the case again just like the sergeant

7    did, reviews it all, makes sure the elements are there.

8    Listens to everything, reviews everything and then from

9    there -- so there is our internal check, but is also

10   external checks.

11        The external checks are the assistant district

12   attorneys, the prosecutor, right, they look at the same

13   facts; they look at the case. And they review it and make

14   sure the elements are there, make sure there's nothing --

15   there's nothing going on that is improper.  And also they

16   have the defense attorney; they look at it, you know, and

17   ultimately the judge looks at it, right, ultimately the

18   judge decides and so you've got all these internal and

19   external --

20        MR. STONE:  Check points.

21        MR. MAJENSKI:  Check points, checks and balances.

22   So when people talk about, well there is a concern of

23   officers going out in making up arrests.

24        MR. STONE:  No. You can't do it.

1    MR. MAJENSKI:  No.  And honestly if that

2    happened, if an officer -- we'd investigate it.  We have

3    internal.  And you know what, they wouldn't have a job.

4        MR. STONE:  They wouldn't have a job.

5        MR. MAJENSKI:  They would not have a job.

6        MR. STONE:  Can't do.

7        MR. MAJENSKI:  It wouldn't be allowed, so I tell

8    you your police chief it just wouldn't be allowed.  I

9    wouldn't allow it.  I would fire them, all right or I

10   would, you know, take action up to and including

11   termination.  And it doesn't happen. So to kind of address

12   that point that now that cops are going out there doing

13   this or doing that and you know it's illegal you got to

14   remember is what we're looking to do is to arrest the

15   people that commit crimes and create havoc, you know, the

16   drug dealers, the people that are driving on suspended or

17   revoked licenses driving around getting into, you know,

18   accidents or whatever they're doing. Stealing you know,

19   committing larcenies, driving, you know, to endanger the

20   public, you know, driving drunk.

21       MR. STONE: Which happens a lot.

22       MR. MAJENSKI:  So things that could affect your

23   life, things that could affect your family, they are

24   committing crimes and we took an oath of office to uphold

20

1    that we would --

2          MR. STONE:  Enforce the laws.

3          MR. MAJENSKI:  Enforce the laws of the

4    Commonwealth, so --

5          MR. STONE:  Laws that have been passed on were

6    voted on --

7          MR. MAJENSKI:  Right.

8          MR. STONE:  -- citizens and this protects us as

9    citizens and yes you have to enforce those laws and

10   sometimes it leads to, yes, to arrest.

11         MR. MAJENSKI:  Absolutely.

12         MR. STONE:  And it's difficult and I don't think

13   anybody likes that but it happens.

14         MR. MAJENSKI:  They don't enjoy it but when we

15   took an oath of office, this is what we do. Or there's

16   arrest warrants or whatever it might be, so we are

17   recognizing the people that say you know what I'm taking

18   this oath of office, and I'm taking it serious.  I'm not

19   going to drive around with blinders on and not see

20   anything.  I'm going to go out with there and I'm going to,

21   you know, take my job serious and enforce the job and

22   enforce the rules that I swore by oath that I would uphold.

23   So, again, and maybe I am way off base, and, you know,

24   certainly, you know I accept that if I'm way off base --

21

1        MR. STONE:   How else can you recognize it?

2        MR. MAJENSKI:  I don't know.

3        MR. STONE:  You can't financially do anything.

4        MR. MAJENSKI:  No.

5        MR. STONE:  You can't give time off or anything

6    like that.  You can't.  That would be unfair to the other

7    officers, but just to be able to, you know, give them a

8    little time with their family, whatever.  I think that's an

9    excellent idea myself.

10       MR. MAJENSKI:  And to make the point again, now

11   this was in 2015, the program didn't happen.  The last time

12   this happened was 2009.  It did not happen in 2015 because

13   again the union said we got a problem with it and I said

14   okay again I disagree with it, but I respect your opinion.

15   Then something was sent out, you know, to the local media

16   to my humble opinion to try to smear myself and the

17   department by people with nefarious intent but any hoot.

18   And this isn't a new concept, Clay, if you don't mind, you

19   know, it was funny somebody I respect gave me a case -- not

20   a case, it was a program that was in one of the sergeants'

21   books for promotional books in order to become a sergeant

22   and it was done by the Ohio state police and it's called

23   the Blue Max Award.

