EX. 77

Volume:      I
Pages    1-109
Exhibits:      7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:15cv13130-RGS

- - - - - - - - - - - - - - - - x

TOM DELANEY,

        Plaintiff

V.

TOWN OF ABINGTON,
DAVID MAJENSKI,
CHRISTOPHER J. CUTTER, AND
KEVIN F. SULLIVAN,

        Defendants

- - - - - - - - - - - - - - - x

     DEPOSITION of MICHAEL J. CARINI, called on

behalf of the Plaintiff, taken pursuant to the

provisions of the Massachusetts Rules of Civil

Procedure, before Michele DeCoste, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at 90 Pleasant Street,

Suite 12, Randolph, MA 02368, on Monday, February 22,

2016, commencing at 9:58 a.m.

- - - - - - - - - - - -

**A AND C COURT REPORTING**
**AND TRANSCRIPTION**
**31 Lyme Street**
**Weymouth, MA 02189**

1   Q   I'm going to show you what's been marked as

2       Exhibit 6 at Chief Majenski's deposition.

3       It's a six-paged document.  For the record,

4       it's been marked today in your deposition as

5       well.  It says, "Traffic Safety and Control

6       Policy."  It's got an effective date of

7       10/20/2012, review date of 10/20/2012.  Just

8       take a moment to review it.

9   A   Okay.

10  Q   Let me know when you're done.  Take your

11      time.

12  A   Okay.

13  Q   All right, sir, you had a chance to review

14      what's been marked as Exhibit 1 in your

15      deposition?

16  A   Yes.

17  Q   Do you recognize this document?

18  A   I do.

19  Q   What is it?

20  A   It's a Traffic Safety and Control Policy.

21  Q   How do you recognize it?

22  A   It's just one of our policies and procedures

23      for the department.

24  Q   Have you followed that policy in the past?

1    A    Yes.

2    Q    Do you still follow it today?

3    A    Yes.

4    Q    Why is that?

5    A    Because it's a policy.

6    Q    On Page 2, there is a statement there I think

7         on Exhibit C -- well, actually, it's on

8         Exhibit B.  It's got an initial to it.  It's

9         initialed by Chief Majenski.  It says,

10        "Traffic enforcement will not be used as a

11        means of generating revenue for the

12        department."  Do you see that statement?

13   A    I do.

14   Q    Is that your understanding as a way that

15        traffic enforcement is not supposed to be

16        used?

17   A    Yes.

18   Q    Were you at a Sergeants' meeting at some

19        point in time where Chief Majenski was

20        present and discussed that revenues from

21        money tickets were going to go into the

22        equipment budget?

23   A    I believe so, yes.

24   Q    Tell me what was discussed by the Chief

1        during that meeting.

2    A   I don't remember exactly.

3    Q   Did he say during that meeting that the money

4        ticket revenues were going to be used for

5        the equipment budget for the town of

6        Abington?

7    A   I don't recall.

8    Q   Who was also present during that meeting?

9    A   It was Sergeant Owings.

10   Q   Sergeant McCollem, was he present?

11   A   Sergeant McCollem was, yes.

12   Q   Any other supervisors?

13   A   I can't remember because we have had a couple

14       turnarounds.  I don't remember exactly who it

15       was.

16   Q   Now, when you say you've had a couple

17       turnarounds, do you mean that people have

18       departed from the Abington Police

19       Department?

20   A   Sergeants, yes.

21   Q   Was Sergeant Gambino one of these sergeants?

22   A   Yes.

23   Q   Around what time did he depart?

24   A   I don't remember.

1    Q    If he was a Sergeant at the point of time

2         that this Sergeants' meeting occurred, which

3         he was present and yourself, would you expect

4         him to have been present?

5    A    Yes.

6    Q    Was Lieutenant Sullivan present?

7    A    I don't recall.

8    Q    Do you recall if Deputy Chief Cutter was

9         present?

