EX. 88

### Employment Background

I, Alex Kokoros, have been employed as a police officer for approximately 10 years.
I worked as a police officer for Curry College (Milton, MA) from February of 2005 until October of 2011. I attended the South Suburban Police Institute's (SSPI) Intermittent Police Academy. I was appointed a Special State Police Officer under MGL Chapter 22C Section 63. I was also appointed a Deputy Sheriff in Norfolk County. I completed all prescribed in-service training and also attended a week long supervisor training at the Massachusetts State Police Academy.
I was promoted several times during my employment at Curry College. I was first promoted to Residence Hall Security Supervisor in August of 2005. Around June of 2006 I became the Community Officer/Investigator. In June of 2007, I became a Shift Sergeant and served in that capacity for the remainder of the time I was employed by Curry College. I also briefly served as an advisor to a student organization, the Alcohol Safety Awareness Organization, served as a department representative to the college's Diversity Committee, and chaperoned several trips sanctioned by the school.
I became employed as a Police Officer by Lasell College (Newton, MA) in September of 2011. I was also appointed as a Middlesex County Deputy Sheriff while working at Lasell. Lasell College Police Officers also work police details in the city of Newton. Lasell College also runs a nursing home, rehabilitation center, and independent living complex which the Lasell College Police Department have jurisdiction over. Sometime in May of 2013 I received a letter indicating that I had been selected to begin the hiring process as a Permenant Intermittent Police Officer for Abington. Around June of 2013 Lasell College Chief Conlin appointed me Accreditation Manager and asked that I begin the process of attempting to have the department certified and eventually accredited by the Massachusetts Police Accreditation Commission. The Lasell College Police Department began providing police services to Mt. Ida College around August of 2013. I was promoted to Shift Sergeant in September of 2013 and continued to serve as Accreditation Manager for the remainder of my employment at Lasell-Mt. Ida College. While employed by Lasell-Mt. Ida College I completed all prescribed in-service training. The Transit Police provided our in-service training and firearms qualifications.
While working for Curry, Lasell, and Mt. Ida Colleges I completed over a thousand incident reports, conducted investigations, made arrests, assisted in court proceedings, referred offenders to internal judicial review, supervised police/civilian personnel, completed various aspects of payroll, hiring/employee reviews, coordinated responses with outside agencies, and numerous other duties/functions a typical police officer/supervisor would be responsible for completing.

On November 1st, 2013 I was officially appointed Permanent Intermittent Police Officer for the Abington Police Department. I began full-time employment with the Abington Police on 11/4/2013. During this time I worked as a dispatcher/desk officer until I began the full-time police academy, I was assigned to the 0800-1600 shift. I was officially appointed a full-time police officer from Civil Service around 12/6/2013. I attended the Boylston Police Academy from January 2014 through June 2014 and completed all aspects of the curriculum.

### Conversation with Kevin Cutter – December 2013

Sometime in December of 2013 while working on a Saturday 0800-1600 shift Officer Kevin Cutter began conversing with me regarding my experience in drug investigations while working at the colleges. I informed him that I had been involved in many drug investigations while working for the colleges and enjoyed the work that I had done in that area. Officer Cutter asked if I would be interested in working with him later on in my career if the opportunity were


Exhibit 7
Majenski
m.o. 1/26/16

available. I told him that I would be interested.

### Conversation with Shannon Reeves, July of 2014

Sometime in June of 2014 I learned through conversation with Officer Shannon Reeves that we, Joe Davern, Shannon Reeves, and I, had earned two weeks of vacation time for fiscal year 2014. Officer Reeves had stated to me that she was advised by Chief Majenski's secretary, Meaghan Geraghty, via internal email that she needed to use the time before July 1st, 2014 or the time would be forfeited. Officer Reeves stated to me she was advised by someone else that she could "give" her time to another officer to use and that the officer she "gave" her time to could then later turn around and "give" vacation time back to her. I was unaware of the fact that we had earned any time while in the police academy and informed her of the same. I expressed to her that I thought it was unfair that Officer Davern and I were not afforded the same opportunity but I was concerned about going to the administration and bringing this to their attention after just returning from the police academy.