24       Now, this is in the books in order to get promoted you

22

1    have to take an exam and this is in the reading is what

2    this individual had to tell my required reading that you

3    have to memorize understand it.  It's called The Blue Max

4    Auto Larceny Enforcement Program.  You can look it up on

5    the Internet, and I'm sure some people will and I hope you

6    do.  It's a way to stop -- it was a way to stop stolen

7    motor vehicles.  They were having a stolen motor vehicle

8    issue problem in Ohio you and in a nutshell they had a

9    program where they gave the officers incentives in the form

10   of, they gave them awards, ribbons, they gave them special

11   things that they can put on their cruiser marks.  They gave

12   them exclusive use of a patrol car.

13       Now, that's not what we're talking about here, but you

14   could use your patrol car, I assume, you know more than

15   somebody else in ways that other people couldn't.  So it's

16   not -- and they did that in 1974 and continue it looks like

17   I think they continue it today.  So it's not a new concept.

18   Again, in the public's --

19       MR. STONE:  But you're very limited.  This is a

20   cut down to the fact limited in how you can say thank you.

21       MR. MAJENSKI:  Exactly.

22       MR. STONE:  And just a shake of the hand and a

23   card or something like that, doesn't cut it really.

24       MR. MAJENSKI:  No.  Because in the public sector,

1   again, is different than in the private sector and it's

2   hard sometimes for people to get there, to understand is

3   that people say you know they ain't doing their job just do

4   that or do that.  It's not that easy.  The public sector is

5   very different, but the way I can do it and I stand by it

6   and I don't shy from and you don't see me sitting there

7   going I'll come out and tell you the way I would like to do

8   it is to reward officers who go above and beyond or you

9   know and some of them aren't even going above and beyond.

10  They're just doing their job.

11       MR. STONE:  They're just doing their job.

12       MR. MAJENSKI: But you know what I mean, but

13  sometimes just doing there job is of above and beyond.

14       MR. STONE:  Absolutely.

15       MR. MAJENSKI:  You know what I'm saying?

16       MR. STONE:  I know what you're saying because

17  there's no such thing as a typical day in the police

18  department, that's for sure.  You never know when you get

19  in that cruiser what you're going to face.

20       MR. MAJENSKI:  So that's sort of the rest of the

21  story.  Thanks for bringing that up.  I appreciate it.

22       MR. STONE:  Barbara saw it on TV and she just

23  mentioned it to me and I've been curious, what the heck is

24  going on.  There was nothing in the paper last night that I

1   A.    Absolutely.

2               MR. HIGHTOWER:  Mark this as Exhibit 2.

3               MS. ECKER:  What is it?

4               MR. HIGHTOWER:  It's going to be a Blue Max

5        Program.

6        (**Exhibit No. 2**, Ohio State Highway Patrol Blue Max

7        Program Article, was marked.)

8               MS. ECKER:  Note my objection for the record.

9               MR. HIGHTOWER:  Sure.

10              MS. ECKER:  Do you have copies of these for me?

11              MR. HIGHTOWER:  Unfortunately, I don't have

12       copies, but I will get you copies today.

13   (BY MR. HIGHTOWER)

14   Q.    Take a moment to review it, sir.

15   A.    (Witness reviews document.)

16   Q.    Sir, is that you -- is Exhibit 2 in reference to the Blue

17       Max Program that you speak to with Mr. Clayton Shields

18       [sic]?

19   A.    Mr. Clayton Stone.  That appears to be.  That isn't the

20       article that I read, but that appears to be the same Blue

21       Max Program.

22   Q.    Would you agree with me Exhibit 2 speaks to the winner

23       receiving a certificate, a Blue Max medal, a Blue Max

24       license plate, a uniform ribbon, superintendent citation

1      of merit and the use of a patrol car?

2                    MS. ECKER:  Can we look at the document?

3                    MR. HIGHTOWER:  Sure.

4                    MS. ECKER:  How about this, we'll stipulate

5      that the document says what it says.

6                    MR. HIGHTOWER:  Okay.

7  (BY MR. HIGHTOWER)

8  Q.   Would you agree with me that the Blue Max Program that's

9      referenced in Exhibit 2 appears to be from Ohio?