10   A    I believe so, yes.

11   Q    Do you recall what Deputy Chief Cutter said

12        during that meeting?

13   A    No.

14             MR. HIGHTOWER:  Let's mark this as

15        --

16   Q    Let me ask you this question:  Your address

17        is 458 Groveland Street, Abington, Mass.?

18   A    Yes.

19   Q    And 02351?

20   A    Yes.

21             MR. HIGHTOWER:  Mark this as 2.

22                  (**Exhibit Number 2**, Subpoena,

23                  was Marked for

24                  Identification.)


MICHELE C. DECOSTE

1    ask you to send reports to him at the end of

2    each shift that you supervised regarding the

3    amount of citations your subordinates were

4    issuing?

5    A    Yes.

6    Q    How was that?

7    A    This email right here (indicating).

8    Q    The email in Exhibit A?

9    A    Exactly.

10   Q    That is Exhibit A to the subpoena, okay.

11                And you're referring to the email

12   dated May 21, 2013?

13   A    Yes.

14   Q    How long did you continue to -- well, did you

15   send emails at the end of each shift pursuant

16   to that directive?

17   A    Yes.  If it was a directive, I must have.

18   Q    How would you have communicated the totals of

19   your subordinates in terms of citations

20   issued at the end of each shift to Deputy

21   Cutter?

22   A    How would I have?

23   Q    Yes.

24   A    I would have just checked the log.

MICHELE C. DECOSTE

```
 1          Absolutely.

 2                   MS. ECKER:  Or find somebody who can

 3          access the IT person, whoever that may be.

 4                   MR. HIGHTOWER:  Okay.

 5     Q    How do you know the Plaintiff in this case

 6          who is sitting next to me, Mr. Delaney?

 7     A    I worked with him.

 8     Q    In what capacity?

 9     A    I worked with him in patrol together and then

10          as a supervisor.

11     Q    As a supervisor with the Abington Police

12          Department, if you want to give somebody a

13          verbal warning, how do you do that?

14     A    I just pull them into my office and I speak

15          to them.

16     Q    Do you document the verbal warning?

17     A    Sometimes, sometimes not.

18     Q    Do you always bring the person to your office

19          to give them that type of warning, verbal

20          warning?

21     A    Well, it might not always be in my office,

22          but I try to do it one-on-one.

23                   MR. HIGHTOWER:  Mark this as the

24          next exhibit, please.
```

MICHELE C. DECOSTE

1    supervise Mr. Delaney while he was

2    conducting investigations as an Abington

3    police officer?

4   A   Yes.

5   Q   What type of investigations did you supervise

6    him on?

7   A   Anything from sudden deaths to accidents to

8    credit card fraud, anything.

9   Q   You mentioned sudden deaths.  Is there a

10    particular sudden death that you're referring

11    to?

12   A   No.

13   Q   In the course of supervising Officer Delaney

14    for those types of investigations, would you

15    characterize his work performance as being

16    poor or good?

17   A   Good.

18   Q   When is the last time that you supervised

19    Officer Delaney during an investigation?

20   A   I don't recall.

21   Q   Would it be 2013, '14?

22   A   It could be.  I mean, we didn't work the same

23    shifts for a little while there at the end,

24    but, you know, overtime shifts and stuff I

1    was off.

2    Q    What is your normal schedule?

3    A    Day shift, 8 to 4.

4    Q    Days of the week?

5    A    I work a four and two.  It rotates.

6    Q    Monday through Friday?  Saturday and Sunday?

7         What days do you work?

8    A    I just explained that.  We work a four and

9         two.  My days rotate.

10   Q    So you don't have any set day of the week

11        that you would normally be working as of May

12        of 2015?

13   A    Well, there's set days, but it's four days on

14        and two days off.

15   Q    So can you say with absolute certainty that

16        you were not at work on May 13, 2015?