I had formed the opinion that the Chief, Deputy, and his administration were not very approachable. I based this opinion, in part, on the fact that I had never actually met the Chief during the hiring process, I met him several weeks after starting work (sometime in December of 2013) by chance as he was passing through dispatch, had virtually no contact with anyone from the department throughout the police academy, and the fact that no one from our departments administration attended our graduation, although they were invited.

### Conversation with Tom Delaney in July of 2014

Sometime around July of 2014 I was assigned to work a day shift, 0800-1600, with Officer Tom Delaney. Officer Delaney was assigned as my Field Training Officer (FTO). It was the only day where we worked together over the course of my Field Training. I knew that Officer Delaney was the Union President and asked him about the fact that we (Officer Davern, Reeves, and I) had earned two weeks of vacation time for fiscal year 2014 and that I was concerned about the fact that I may have lost a week of it without being afforded the same opportunity to use it, give it away as Officer Reeves had done, or be paid out for it. I expressed my concerns over the fact that I did not believe the Chief, or the administration, were very approachable and the fact that I didn't want them to become upset that I just returned from the police academy and potentially perceive me to be causing an issue over vacation time. I had worked for other employers in the past where unions were a part of the work environment and had even held a position as Union Secretary in the past. I believed that Officer Delaney would likely have a closer working relationship with the Chief, and other administrators, and that he could likely have an informal conversation with them regarding the issue. I expressed my desire to have him attempt to resolve the issue by discussing it with them in hopes that it could be resolved. Officer Delaney asked whether I would be comfortable with filing a grievance over the issue and I told him that I would as I felt that it was important as the 7 days of vacation time would be time spent with my wife and children. I told Officer Delaney that I had no idea how much vacation time I had as I had never been notified by anyone regarding this. I informed him that the lists posted in the station with accrued time off by Meaghan had not been posted in some time and that the last one posted showed that I had not accrued any time.

### August 2014

Sometime in August of 2014 Officer Delaney stated that he was still waiting to see if Officer Davern wanted to go forward as well as the issue also affected him.

On August 18th I emailed Meaghan to inquire about the amount of vacation time I had accrued, if any, as my wife was due with our daughter, Payton, in the coming months and I had other

family obligations that would require time off. I received a response on the same day stating that I had "carried over" 7 days, that I had earned an additional 14 days on July 1st, and that I had used two days.

## October 2014

Officer Delaney submitted a grievance on my behalf on 10/10/2014. It is my understanding that Officer Delaney also submitted a grievance on behalf of Officer Davern for the same issue regarding the vacation time from fiscal 2014.

During the month of October I was not at work for most of the month as my wife suffered complications, developed a serious infection from her cesarean section, and was hospitalized. When I submitted an additional request for time off as a result of this I received a phone call on my cell phone from Officer Ronald Sweeney (from his cell phone) where he stated that I was going to upset people by taking time off even though my wife was in the hospital and I had no one else to care for my children, one of which was a newborn. Officer Sweeney stated that he didn't know whether I cared or not but that he thought I should try to find people to do swaps with instead because people were getting upset with me as a result of the overtime being assigned to them. I told him that while I cared I simply did not have the time to devote to trying to arrange to cover my own shifts.

## 11/14/2015 - Meeting with Chief Majenski

At around 07:55 hours Chief Majenski requested that the entire shift meet him in his office. Officer Reeves was excused and remained on the desk during this time. Officer Marquardt and I went into the Chief's office first and Sgt. Owings came in but left to attend to something else. I had formed the impression that Chief Majenski and Deputy Chief Cutter were not very approachable individuals. I did not get the opinion that they wanted to be involved with their employees. I had only met the Chief on a handful of other occasion since being hired and had never been in his office before. I did not get the impression from the Chief or Deputy that they wanted to be involved in the lives of their employees and felt that they only took notice if you did something wrong.

The Chief asked Officer Marquardt and I what our opinion of the traffic assignment we had received was. Neither of us replied and the Chief asked Officer Marquardt directly what his opinion was of the assignment. The Chief stated that I hadn't been here long enough to have an opinion. The Chief then asked if we thought it was punishment and Officer Marquardt thought it was punishment and he replied that he thought it was. The Chief then appeared to become irate and Sgt. Owings entered. The Chief then stated that he couldn't count on any of his supervisors to disseminate his instructions properly and went on about how his supervisors were not doing their jobs properly. Sgt. Owings then explained what he had stated to us the assignment was. The assignment was to be standing outside the schools, Frolio Middle & High School, from 0600-0800 hours and to get to know the students, parents, and staff in order to form relationships in hopes that they would feel comfortable approaching us with concerns that they have.