10 A.   Yes.  Ohio State Highway Patrol.  That's what it says.

11 Q.   It talks about the thief of auto motor vehicles as well?

12                   MS. ECKER:  In the last paragraph.

13 A.   Yes, it does.

14 Q.   One of the things you said in the segment of the video

15     that we just watched was that you can look up the Blue

16     Max Program on the internet?

17 A.   Correct.

18 Q.   Do you see anywhere in Exhibit 2 where it speaks to

19     giving officers a paid day off for winning the Blue Max

20     Program?

21 A.   Do I, no.  Not in that particular article.

22 Q.   And when you spoke to Mr. Clayton Shields [sic], you

23     didn't tell him that in the video segment that we just

24     went over that officers were receiving paid days off as

38

1   A.   I physically have seen it, yes.

2   Q.   Have you seen it before today?

3   A.   I have seen it before today, yes.

4   Q.   I'm going to ask you some questions about it.

5   A.   Could I see it while you're asking me the questions,

6        please?

7   Q.   Sure.  Absolutely.  Here you go, sir.

8   A.   Thank you.

9   Q.   So Mr. Shaw, I'm going to ask you some questions about

10       his affidavit.  Do you know who Mr. Shaw is?

11  A.   I do.

12  Q.   How long have you known him?

13  A.   I'm going to say in excess of maybe around 20 years.

14       He's been in charge of the IT.  He was -- roughly he was

15       -- he was hired by the chief before me, and he's

16       basically built the whole system, which is pretty

17       intricate, for the Abington Police Department.  He built

18       the computer system.  The old one at the old station and

19       then the brand new one at this new station about eight

20       years ago.

21  Q.   In all the years that you've known Mr. Shaw, how many

22       times has he come to you and said that he lost data as a

23       result of routine maintenance?

24  A.   I have no idea.

1    Q.    One of the things that Mr. Shaw speaks to is information

2          on the TriTech System being lost in 2014 during a routine

3          maintenance.  When did you first become aware that emails

4          on the TriTech System were lost?

5    A.    I would imagine back then, but I can't recall.

6    Q.    How did you become aware?

7    A.    I couldn't remember.  I would assume -- again, I'm

8          assuming this, that he would have called me.

9    Q.    Now, Mr. Shaw's an outside consultant; correct?

10   A.    That is correct.

11   Q.    Who's the -- Mr. Paul Januszewski, his name has come up

12         in the past at depositions; correct?

13   A.    If you say so.

14   Q.    Was he an IT administrator for the Town of Abington?

15   A.    And he has very limited knowledge of the system.

16         Mr. Shaw -- Bob Shaw is the kind of person who oversees

17         the system of the police department.  Officer Januszewski

18         had very minor -- more administrative, whereas, Bob would

19         do the kind of heavy lifting or the stuff that required,

20         you know, any degree -- any high degree of knowledge.

21   Q.    Was Mr. Januszewski the IT administrator for the Town of

22         Abington when this system crashed referred to by Mr. Shaw

23         in his affidavit occurred?

24   A.    I'm not sure.  I could assume so, yes.

46

1     They didn't make -- it's foolishness to me.  I don't know

2     how else I can say it.

3  Q.  Did you think that the Town of Abington was going to

4     investigate the allegations that Mr. Delaney had made?

5  A.  I can't answer that question.  I would assume so.

6  Q.  So one of the things that Mr. Delaney has alleged in this

7     case is that you told him that some of the emails that

8     pertain to this money ticket quota system were deleted

9     from the TriTech System?

10         MS. ECKER:  Objection.  Where does he allege

11    that?  Is it in the complaint somewhere?  Answers to

12    interrogatories?  That is a new allegation.

13         MR. HIGHTOWER:  Okay.  Very well.  I'll take it

14    up a little bit later.  I'll withdraw that question for

15    now.

16  (BY MR. HIGHTOWER)

17  Q.  So when this crash happened in 2014, did you talk to Mr.

18     Shaw about trying to recover the emails that were lost?

19  A.  I think Mr. Shaw told me that he tried diligently to try

20     to recover those emails.

21  Q.  When did he tell you this?

22  A.  I'm assuming on the phone.

23  Q.  Did he come to you in person and explain that the emails

24     had been lost?