17   A    Considering I was at Plymouth Superior Court,

18        I would say I was not at work.

19   Q    For the record, I'll represent to you that

20        May 13th of 2015 is a Wednesday.

21   A    Okay.

22   Q    Who did you speak with at the Plymouth

23        Superior Court?

24   A    The clerk's office.  I don't know who.

1    Q    Did you say "Baxter"?

2    A    Baxter.

3    Q    Okay.  So turning to the last paragraph,

4         Page 5, it's on the first page, it's

5         "Defendant Production ABIN0458"?

6    A    Yes.

7              MS. ECKER:  What did you just say,

8         plan of production what?

9              MR. HIGHTOWER:  "Defendant

10        production ABIN, dash, 0458.  It's in the

11        lower, right-hand corner.

12             MS. ECKER:  Of what?

13             MR. HIGHTOWER:  Of the statement.

14             MS. ECKER:  Oh, I see.  I've got

15        it.

16   Q    Now, looking to that last paragraph, on Page

17        458 that I just referenced, a segment of this

18        statement says that between the 16 to 0:00

19        hour shift between January 2013 and May 2013

20        you were Mr. Delaney's supervisor?

21   A    Yes.

22   Q    And as his supervisor, would it have been

23        your duty to conduct role calls?

24   A    Yes.

MICHELE C. DECOSTE

```
1    Q    Can you tell me what you do during the role

2         call as a supervisor?

3    A    We talk about the prior shifts, what happened

4         in the town, any assignments that needed to

5         be addressed.

6    Q    What time does role call start, typically?

7    A    Typically, 16:05.

8    Q    Why do you say 16:05 as opposed to 16:00?

9    A    Give the guys five minutes to get there.

10   Q    Sometimes you have officers hold over for

11        other officers who are running late?

12   A    Sometimes.

13   Q    Can you tell me how that process would work?

14   A    What do you mean?

15   Q    The holdover process.

16   A    If someone was running late, they typically

17        call the station and ask if someone can hold

18        over and they sit there until they get there.

19   Q    Are there different people that the office

20        could call such as yourself or other

21        supervisors?

22   A    They try to call the supervisor on the shift

23        prior.

24   Q    What about Dispatch?  Could Dispatch be
```

MICHELE C. DECOSTE

1            contacted?

2     A     Yes.

3     Q     What about other officers who are not

4            supervisors?  Could they be contacted as

5            well?

6     A     Yes.

7     Q     So all the ways that you just referenced, is

8            it fair to say that the practice in terms of

9            an officer using the holdover procedure

10           varies?

11    A     Yes.

12    Q     How often have you seen the holdover

13           procedure utilized?

14    A     How often?

15    Q     Yes.

16    A     I don't know.

17    Q     Would you say more than ten times?

18    A     Yes.

19    Q     More than 100?

20    A     Probably not.

21    Q     So the part of the reference that Delaney --

22           the statement and complaint says that you

23           disagree that Mr. Delaney said in his

24           complaint, "Carini repeatedly told Delaney

MICHELE C. DECOSTE

1       and other officers that Deputy Chief Cutter

2       wanted them to issue more money tickets than

3       warnings and Carini would continually

4       emphasize to Delaney and other officers

5       between January 2013 and May 2013 to issue

6       money tickets pursuant to Deputy Christopher

7       Cutter's directives," do you see that?

8    A  Yes.

9    Q  Why do you disagree with what Mr. Delaney

10      said on Page 5 of his initial complaint?

11   A  Because in my role calls, I stressed a lot of

12      proactivity.  I just wanted the guys to be

13      proactive.  That is how I stressed it and

14      that's how I interpreted it.  I didn't go out

15      there and tell them to write more money

16      versus more warnings.  I didn't tell them how

17      many.  I didn't tell them they had to go do

18      it.  I just stressed proactivity.

19   Q  What do you mean by "proactivity"?

20   A  Going out there and being proactive in the

21      community.

22   Q  Did you mean "proactive" in terms of writing

23      tickets?