Sgt. Owings stated to the Chief that we had had a prior conversation where I expressed my interest in someday serving as a School Resource Office.

I had told Sgt. Owings that I really enjoyed working with college students and had served in a similar role as a Community Officer, and advisor to student groups, at Curry College. I told Sgt. Owings that I felt it would be similar working with students here in Abington and felt that we could really benefit from partnering with the youth in the community.

When Sgt. Owings told the Chief that I would be interested in this position eventually he immediately replied that I had not been there long enough, that other more senior officers would

be interested in this, and the more senior officers would be given the position before I would be considered for it.

The Chief then went on to say that the assignment was not supposed to be punishment, that we could go inside the building and have breakfast with the kids, and that we only needed to be there for the half hour prior to school opening.

Later, sometime between December 2014 and February of 2015, the traffic assignment was changed from just being present during the opening of school back to 0600-0800 hours. No one is present for the majority of this time at the schools. At one point I received a notification from the Assistant Principle at the Middle School regarding an incident that occurred. I told Sgt. Owings I believed that this was a result of the partnership I formed. Shortly after, within a week or two, our assignment was changed away from the schools to monitor intersections.

## February 1st, 2015 – Conversation with Officers Davern and Kalianiotis

After working a Comcast Detail I returned to the station to submit my slip. Officer Davern had just finished assisting someone at the window in dispatch and Officer Kalianiotis was working dispatch. Officer Davern stated that he was dropping his grievance as a result of being approached by the Deputy Chief and Chief regarding it. Officer Davern stated that he didn't want to make them mad and that the Chief had said he had heard Officer Davern was interested in a spot on the swat team. Officer Davern stated that the Chief stated to him that we had an open spot available and that if he kept his nose clean for the remainder of our probationary period that he may be able to explore that opportunity.

Officer Davern also stated that the Deputy Chief had brought him into his office and asked him to discuss the grievance without the union present. Officer Davern stated that he was planning on switching to the day shift, didn't want to make the Chief/Deputy Chief mad, and that he didn't really care about the vacation time as he didn't have any vacation time at his prior job. Officer Davern stated that as a result he had decided to drop his grievance.

*Officer Davern subsequently dropped his grievance and later told me that the Deputy Chief thanked him for doing so. Since dropping the grievance Officer Davern has been working overtime with Officer Cutter as a Detective.

## 2/18/2015 - Deputy Chief Cutter – Verizon Detail with Marshfield PD Officer Christopher Nichols

On 2/18/15 I was working a paid detail for Verizon, along with Officer Christopher Nichols of the Marshfield Police who was also present in his Dodge Ram pick-up truck, and we were awaiting their arrival at 30 Central Street (Emerald Hall Parking Lot). I had worked over a dozen details as an Abington Police Officer at this point. Sometime between 0900-0930 hours Deputy Chief Cutter pulled into the parking lot in his black unmarked Ford Explorer and pulled beside me. Deputy Cutter asked if I was working a detail today and I said that I was. Deputy Cutter then left. I found this to be odd as we are required to log on over the radio when we arrive at our details. I also believed it was odd because I had never been approached by any administrators during a detail assignment and the fact that we were off the road in the back parking lot of Emerald Hall made me feel as though the Deputy was seeking me out for some reason.

Officer Nichols and I met Verizon workers a short time later and were now in the parking lot of St. Brigit's, off Plymouth Street, when Deputy Cutter returned. Deputy Cutter asked that I come over and speak with him. Deputy Cutter then asked me what the deal was with the grievance I filed. I felt very uncomfortable with him approaching me without union representation present and was very nervous as I was a probationary employee.

I advised Deputy Cutter that I had filed the grievance as a result of my 7 days vacation time being taken away without payment at the end of June and the fact that I felt it was unfair that Officer Reeves was notified that she needed to use the 7 days and I was not. I stated that Meaghan had stopped posting the lists indicating how much vacation and personal time each officer had accrued sometime while I was in the police academy and that I had no idea how much, if any, time I had available as a result. I told Deputy Cutter that I was nervous about approaching him immediately after returning from the police academy and asking about my vacation time. Deputy Cutter replied, stating something to the effect of, "No, so instead you just came back and filed a grievance." I perceived his tone to be very argumentative and intimidating.