1   any real knowledge.  Someone went behind my back and went

2   right to the media.

3   Q.   Who is the person that went right behind your back and

4   went to the media?

5   A.   No idea.  I would only be guessing.

6   Q.   Did you contact the Brockton Enterprise and ask that they

7   correct any of the statements that you made that are

8   referenced in Exhibit 11?

9   A.   I'm not in the business of telling the newspapers what

10   they can write.  That's a -- I've never done that.  They

11   would very much take objection to that if I tried to

12   somehow, you know, influence them in what they would

13   write.  It wouldn't really work out well for me.

14   Q.   So is that a no, you didn't contact them and ask them to

15   correct anything?

16   A.   I never had done that.  That would be a no.

17   Q.   Did Mr. Delaney ask that you not keep him as a police

18   prosecutor?

19   A.   Yes.  He had reservations about being a police

20   prosecutor.

21   Q.   And he expressed those reservations to you?

22   A.   He did.  In email form, correct.

23   Q.   Notwithstanding those reservations, you still ordered him

24   to be the police prosecutor?

1  A.  I still felt he was best suited for the police prosecutor

2     position, and that it would -- he would enjoy it.  I

3     think he -- my humble opinion is that he had reservations

4     because of the fear of the unknown, and I certainly had

5     him be prosecutor with the caveat that if you didn't want

6     to do it in a year's time, he did not have to do it.

7  Q.  Sir, did you tell Mr. Owings that you were displeased

8     with him disseminating information to Mr. Delaney

9     regarding what Mr. Delaney has alleged is the money

10     ticket quota system at the Abington Police Department?

11 A.  I don't believe so.

12 Q.  Did you ever tell him that, quote/unquote, he was not on

13     the team?

14 A.  I don't recall if I said that.

15 Q.  Are you aware of the harassment policy in the Town of

16     Abington?

17 A.  I'm aware that one exists.

18 Q.  Do you know that you are prohibited from retaliating

19     against your subordinates if the subordinates believe

20     they've engaged in lawfully protected activity?

21 A.  Yeah.  That could make commonsense.

22 Q.  Sir, if an officer is out sick, if there's a certain

23     amount of time between their being out sick and their

24     next scheduled overtime assignment -- sorry.  Let me take

1      the law is that -- with regards to whatever documents,

2      whether it be emails, documents of the law, because it's

3      very -- the record destruction or record retention laws

4      are very interesting and depending on the topic,

5      depending on, you know, what the item is, there are

6      different time periods in which we need to retain those

7      before we can destroy the documents.

8  Q.  Can you point me towards some of the record retention

9      laws that you're referencing?

10         MS. ECKER:  Objection.

11  A.  I can point to -- I don't have them in front of me.  It's

12      convoluted that you, you know, we have to send people to

13      school just to understand it and even then I don't think

14      we all understand it sometimes.  It's difficult.

15  Q.  But as the Chief of Police for the Town of Abington,

16      you're aware that there are standards regarding how long

17      emails should be kept by the Abington Police Department?

18         MS. ECKER:  Objection.  Certain emails.

19  A.  Yes.  Under the Republic Retention Laws, I'm sure that

20      there are topics and emails regarding the retention laws

21      of how long emails are supposed be kept before they're

22      destroyed along with other items.

23         MS. ECKER:  Are you really going to ask him

24      about the statute.  I'm going to object.  He's not an

1    attorney.

2                 MR. HIGHTOWER:   Right.

3  Q.   I'm sorry.   Keep going.

4  A.   I was done.

5                 MR. HIGHTOWER:   Can you mark that?

6       (**Exhibit No. 13**, Public Records Law document, was

7       marked.)

8  (BY MR. HIGHTOWER)

9  Q.   I'm going to give you Exhibit No. 13.

10                MS. ECKER:   Which is the Public Records Law.   I

11      object particularly since it doesn't have any schedules

12      he's talking about, but you can show it to him.

13 (BY MR. HIGHTOWER)

14 Q.   Go ahead.   Take a peek at it.

15 A.   Okay.

16 Q.   So you've had a chance to review what your counsel has

17      referred to as the public records law?   I'm just going to

18      refer to it as Exhibit 13.