24   A  If they felt the need.

MICHELE C. DECOSTE

1      statement he probably had the right p

2      paragraph number.  I think it was with

3      complaint that was filed at the time.

4    Q   So you looked at the original complaint,

5      the amended complaint, in making your

6      statement?

7    A   Yes.

8           MR. HIGHTOWER:  Okay, thank you.

9      That's helpful.

10           MS. ECKER:  The one he went and got

11      at court.

12           MR. HIGHTOWER:  Sure.

13    Q   So let's do this:  Let's bring out your

14      original complaint.

15           And you just had certain sections,

16      is that accurate?  Or...?

17    A   Let me just make sure.

18    Q   Sure.

19    A   Okay.

20    Q   As we are going over this exhibit, have you

21      ever seen an officer suspended for using the

22      holdover procedure since you've been a

23      supervisor?

24    A   No.

1    Q    So let's go over to Exhibit 6.

2

3              (**Exhibit Number 6**, Original

4              Complaint, was Marked for

5              Identification.)

6

7    Q    The only reason why I'm referencing this is

8         because you made reference to this in your

9         initial complaint.

10   A    Okay.

11   Q    So let's speed through it.  On Page 6,

12        Section 22 of the initial complaint, there is

13        a reference to on May 29th Mr. Delaney was at

14        role call with yourself, and the Newton case

15        was discussed with you by Mr. Delaney, and

16        Mr. Delaney communicated that he did not want

17        to follow the money ticket quota system.  It

18        is also referenced in that initial paragraph

19        that he gave you a copy of Rule 7.0

20        concerning unlawful orders.  It's highlighted

21        in green in your copy.  Did you put those

22        highlights in here?

23   A    I did.

24   Q    Once again, in your statement, the second

48

1          paragraph on Page ABIN0459, there is a

2          specific reference to that in your statement,

3          correct?

4     A    Yes.

5     Q    So tell me about the conver- -- was there

6          conversation between yourself and Mr. Delaney

7          on May 29, 2013, at role call?

8     A    Yes.

9     Q    Did Mr. Delaney talk to you about the Newton

10         case?

11    A    Yes.

12    Q    What did that case discuss?

13    A    It discussed the money quota system, I

14         believe, Newton was involved in.

15    Q    Did he tell you that he did not want to

16         follow what he thought was a money ticket

17         quota system in the Abington Police

18         Department?

19    A    Yes, what he disliked about it.

20    Q    When you say "disliked," how did he express

21         that dislike?

22    A    I don't recall exactly.

23    Q    Do you have anything as you sit here today to

24         rebut an allegation by Mr. Delaney that he

MICHELE C. DECOSTE

1      told you that he did not want to follow a

2      money ticket quota system because he believed

3      it violated the law?

4                 MS. ECKER:  Objection.

5      Q    Go ahead.

6      A    I don't know.

7      Q    So the question that I'm asking is a little

8           bit different, though.  I'm not asking you if

9           you recall because I understand people forget

10          things.  I'm asking, as you sit here today,

11          are you saying that Mr. Delaney did not hand

12          you a copy of Abington Police Rule 7.0?

13     A    I don't recall that.

14     Q    So when you say you don't recall him handing

15          you a copy of Rule 7.0, do you mean that he

16          did not hand it to you or you don't recall if

17          he gave it to you or not?

18     A    I don't recall if he gave it to me or not.

19     Q    So that answer that you just gave, would you

20          agree that that does not mean that he did not

21          give it to you, but that you can't remember

22          if he gave it to you?

23                 MS. ECKER:  Objection.

24     A    I don't recall if he gave it to me or not.


                    MICHELE C. DECOSTE

1   Q   So is it possible that he did give it to you?

2   A   I don't recall.

3   Q   But in terms of your recollection -- I'm

4       asking about your recollection.  I'm asking

5       you, is it possible that he could have given

6       it to you, based on the conversation that's

7       referenced in Paragraph 22 in this complaint?