I attempted to explain that I had approached Union President, Officer Thomas Delaney, to inquire about how to resolve the matter as I felt it was the appropriate way to resolve disputes and that I was later informed that a grievance was filed on my behalf as a result. I stated that I did not directly file a grievance but that the union had filed on my behalf. Deputy Cutter stated that the grievance had my name on it and asked if I had seen it. I stated that I had not seen the grievance. He stated that it had my name on it and I said that I had been under the impression that it was filed on my behalf and that I would speak to the union regarding the grievance to get clarification on how it was filed, on my behalf or if it was said to be filed by me.

Deputy Cutter seemed to become agitated and stated that he did not feel that it was the job of the administration to explain my time off benefits. Deputy Chief Cutter stated that Meaghan was very busy at times and was not under any obligation to maintain the time off lists. Deputy Cutter stated that he felt it was the job of the union to do this and as a result he would be adding a meeting with the union to explain benefits to new officers as part of their Field Training in the future. Deputy Cutter then left.

Deputy Cutter returned a short time later and stopped while I was directing traffic, pulled beside me, and handed me a piece of paper. Deputy Cutter stated that it was a copy of the grievance filed. I thanked him for giving me a copy of it and said that I would look into it.

Throughout the day I expressed concerns to Officer Nichols that I would be retaliated against as a result by the administration from this point forward. I was very nervous and uncomfortable after speaking to Deputy Cutter. I felt so nervous, intimidated, and uncomfortable that I considered dropping the grievance as Officer Davern had done because I felt as though I would likely be retaliated against if I didn't.

I have never on any other occasion been approached by any administrator of the department while working a detail.

### 2/18/2015 - Conversation with Officer Gerard Julien-Suarez (union official)

That afternoon when my detail was complete, sometime between 1400-1600 hours, I approached Officer Julien-Suarez who is also an elected official on the union and advised him of the above. I told him I was very nervous about what happened and uncomfortable about the Deputy approaching me. I expressed concerns that I would be retaliated against as a result. I told Officer Julien-Suarez that I had concerns over the fact that the grievance was filed so late and that it had my name right on it. I had never filed a grievance and did not know how a grievance was submitted when it was submitted on your behalf. I expressed concern over the fact that the grievance stated that I did not receive the vacation time but that I believed that I may have technically received it without my knowledge but that I had lost it as a result of not using it. Essentially, I did not think it was accurately reflecting what had taken place. I told Officer Julien-Suarez that I was thinking about withdrawing the grievance. Officer Julien-Suarez expressed concerns over how the grievance was filed. I told Officer Julien-Suarez that I was

going to speak with President Delaney and he said he was going to do the same.

### 2/18/2015 - Conversation with Thomas Delaney (union president)

I approached Thomas Delaney when I returned to work at approximately 2345 hours on 2/18/15. We spoke in the locker room of the police station. I advised him that I did not understand the grievance process and what it meant to file on my behalf. I also explained that I didn't understand the generalization that was made in the language of the grievance. Delaney explained the process to me in detail. I told him that I now understood the process and was comfortable with going forward.

Delaney told me that Deputy Cutter should not have approached me regarding the grievance as he did and I expressed my concerns about Deputy Cutter doing so. I told Delaney that I was very nervous and intimidated by Deputy Cutter's actions. I also stated that I believed that Deputy Cutter was acting on behalf of Chief Majenski when he did this and that I did not believe that Deputy Cutter took it into his own hands to approach me like this.

### 2/19/2015 - Conversation with Officer Julien-Suarez

I spoke to Officer Julien-Suarez around 0800 hours on 2/19/15 and advised him that I had spoken to Delaney and was comfortable with going forward but nervous that I would be retaliated against.

### 3/6/2015 - Day of Union Election

On 3/6/15 our local was holding elections again as a result of some people challenging the way our last election was held as they believed it was not done in accordance with by-laws.

At around 0800 hours Officer Ron Sweeney approached me at Roll Call and began telling me that I needed to vote for Jake Poulin for President because the Chief would not work with Delaney. Sweeney stated that as a result of Delaney filing grievances and complaints with the Attorney General over actions taken by the Chief, and administration, that we would all continue to suffer adverse consequences. I observed Officer Sweeney approach numerous others in efforts to spread similar messages lobbying for Jake Poulin.