19 A.   Yes, I did.

20 Q.   Have you seen Exhibit 13 prior to today?

21 A.   I have not.

22                MR. HIGHTOWER:   Off the record for a second.

23      (Whereupon, parties had an off-the-record discussion.)

24 (BY MR. HIGHTOWER)

69

1   Q.   So I have a couple of brief statements of publicly

2        available information concerning statements you made to

3        the media after the complaint was filed and I'm going to

4        first turn to the video link one, which was part of the

5        exhibit.  I'm going to click on it and I'm going to bring

6        you to it and I'm going to let you see it.  Let me ask

7        you this question.  Were you ever interviewed by Fox 25

8        regarding the case that Mr. Delaney has brought against

9        you?

10  A.   I can't recall.  I was interviewed by some TV stations.

11       I'm not sure which ones.

12  Q.   Let's do this, did you ever tell Mr. Owings you didn't

13       know why Mr. Delaney was not being, quote/unquote, a good

14       Marine?

15  A.   No.

16  Q.   Did you ever tell Mr. Owings that you didn't think

17       Mr. Delaney was following your orders regarding how

18       citations should be issued?

19  A.   Say that again.

20  Q.   Did you ever tell Mr. Owings that you didn't believe

21       Mr. Delaney was following your orders as to how to issue

22       citations to citizens?

23  A.   No.

24  Q.   Did you have a meeting with Mr. Owings prior to this

70

1    complaint being filed against you in this case where you

2    told Mr. Owings to have Delaney come and see you at your

3    office?

4   A.   I don't recall.

5   Q.   Sir, Mr. Paige, you were here for every single deposition

6    that we've taken in this case?

7   A.   I believe so, yes.

8   Q.   And you heard Mr. Paige's testimony; right?

9   A.   I heard it, yes.

10  Q.   One of the things he referenced was that he thought you

11   were involved in covering up an allegation of rape; do

12   you remember that?

13  A.   I do.

14  Q.   I want to ask you some questions about that in terms of

15   what Mr. Paige said.  Was there any truth to what he said

16   in that regard?

17  A.   Was I covering up a rape or have I covered up a rape?

18  Q.   Yes.

19  A.   Yeah.   There's no truth to that.

20  Q.   Was there a Lieutenant Sullivan -- was there a supervisor

21   at the Abington Police Department that was involved in an

22   allegation of rape as it pertains to a prostitute?

23  A.   Is there a supervisor?

24  Q.   In 2005.

78

1    A.    I can.   Pretty substantial incident.

2                    MR. HIGHTOWER:  Just one quick moment.  Can we

3          go off the record for a second?

4                         (Brief recess was taken.)

5                    MR. HIGHTOWER:  Back on the record.

6          (**Exhibit No. 15**, Harassment Policy, was marked.)

7    (BY MR. HIGHTOWER)

8    Q.    Sir, Exhibit 15, do you recognize it?

9    A.    I do.

10   Q.    Is that the harassment policy we talked about earlier

11         today?

12   A.    I believe we talked about the town harassment policy.

13         This is the Abington Police Department harassment policy,

14         which I would assume is -- mirrors the town, which I

15         assume, but I don't know for sure.

16   Q.    So are you familiar with the content of Exhibit 15?

17   A.    I know it exists.  I'm not familiar with every aspect of

18         it.

19   Q.    Have you read it before?

20   A.    I don't believe I've read it from cover to cover.

21   Q.    Sir, going back to Exhibit 8, there's a paragraph in here

22         that references changes that were made at the beginning

23         of October 2014 to the benefits that the union members

24         were receiving.  I just want to point this out to you and

79

1        I'm going to ask you some questions about it.

2   A.   What are we looking at?

3   Q.   Just take a moment to review it.

4   A.   And what is this?    This is --

5   Q.   We're referring to --

6   A.   This is -- okay.  What do you have for questions?

7   Q.   So just look at that middle paragraph and just let me

8        know when you're done.  I'm going to ask you about some

9        of those union changes.

10  A.   Okay.  Go ahead.  You can ask me anything you want.

11  Q.   Can I take it back for one quick second?

12  A.   Okay.

13  Q.   So would you agree with me that beginning in October of

14       2014 and ending in November of 2014, there were a number

15       of changes that you wanted to have happen at Abington

16       Police Department?

17            MS. ECKER:  Objection.

18  A.   I would agree that there are issues that we wanted to

19       bargain in good faith with the union.