8               MS. ECKER:  Objection.

9   Q   Go ahead.

10  A   Anything is possible, but I don't remember

11      it.

12  Q   Who else was present during this role call?

13  A   I don't remember.

14  Q   Who were you supervising as of May 29th of

15      2013?

16  A   To be honest with you, I don't recall.

17  Q   Officer Gentile, was that someone that you

18      supervised at that point in time?

19  A   Yes.

20  Q   What is his first name?

21  A   Antonio.

22  Q   As you sit here, you don't have any

23      recollection about Mr. Gentile standing

24      adjacent to Mr. Delaney when he and you

1       number of supervisors, including yourself,

2       had concerns as to whether you could issue

3       money tickets to citizens?

4              MS. ECKER:  Objection.

5   Q   Go ahead.

6   A   I didn't have concerns.

7   Q   But officers were discussing this Newton

8       case, correct?

9   A   Yes.

10  Q   And you put in your statement that Mr. Owings

11      was going to talk to the Chief and Deputy

12      Chief about that same case?

13  A   Yes.

14  Q   So did you tell Officer Owings that you

15      didn't have any concerns about whether or not

16      the Abington Police Department was violating

17      the law?

18  A   I don't even really remember discussing it

19      with Sargent Owings.

20  Q   How did you come to understand that Sergeant

21      Owings was going to be the person to discuss

22      the applicability of the Newton case to the

23      Abington Police Department with the Chief and

24      Deputy Chief?

54

1    A    I don't recall if I was talking to the

2         Sergeant or if he brought it up.  I don't

3         recall exactly.

4    Q    So when you say -- actually, I'm not going to

5         ask that question.

6              There is a chart that is referenced

7         in the initial complaint on Page 6, Section

8         25.  Do you remember looking at that chart at

9         some point?

10   A    I do.

11   Q    And you reference in your statement that you

12        found that you did not print the chart, but

13        somebody else did?

14   A    Correct.

15   Q    Who is the person that created it?

16   A    Sergeant McCollem.

17   Q    Did you talk to him about it?

18   A    I asked him who wrote it.

19   Q    What did he say?

20   A    He said he did.

21   Q    Did he tell you why he wrote it?

22   A    No.

23   Q    On the chart, is it fair to say that it

24        referenced the amount of money tickets that

1       were being issued on Vernon and Chestnut

2       Streets?

3   A   Can I see the chart?

4   Q   Sure.

5   A   I'm going to show you what's marked as

6       Exhibit 4 to Chief Majenski's deposition.

7       Just turn right to it.  It's a chart that

8       says "Vernon Street, Chestnut Street," and

9       there is an up sign in the middle of that,

10      and there is a cash symbol, and after that

11      there is a down sign.  I'm going to hand it

12      to you.

13          MR. HIGHTOWER:  For the record,

14      it's Exhibit 4.  It's part of the first

15      amended complaint.  Exhibit 4 was marked at

16      Chief Majenski's deposition.

17  Q   Just tell me if the chart that I referred you

18      to that you're looking at now is the chart

19      that you're referring to in your statement?

20  A   Yes.

21  Q   And that chart references Vernon Street and

22      Chestnut Street?

23  A   Yes.

24  Q   Part of that chart also references CP.  I

1      violation versus another warning, right?

2    A   Correct.

3    Q   So wouldn't you agree that what you're saying

4        there is that for people who had received

5        multiple warnings and that was subsequently

6        stopped for potential motor vehicle

7        violations, that the Chief wanted the police

8        officers to issue that person a money

9        violation versus another warning?

10             MS. ECKER:  Objection.

11   A   He wished to see money violations versus

12       another warning.

13   Q   Now, based on that understanding, did you go

14       and talk to your subordinates about what the

15       Chief wished to happen regarding how money

16       citations were going to be issued to certain

17       citizens?

18   A   I basically went to role call and stressed

19       proactivity because proactivity I knew would

20       generate some type of activity.