After the vote took place many people were speculating over how each person voted and spreading this gossip throughout the department. Officer Brian Solimini approached me at one point and stated that I voted for Delaney and that as a result was exacerbating the problem. Solimini stated that he felt we would all continue to pay the price of Delaney being elected president by the Chief.

Solimini had also filed grievances while he was in the police academy but when he returned from the training he withdrew them.

### 3/25/2015 - Chief Majenski and Deputy Chief Cutter approach me at Dispatch

On 3/25/2015 I was working dispatch on the 0800-1600 shift when I was approached sometime that afternoon, between 1200-1400, by Deputy Cutter and Chief Majenski. Chief Majenski asked me if I was happy here. I said that I was because I was afraid that if I said anything else he would use that against me as I was still on probation. Chief Majenski then asked if I had any intentions of transferring. I told him that I had been accepted to the Massachusetts School of Law for the fall and intended to stay where I was while I attended. Chief Majenski then stated that he had heard that I was the most disgruntled employee in the department and that I intended to quit to return to work at a college again as soon as next week. Chief Makenski stated that he needed to know whether this was true or not so that he could properly prepare his budget and anticipate any vacancy. I again told him I had no intention of leaving. Chief Majenski and Deputy Cutter then left towards their offices. Chief Majenski returned after Deputy Chief Cutter had left and stated, "I'm not going anywhere either, just so you know." Chief Majenski then left dispatch towards his office and did not return.

I perceived Chief Majenski's tone, mannerisms, and approach to be extremely intimidating. I also believed that the fact he had Deputy Chief Cutter with him was very concerning.

### 3/26/2015 - Conversation with Chief Majenski in locker room

On 3/26/15 I accepted a detail in the Town of Rockland for Comcast and went to the Abington Police Station to get my gear. At around 0930 hours I arrived at the station and saw Chief Majenski talking to Officer Poulin in the hallway. I went into the locker room and was approached by Chief Majenski. Chief Majenski initiated a conversation by stating something to the effect of, "That was a good talk we had yesterday." I replied by saying something to the effect, "I don't think so, I don't think it's a good thing when the head of your organization who doesn't usually engage you in conversation approaches you and says that he heard that you are the most disgruntled employee and are looking to leave." Chief Majenski stated that he was not worried about it and that he was looking to see if it was true or not and that everything was all set as a result of our conversation.

I asked where the rumor was coming from and he said not to worry about it. I stated that with all due respect I was worried about it. I asked that he tell me who was saying this and he said that he would not and not to worry about it.

Chief Majenski stated that he understood that things were difficult at the moment at work and that he was concerned with Delaney's tactics as union president. I told Chief Majenski that when I returned from the police academy I did not know that there was a strained relationship between him and Delaney. I stated that I believed from past union involvement that the union leadership usually has a relationship with the administration where they can approach them and discuss things in an effort to resolve them. I told Chief Majenski that it I believed that I was doing the right thing by approaching Delaney about my vacation time and that I did not know how the Chief would've received me approaching him directly. I informed Chief Majenski that I did not think he was very approachable. Chief Majenski stated that he would've preferred that I came to him.

Chief Majenski stated that he was concerned that Delaney had a personal vendetta against him and that he would not be able to work with him. Chief Majenski stated that Delaney had not given him the opportunity to discuss the grievances before filing them and just came in and filed multiple grievances. Chief Majenski then explained how in the past the union would work with the Former Chief and had gone to dinner with the Chief to discuss the contract and that they had a positive relationship. Chief Majenski stated that he did not feel that the union had a positive relationship as it had in the past and that things would be difficult for some time. Chief Majenski stated that we had someone who lived in his parent's basement making decisions that would affect us.

I explained to Chief Majenski that my grievance was not meant to further any agenda or as a personal attack. I stated that it was a result of my belief that I was entitled to be paid for that time or to use that time. Chief Majenski asked me why I felt entitled to the vacation time as he believed I was not. Chief Majenski stated that I was not employed there for 30 weeks and should not have received any time. Chief Majenski stated that I started working there on, or around, November 14th, 2013. I informed Chief Majenski that I had actually started full-time work on 11/4/2013 and was not sure why I wasn't in attendance in IMC for that day. Officers Reeves and Davern were also present that day. We went over policies and procedures in the roll call room for the entire day then attended training in Maynard, MA for the remainder of the time prior to beginning our shifts at dispatch. I also expressed my concern that Officer Reeves had been afforded notice that I was not. Chief Majenski stated that he was simply trying to be nice in

granting that to Officer Reeves and regretted it.