20  Q.   So I'll ask you this question.

21  A.   Go ahead.  Impact bargain I should say.  Sorry.

22  Q.   So would you agree with me that one of those issues with

23       that was concerning the overtime pay for travel and

24       training assignments?

1  A.   Was one of them overtime, yeah.  That was a contractual

2       item that, if my memory serves me right, it was a

3       contractual item that we had the option to pay them, yes,

4       pay them travel time, or, I think, it was mileage

5       according to their contract to and from training, yes.

6  Q.   Just to speed things along --

7  A.   No worries.

8  Q.   I'm just going to ask you this, in terms of looking at

9       the statement that Mr. Delaney has made in this middle

10      paragraph that is part of Exhibit 8 that you and I are

11      discussing, do you recognize these changes that he's

12      speaking to that start around October 24th and ending in

13      November?

14 A.   Again, these aren't changes.  These are basically request

15      to bargain -- impact bargain items with the union.

16 Q.   Okay.  So --

17 A.   And some of them aren't changes.  For instance, as I look

18      here, I'm just looking at October 29th per the deputy

19      something about with failed fitness test for having high

20      body fat percentages.  That's not a change.  That's

21      always been in place.  That's in the contract.  Let me

22      look at the 24th, overtime pay for travel, that's in the

23      contract, so October 30th, GPS, that was a change that we

24      wanted to impact bargain.  That's having GPS cruiser

81

1    mapping and also audio/video.  I think that's a hot

2    topic, obviously, for today for both the integrity of the

3    officers and the public.  It's important to have, you

4    know, audio/video recorders in cruisers and also body

5    cameras to record the officer's actions.  So that was

6    definitely an impact bargain, which ultimately I dropped

7    because the union had such an issue with it, put up so

8    many roadblocks to me.  It just wasn't worth it anymore.

9        November 14th, online to complete -- "I was

10   requested by Acting Sergeant Kilgour to complete online

11   racial profiling."  That we've done every year.  I don't

12   know that that's ever changed.  That would be something

13   the deputy does, but I don't think that's a change.  I

14   think that's been done.  He's not the only officer.  It

15   would be every officer I think goes through that per the

16   chief's orders.

17       November 21st, would not be paid according to past

18   practice for testifying in court.  That, I think I spoke

19   to before.  That is a four-hour minimum.  For instance,

20   when officers go to court, they get four-hour minimum

21   pay.  We're pretty understaffed.  As you can see, we're

22   overworked.  A lot of the times they're in there for a

23   three-hour, you know, there in there for a four-hour

24   minimum, but they're in there for 10 minutes for

1   traffic -- might be a traffic, you know, violation where

2   it literally takes them 15, 20 minutes.  They're out of

3   court.  We're still paying them for the three and half

4   hours.  That was a change.  We ultimately ended up going

5   to arbitration on that one and the union prevailed and

6   then -- I'm trying to think.

7        What is the last one?  The last one is 21st, we

8   would add gloves and CPR masks to officers already

9   overburdened with heavy duty belts.  That makes no sense

10  to me whatsoever.  I was willing to give the officers in

11  today's -- there was Narcan that was being administered

12  and there were officers who were getting blood on them or

13  vomit or whatever and CPR masks, so my way of thinking

14  was it was a good positive thing to have the officers

15  wear, you know, issue them gloves, safety gloves, meaning

16  rubber gloves and CPR masks so they didn't have to ever

17  do mouth-to-mouth contact with any, you know, victims or,

18  you know, people that are in distress, and I worked with

19  the union to have them pick out what would be the best --

20  I let them decide what type of items they would want on

21  the belt.  The only thing I asked was that it would be

22  uniform so those are changes as kind of outlined.

23  Q.   And those changes --

24  A.   If they're changes.  A lot of them are benefits.

1  Q.   So these benefits, if you will, they were raised by you

2        beginning on October 24; is that accurate?

3  A.   I'm not sure.  I would have to look at it.  That's what

4        he writes.  I would have to go back and look through all

5        of the, you know, the impact bargain folders that I have

6        that would tell me.

7  Q.   In October of 2014, Mr. Delaney was the union president;

8        correct?