21   Q   So based on what you write here in the same

22       text, you didn't say that the Chief wanted

23       the officers to be proactive, right?

24             MS. ECKER:  Objection.

1   wanted them to be proactive, correct?

2      MS. ECKER:  Objection.

3  A Can you repeat that?

4  Q Did you communicate to your officers that you

5   wanted them to be more proactive?

6  A Yes.

7  Q Certain of your officers communicated to you

8   that they did not want to be proactive in the

9   way that you wanted them to be?

10      MS. ECKER:  Objection.

11  Q Go ahead.

12  A I guess.  I never had any issues with any of

13   them.

14  Q So you stressed to Officer Delaney that you

15   wanted him to be proactive?

16  A Yes.

17  Q And he said that he disagreed with what you

18   wanted him to do?

19  A Yes.

20  Q And he wasn't the only officer that disagreed

21   with what you wanted him to do?

22  A I don't recall.

23  Q So why did you not specifically tell your

24   officers -- I'm sorry, let me ask you this

MICHELE C. DECOSTE

1       question:  Did you specifically tell your

2       officers that the Chief said if a person

3       received multiple warnings from this

4       department and was pulled over for a similar

5       violation, that he wished to see a money

6       violation versus another warning?

7   A   I may have.  I don't recall.

8   Q   I think we may be coming towards the end.

9       Give me a second here.

10

11              (Pause.)

12

13  Q   So at some point I think in your statement

14      you referenced on Page 7 of Section 6, 29 of

15      the initial complaint that -- well, before we

16      get into that -- well, okay.

17              So let's keep going through this.

18      At the end of the first page, which is 0458,

19      and 0459 begins, that text at the top that

20      we're talking about, who were the other

21      officers that you spoke to regarding what was

22      said during role calls?

23  A   Where are you?

24  Q   So go to your second page at the top.

```
 1           with Mr. Delaney on June 4th of 2013, you had

 2           yet to hear the term "money ticket quota

 3           system" at all, correct?

 4      A    Correct.

 5      Q    So you couldn't have told him that you did

 6           not want to see him get in trouble for not

 7           following the money ticket quota system,

 8           correct?

 9      A    Well, I never said "the money quota system"

10           is what I'm getting at.

11      Q    Right, you never said that?

12      A    No.

13      Q    My point is you couldn't have said that

14           because at that point as of June 4th of 2013

15           you had yet to hear that term used in the

16           Abington Police Department?

17      A    Yes, I never heard that, "money quota

18           system," used.

19      Q    So then, naturally, you would not have said

20           that to him?

21      A    Correct.

22      Q    That is what you meant by that sentence?

23      A    Yes.

24      Q    But you did say that you did not want him to
```

1          get into trouble?

2     A    Correct.

3     Q    Why were you concerned that Mr. Delaney was

4          going to get in trouble?

5     A    For not being proactive.

6     Q    How?

7     A    I've already explained that.

8     Q    Was it for not stopping cars?

9     A    Cars, yes.  Just doing CP.

10    Q    Well, let's break that down.

11              He's out on CP on June 4th of 2013

12         when you come across him, correct?

13    A    Correct.

14    Q    So he is doing CP?

15    A    Yes.

16    Q    And you already answered that you had no

17         information -- or you don't even have

18         information as you sit here today in 2016

19         that he had stopped cars as of the point in

20         time that you came across him on

21         June 4, 2013?

22    A    Correct.

23    Q    So in terms of being proactive, what else is

24         there?

MICHELE C. DECOSTE

1          authorized you to prepare that statement?

2   A   Did I have an understanding what?

3   Q   Did you presume that when the Deputy Chief

4       told you to put the statement together, that

5       the Chief would not disagree with you doing

6       it?

7   A   I don't presume.  I don't know.

8   Q   Okay, that's fair.

9          So Section 459 of the statement

10      here, on that page, the second page of the

11      statement, said, "I do believe I did stress

12      proactivity and may have made some references

13      to they wanting to see more money tickets

14      being issued"?