I told the Chief that based upon all the things that have taken place I would have gone to him had I known that this is what he wanted. I told him that if I could go back and do it again I'd come to him first. Chief Majenski stated that he felt if I had we likely could have worked something out but now there is a process that will work it out. I told him that I was interested in working it out and moving on as my intention was not to waste his time or the town's time or money. Chief Majenski stated that the process would now work things out.

The Chief also stated that everyone seems to think that he has approximately 5 years left on the job and that while it is true that he could retire in that timeframe he may just stay "out of spite" for 10 years. He stated that he may stay out of spite twice.

The Chief had also asked me whether I would be interested in being part of group that would meet with him occasionally to discuss how things are going and identify issues to help resolve them. The Chief stated that he was hoping to have someone from each shift be part of this and meet occasionally to discuss things. I said I would be but asked whether he felt I had not been there long enough. The Chief stated that over half of our department had been on the job for less than 5 years and he didn't think it was relevant.

Prior to leaving Chief Majenski asked me to think about where I wanted to go in my career and what path I wanted to take. Chief stated that when I figured out what path I wanted to take to come back and see him and he would provide me with some guidance on how to go about getting there.

**4/7/2015 - Officer Brian Solimini Attending School Resource Officer Training**
Officer Solimini returned from the police academy on 2/16/15 and went to School Resource Officer Training on 4/7 and 4/8. Officer Solimini went to additional training for that position the week of 6/8 through 6/12/15. There are other employees who are more senior to him that have interest in the position other than myself but the department lacks any sort of merit based promotion or assignment protocol. The Chief doesn't even ask that those interested in available positions apply or send a letter of interest. The Chief doesn't even attempt to give the impression that assignments or promotions are done in a fair and equitable manner. This is true in all positions such as matrons, auxiliary police, administrative assistants, as well as police positions.

**4/22/2015 - Conversations with Officer Julien-Suarez regarding Court Prosecutor position**
On 4/22/15 at approximately 1600 hours Officer Julien-Suarez came into dispatch where I was assigned for that shift and asked me if I'd be interested in taking over his position as Court Prosecutor when he left. Officer Julien-Suarez is awaiting Chief Majenski's signature for a transfer to West Bridgewater. Officer Julien-Suarez stated that Officer Poulin was able to select his replacement when he became Station Administrator/Property Control Officer and selected Officer Julien-Suarez. Officer Julien-Suarez stated that he was under the impression that he would need to identify someone to take over his position and thought that I would be the best suited person for the position. I informed him that I would be extremely interested in the position as I am looking to go in that direction eventually as I am slated to attend law school in the fall. Officer Julien-Suarez stated that this is why he thought I would be well suited for the position as well as the fact that I have experience as a police officer from the college's and have a Master's Degree. Officer Julien-Suarez stated that he would talk to the Chief and recommend me to replace him.

4/28/15 – I asked Officer Julien-Suarez about whether he spoke to the Chief and he stated that he was told by the Chief that he couldn't leave. I was contacted by IBPO Attorney Dever on this same date and offered two days of my vacation time back for the seven that were taken if I agreed to drop the grievance and forgo arbitration. Attorney Dever recommended I settle

because it was not filed in a timely manner (within 30 days as stipulated by contract).

On 5/22/15 Officer Julien-Suarez stated that he was told that Officer Delaney would be replacing him as Court Prosecutor and that the Chief had again agreed to let him leave for West Bridgewater at a TBD date. Officer Delaney later told me that Officer Julien-Suarez asked if I could replace him but the Chief stated that I did not have enough experience. Officer Delaney later sent the Chief a letter through internal email attempting to decline the position because he did not want it and others have been allowed to decline assignments such as this but Delaney stated that the Chief refused to allow this.