9  A.   I would assume so.  I don't know off the top of my head,

10       but it seems reasonable that he would.

11  Q.   Can I take that back for a second?

12  A.   Please.

13  Q.   Did you speak with Mr. Suarez, that's Officer Suarez, and

14       Officer Sweeney about the fact that Mr. Delaney had filed

15       a complaint at the Attorney General's Office in 2014?

16  A.   Not that I can recall.

17  Q.   I'm going to hand you back Exhibit No. 8 and just take a

18       moment to review that top paragraph before the paragraph

19       that we just referenced and let me know if that refreshes

20       your recollection as to any conversations that you may

21       have had with Officers Suarez and Sweeney.

22  A.   Yeah.  It won't change my opinion.  Just because he

23       writes it, that doesn't mean that it's true.

24  Q.   Right.  And I'm not asking for you opinion.  I just want

84

1    to see if you review it -- just tell me if you can review

2    that top paragraph there and just let me know if that

3    refreshes your memory regarding any conversations that

4    you would have had with Mr. Suarez or Sweeney regarding

5    Mr. Delaney filing a complaint at the AG's Office.

6  A.   Yes.  I do recall some sort of a conversation and I --

7    I'm trying to remember.  Some of this is drawing -- there

8    was a conversation and I'm trying to go off the top of my

9    head.  That is correct.  There was a conversation that

10   took place between myself and the deputy chief, I

11   believe, was there and Suarez -- Officer Suarez and

12   Sweeney and there was something that was said -- I'm

13   trying to remember the context of it.  It was basically

14   that we -- it was in the context that we were trying to

15   say that there was, you know, that we've always kind of

16   been able to speak with each other, and if there were

17   issues ever, to come forward and talk with each other

18   about it.  We've always kept things, as much as would we

19   could, in-house, and if there was a problem, come

20   forward.

21       We don't go to the outside, you know, typically, and

22   there were times when certainly we could have gone to the

23   outside, but we don't.  We try to handle our issues

24   appropriately, as much as we can, in-house.  The deputy

1       may be able to answer the question better because my

2       memory's a little bit fuzzy on that one.

3  Q.    But in terms of -- I get what you're saying in terms of

4       you explaining the context of the conversation, and as

5       part of that answer, you kept referencing the term

6       "in-house"; right?

7  A.    I did.

8  Q.    And what you meant by that was that by using the term

9       "in-house," did you mean that problems that police

10      officers have should be resolved internally?

11  A.    What I mean by that is that if there is a problem, come

12      forward and discuss the problem amongst each other.  So

13      if there's a problem that I'm not aware of, I always

14      assume and I appreciate the courtesy and I do the same

15      courtesy, if I got a problem with something that's done

16      or said to come forward and try to work it out and if we

17      can't work it out, then certainly you go, you know,

18      whatever, you go to the outside, but I think the contents

19      of it was let's first try and make each other aware that

20      there's a problem and then give each other the courtesy

21      that there's a problem and then go from there, which --

22      and I don't think that happened.  That was the problem.

23      Nobody came forward and said, "I got a problem here."  It

24      just didn't happen.

1  Q.  And when you say it didn't happen, are you talking about
2      in reference to Mr. Delaney bringing forward this
3      allegation of a money ticket quota system?
4  A.  I don't know.  You know, I would assume that this is, you
5      know, first of all, there is no money ticket quota
6      system.  That's just --
7  Q.  So let's take a step back when you say, you know, are
8      making references in terms of Mr. Delaney coming forward
9      with his complaints that he was dissatisfied with what he
10     believed were orders to issue citations to citizens for
11     fines?
12 A.  I think I was in shock that Mr. Delaney would go to the
13     Attorney General's Office on something so frivolous and
14     something that certainly could have, you know, if there
15     was an issue, he could have come forward to me.
16 Q.  And that's what you meant in terms of the conversation
17     that you referenced --
18 A.  I would assume.
19 Q.  In terms of the conversation between yourself, Suarez,
20     Sweeney and Deputy Chief Cutter?
21 A.  I would assume so.
22 Q.  Now, do you agree with me that Mr. Delaney says that this
23     meeting between yourself, Sweeney, Suarez, and Deputy
24     Chief Cutter happened on November 10, 2014?