15   A   Correct.

16   Q   Who is "they" that you're referring to?

17   A   It would be the Chief and Deputy Chief.

18   Q   Going back to that June 4th meeting that you

19      had with Mr. Delaney on the roadside, if it

20      was determined that he was not being

21      proactive, from your perspective, what were

22      some of the things that could have happened

23      to him?

24   A   He could have been disciplined, I guess.

84

```
 1    Q    And what could that discipline include?

 2    A    Verbal warnings, written warnings.  I don't

 3         know.  I didn't give him any.

 4    Q    When you say you didn't give him any, you did

 5         tell him that you didn't want to see him get

 6         in trouble?

 7    A    Correct.

 8    Q    You didn't tell Mr. Delaney that he should

 9         not take that as a verbal warning to be,

10         quote, unquote, "more proactive," from your

11         perspective?

12    A    No.

13    Q    During that meeting, did Mr. Delaney tell you

14         that he believed issuing more citations for

15         fines to citizens instead of using his

16         discretion as he saw fit as an officer was

17         illegal?

18    A    I don't recall.

19    Q    In your meetings with the Chief or Deputy

20         Chief, did you discuss with them how

21         Mr. Delaney felt about the directives to

22         issue money citation to citizens?

23    A    I don't recall.

24    Q    Now, when you say you don't recall, do you
```

MICHELE C. DECOSTE

1    Q    Let me ask you about this fax machine

2         assignment.  I have a few more questions.

3                  When you were supervising

4         Mr. Delaney, did you ever tell him that

5         because he had not issued money citations to

6         citizens, that you were going to go out and

7         issue citations to citizens to make up for

8         the deficit that he caused?

9    A    No.

10   Q    Did you ever send emails to Deputy Chief

11        Cutter regarding the amount of citations that

12        people were issuing on your shift while

13        Mr. Delaney was observing you type those

14        emails?

15   A    While he was observing me type those emails?

16   Q    Yes.

17   A    No.

18   Q    Have you ever shown Mr. Delaney emails that

19        you were sending to Deputy Chief Cutter

20        regarding the total warnings or citations

21        for fines that your subordinates were

22        issuing?

23   A    I don't think so.

24   Q    So at some point in time, Mr. Delaney was

MICHELE C. DECOSTE

1        generally, yes.

2    Q   And would that be because of what's embodied

3        in that email?

4    A   Correct.

5    Q   Let's take a break for a few minutes.

6

7                (Short break.)

8    Q   Sir, I have a few more questions.

9    A   Okay.

10   Q   If an officer tells you that they believe

11       they had been instructed to follow an

12       unlawful order, what do you do?

13   A   I would probably pass that up to my Deputy

14       Chief or lieutenant.

15   Q   Are there any circumstances where an

16       officer tells you that they believe they've

17       been told to execute an unlawful order where

18       you would not pass that communication from

19       the officer on to the Deputy Chief or

20       lieutenant?

21   A   No.

22   Q   Why is that?

23   A   Why would I not?

24   Q   Yes.  Well, in other words, every time an

1      officer says this order is unlawful, are you

2      required to tell your Deputy Chief what that

3      officer said?

4  A   I'm not 100 percent sure if I'm required, but

5      I would.

6  Q   You would?

7  A   Yes.

8  Q   You would do that without fail, right?

9  A   I guess.

10 Q   Well, would you or not?

11 A   I just said I would.

12 Q   Aside from Mr. Delaney, have you ever told

13     other officers to program fax numbers at the

14     Abington Police Department?

15 A   No.

16 Q   In the Abington Police Department, is there

17     someone who -- what are they, the

18     administrative officers?

19 A   I....

20 Q   Are you familiar with the IT officer in the

21     Abington Police Department?

22 A   Are you talking about like -- what are you

23     talking about?

24 Q   Are there specific officers in the Abington

MICHELE C. DECOSTE