On 5/24/15 Acting Sergeant Ron Sweeney approached me in dispatch and stated that he thought I would be great as Court Prosecutor and probably would've got the position if Delaney wasn't Union President and if I hadn't voted for him. Sgt. Sweeney stressed that it wasn't too late to change course and remove Delaney as President. Sgt. Sweeney stated that things can still change if we get Delaney out of there.

Sgt. Sweeney was slated to leave for transfer to West Bridgewater in December of 2014 but something didn't work out. A short time later, somewhere around the end of December, our department responded to a 911 call involving, then Officer Sweeney, causing a disturbance at a local restaurant. Then Officer Sweeney was placed in protective custody for intoxication. Sweeney has continued to lobby against Delaney as union president and I believe it is being done at the direction of the Chief. Sweeney was suspended as a result of his behavior but then promoted to Acting Sergeant shortly after the March 6th, 2015 union election. Acting Sergeant Wayne Paige was demoted prior to promoting Sweeney. Paige had supported Delaney and this was said to be known by the administration.

On 5/29/15 I requested to meet with Chief Majenski. I met with Chief Majenski and Deputy Chief Cutter at approximately 0930 hours in Chief Majenski's Office. I advised him that I wanted to express interest in the Court Prosecutor position as the Chief asked me to think about where I wanted to go in terms of my career path and that I intended to complete law school and was extremely interested in the Court Prosecutor position. The Chief chuckled and stated that it was good to know that I was interested in that but that he would not consider me for it as I did not have any experience. The Chief stated that I didn't even know how to read a police report. It should be noted that I was responsible for approving police reports as a Sergeant at all of the College's I worked for just as Sergeants do in Abington. The Chief stated that I should learn my job first by getting out there and being proactive. The Chief stated that he thought it was odd that I wanted to become a Court Prosecutor as it was an odd career goal. The Chief stated, "You know you're a police officer, right?" I was extremely offended by his comment as I believe was his intention. The Chief then thanked me for coming in and letting him know I was interested in the position. I then left and returned to dispatch.

5/29/15 – Officer Julien-Suarez approached me in dispatch towards the end of the shift and stated that he had called the Chief but he didn't answer and was going to ask him to allow me to be trained as back-up Court Prosecutor. While speaking with me in dispatch Officer Julien-Suarez' phone rang and he stated that it was the Chief. Officer Julien-Suarez left dispatch to take the call. Officer Julien-Suarez returned a short time later and stated that he told the Chief that he thought we should train a back-up for Delaney. Officer Julien-Suarez stated that the Chief agreed. Officer Julien-Suarez stated that he then said he thought I would be a good back-up as I'd expressed interest and he stated that the Chief replied that he felt we should hold off for now and he'd cross that bridge at a later time in terms of back-up Prosecutor. I thanked Officer Julien-Suarez for his efforts.

### 7/24/2015 - Conversation with Chief Majenski – Transfer Interest/other opportunities

On June 24th, 2015 I requested to meet with Chief Majenski by email. Chief Majenski stated that he would be in the office at around 1215 hours. I then met with him and stated that I wanted to meet with him so that he was not taken aback if he received a phone call from someone requesting a reference for me. I stated that I had been exploring other opportunities. Chief asked me, what kind of opportunities? He stated that I better not even mention transfer because it wasn't going to happen. Chief stated that he would never under any circumstance authorize a transfer for me, ever. I said that a transfer was one option that I had considered but that I had also submitted letters of interest to colleges, universities, non-law enforcement, and non-civil service departments. The Chief replied that I could definitely go to one of those places but that he would never grant me a transfer. I asked him why and he stated that he wasn't in a position to authorize one and that as long as he is Chief I will never receive authorization from him for one. I told the Chief that the money is very low here and I would like to work for a much larger department with more specialization and opportunity. The Chief stated that he understood and had wanted to work in Barnstable which is a much larger department but that it didn't work for his family. The Chief also discussed the fact that he derived his management style from a former Barnstable Chief.

Chief stated that he would be disappointed to see me leave as I've been a good employee and he's never had any issues with my work quality. Chief further stated that he had nothing but good things to say about me and would give me a positive recommendation as long as I do not change who I am. The Chief strongly recommended that I do not begin to use excessive amounts of sick time as he believes that this is something that perspective employers will look negatively upon and stated that sick time use hasn't been an issue for me.

We also discussed the fact that I believe that I feel that we need to start working together and stop the internal conflicts that are taking place. The Chief stated that he doesn't have a horse in the race and that we as union members need to work on that if we want to. The Chief stated that he is going to keep doing his job. The Chief stated that he believes that some people think that he is going to be removed as Chief soon but that he was appointed a Strong Chief and he is not going anywhere.

We further discussed the fact that other more affluent departments still fund education incentives and the Chief said that he believes that education is a critical component to this job. I stated that I agreed and that it was unfortunate that I could be paid significantly more in other places. The Chief agreed and stated that he felt that I could make more and have less aggravation if I chose to go back to working for a college or university. I stated that I would also receive educational benefits for my three children. I informed the Chief that I did not view leaving municipal law enforcement as the ideal or desired situation but felt that it was something I needed to explore. I thanked him for his time at the end of this and returned to work.

I believe that he is refusing to allow me to transfer, in part, because I filed the grievance regarding my vacation time and refused to withdraw it after his attempts to intimidate me into doing so as he had done with others. My belief was furthered by the fact that the Chief stated that he had no issues with my work or the job that I was doing. If there are no issues with me as an employee then why would he be holding me back from opportunities?

### 7/1/2015 - Conversation with Kevin Cutter

At approximately 1300 hours I spoke to Kevin Cutter at dispatch and stated that I had been meaning to ask him why he had asked me several times if I'd be interested in assisting him with

Detective work that he was conducting and I told him that I would be interested but then nothing ever transpired and he began working with other people. Kevin Cutter stated that he was told to find someone to that would be interested in working with him after Sweeney was promoted to Acting Sergeant. Kevin Cutter asked me if I'd be interested again at that time and I said I would be. Kevin stated that he mentioned that he wanted to work with me and said that he couldn't really get into it further. Kevin stated that he was given the ok to work with Joseph Davern. Davern was my classmate and filed the same grievance as I did but withdrew it. I believe that this was intentionally done to send a message to me that I should've done as Davern did and withdrawn the grievance.

## Health Issues

Prior to working for the Abington Police I had weighed the same, or more, than after becoming hired. I did not exercise often either. I began working out and running just prior to working for the Abington Police. I also had worked similar schedules. I worked overnights for several years prior to working in Abington and typically worked well beyond 40 hours per week.

Since returning from the police academy and working in Abington I have experienced several medical issues that I believe are a result of stress and work conditions caused by Chief Majenski and his retaliation against me, and the entire department.

My doctor had become concerned about my blood pressure sometime around December of 2014 and had been monitoring it. I had to begin taking blood pressure medicine sometime around February of 2015 to treat high blood pressure. I took the medication for several months but still felt as though the medication was not working. The medication I had been prescribed was a low dose medication. I returned to see my doctor in June of 2015 and was put on a stronger, higher dose, medication. I told my doctor that I was enduring what I believed to be a large amount of stress at work that had nothing to do with my job but was instead a result of the administrators that I worked for. My doctor stated that it sounded to her as though my work was making my physically sick. I agree with her.

Sometime around February of 2015 I also experienced kidney stones.

## 7/4/2015 Conversation with Sergeant Matthew Owings

Sometime around 0400 hours I met Sgt. Owings at the Abington Ale House parking lot and expressed my concerns over the fact that Kevin Cutter basically confirmed that I was being retaliated against by the Chief, in my opinion, because of the fact that he was told he couldn't work with me.

Sgt. Owings stated that Kevin Cutter had also asked him to work with him at some point in the past and that Sgt. Owings was aware of what he called "an authorized list" of people eligible to work with Kevin Cutter.

Sgt. Owings also stated that he had been instructed to enforce retaliatory actions against officers in the past for filing complaints and grievances.

## General Retaliatory Actions

Since Delaney filed complaints with the Attorney General's Office and Town Manager regarding ticket quotas being imposed by the Chief we have had our Court Time changed in violation of our contract, we have been given three hours of traffic assignments per officer, per shift, new officers are now required to pay the cost of tuition for the police academy, new hires cannot start working prior to the academy, and we no longer allow Permanent Intermittent Officer's to work for our department. We are also no longer allowed to take department vehicles to training and are not paid for commuting to training. We are also required to have instructors sign our overtime slips and put a time on them. These changes were all made almost immediately after Delaney filed the grievances and actions against the Chief.