EX. 102

## Page 1

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS.                    SUPERIOR COURT
                               DEPARTMENT


* * * * * * * * * * * * * * * *
TOM DELANEY,                    *
         Plaintiff              *
                                *
VS.                             *   DOCKET NO.
                                *   2015-00423
THE TOWN OF ABINGTON, DAVID     *
MAJENSKI, CHRISTOPHER CUTTER,   *
and KEVIN SULLIVAN,             *
         Defendants             *
* * * * * * * * * * * * * * * *


        DEPOSITION OF THOMAS DELANEY, taken on behalf of
the Defendant, pursuant to the applicable provisions of
the Massachusetts Rules of Civil Procedure, before Ruth
E. Hulke, CSR No. 114893 and Notary Public for the
Commonwealth of Massachusetts, at Kopelman and Paige,
P.C., 101 Arch Street, Boston, Massachusetts, on Monday,
December 21, 2015, commencing at 10:00 a.m.

APPEARANCES:

    DEBORAH L. ECKER, ESQ., of Kopelman and Paige, P.C.,
101 Arch Street, Boston, Massachusetts, 02110, on behalf
of the Defendant.

    JOHN J. HIGHTOWER, ESQ., 90 Pleasant Street, Suite
12, Randolph, Massachusetts, 02368, on behalf of the
Plaintiff.

ALSO PRESENT:  David Majenski
               Christopher Cutter
               LEAVITT REPORTING, INC.

## Page 2

                    I N D E X
WITNESS     DIRECT  CROSS  REDIRECT  RECROSS
Thomas Delaney  3



                  E X H I B I T S

NUMBER                              PAGE
  1  Complaint and Jury Trial Demand      4
  2  Delaney Affidavit        152
  3  Plaintiff's Answers to Defendant's
     Interrogatories          152

  4  Plaintiff's Supplemental Answer to
     Interrogatory 11         152
  5  Handwritten notes        230

LEAVITT REPORTING, INC.

## Page 3

PROCEEDINGS

        MS. ECKER:  Reserve all objections, except as
to form, until time of trial.  The same with motions to
strike.  The witness will read and sign the deposition
transcript, waiving filing and notary.

        He is reserving the right to object on the
record for attorney/client privilege and work product.

        THOMAS DELANEY, having been identified by his
U.S. Government Marine Corps identification and duly
sworn, testified as follows in answer to direct
interrogatories by Ms. Ecker:

    Q.  Good morning, Officer.

    A.  Good morning.

    Q.  Could you state your name for the record?

    A.  Thomas Delaney.

    Q.  You're here today to have your deposition
taken.  Have you ever been deposed before?

    A.  No, I have not.

    Q.  You have testified in court before, I assume?

    A.  Yes, I have.

    Q.  Similar, but as you can see, there's a
stenographer here today.  She's taking down everything
that is said.  So, if you can, all your responses must be

LEAVITT REPORTING, INC.

## Page 4

verbal.  The shaking of heads, um-hmms aren't recorded
well in a transcript.  Likewise, if you can let me finish
my question, I will try to let you finish your answer.
It becomes difficult, you'll see, but I'll try to remind
you as you go along.  If at any time you want to take a
break, all I ask is that you answer the question that is
pending.  Do you understand you're under oath here today?

    A.  Yes.

    Q.  If at any time you don't understand one of my
questions, please ask me to rephrase.  If you answer the
question, I will assume that you understood it.  Fair
enough?

    A.  Yes.

    Q.  I am going to have the stenographer mark an
exhibit.

        (Document marked Exhibit No. 1 for Id.)

    Q.  I'm going to show you what has been marked as
Exhibit 1, and I have copy for your attorney.

        Do you recognize Exhibit 1 as a complaint that you
have filed?

    A.  Yes, I do.

    Q.  In this complaint you talk about a Money Ticket
Quota System.  Is that correct?

LEAVITT REPORTING, INC.

Page 5

1    A.  Yes, I do.
2    Q.  When is the first time you heard the phrase
3  Money Ticket Quota System?
4    A.  The first time that I heard the phrase money
5  ticket, I was ordered to write money tickets back in May
6  of -- the end of May, 2013.
7    Q.  My question is when is the first time you heard
8  the phrase Money Ticket Quota System.
9    MR. HIGHTOWER:  Objection to the extent it
10  calls for information as to attorney/client privilege or
11  work product.
12    Q.  You can answer.
13    A.  I had the conversation with my attorney
14  explaining what had occurred --
15    Q.  No, no.  All I want to know is when is the
16  first time you heard the phrase.  You write in here Money
17  Ticket Quota System.  When is the first time you heard
18  that phrase being used?
19    MR. HIGHTOWER:  Objection.  Form of the
20  question in terms of what he wrote in there.
21    Answer the question to the extent that it
22  doesn't pertain to conversations between yourself and
23  myself.

LEAVITT REPORTING, INC.

Page 6

1    A.  All right.  Based on what occurred, I believe
2  that Money Ticket Quota System had occurred based on
3  orders that I received.
4    Q.  I'm asking you specifically about the phrase
5  Money Ticket Quota System.  Did you hear that phrase when
6  you were in the police academy?
7    A.  No, I did not.
8    Q.  Did you hear that phrase the first year you
9  were employed by the Town of Abington?
10    A.  No, I did not.
11    Q.  Did you hear that phrase the second year you
12  were employed by the Town of Abington?
13    A.  No, I did not.
14    Q.  What about the third year, did you ever hear
15  the phrase Money Ticket Quota System being used the third
16  year you were employed by the Town of Abington?
17    A.  No, I did not.
18    Q.  How many years have you been employed by the
19  Town of Abington?
20    A.  It would be since, I believe, November of 2010.
21    Q.  Prior to filing the complaint that we're here
22  to discuss today, I believe you filed it in May of 2015,
23  did you ever hear the phrase Money Ticket Quota System?

LEAVITT REPORTING, INC.

Page 7

1    A.  Not in those exact words, no.
2    Q.  Have you ever heard the phrase Money Ticket
3  Quota System being used in the Town of Abington?
4    MR. HIGHTOWER:  Objection.  Form of the
5  question.
6    A.  No, I have not.
7    Q.  Did you make up the phrase Money Ticket Quota
8  System?
9    MR. HIGHTOWER:  Objection.  Form of the
10  question.
11    A.  No.  That's the form of what occurred based on
12  being ordered to write money tickets in the form of a
13  ticket quota system which I believe a reasonable person
14  would say had occurred.
15    Q.  I'm asking about the phrase itself.  Is that a
16  term that you created?
17    A.  It's an explanation of what occurred, yes.
18    Q.  That's a phrase, though, that you created.
19  Correct?
20    MR. HIGHTOWER:  Objection.  Form of the
21  question.
22    A.  No.  That would be between speaking with myself
23  and the lawyer.

LEAVITT REPORTING, INC.

Page 8

1    Q.  Your lawyer being Hightower?
2    MR. HIGHTOWER:  You can answer that.
3    A.  Yes.
4    Q.  When you used the phrase Money Ticket Quota
5  System, what is the quota you're referencing?
6    A.  The quota that I'm referencing is that I was
7  ordered to write more money tickets than warnings.
8    Q.  Were you ever ordered to write a specific
9  percentage of money tickets?
10    A.  Yes.
11    Q.  What was the percent?
12    A.  Over 33 percent.
13    Q.  Who told you to write over 33 percent of money
14  tickets?
15    A.  That would be Sergeant Owings who was ordered
16  by Lieutenant Sullivan.
17    Q.  Did you hear Lieutenant Sullivan order Sergeant
18  Owings to tell you to write more than 33 percent of money
19  tickets?
20    A.  No, I did not.  Sergeant Owings informed me
21  that Lieutenant Sullivan told him that.
22    Q.  Have you ever written 33 percent money tickets?
23    A.  No, I have not.

LEAVITT REPORTING, INC.

Page 9

1    Q.  Have you ever been disciplined for not writing
2  33 percent money tickets?
3    A.  Not disciplined, but retaliated against, in my
4  belief.
5    Q.  Have you ever been disciplined for not writing
6  33 percent money tickets?
7    MR. HIGHTOWER:  Objection.  Form of the
8  question.
9    A.  I don't understand the question.  Disciplined
10  in regards to what?
11    Q.  For not writing more than 33 percent of the
12  tickets that you issued as fine citations.
13    A.  I've never been told that I was disciplined for
14  33 percent.
15    Q.  Has anyone told you a specific number of
16  tickets you need to write?
17    A.  Yes.
18    Q.  Who?
19    A.  Sergeant Carini.
20    Q.  How many tickets has Sergeant Carini told you
21  you needed to write?
22    A.  Sergeant Carini explained to me that the Chief
23  and Deputy Chief wanted more money tickets than warnings
LEAVITT REPORTING, INC.

Page 10

1  and that we were not allowed to not -- to get at least
2  one ticket.  So it was explained to me that the
3  percentage of money tickets would have to be more than
4  that percentage of warnings.  So I would say I at least
5  have to get one money ticket per shift.
6    Q.  Is it Sergeant Carini?
7    A.  Yes.
8    Q.  Did Sergeant Carini tell you a specific number
9  you had to write of money tickets per shift?
10    A.  At least one money ticket.
11    Q.  Did you write at least one money ticket per
12  shift?
13    A.  No.
14    Q.  Have you ever been disciplined for not writing
15  at least one money ticket per shift?
16    MR. HIGHTOWER:  Objection.  Form of the
17  question in terms of discipline.
18    Q.  Do you understand what the term discipline is?
19    A.  In terms of discipline, like I said, I believe
20  I have been retaliated against for that on other bases
21  all the way through this, since that occurred.
22    Q.  Officer, do you understand what the term
23  discipline means?
LEAVITT REPORTING, INC.

Page 11

1    A.  I'd say discipline in the form of, like, a
2  verbal warning or a suspension or fired, no, I have not.
3    Q.  Have you ever heard the Chief tell anyone in
4  the department a percentage of money tickets that they
5  must write?
6    A.  No.  But I've seen e-mails in which the Chief
7  was cc'd.
8    Q.  Is it your testimony those e-mails tell you a
9  specific percentage of tickets that officers must write?
10    A.  Yes.
11    Q.  Have you produced those e-mails to me?
12    A.  Yes.
13    Q.  Are those e-mails from the Deputy Chief?
14    A.  Yes, they are.
15    Q.  So is it your testimony that the Deputy Chief
16  said a percentage of money tickets that each officer must
17  write?
18    A.  Yes.
19    Q.  What's the percentage?
20    A.  More money tickets than warnings, which would
21  be more than 50 percent.
22    Q.  Has the Deputy Chief ever told anyone it needs
23  to be more than 50 percent?
LEAVITT REPORTING, INC.

Page 12

1    MR. HIGHTOWER:  Objection.  Form of the
2  question.
3    Q.  Have you ever heard the Deputy Chief tell
4  anybody that they need to write more than 50 percent
5  money tickets?
6    MR. HIGHTOWER:  Objection.  Form of the
7  question.
8    A.  I haven't heard, but I've seen it in the cc as
9  well as passed down through the Sergeants to myself.
10    Q.  Which Sergeant has ever told you that you
11  needed to write at least 50 percent money tickets?
12    A.  That would be Sergeant Carini.
13    Q.  He specifically said more than 50 percent?
14    MR. HIGHTOWER:  Objection.  Form of the
15  question.
16    A.  Yes.
17    Q.  Have you ever heard the Deputy Chief put a
18  number to that?
19    MR. HIGHTOWER:  Objection.  Form of the
20  question.  Asked and answered.
21    Q.  Have you ever heard the Deputy Chief ever tell
22  you a specific percentage of money tickets you needed to
23  write?
LEAVITT REPORTING, INC.

Page 13

1    A.  No, I have not.
2    Q.  Has the Chief ever told you which motorists
3  that you needed to pull over for traffic enforcement?
4    A.  He said in specific locations, that would be
5  the assignments to whatever location we were at.
6    Q.  Has he ever told you specific individuals you
7  needed to pull over?
8    A.  No. But I did have a conversation with him in
9  regards to, I believe it was a female party in the Town
10  of Abington that he said that I issued a warning to and I
11  should have issued a civil citation to her because she
12  had multiple warnings.
13    Q.  Has the Chief ever told you what speed you
14  needed to pull a motorist over for?
15    A.  No.
16    Q.  How do you determine when to pull a motorist
17  over for speeding?
18    A.  Whenever I see a civil infraction, I pull them
19  over.
20    Q.  Is there a certain number of miles above the
21  speed limit that you use as a threshold to determine
22  whether to pull a motorist over?
23    A.  Yes.  I was trained in the academy by Attorney
              LEAVITT REPORTING, INC.

Page 14

1  Patrick Rogers that radar guns are reliable up to, like,
2  three miles per hour give or take, three miles per hour
3  up or below that, and usually around 10 miles per hour
4  I'll initiate a motor vehicle stop.  Depends on the
5  circumstances as well as based on my estimation of the
6  vehicle.
7    Q.  Has the Deputy Chief ever told you how many
8  miles over the speed limit you should use as a threshold
9  to pull motorists over?
10    A.  No, he's not.
11    Q.  Has Lieutenant Sullivan ever told you any type
12  of threshold you should use in order to determine whether
13  to pull motorists over?
14    A.  No, he has not.
15    Q.  Has Lieutenant Sullivan ever told you a certain
16  percentage of money tickets you should issue?
17    MR. HIGHTOWER:  Objection.  Form of the
18  question.
19    A.  He said a percentage of 33 percent money
20  tickets, passing it down, by ordering Sergeant Owings to
21  inform me to write more than 33 percent money tickets.
22    Q.  Let me see if I understand it.  Did you ever
23  hear Lieutenant Sullivan tell Sergeant Owings that you
              LEAVITT REPORTING, INC.

Page 15

1  needed to write 33 percent money tickets?
2    A.  No, I did not.
3    Q.  Did Sergeant Owings tell you that the
4  Lieutenant said that?
5    A.  Yes.
6    Q.  When did the Lieutenant say that?
7    A.  I believe that was in March of 2014.  On or
8  about.
9    Q.  Did you ever speak with the Lieutenant about
10  that?
11    A.  No, I did not.
12    Q.  Did the Lieutenant ever tell you a certain
13  number of money tickets you needed to issue?
14    MR. HIGHTOWER:  Objection.  Form of the
15  question.
16    A.  33 percent of money tickets.
17    Q.  But not a specific number?
18    A.  Of all the tickets, it had to be 33 percent,
19  which is one out of every three tickets would have to be
20  a money ticket.
21    Q.  Did he ever give you a specific number, though,
22  you needed to issue 50 tickets a month or something like
23  that?
              LEAVITT REPORTING, INC.

Page 16

1    A.  He never said to me you need to issue 50
2  tickets a month, no.
3    Q.  Has Lieutenant Sullivan ever spoken with you
4  about not writing 33 percent?
5    A.  At that time when Sergeant Owings told me, I
6  told him to tell the Lieutenant I believed it was illegal
7  per the orders of the Abington Police rules and
8  regulations.  And he said that he did inform him and that
9  that was it.  Then he never came and talked to me, the
10  Lieutenant or anybody else.
11    Q.  Have you seen anything in writing from Sergeant
12  Owings in which he directs you and the other officers
13  that there has to be 33 percent money tickets issued?
14    MR. HIGHTOWER:  Objection.  Form of the
15  question.
16    A.  From Sergeant?  Did you say Lieutenant?
17    Q.  From Sergeant Owings?
18    A.  Not from Sergeant Owings, no.
19    Q.  Have you ever seen anything in writing that any
20  superior officer has issued in the Town of Abington
21  Police Department that says there needs to be 33 percent
22  money tickets?
23    MR. HIGHTOWER:  Objection.  Form of the
              LEAVITT REPORTING, INC.

Page 17

1   question.
2        A.  No, I have not.
3        Q.  Have you ever seen anything in writing from any
4   superior officer in the Town of Abington Police
5   Department that says the specific number of tickets per
6   month an officer needs to issue?
7        MR. HIGHTOWER: Objection. Form.
8        A.  Not the number of tickets, no.
9        Q.  Have you ever seen anything in writing from any
10  superior officer in the Town of Abington Police
11  Department that directs officers which motorists they
12  should write money tickets for?
13       A.  I believe there's actually a policy on that in
14  regards to, like, equipment violations, giving operators
15  warnings, in the traffic enforcement policy.  So, yes.
16       Q.  Have you ever seen anything in writing from any
17  superior officer in the Town of Abington Police
18  Department that directs officers to write tickets for any
19  specific individual in the Town of Abington that they
20  stop?
21       A.  No, I have not.
22       Q.  Have you seen anything in writing from any
23  superior officer in the Town of Abington Police

LEAVITT REPORTING, INC.

Page 18

1   Department that directs officers that they must write
2   money tickets depending upon how many warnings a motorist
3   has already had?
4        A.  In writing?
5        Q.  Yes.
6        A.  I've seen some e-mails that documented the
7   Deputy Chief speaking about how he wanted officers to
8   write money tickets to officers who had warnings, and I
9   believe that was between Sergeant, I believe that was
10  e-mails received by Sergeant Owings by the Deputy Chief.
11       Q.  In those e-mails does the Deputy Chief order
12  that the officers have to write money tickets for
13  individuals who have received warnings?
14       A.  I can't recall.  I know that the context there
15  was in the e-mail in regards to that.
16       Q.  Have you ever seen any order -- And you
17  understand what an order is, correct?
18       A.  Yes.
19       Q.  Have you ever seen any order from any superior
20  officer in the Town of Abington Police Department that
21  directs officers which motorists they need to write money
22  tickets for?
23       MR. HIGHTOWER: Objection. Form of the

LEAVITT REPORTING, INC.

Page 19

1   question and vague.
2        A.  Specific people, no.
3        Q.  Have you ever seen any order in writing from
4   any superior officer in the Abington Police Department
5   that directs officers which motorists to issue tickets to
6   depending upon the number of warnings that the motorist
7   has been issued?
8        MR. HIGHTOWER: Objection to form.
9        A.  Like I said in the previous question, I said
10  I've seen e-mails between the Deputy Chief and Sergeant
11  Owings where the Deputy Chief says that, you know,
12  multiple officers received warnings and -- Actually, one
13  of the e-mails, I believe it was sent to all the
14  sergeants, but I believe Sergeant Owings gave it to me.
15  He did make statements to that, saying that they had been
16  seeing officers who write warnings to -- they see
17  multiple drivers with warnings and they wanted to see
18  money citations because they felt it would deter the
19  public.
20       Q.  You took that as an order?
21       A.  After I read the e-mail?
22       Q.  Yes.
23       A.  Yes.

LEAVITT REPORTING, INC.

Page 20

1        Q.  Did you follow that order?
2        A.  No, I did not.  I reported it as illegal.
3        Q.  Were you disciplined for not following that
4   order?
5        MR. HIGHTOWER: Objection. Form of the
6   question in terms of discipline.
7        A.  In terms of discipline, no.
8        Q.  You were not disciplined.  Correct?
9        MR. HIGHTOWER: Objection.
10       A.  This is directly --
11       MR. HIGHTOWER: Hold on. Objection. Form of
12  the question.
13       Q.  Were you given a written warning for not
14  following that order?
15       MR. HIGHTOWER: Objection.
16       A.  No.
17       MR. HIGHTOWER: Form of the question.
18       Q.  Were you given --
19       THE STENOGRAPHER: You're talking over one
20  another.
21       MR. HIGHTOWER: Just wait.  If I have an
22  objection, give me a second because I may have an
23  objection.  And then after I'm done talking.  That way

LEAVITT REPORTING, INC.

Page 25

1  result of, I think you said a brain injury?
2      A.  Yeah.  Mild traumatic brain injury.
3      Q.  When were you injured?
4      A.  I was injured in January of 2009.
5      Q.  Did you have any treatment for your injury?
6      A.  In January of 2009 I didn't.  I didn't believe
7  -- I had a concussion when a humvee rolled into a ditch
8  and I hit my head on the side of the turret.  And then I
9  ended up not finding out about it until, I believe it
10 was, like, March of 2011.
11     Q.  How did you find out about it?
12     A.  They had, like, a post-deployment health
13 survey, and I was speaking with a person there.  They
14 sent me to the VA Medical Center in Portsmouth, I
15 believe, and that is when they began my workup with
16 posttraumatic stress -- not posttraumatic -- mild
17 traumatic brain injury.
18     Q.  Do you have disabled status?
19     A.  Yes, I do.
20     Q.  Have you ever spoken with the Chief about your
21 brain injury?
22     A.  Not the Chief -- not the Chief directly.
23     Q.  It's Chief Majenski who is sitting here?
              LEAVITT REPORTING, INC.

Page 26

1      A.  Yes.  I did have a conversation where he asked
2  me if I was okay and if my mild traumatic brain injury
3  was affecting my job at all.
4      Q.  When was that?
5      A.  That was in May -- Not May.  I believe it was
6  April of 2014.
7      Q.  You were diagnosed, as I understand it, in
8  2011?
9      A.  Yes.
10     Q.  Between the time of your diagnosis in March --
11 I think it was March, 2011, you told me.  Is that right?
12     A.  I believe so.  Around then.
13     Q.  Between the time of your diagnosis in March,
14 2011, and this conversation you just told me about in
15 April of 2014 with the Chief, did you ever speak with the
16 Chief about your brain injury?
17     A.  Between those time periods?
18     Q.  Yes.
19     A.  No.
20     Q.  Did you ever report to anyone between March of
21 2011 and April of 2014 that you had disabled status as a
22 veteran?  Anyone in the Abington Police Department?
23     A.  I informed Deputy Chief Cutter.
              LEAVITT REPORTING, INC.

Page 27

1      Q.  When did you first tell Deputy Chief Cutter you
2  had status as a disabled veteran?
3      A.  Prior to the, what's it's called, prior to -- I
4  was in the academy at that time, so I was graduating in
5  April of 2011, and I ended up finding out I had mild
6  traumatic brain injury and, what else is it, from them
7  and I was undeployable.  And there was kind of an issue
8  with my reserve company was going to be deployed to
9  Afghanistan.  So I went and I told the Deputy Chief
10 prior, prior to that, I think it was probably about a
11 month prior to that I informed him I was possibly not
12 going to be able to finish the police academy because I
13 was going to go to Afghanistan.  That is when they were
14 having the post-deployment health survey.  And during the
15 workup they said that I was undeployable, I wouldn't be
16 able to go because of the mild traumatic brain injury
17 that I suffered in 2009.  So that's when, when I found
18 out I was undeployable, I informed the Deputy Chief.  I
19 went to the station, I had a conversation with him in his
20 office.
21     Q.  When is the first conversation you had with him
22 about your possibly going to Afghanistan?  Do you recall?
23     A.  It was, it was, like, right after I found out.
              LEAVITT REPORTING, INC.

Page 28

1      Q.  Were you in the academy at the time?
2      A.  Yes, I was.
3      Q.  Do you know where the conversation occurred
4  between you and the Deputy Chief?
5      A.  Occurred in his office.
6      Q.  Was anyone else present?
7      A.  There was just me and him.
8      Q.  Did you call the meeting?  Or did he call the
9  meeting?
10     A.  I think I called and I asked if I could come
11 and talk to him to tell him about the situation, that I
12 wouldn't have to do the academy again because I wasn't
13 going to be deployed.
14     Q.  I'm talking about the first time you told the
15 Deputy Chief you might be deployed.  Do you recall when
16 that meeting was?
17     A.  I think -- I don't think I met with him about
18 that.  I met with him after the fact when I was telling
19 him I had a mild traumatic brain injury.  It wasn't --
20 What's it called?  Before that I think I called him and I
21 just said, hey, you know, I kind of have this issue, I'm
22 trying to figure it out.
23     Q.  What did the Deputy Chief say to you during
              LEAVITT REPORTING, INC.

Page 29

1  that conversation?
2       A.  He told me to keep him informed.
3       Q.  So then you went into his office and met with
4  him?
5       A.  Yes.
6       Q.  What did you specifically say to him about your
7  injury?
8       A.  I said that I got diagnosed with mild traumatic
9  brain injury from the humvee accident that occurred while
10  I was in Iraq from a concussion.
11       Q.  What did the Deputy Chief say to you?
12       A.  He said, "Okay.  Does it affect your, does it
13  affect your performance in the academy or policing?"  I
14  was, like, no, it doesn't.
15       Q.  Did the Deputy Chief ask for any medical
16  documentation?
17       A.  He did not.
18       Q.  Did the Deputy Chief ask you to undergo a
19  fitness for duty evaluation?
20       A.  No, he did not.
21       Q.  Did the Deputy Chief ask you anything else
22  about any diagnosis you might have had during that
23  conversation?

LEAVITT REPORTING, INC.

Page 30

1       A.  No.  He just told me to keep him informed if I
2  needed anything.
3       Q.  Did you tell anybody else in the Abington
4  Police Department at that time that you had a traumatic
5  brain injury?
6       A.  I think I shared it with a couple of close
7  friends.
8       Q.  In the Police Department?
9       A.  Yes.
10       Q.  Who?
11       A.  Officer Marquardt, I believe Sergeant Kilgour,
12  and I think I spoke with Officer Kevin Cutter about it
13  because I was only going to go through the disability to
14  attempt to get that.
15       Q.  When did you get disability status?
16       A.  I'm not exactly sure of the date.
17       Q.  Did you tell Chief Majenski that you got status
18  as a disabled veteran?
19       MR. HIGHTOWER:  Objection to form.  But answer.
20       A.  I'm not sure if -- I -- Because the
21  disabled status I have right now, it's 20 percent from my
22  hearing and tinnitus which I had going into -- when I
23  came out of Iraq.  So I had that earlier, before.  I'm

LEAVITT REPORTING, INC.

Page 31

1  not too sure if I --
2       Q.  Okay.
3       A.  I don't recall whether or not it was before I
4  was employed or after I was employed.  I've had it for a
5  long time now.
6       Q.  I didn't realize you had another disability.
7  So when you came out from being deployed?
8       A.  Yes.
9       Q.  What year was that?
10       A.  It was May of 2009.
11       Q.  When you came out of Iraq in May of 2009, you
12  had hearing loss and tinnitus?
13       A.  Yes.
14       Q.  You were given a 20 percent disability as a
15  result?
16       A.  Yes, I was.
17       Q.  When you applied under Civil Service, did you
18  disclose that you were a disabled vet?
19       A.  I can't recall.
20       Q.  Is there a reason that you wouldn't?
21       A.  I mean, I definitely would have because it
22  would put me right at the top of the list.  I mean, no
23  reason that I wouldn't.

LEAVITT REPORTING, INC.

Page 32

1       Q.  So did you tell anyone when you were applying
2  to the Abington Police Department that you had a hearing
3  loss and tinnitus?
4       A.  Like I said, I'm not sure whether or not when I
5  actually had the -- I'm trying to remember when I had the
6  workup from the VA.  I can't, I can't recall when it
7  happened.  I would have to look at the record.
8       Q.  Is any of your disabled status due to the brain
9  injury or is it all for the hearing and tinnitus?
10       A.  Right now it's for the hearing and tinnitus.
11       Q.  You're trying to get additional disabled status
12  for the brain injury?
13       A.  Yes.
14       Q.  Where are you in the process of that?
15       A.  I'm not too sure.  My attorney has filed some
16  stuff.
17       Q.  Now, you went through the academy.  Correct?
18       A.  Yes.
19       Q.  And were you taught anything about traffic
20  enforcement during the academy?
21       A.  Yes, I was.
22       Q.  Were you taught part of your responsibility was
23  to issue fines to motorists who violated motor vehicle

LEAVITT REPORTING, INC.

Page 29

1  that conversation?
2      A.  He told me to keep him informed.
3      Q.  So then you went into his office and met with
4  him?
5      A.  Yes.
6      Q.  What did you specifically say to him about your
7  injury?
8      A.  I said that I got diagnosed with mild traumatic
9  brain injury from the humvee accident that occurred while
10 I was in Iraq from a concussion.
11     Q.  What did the Deputy Chief say to you?
12     A.  He said, "Okay.  Does it affect your, does it
13 affect your performance in the academy or policing?"  I
14 was, like, no, it doesn't.
15     Q.  Did the Deputy Chief ask for any medical
16 documentation?
17     A.  He did not.
18     Q.  Did the Deputy Chief ask you to undergo a
19 fitness for duty evaluation?
20     A.  No, he did not.
21     Q.  Did the Deputy Chief ask you anything else
22 about any diagnosis you might have had during that
23 conversation?

LEAVITT REPORTING, INC.

Page 30

1      A.  No.  He just told me to keep me informed if I
2  needed anything.
3      Q.  Did you tell anybody else in the Abington
4  Police Department at that time that you had a traumatic
5  brain injury?
6      A.  I think I shared it with a couple of close
7  friends.
8      Q.  In the Police Department?
9      A.  Yes.
10     Q.  Who?
11     A.  Officer Marquardt, I believe Sergeant Kilgour,
12 and I think I spoke with Officer Kevin Cutter about it
13 because I was only going to go through the disability to
14 attempt to get that.
15     Q.  When did you get disability status?
16     A.  I'm not exactly sure of the date.
17     Q.  Did you tell Chief Majenski that you got status
18 as a disabled veteran?
19         MR. HIGHTOWER:  Objection to form.  But answer.
20     A.  I'm not too sure if -- I -- Because the
21 disabled status I have right now, it's 20 percent from my
22 hearing and tinnitus which I had going into -- when I
23 came out of Iraq.  So I had that earlier, before.  I'm

LEAVITT REPORTING, INC.

Page 31

1  not too sure if I --
2      Q.  Okay.
3      A.  I don't recall whether or not it was before I
4  was employed or after I was employed.  I've had it for a
5  long time now.
6      Q.  I didn't realize you had another disability.
7  So when you came out from being deployed?
8      A.  Yes.
9      Q.  What year was that?
10     A.  It was May of 2009.
11     Q.  When you came out of Iraq in May of 2009, you
12 had hearing loss and tinnitus?
13     A.  Yes.
14     Q.  You were given a 20 percent disability as a
15 result?
16     A.  Yes, I was.
17     Q.  When you applied under Civil Service, did you
18 disclose that you were a disabled vet?
19     A.  I can't recall.
20     Q.  Is there a reason that you wouldn't?
21     A.  I mean, I definitely would have because it
22 would put me right at the top of the list.  I mean, no
23 reason that I wouldn't.

LEAVITT REPORTING, INC.

Page 32

1      Q.  So did you tell anyone when you were applying
2  to the Abington Police Department that you had a hearing
3  loss and tinnitus?
4      A.  Like I said, I'm not sure whether or not when I
5  actually had the -- I'm trying to remember when I had the
6  workup from the VA.  I can't, I can't recall when it
7  happened.  I would have to look at the record.
8      Q.  Is any of your disabled status due to the brain
9  injury or is it all for the hearing and tinnitus?
10     A.  Right now it's for the hearing and tinnitus.
11     Q.  You're trying to get additional disabled status
12 for the brain injury?
13     A.  Yes.
14     Q.  Where are you in the process of that?
15     A.  I'm not too sure.  My attorney has filed some
16 stuff.
17     Q.  Now, you went through the academy.  Correct?
18     A.  Yes.
19     Q.  And were you taught anything about traffic
20 enforcement during the academy?
21     A.  Yes, I was.
22     Q.  Were you taught part of your responsibility was
23 to issue fines to motorists who violated motor vehicle

LEAVITT REPORTING, INC.

Page 33

1  traffic laws?
2      MR. HIGHTOWER: Objection.
3      A.  Not part of my --
4      MR. HIGHTOWER: Objection to form. Go ahead.
5      A.  Not part of my responsibility, but part of my
6  duties.
7      Q.  What's the difference between it being part of
8  your responsibilities versus your duties?
9      A.  It's kind of the, it's a tool, and you're the
10 officer and you impose the fine or the warning or a
11 verbal warning.  It's up to your discretion.
12     Q.  You distinguish between responsibilities and
13 duties.  What's the difference between the two?
14     MR. HIGHTOWER: Objection. Asked and answered.
15 Go ahead.
16     A.  Like, responsibilities, it almost seems like
17 you said that you have to issue the citations based on
18 the question that you asked.
19     Q.  Do you ever -- I'm just following up on your
20 answer.  Then what does duties mean?
21     A.  Duties would be, like, that could be part of,
22 you know, imposing a fine on a violator.
23     Q.  What were you taught in the academy the purpose
                LEAVITT REPORTING, INC.

Page 34

1  was of issuing money citations or fines to motorists who
2  violate traffic laws?
3      A.  I don't believe I was really -- It's to educate
4  the public.  That's what, Attorney Patrick Rogers was
5  the, was the instructor for the class, and I clearly
6  remember him speaking about discretion, and he advised us
7  that you have the power to issue a civil citation, a
8  warning citation, or verbal warning, and it's your duty
9  to impose the fine and it's up to your discretion.  And
10 he explained discretion as having no influence from any
11 outside party and that the officer, being the officer on
12 scene who observed the violation, to be able to come up
13 with their discretion to issue the citation itself
14 without any outside influence.
15     Q.  What was the purpose that this Attorney Rogers
16 told you was for issuing fines?  Did he tell you?
17     A.  To educate the motoring public.  It's something
18 we could impose on the operator.  We make the decision on
19 the penalty.  Kind of like a judge on a, on like a
20 sentencing, I guess you could say.
21     Q.  The purpose of traffic enforcement is only to
22 educate the public, in your mind?
23     MR. HIGHTOWER: Objection. Relevance.
                LEAVITT REPORTING, INC.

Page 35

1      A.  Well, educate the public and deter the
2  violation.
3      Q.  Is one of the purposes behind traffic
4  enforcement to deter motorists from speeding?
5      A.  Yes.
6      Q.  And why is it important were you taught to
7  deter motorists from speeding?
8      A.  Because that's our job, you know, to make
9  traffic, to protect the community by making, you know,
10 traffic stops and, you know, educating and also imposing
11 fines if we need to.
12     Q.  Do you believe it's a part of public safety to
13 do traffic enforcement?
14     A.  Yes, I do.
15     Q.  Now, when did you get out of the academy?
16     A.  I believe it was April of 2011.
17     Q.  You started working immediately for the Town of
18 Abington Police Department?
19     A.  Yes, I did.
20     Q.  What shift were you on?
21     A.  I was on the four to twelve shift.
22     Q.  I'm sorry?
23     A.  The four to midnight shift.
                LEAVITT REPORTING, INC.

Page 36

1      Q.  Did you bid for that shift?  Is that what was
2  available?
3      A.  Yes, I bid for that.
4      Q.  Who was your supervisor on that shift?
5      A.  It would be Sergeant Sullivan, I believe.
6      Q.  On that shift were you assigned to do traffic
7  enforcement?
8      A.  Yes, I was.
9      Q.  How often would you be assigned to do traffic
10 enforcement when you first started?
11     A.  When I first started, it was for one hour of
12 traffic enforcement in an eight-hour shift.
13     Q.  Were you assigned to a specific area to do
14 traffic enforcement?
15     A.  I believe so.  If the supervisor or there
16 wasn't any direct directive that came down to set
17 officers in a certain location, then it was usually up to
18 the officer to decide.  I think most of the time in 2011
19 I think I decided on where I would go, from what I can
20 recall.
21     Q.  Do you think that it's wrong that you're
22 assigned to specific locations to conduct traffic
23 enforcement?
                LEAVITT REPORTING, INC.

Page 41

1    A.  I selected it to get away from the midnight to
2  eight because we were assigned to a school assignment
3  that I didn't agree with.
4    Q.  But the bid was voluntary?  The Chief didn't
5  make you bid four to midnight, correct?
6         MR. HIGHTOWER:  Objection.  Form of the
7  question.
8    A.  He didn't make me?
9    Q.  He didn't make you bid the four to midnight
10  shift, did he?
11         MR. HIGHTOWER:  Objection.
12    A.  No.  I bid it to try to get away from the
13  midnight to eight shift.
14    Q.  The Deputy Chief never forced you to bid any
15  particular shift.  Correct?
16         MR. HIGHTOWER:  Objection.  Form of the
17  question.
18    A.  No, he did not.
19    Q.  Lieutenant Sullivan has never ordered you to
20  bid one shift or the other.  Correct?
21         MR. HIGHTOWER:  Objection.  Form of the
22  question.
23    A.  No, he did not.
         LEAVITT REPORTING, INC.

Page 42

1    Q.  When you were on the four to twelve shift
2  initially, were there any investigators or detectives in
3  the Town of Abington Police Department?
4    A.  For those first two years?
5    Q.  Yes.
6    A.  I was utilized to do some investigations by the
7  Lieutenant, by the Deputy Chief, to do some
8  investigative-type work on assignments that weren't
9  regularly mine.
10    Q.  During the first two years you were in the
11  Abington Police Department, was there a detective's
12  position?
13         MR. HIGHTOWER:  Objection to form.
14    A.  No, there was not.
15    Q.  How about from 2013 to the present, has there
16  been a detective's position in the Town of Abington
17  Police Department?
18    A.  I believe that in 2013, in July, there was
19  going to be a position where Ronald Sweeney was going to
20  be a detective that July.  But then due to, I guess, he
21  didn't want to work eight to four, or something, all the
22  way Monday through Friday, and then it was taken from
23  him, it was taken back, and they didn't have the
         LEAVITT REPORTING, INC.

Page 43

1  detective spot July, 2014.  And then this July, 2015,
2  Kevin Cutter was put in a detective's spot.  Or before
3  that.  Sorry.  Like, I believe it was, like, March or
4  something he was acting in a position as detective.
5    Q.  So prior to Officer Cutter becoming a detective
6  in May or so of 2015, was there a position of detective
7  in the Town of Abington Police Department?
8         MR. HIGHTOWER:  Objection to form.
9    A.  No.  There was officers that were utilized in
10  that position, but they were never formally said to be
11  you're a detective.
12    Q.  How were the officers utilized?
13    A.  For instance, from when I began until May of
14  2013, I was asked multiple times to work on other
15  officers' cases.
16    Q.  Who would ask you?
17    A.  The Deputy Chief, the Lieutenant.
18    Q.  When did Deputy Chief Cutter ever ask you to
19  work on other officers' cases as a detective?
20    A.  Not as a detective, but in a detective's
21  capacity, I would say.
22    Q.  What cases did Deputy Chief Cutter ask you to
23  work on in a detective's capacity?
         LEAVITT REPORTING, INC.

Page 44

1    A.  His nephew, Kevin Cutter, was, he had a stolen
2  backhoe case.  I was asked to assist him and help with
3  the search warrant application for a residence where the
4  backhoe was at, and I stayed for, I believe, over, I was
5  at the station for over 24 hours.
6    Q.  When was that?
7    A.  That was, I believe, sometime in -- I believe
8  it was sometime in 2012.
9    Q.  Did that case initiate while you were on shift?
10    A.  Not to me, no.  It was Kevin Cutter's case.
11    Q.  Was it during your shift that Cutter started
12  performing work on that case?
13    A.  No.  I believe it was reported to him.  I, I
14  think he was on the eight to four or.  I can't really
15  recall, but I know it was days before.  And then he
16  started getting some -- I got some information from a
17  house or from -- I saw the vehicle, and I passed it on to
18  him, and I was asked to assist with the case at that
19  point.
20    Q.  So you saw the vehicle and you passed
21  information on to Kevin Cutter while you were on your
22  regular shift.  Correct?
23    A.  Yes.
         LEAVITT REPORTING, INC.

Page 45

1    Q.   Were there any other cases that you recall that
2  Deputy Chief Cutter asked you to assist as doing
3  detective-type work?
4    A.   Yes.  There was a case involving the Lieutenant
5  was doing investigation at G. P. Ryan's for drug
6  distribution, and he requested that I help the
7  Lieutenant, and the Lieutenant requested also that I help
8  the Lieutenant.
9    Q.   Is that Lieutenant Sullivan?
10   A.   Yes.
11   Q.   When did that occur?
12   A.   I believe it was 2012, I believe.
13   Q.   Did you do that work during your shift?
14   A.   No.  I did it on overtime.
15   Q.   Who asked you to do the overtime?
16   A.   The Lieutenant asked me to finish typing the
17 report.
18   Q.   Had you started it prior to -- during your
19 shift and then it went into overtime?
20   A.   I don't recall.
21   Q.   Any other cases that you can think of that the
22 Deputy Chief asked you to perform detective-type work?
23   A.   I can't recall any more at this time.
                LEAVITT REPORTING, INC.

Page 46

1    Q.   What about Lieutenant Sullivan, did Lieutenant
2  Sullivan ever ask you to perform detective-type work?
3    A.   Yes.  Lieutenant Sullivan asked me to do an
4  investigation involving a larceny by check.
5    Q.   When was that?
6    A.   I believe that was in 2011.
7    Q.   What did the Lieutenant say to you?
8    A.   He gave me the paperwork, asked me to locate,
9  to identify the party and call the victim down to
10 investigate the case.
11   Q.   Was this during your shift?
12   A.   I believe it was -- Yes, it was.
13   Q.   Any other cases you can recall where Lieutenant
14 Sullivan asked you to perform detective-type work?
15      MR. HIGHTOWER:  Objection to form.
16   A.   Yes.  I believe he asked me to help Sergeant
17 Gambino on doing a warrant in a detective's capacity
18 where I was not in full departmental uniform but
19 undercover clothes, I guess you could say.
20   Q.   When you say help him do a warrant, was there
21 an outstanding warrant on an individual that needed to be
22 executed?
23   A.   I was overtime, and we drove around picking up
                LEAVITT REPORTING, INC.

Page 47

1  parties on warrants at different locations, inside
2  Abington as well as outside Abington.
3    Q.   Was that an overtime assignment specifically to
4  execute warrants?
5    A.   Yes.
6    Q.   Were those overtime assignments offered to all
7  officers?
8    A.   No.
9    Q.   Are those overtime assignments still offered to
10 officers to execute warrants?
11      MR. HIGHTOWER:  Objection to form.
12   A.   I haven't seen one recently.
13   Q.   When is the last time you have seen an overtime
14 assignment being offered for the execution of warrants?
15   A.   Say, like, 2013, 2012.
16   Q.   Did you take the overtime for all of those?
17      MR. HIGHTOWER:  Objection to form.
18   A.   Yes.  Whenever Gambino asked me.
19      MR. HIGHTOWER:  Actually, withdrawn.  Go ahead.
20   A.   Whenever Lieutenant Sullivan or Sergeant
21 Gambino asked me, I jumped right up to do it.
22   Q.   How did overtime assignments work in the Town
23 of Abington Police Department?
                LEAVITT REPORTING, INC.

Page 48

1    A.   For what type of overtime assignment?
2    Q.   If there's an overtime being offered for
3  officers to execute warrants, pursuant to the union
4  contract how does that have to go out for the officers to
5  accept?
6    A.   Any overtime has to be on a posted list or
7  availability to sign up.  But what I've seen in the past
8  at the Abington Police Department, that isn't followed
9  and it's whoever is selected to do it, kind of like
10 overtime traffic enforcement which also occurred as well.
11   Q.   So is it your testimony that the overtime
12 hasn't been posted pursuant to the union contract?
13      MR. HIGHTOWER:  Objection to form.
14   A.   In regards to traffic --
15   Q.   Let me ask again.  Is it your testimony that
16 overtime has not been posted pursuant to the union
17 contract to conduct traffic enforcement?
18   A.   To conduct traffic enforcement as well as
19 warrants.
20   Q.   When did that occur that it wasn't posted
21 properly?
22   A.   Let me see.  So in May of 2013, I believe it
23 was the end of May, I saw Kevin Cutter in roll call and
                LEAVITT REPORTING, INC.

Page 49

1  he was walking by with a radar gun.  He walked up to me,
2  he said, "The Deputy Chief just forced me to stay and
3  write money tickets only.  Can you do that?"  I told him,
4  I said, "No."  I was, like, "That's illegal."  I was
5  like, "How long do you have to stay?"  He said, like,
6  "Four hours."  I'm, like, "Oh, all right."  Then he left,
7  and he ended up doing an overtime traffic enforcement
8  that day.  Do you want me to explain them all?
9      Q.  Let me start with that one.  Do you know if
10  Officer Cutter accepted the overtime assignment --
11          MR. HIGHTOWER:  Objection to form.
12      Q.  -- in that instance?
13          MR. HIGHTOWER:  Objection to form.
14      A.  He told me he was ordered to.
15      Q.  Who ordered him to?
16      A.  The Deputy Chief, his uncle.
17      Q.  Do you know if that overtime assignment was
18  posted?
19      A.  It was not.
20      Q.  How do you know that?
21      A.  Because I wasn't available to take it.  I
22  didn't see it anywhere.
23      Q.  Have you accepted all overtime assignments that
          LEAVITT REPORTING, INC.

Page 50

1  have been posted and available to you?
2      A.  Available like?  Every overtime assignment
3  ever?
4      Q.  Yes.
5      A.  No.
6      Q.  Have you accepted all overtime assignments that
7  have been posted and available to you to conduct traffic
8  enforcement?
9      A.  I've done some traffic enforcement, yes.
10      Q.  Have you accepted all overtime assignments that
11  have been posted and available to you to conduct traffic
12  enforcement?
13      A.  All?
14      Q.  Yes.
15      A.  No.
16      Q.  What percentage have you turned down?
17      A.  I don't recall.
18      Q.  Is it a lot?
19      A.  I don't believe so.
20      Q.  Have you ever been denied an overtime
21  assignment that you have requested?
22          MR. HIGHTOWER:  Objection to form.
23      A.  I've never requested an overtime assignment.
          LEAVITT REPORTING, INC.

Page 51

1      Q.  So, therefore, you've never been denied.
2  Correct?
3          MR. HIGHTOWER:  Objection to form.
4      A.  Yes.
5      Q.  Have you ever requested to be able to perform
6  detective-type work during overtime and your request has
7  been rejected?
8      A.  To do it during overtime?
9      Q.  Yes.
10      A.  No, I have not.  I just stopped getting those
11  assignments.
12      Q.  I'm asking you if you have ever requested to be
13  able to conduct detective-type work from a case that you
14  developed during your shift during overtime.
15      A.  On cases that I've gotten on my shift?
16      Q.  Yes.
17      A.  I've not been denied overtime on those cases
18  that I've gotten on my shift.  But other officers, I
19  haven't been able to assist them like I was in the past.
20      Q.  So you have told me two.  Any other officers
21  that you've requested to assist in the past to conduct
22  detective-type work?  Other than what you have told me
23  about already.
          LEAVITT REPORTING, INC.

Page 52

1      A.  Repeat the question?
2      Q.  Sure.  You have told me two occasions where you
3  say that the Deputy Chief or the Lieutenant asked you to
4  perform detective-type work in assisting other officers.
5  Are there any other occasions that you have been or were
6  asked to conduct detective-type work to assist other
7  officers that you can recall?
8      A.  Not at this time, no.  I can't recall.
9      Q.  If you can look at Exhibit 1, and it is your
10  complaint.  And specifically if you could look at Page 3,
11  Paragraph 12.  Do you see that?
12      A.  Yes, I do.
13      Q.  In here you put, "The Abington Police
14  Department as of May, 2013, did not have detectives and
15  Delaney regularly received overtime assignments
16  performing detective-type work in addition to his
17  patrolman duties."  Other than what you have told me
18  today, do you recall any other overtime assignments that
19  you are referring to?
20      A.  Yes, I do.
21      Q.  What other overtime assignments do you recall?
22      A.  I recall there was a male party that was lost
23  in the woods off of Chestnut Street and I was requested
          LEAVITT REPORTING, INC.

Page 53

1  by Sergeant Gambino to stay and assist Todd Cantalupo
2  with entering property in the investigation.
3      Q.  So you were on shift and you were asked to stay
4  over to assist?
5      A.  He gave me the option of whether or not I
6  wanted to stay.
7      Q.  But you stayed from your shift?  It started on
8  your shift, and then you held over.  Correct?
9      A.  Yes.
10         MR. HIGHTOWER:  Objection to form.
11     A.  Sergeant Gambino said he spoke with the Deputy
12  Chief and he said that I could stay if I wanted to to
13  assist Todd Cantalupo with the investigation and the
14  report by entering the property.
15     Q.  By entering the property into the system, you
16  mean?
17     A.  Yes.
18     Q.  As evidence?
19     A.  Yes.
20     Q.  So that just means going into the computer?
21     A.  Well, logging in all the property and going
22  through it for any evidence involving the situation.  It
23  was a sudden death in which the male party had a, we

LEAVITT REPORTING, INC.

Page 54

1  later found out, had a cardiac issue.
2      Q.  Any other overtime assignments you recall that
3  you refer to in Paragraph 12 of Exhibit 1?
4      A.  I believe there was, there was an assault at
5  Stix & Stones that I was part of the investigation that I
6  took the initial report, and then the Lieutenant had
7  gotten some calls in regards to that.  And from there I
8  worked with Lieutenant Sullivan and Sergeant Gambino in
9  order to complete the report.
10     Q.  You say you took the initial report.  Did you
11  take the initial report during your shift?
12     A.  Yes, I did.  At the end of the shift.
13     Q.  So you stayed over to assist the individuals in
14  completing that investigation?
15     A.  Not sure if I stayed over that night on
16  overtime, but I know that the tip line got a lot of calls
17  in regards to the identity of the parties.
18     Q.  Are there any overtime assignments that you
19  performed doing detective-type work where the incident
20  wasn't initiated during your shift?
21     A.  Yes, there was.
22     Q.  Other than what you told me today?
23         MR. HIGHTOWER:  Did you finish your answer?

LEAVITT REPORTING, INC.

Page 55

1      A.  Not that I can recall.
2      Q.  So you have told me all of them?
3      A.  From what I can remember right now, yes,
4  without seeing the records.
5      Q.  You continue on, "The detective-type work
6  performed by Delaney included investigating homicides,
7  drug distributions, and assaults."  What homicides did
8  you investigate?
9      A.  Based off that homicide, I believe I was
10  speaking about the sudden death involved in the party
11  because you have to treat every death as a homicide, not
12  as just what it looks like right at the beginning.  You
13  have to take all the facts and --
14     Q.  Any other --
15     A.  -- do the investigation.
16     Q.  Any other homicides?
17     A.  No.
18     Q.  Do you know if there have been any other
19  homicides in the Town of Abington?
20     A.  No.
21     Q.  There haven't?
22     A.  Not homicides.  But, like I said, any sudden
23  deaths you have to treat as a crime scene.

LEAVITT REPORTING, INC.

Page 56

1      Q.  Since you have been with the Town of Abington,
2  have there been any murders in the Town of Abington?
3      A.  No.
4      Q.  Any manslaughters in the Town of Abington?
5      A.  No, there has not.
6      Q.  You talk about drug distribution.  What drug
7  distribution cases have you performed detective-type work
8  on?
9      A.  Like I explained before, the one at G. P.
10  Ryan's with Lieutenant Sullivan.
11     Q.  Any others?
12     A.  I can't recall anything at this time.
13     Q.  Have you ever developed any drug informants on
14  your own?
15     A.  No, I have not.
16     Q.  Assaults, what assaults have you performed
17  detective-type work on?
18         MR. HIGHTOWER:  Objection.  Asked and answered.
19     A.  Like I said, the Stix & Stones incident in
20  regards to that.
21     Q.  Do you know any other officers in the Town of
22  Abington who have been given overtime assignments to
23  perform detective-type work where the cases have not

LEAVITT REPORTING, INC.

Page 57

1   arisen from incidents that have initiated on their
2   shifts?
3       A.   Like, all the ways through?
4       Q.   Yes.
5       A.   Since I have been working there?  So
6   immediately following -- Before May of 2013, when I
7   believe the Money Ticket Quota System occurred,
8   immediately following that, that's when I observed that
9   Kevin Cutter was getting multiple over-time assignments
10  involving drug work and he was being given multiple calls
11  from the tip line, according to him, from his uncle, the
12  Deputy Chief.
13      Q.   Do you know if Kevin Cutter has developed drug
14  informants while he was on the force?
15      A.   Yes.  While he was working on overtime.
16      Q.   Is it your testimony he didn't develop any
17  informants during his regular shifts?
18      A.   I can't, I can't testify to that, but I know
19  that he was working with drug informants on overtime,
20  according to him.
21      Q.   Do you think you should have been offered that
22  overtime assignment?
23      A.   Yes, I do.
                LEAVITT REPORTING, INC.

Page 58

1       Q.   Why, if they're his informants?
2       A.   Are you talking about his informants or the
3   investigations themselves?
4       Q.   Well, do you know if the investigations that
5   Kevin Cutter was asked to perform detective-type work on
6   involved his drug informants that he developed?
7       A.   He told me that through his drug investigations
8   that he received informants and that he also had gotten
9   informants from the tip line, that the information was
10  being -- There's a tip line for the Abington Police
11  Department, and people anonymously can call and say this
12  is what is going on, this is what is going on.  The only
13  person that I knew that was being given that information
14  was Officer Kevin Cutter.
15      Q.   No other officer?  Just Kevin Cutter?
16      A.   Yes.
17      Q.   Do you know why that is?
18      A.   That's the only officer that told me that he
19  was receiving that information.
20      Q.   Do you know why Officer Cutter was receiving
21  that information and not other officers?
22      A.   I believe it was because he wrote the money
23  tickets and followed the quota system.
                LEAVITT REPORTING, INC.

Page 59

1       Q.   Why do you believe that?
2       A.   Just based on how I worked in the past, I was
3   assigned by the Deputy Chief to help him with his
4   assignments, I was doing this detective-type work, and
5   then all of a sudden it just changed when he started
6   following the ticket quota, and from there he was pretty
7   much given everything.  I even spoke with the union
8   president, Todd Cantalupo.  He said they were thinking
9   about filing an unfair labor practice based on how the
10  overtime was being given to Kevin Cutter that summer and
11  they decided not to.
12      Q.   Do you know why they decided not to?
13      A.   They didn't want to piss off the Chief.
14      Q.   Who told you that?
15      A.   Todd Cantalupo.
16      Q.   But you don't know why Kevin Cutter was given
17  those overtime assignments, do you?
18      MR. HIGHTOWER:  Objection.  Asked and answered.
19      A.   That he told me?
20      Q.   No.  Why the Chief decided to give --
21      A.   I believe it was because of he was out there
22  writing money tickets.
23      Q.   Do you have any idea how many drug
                LEAVITT REPORTING, INC.

Page 60

1   investigations Kevin Cutter has conducted while he has
2   been on shift?
3       A.   No, I do not.
4       Q.   Do you conduct any drug investigations while
5   you're on shift on your own initiative?
6       A.   I don't.  Because when I was on the four to
7   twelve shift, I was consistently busy doing
8   investigations and reports.
9       Q.   Did you conduct any drug investigations on your
10  own using your own initiative on any of the shifts you
11  have been on?
12      A.   On a motor vehicle stop I believe I got some
13  drugs out of a car one day.
14      Q.   So one?
15      A.   I think I got, like, a marijuana plant out of a
16  house one day.  I would have to look at the records.  I
17  can't really recall.
18      Q.   Have you ever requested that you be given more
19  drug investigations?
20      A.   I didn't think there was a procedure to.  No, I
21  haven't.
22      Q.   Have you ever requested that you be given more
23  of the tips that come into the tip line?
                LEAVITT REPORTING, INC.

Page 61

1   A. No, I have not.
2   Q. Why not?
3   A. I didn't think that was something that I could
4   request. Honestly, based on threats that happened to me,
5   I didn't feel that the Chief would listen to me.
6   Q. What threats happened to you?
7   A. After I filed the complaint with the attorney
8   general's office, I was called into the Chief's office
9   for my first time. I'd never even been in the Chief's
10  office, never even had a conversation with him. While I
11  was in there, he threatened me. He said that people who
12  come against him may win the battle, but he always wins
13  the war.
14  Q. What was the nature of the conversation you
15  were having with the Chief when that statement was made?
16  A. The Chief called me in. He said that I wasn't,
17  I wasn't cut out for the job and that I didn't have the
18  heart to give money tickets. And I tried to explain to
19  him that it wasn't, it wasn't what he thought it was and
20  I was just trying to use the discretion, use the
21  discretion on every motor vehicle stop, just like I have
22  been trained in the police academy.
23  Q. Were you union president at the time?
                LEAVITT REPORTING, INC.

Page 62

1   A. I can't recall if I was. It was either
2   April 1st or April 30th I was set as union president.
3   Q. Do you recall the first time you went into the
4   Chief's office that you were the union president at that
5   point to have this meeting?
6   A. No. I think the first thing that I did as
7   union president was I spoke with him about the social
8   media policy, was the first union business that I
9   conducted.
10  Q. I'm going to get back to that. I want to focus
11  on this detective-type work. Do you know -- When did you
12  file -- When do you say you filed your complaint with the
13  attorney general's office?
14  A. I just looked in my bank statements, and I saw
15  a parking garage fee on April 8th of 2015. That's the
16  only time I ever went into Boston.
17  Q. 2015 or --
18  A. 2014.
19  Q. April 8, 2014?
20  A. Yes.
21  Q. Prior to April 8, 2014, do you know how much
22  you earned in overtime?
23  A. I do not.
                LEAVITT REPORTING, INC.

Page 63

1   Q. Do you know if you earned more than you did in
2   the months after April 8, 2014?
3   A. I don't know.
4   Q. Do you know if you have earned $500 a month in
5   overtime while you have been employed by the Town of
6   Abington Police Department?
7   A. I don't get the question.
8   Q. You earn an additional amount when you work
9   overtime. Correct?
10  A. Yes.
11  Q. And you get paid the pay period afterwards.
12  Correct?
13  A. Yes.
14  Q. How much, on average, did you earn a month
15  prior to April 8, 2014, conducting overtime working for
16  the Town of Abington Police Department?
17  A. From April, 2014?
18  Q. Prior to April 8, 2014.
19  A. There's two -- By overtime, do you mean all
20  overtime? Like, any overtime assignment?
21  Q. Any overtime assignment.
22  A. I think I was getting about eight hours a week
23  probably, if I would have to guess, but I'm not exactly
                LEAVITT REPORTING, INC.

Page 64

1   sure.
2   Q. You distinguished between different types of
3   overtime. What overtime are you distinguishing between?
4   A. There's, like, overtime, obviously, for
5   training, overtime for, what's it called, overtime for
6   reports and overtime for investigations.
7   Q. Prior to April 8, 2014, how much were you
8   earning on average per month doing detective-type work
9   overtime assignments?
10  A. Prior to what date?
11  Q. April 8, 2014.
12  A. April 8, 2014? The detective-type assignments
13  stopped in the end of May of 2013.
14  Q. So prior to May of 2013, how much were you
15  earning per month doing detective-type work during
16  overtime?
17  A. I would say probably about 250 to 300 dollars a
18  month, if I had to guess.
19  Q. If you look at Paragraph 13 of Exhibit 1. You
20  write, "Delaney was able to earn approximately an
21  additional $500 per month performing the detective-type
22  work in addition to his core patrolman salary." Does
23  that seem right to you?
                LEAVITT REPORTING, INC.

Page 65

1    A.  That's around the same, 300, 500.
2    Q.  So you believe that's how much you earned per
3  month?
4    A.  Yes.
5    Q.  Prior to May, 2013, just on detective overtime
6  assignments?
7    A.  On overtime assignments, yes.
8    Q.  Are you talking general overtime assignments
9  then?
10    A.  On the detective-type work, yes.
11    Q.  500, right?
12    A.  Yes.
13    Q.  What documents did you look at prior to coming
14  here today?
15    MR. HIGHTOWER:  Objection to the extent that
16  the question pertains to attorney/client privilege or
17  work product protected materials.
18    Answer the question to the extent that you can
19  provide a response that deals with publicly-disclosed
20  documents.
21    A.  The only paperwork I looked over was the
22  exhibits that were provided by, by you guys.  But, like I
23  said, it was very confusing, I didn't really understand
   LEAVITT REPORTING, INC.

Page 66

1  what we were looking at.
2    Q.  Have you ever looked at the amounts you earned
3  in overtime during the period of time you have been
4  employed by the Town of Abington?
5    A.  No, I did not.
6    Q.  Do you keep track of that on your own, so you
7  know how much you're earning?
8    A.  No.  I just kind of know it.
9    Q.  Since May of 2013, have you earned any amount
10  in overtime doing detective-type work?
11    A.  No.  Not that I can recall.
12    Q.  Since May of 2013, have you earned overtime?
13    A.  Yes, I have.
14    Q.  Since May of 2013, is it your position that you
15  have earned less in overtime than you did prior to May of
16  2013 while working for the Town of Abington Police
17  Department?
18    A.  Less in overtime in regards to, like, the
19  detective-type work?
20    Q.  No.  In general overtime.
21    A.  In general?  Without looking at the numbers, I
22  wouldn't be able to answer that.
23    Q.  In November of 2012 it's my understanding that
   LEAVITT REPORTING, INC.

Page 67

1  there was some newspaper articles that ran in the
2  Brockton Enterprise and the Patriot Ledger, is that
3  correct, that you reference in your complaint?
4    A.  Yes.
5    Q.  When did you first see those newspaper
6  articles?
7    A.  I first saw them, like, when they first came
8  out.
9    Q.  Did you ever discuss those newspaper articles
10  at any time with the Chief?
11    A.  No.
12    Q.  Have you ever heard the Chief discuss those
13  newspaper articles at any time?
14    A.  Other than what I read in the article itself --
15    Q.  Yes.
16    A.  -- with him speaking with the?  That's all I
17  saw, was what he wrote to the paper as well as what was
18  provided in some of the exhibits.
19    Q.  But have you personally ever heard the Chief
20  speak about the newspaper articles that you reference in
21  your complaint?
22    A.  No.
23    Q.  Same question for the Deputy Chief.  Have you
   LEAVITT REPORTING, INC.

Page 68

1  ever had a conversation with the Deputy Chief about the
2  newspaper articles that ran in the Brockton Enterprise
3  and Patriot Ledger in November of 2012?
4    A.  No, I have not.
5    Q.  Have you ever heard the Deputy Chief speak
6  about the newspaper articles that ran in the Brockton
7  Enterprise and Patriot Ledger in November, 2012?
8    A.  No, I have not.
9    Q.  Have you ever heard Lieutenant Sullivan speak
10  about the he newspaper articles that ran in the Brockton
11  Enterprise and Patriot Ledger in November of 2012?
12    A.  Yes, I have.
13    Q.  When did you hear the Lieutenant speak about
14  them?
15    A.  I think it was in, like, January of 2013.
16    Q.  What did he say?
17    A.  He said a comment that he couldn't believe that
18  the Chief would ask for that amount of money.
19    Q.  About the public records request?
20    A.  Yes.
21    Q.  Do you know how that amount was calculated?
22    A.  No.
23    Q.  Do you know if town counsel was involved in
   LEAVITT REPORTING, INC.

Page 69

1  calculating the number?
2      A.  No, I do not.
3      Q.  Anything else Lieutenant Sullivan asked about
4  that?  Or said about that?
5      A.  That's all he said, from what I can recall.
6      Q.  Do you know if the Chief eventually did provide
7  the information to the newspaper?
8      A.  I believe it's written in one of the newspaper
9  articles that he does after the article was published.
10     Q.  Do you believe that the Chief had any opinion
11 as to the newspaper articles that were written?
12     A.  I believe in one of the newspaper articles, it
13 said in there that he had an opinion that it was -- I
14 don't know if I'm confusing the exhibit and that, but
15 there was some, like, opinion saying that releasing such
16 a thing would be detrimental or something.
17     Q.  You mean releasing the information?
18     A.  I don't know if it was in the article.  I don't
19 want to say that.
20     Q.  If you look at Page 4 of your complaint,
21 paragraph 18.  You write, "On information and belief,
22 Chief Majenski was embarrassed by the newspaper
23 articles."  What do you base your statement that the

LEAVITT REPORTING, INC.

Page 70

1  Chief was embarrassed by the articles on?
2      A.  Based off the fact that he didn't want to
3  release the numbers like all the other police departments
4  did.
5      Q.  Do you know why he didn't want to release the
6  numbers initially?
7      A.  Because we were the lowest issuance of civil
8  citations to warnings compared to the other surrounding
9  towns.
10     Q.  What do you base your statement on that's why
11 the Chief didn't want to release the information?
12     A.  By the 16,900 or whatever the amount was,
13 $16,000.
14     Q.  So you think that the amount that the Chief
15 gave the newspaper for money to be paid for the public
16 information request was the reason that he was
17 embarrassed, he gave them that amount because he was
18 embarrassed by what information might be produced?
19     A.  Yes.  And that he didn't want them to see it.
20     Q.  What do you base that statement on?
21     A.  Based off him saying $16,000 and then us,
22 obviously, being the lowest, and waiting to release the
23 information for free right after the article came out.

LEAVITT REPORTING, INC.

Page 71

1      Q.  Other than the number, do you have any
2  information that the Chief was embarrassed about the
3  information provided to the newspaper and the numbers?
4      MR. HIGHTOWER:  Objection to the form of the
5  question.
6      A.  No, I don't.
7      Q.  So it's just the amount that the town wanted to
8  charge for the information?
9      MR. HIGHTOWER:  Objection to form.
10     A.  Yes.
11     Q.  You don't know how that number was calculated.
12 Correct?
13     A.  I do not.
14     Q.  The Chief did give the newspaper information.
15 Correct?
16     A.  Yes.  After the article was published.
17     Q.  Do you know if that information that the Chief
18 gave became public?
19     A.  Yeah, I believe they did an article on that as
20 well.
21     Q.  Do you know if the Chief had any opinion about
22 that article?
23     A.  I think he said he was confused, or something,

LEAVITT REPORTING, INC.

Page 72

1  about the request or.  I'm not sure.  I don't recall.
2      Q.  Do you believe that the Chief was embarrassed
3  by that article?
4      A.  By what article?  The second one?
5      Q.  The second one that had the figures.
6      A.  Yes, I do.
7      Q.  Why do you think that?
8      A.  Because our police department had issued less
9  civil citations than warnings.
10     Q.  Why do you think the Chief was embarrassed by
11 that?
12     A.  Because immediately following that, in January,
13 Sergeant Carini had started coming down saying that the
14 Chief and Deputy Chief wanted more money citations
15 issued.
16     Q.  That was January of 2013?
17     A.  Yes.
18     Q.  When did Sergeant Carini first tell you that
19 they wanted more money citations issued?
20     A.  Between January and then May, when we were
21 ordered to write more money tickets than warnings.
22 Between that time frame, Sergeant Carini kept saying they
23 want to see more civil citations and less warnings and if

LEAVITT REPORTING, INC.

Page 73

1  you guys can look at the -- He was saying this to me and
2  Officer Tony Gentile during roll call.  He said it
3  approximately ten times during the roll call.  I found it
4  as odd, and that's why I believe the Chief was
5  embarrassed that the news article was occurring.  And
6  Sergeant Carini was saying the Chief and Deputy Chief had
7  told him that we need to look at the IMC, the IM records
8  of whatever somebody was issued, whether or not they were
9  given warnings before, look at their driving history.  I
10  found that as odd because I had already been doing that.
11  In some civil citations that I was writing, I was even
12  writing the driver's history on the citation in the
13  narrative.
14      Q.  Do you know if all officers were doing that,
15  though?
16      A.  What?
17      Q.  Looking up everyone's history that they
18  stopped.
19      A.  I spoke to multiple officers.  They said they
20  were, and they didn't understand why.
21      Q.  Which officers did you speak with?
22      A.  I spoke with Officer Gentile, Sergeant Kilgour,
23  Sergeant Sweeney, Officer Cutter, Officer Doherty, some

LEAVITT REPORTING, INC.

Page 74

1  others I can't remember.  Pretty much everybody.
2      Q.  So the Deputy Chief was asking you to do what
3  you were already doing.  Correct?
4      A.  Yes.
5      Q.  And so between January, 2013 and May, 2013, how
6  many times did Sergeant Carini tell you to write more
7  civil citations?
8      A.  Approximately ten times during roll call.
9      Q.  Was it each roll call?
10      A.  No.  It was about ten times.  It was on and
11  off.
12      Q.  Did Sergeant Carini during that period of time,
13  January, 2013 to May, 2013, ever tell you a specific
14  number of citations you needed to write?
15      MR. HIGHTOWER:  Objection to form.
16      A.  Between?
17      Q.  January of 2013 to May, 2013, did Sergeant
18  Carini ever tell you a specific number of civil citations
19  you needed to write?
20      MR. HIGHTOWER:  Objection to form.
21      A.  No, he did not.
22      Q.  Between January, 2013 and May, 2013, did
23  Sergeant Carini ever tell you a specific percentage of

LEAVITT REPORTING, INC.

Page 75

1  civil citations that you needed to write?
2      A.  During that time, no.
3      Q.  When I say civil citations, I'm talking about
4  what you refer to as money tickets.  Okay?
5      A.  Yes.
6      Q.  Have you ever heard the Chief use the term
7  money tickets?
8      A.  Yes.
9      Q.  When?
10      A.  That was during our conversation.
11      Q.  What year was that?
12      A.  That was immediately following my filing of the
13  118-page affidavit with the attorney general's office.
14      Q.  When was that?
15      A.  I think, after seeing the records, it looks
16  like I had the meeting on April 9th, 2014.
17      Q.  Prior to April 9, 2014, did you ever hear the
18  Chief use the term money tickets?
19      A.  No.
20      Q.  Prior to April 9, 2014, did you ever hear the
21  Deputy Chief use the term money tickets?
22      MR. HIGHTOWER:  Objection to form.
23      A.  I observed him write money tickets in e-mails

LEAVITT REPORTING, INC.

Page 76

1  that were provided to me by Sergeant Gambino and Sergeant
2  Owings.
3      Q.  When was that?
4      A.  That was in May or -- I'm not exactly sure when
5  I got it, but it was sometime at the end of May, 2014, or
6  beginning of June.
7      Q.  2013 or?
8      A.  2013, yes.
9      Q.  In May, 2013, that time period, was there a
10  specific traffic enforcement assignment that the Deputy
11  Chief was making to all officers?
12      A.  During that?
13      Q.  Yes.
14      A.  Yes.  It was one hour of community policing at
15  Chestnut Street and Vernon Street and with the order to
16  issue more money tickets than warnings.
17      Q.  Do you know why the Deputy Chief was making the
18  traffic assignment enforcement assignment to those
19  specific areas?
20      A.  No, I did not.
21      Q.  Did you ever ask?
22      A.  No.
23      Q.  Had the Deputy Chief or any other superior

LEAVITT REPORTING, INC.

Page 77

1  officers made assignments in traffic enforcement to
2  specific areas in the past?
3      A.  Yes, they had.
4      Q.  Do you know why they selected those specific
5  areas?
6      A.  That's because of, I guess, complaints that we
7  get as well as, obviously, motor vehicle accidents that
8  occur.
9      Q.  So the specific areas where the assignments
10 were made have higher incidents of either traffic
11 infractions or accidents.  Is that correct?
12         MR. HIGHTOWER:  Objection to form.  Answer the
13 question.
14     A.  I would say traffic complaints.  Because I go
15 up there and I've seen no complaints.  I know we've been
16 issued to or assigned to go to Vineyard Road before, and
17 I even actually spoke with the complainant himself, and
18 he said that cars were speeding down there.  And a lot of
19 these side roads, people don't understand the speed limit
20 there is 30 miles per hour and the cars going down there,
21 although they look like they're speeding, they're
22 actually going 25 miles an hour.  And I actually sat
23 there and spoke with one of the complainants one day.
                 LEAVITT REPORTING, INC.

Page 78

1      Q.  But that individual had actually complained to
2  the town?
3      A.  Yes.
4      Q.  Do you know if the police department, in fact,
5  gets a lot of complaints about speeding in town?
6      A.  Yeah, the Chief and Deputy Chief have over the
7  past year continuously said that we're getting multiple
8  complaints.
9      Q.  Do you know if that was the case prior to
10 April, 2014?
11     A.  I hadn't heard anything since, of the
12 complaints or any system.  I thought it's just based off
13 where to go, from what I've been assigned.
14         MS. ECKER:  I'm going to take a quick break.
15         (Brief recess)
16     Q.  If you could turn to Page 6 and in Paragraph
17 22.  I'm going to have to refer to one of your complaint
18 exhibits attached to your complaint.  You write "A true
19 and accurate copy of the unlawful order protocol Delaney
20 provided to Carini on May 29, 2013, is attached as
21 Exhibit 4."  So it's attached as Exhibit 4 to your
22 complaint.  If you can turn to that.  So when you say you
23 attach Exhibit 4, the unlawful order, are you referring
                 LEAVITT REPORTING, INC.

Page 79

1  to -- This is part of, what, the police manual?
2      A.  I believe it's the Abington Police rules and
3  regulations.
4      Q.  So in the paragraph I just sent to you, you
5  write, "At that time, Delaney provided Carini with a copy
6  of Abington Police Rule 7.0 concerning unlawful orders,
7  discussed the Newton cases with Carini at the time, and
8  told Carini he no longer desired to follow the Money
9  Ticket Quota System because he felt it was in violation
10 of the law."  When you were speaking with Sergeant
11 Carini -- was it Sergeant Carini at the time?
12     A.  Yes.
13     Q.  -- Sergeant Carini, did you use the term Money
14 Ticket Quota System?
15     A.  I said that -- No, I didn't say the term Money
16 Ticket Quota System.
17     Q.  What did you specifically say to Sergeant
18 Carini?
19     A.  I said that him ordering us to write more money
20 tickets than warnings was going against the officer's
21 discretion which is part of law based on that Newton
22 Police Association case as well as what's written in the
23 law itself.
                 LEAVITT REPORTING, INC.

Page 80

1      Q.  What law are you referring to?
2      A.  Chapter 90, Section 2, and I believe also
3  Section 3.
4      Q.  When did you first become aware of Chapter 90,
5  Sections 2 and 3?
6      A.  When I was in the police academy training.
7      Q.  Who trained you on that law?
8      A.  Attorney Patrick Rogers.
9      Q.  Did Mr. Rogers or Attorney Rogers give you any
10 training material, written material?
11     A.  I don't believe so.  I think it was a
12 PowerPoint.
13     Q.  Did Attorney Rogers provide you with the Newton
14 case at that times?
15     A.  Yes.  He talked about the Newton Police
16 Association case in which Chief Cordeiro had ordered his
17 officers to write money tickets.
18     Q.  Do you know specifically what the Chief in the
19 Newton case had ordered his officers to do?
20     A.  Based off what I think I believe I wrote in my
21 affidavit as well, or not my affidavit, to my appeal to
22 the selectmen, I kind of explained it in there.  And off
23 of what I know, and I believe the police chief ordered
                 LEAVITT REPORTING, INC.

Page 81

1  officers to write money tickets, because he believed that
2  there was, his officers were writing, like, seven percent
3  money tickets to 90 percent issuance of warnings, and
4  said it was an abuse of discretion, and he said that any
5  major intersection, if they saw a violation, they had to
6  issue a money citation.
7      Q.  Do you know if the Chief in Newton in that case
8  took away all of the officers' discretion as to whether
9  they can write warnings or fine citations?
10         MR. HIGHTOWER:  Objection.  Calls for legal
11 conclusion.
12     Q.  You can answer.  Do you know that?
13         MR. HIGHTOWER:  Based on whatever facts you
14 have, you can answer that.
15     A.  Can you repeat the question?
16     Q.  Sure.  When you were speaking with Sergeant
17 Carini in 2013, did you know that the Newton Police Chief
18 in the Newton case that you referred to had taken away
19 all of the discretion his officers had as to whether to
20 write written warnings or fine citations?
21         MR. HIGHTOWER:  Objection.  The law speaks for
22 itself.
23         MS. ECKER:  I'm asking what he knew at the
                    LEAVITT REPORTING, INC.

Page 82

1  time.
2      Q.  Did you know that at the time?
3          MR. HIGHTOWER:  Objection.  Hold on for a
4  second.  The question, as I understand it, this is why
5  I'm objecting --
6          MS. ECKER:  Let me reask.  I don't want you to
7  testify.
8          MR. HIGHTOWER:  I'm not testifying.  I want to
9  make sure.
10     Q.  When you spoke with Sergeant Carini in 2013,
11 had you read the Newton case?
12     A.  Yes, I had.
13     Q.  How many times had you read it?
14     A.  Not the whole case.  It's written in our police
15 books, in the motor vehicle law books, which is provided
16 by the Abington Police Department.
17     Q.  So have you ever read the entire Newton case?
18     A.  I believe I read a transcript that I included
19 in my attorney general's complaint.
20     Q.  What do you mean, transcript?  The case law?
21     A.  Yeah, I don't really understand the whole.
22     Q.  Did you ever have an understanding of the facts
23 of the Newton case in 2013?
                    LEAVITT REPORTING, INC.

Page 83

1      A.  I had the understanding, based off of what I
2  learned from Attorney Patrick Rogers as well as what was
3  displayed in the training books and what I was trained on
4  at the police academy, it was the officer's discretion at
5  the time of the motor vehicle violation to decide and
6  have the discretion to issue a civil citation, a warning
7  or a verbal warning.
8      What I understood from the Newton case was that it
9  was put up for -- From what I understand from reading it,
10 it was put up to the, it was put up to some court.  They
11 sided with the Chief on that, and then they brought it
12 to, like, the Mass. Appeals Court.  And then the appeals
13 court said they brought it back to where the law was, and
14 the law was -- Previously they changed the law, the
15 section of the law, either Chapter 90, Section 2 or
16 Section 3, because the chiefs of police had -- Before
17 that, you would issue a citation, then send it up to the
18 police chief, and then he would make the decision on
19 whether or not it was a civil citation or a warning based
20 off that.  They took that discretion away from the police
21 chief and gave it to the police officers.  And the
22 judges, from what I read, the judges -- it was
23 unambiguous about the police officer's discretion on
                    LEAVITT REPORTING, INC.

Page 84

1  every motor vehicle stop.
2      Q.  Did you believe that or did you believe in 2013
3  that the Newton police case barred the chief from having
4  any discretion whatsoever in what his officers were to do
5  as regards issuing tickets versus warnings?
6      A.  Yes.
7      Q.  What did you base that on?  Just what you
8  learned at the academy?
9          MR. HIGHTOWER:  Objection.  Asked and answered.
10 Go ahead.
11     A.  Just how I just explained.  What I learned at
12 the academy, was trained by Attorney Patrick Rogers and,
13 obviously, what I read in the Newton Police Association
14 versus the Newton police chief.
15     Q.  Do you know whether or not, from what you read,
16 whether the Newton police chief had told his officers
17 they couldn't write any warnings, that they were mandated
18 to write all fine citations?
19     A.  I thought I just explained that.
20     Q.  That specific question, do you know from your
21 understanding of reading the Newton case whether the
22 Newton police chief had mandated that his officers write
23 all fine citations and no written warnings?
                    LEAVITT REPORTING, INC.

Page 85

1    MR. HIGHTOWER: Objection. Case law speaks for
2  itself.
3    A.  From what I understood of the case, it was the
4  Newton police chief had ordered them to write money
5  tickets at certain intersections and they couldn't write
6  warnings.
7    Q.  Has Chief Majenski ever ordered you to write
8  all money tickets at certain locations in the Town of
9  Abington?
10    A.  No.  But -- No.
11    Q.  Has the Deputy Chief ever ordered you to write
12  all money citations in certain locations in the Town of
13  Abington?
14    MR. HIGHTOWER: Objection to form.
15    A.  Based off the e-mail that I saw, the
16  explanation of the e-mail and how it was explained was
17  that we were unable to, during an hour traffic assignment
18  we weren't allowed to get no motor vehicle citations
19  because the Deputy Chief said that after he sits there
20  for an hour, that getting no violators would be absurd.
21  And the issuance was that you had to write more money
22  citations than warnings.  So it was explained to me you
23  had to at least get one money ticket during that traffic
LEAVITT REPORTING, INC.

Page 86

1  enforcement by Sergeant Carini.  And, obviously, if you
2  were to get more money tickets than warnings, if you
3  ended up pulling over a car and had given a warning, now
4  you have to get two money tickets.  So it's almost worse
5  than to say you have to get a civil citation.
6    Q.  That's what Sergeant Carini explained to you?
7    A.  Yes.
8    Q.  When did Sergeant Carini say that to you?
9    A.  Sergeant Carini -- Myself and Sergeant Carini
10  had multiple conversations in regards to the issue of
11  this.  And I obviously said right at the beginning, I
12  gave him the order, I said, "Hey, this is illegal, we
13  can't be doing this."  And he said to me, you know, "Just
14  go out there and do it."
15    And then he ended up coming up on my car stop, one
16  of my car stops, saying, you know, he didn't want to see
17  me get in trouble and that he was asking me what I was
18  issuing.  And then he said, "Hey, what can we do to try
19  to get over this and try to get more money tickets than
20  warnings?  Because I have to send an e-mail to the Chief
21  and Deputy Chief at the end of every shift explaining how
22  many tickets, money citations versus warnings were given
23  by each officer."  I saw him type that e-mail.
LEAVITT REPORTING, INC.

Page 87

1    And he said to me, he said, "How about after that
2  hour assignment you go out and then you go get some money
3  tickets and then I'll put those tickets in as well, so we
4  can say, hey, the shift ended at this percentage compared
5  to this percentage of money tickets compared to
6  warnings."  Then I issued, I remember I issued, like,
7  five, I think it was four warnings and one money ticket,
8  I told him one day.  Then he went out and he pulled over
9  three cars and wrote three money tickets to try to get
10  that percentage.
11    Q.  Sergeant Carini did?
12    A.  Yes.
13    Q.  Had you ever heard the Deputy Chief ever order
14  anybody to write all money tickets?
15    MR. HIGHTOWER: Objection to form.
16    A.  No.
17    Q.  Have you ever heard the Deputy Chief order any
18  officer to write all money tickets in any specific
19  location?
20    MR. HIGHTOWER: Objection.
21    A.  No.
22    Q.  Have you ever heard the Deputy Chief ever order
23  any officer to write a money ticket on any particular
LEAVITT REPORTING, INC.

Page 88

1  stop?
2    MR. HIGHTOWER: Objection to form.
3    A.  Are you saying to me or?
4    Q.  Any of your officers.
5    A.  Officer Kevin Cutter was informed by the Deputy
6  Chief to write money tickets only during his overtime
7  traffic assignment on, I think it was, on May 29th.  From
8  what I understand, he did go out and write those money
9  tickets to the point that Officer Gerard Julien-Suarez
10  informed me that there was a ticket appeal in front of
11  the clerk magistrate for a speeding ticket.  I think it
12  was 31 miles an hour in a 30 miles per hour zone.
13    Q.  Have you seen that ticket?
14    A.  I have not.  But that was informed to me.
15    Q.  Do you know if motorists often appeal the
16  tickets that are issued to them?
17    A.  Yes.
18    Q.  It's quite common, correct?
19    A.  No.  People will pay them if they're, you know,
20  caught speeding, obviously.
21    Q.  Why did you object to writing fine citations if
22  the motorists were going at least ten miles over the
23  speed limit?  Why did you object to that?
LEAVITT REPORTING, INC.

Page 93

1    MR. HIGHTOWER:  He can't speak for all police
2  officers.
3    A.  Like I said --
4    MS. ECKER:  I'm asking.  He's a police officer.
5    Q.  You're a police officer.  Correct?
6    A.  Yes.
7    Q.  You engage in traffic enforcement.  Correct?
8    A.  Yes.
9    Q.  What is your belief as to whether issuing a
10  fine citation versus a written warning, the effect it has
11  on deterring a motorist's behavior?
12    MR. HIGHTOWER:  Objection.  Asked and answered.
13    MS. ECKER:  He hasn't answered because you have
14  objected three times.
15    MR. HIGHTOWER:  Answer.
16    A.  You're asking my personal opinion?
17    Q.  Yes.
18    A.  I have seen that warnings do go a far way.  But
19  a civil citation is more of a penalty.  You would take
20  all the circumstances of what occurred with the
21  violation, the seriousness of it, and decide whether or
22  not, hey, I'm going to issue the civil citation to this
23  party.
     LEAVITT REPORTING, INC.

Page 94

1    Q.  Had your percentage of money tickets gone down
2  since 2013?
3    A.  Yes, they have.
4    Q.  Why?
5    A.  I'm, like I said, I'm not sure.  You can't sit
6  here and put the numbers together because, like, every
7  stop has been different.
8    Q.  And, in addition to written warnings and fine
9  citations, you can also just give a verbal warning.
10  Correct?
11    A.  Yes.
12    Q.  And those aren't tracked by the Abington Police
13  Department.  Correct?
14    A.  They are.
15    Q.  How?
16    A.  By community policing sheet.
17    Q.  So you write down in your community policing
18  sheets how many verbal warnings you have given motorists?
19    A.  Yes.
20    Q.  Who created that sheet?
21    A.  I believe -- I forget.  I was told by Officer
22  Cantalupo, this was I believe sometime, I think it was
23  sometime in the end of 2013, he ordered me to write my
     LEAVITT REPORTING, INC.

Page 95

1  community policing sheets and break them up by money
2  citation, written warning, and verbal warning.  And I
3  believe there's also, there's an e-mail that Gerard
4  Julien-Suarez was also informed he needed to do that.
5  And I think it was sent by the Deputy Chief to give him
6  credit for his verbal warnings motor vehicle stops.
7    Q.  Were you required to do that to give you credit
8  for your verbal warning motor vehicle stops?
9    A.  I was just ordered to do it.
10    Q.  By the Deputy Chief?
11    A.  By Todd Cantalupo.
12    Q.  Now, when you were objecting to having to write
13  more fine citations in May, 2013 to June, 2013, did you
14  go to the union and grieve that order?
15    A.  I went to Todd Cantalupo.  I asked to set up a
16  meeting with the union representative, Bill Chaisson.
17    Q.  Did that meeting occur?
18    A.  It did not.
19    Q.  Did you ask again?
20    A.  Yes.  Multiple times.
21    Q.  Why didn't that meeting occur?
22    A.  Todd was aware on, I think it was, like, he was
23  on his active duty military.  He wasn't at the station,
     LEAVITT REPORTING, INC.

Page 96

1  and it just, it just stopped.  He said it was a dead
2  issue.
3    Q.  Did you have any other conversations with
4  Officer Cantalupo about that?
5    A.  I had a conversation with him, I think it was,
6  like, two days before I was going to file with the
7  attorney general's office.  And he warned me, he said,
8  you know, "Don't do it.  Don't drop it off.  The Chief is
9  a vindictive person.  He's going to come after you."
10    Q.  What did Officer Cantalupo say about the Chief
11  being a vindictive person?
12    A.  That's what he said to me.
13    Q.  That's it?
14    A.  Yeah.
15    Q.  You didn't ask him why he thought that?
16    A.  No.  Not at the time, no.
17    Q.  Prior to your coming to the Abington Police
18  Department, did you know Chief Majenski?
19    A.  No.
20    Q.  Did you have any interaction with Chief
21  Majenski prior to coming to the Abington Police
22  Department?
23    A.  No, I did not.
     LEAVITT REPORTING, INC.

Page 97

1    Q.  Did any of your family members have interaction
2  with Chief Majenski prior to coming to the Abington
3  Police Department?
4    A.  I found out my family did when my peers started
5  coming up to me saying that the Chief had told them to
6  look up a report that involved my father getting arrested
7  by him for a domestic violence.
8    Q.  Was your father arrested for domestic violence?
9    A.  I haven't seen the report, but I know when I
10  was younger I was the one who was calling the police on
11  him.
12    Q.  Do you know if Chief Majenski was one of the
13  ones who arrested him?
14    A.  I didn't know at the time, but that's what
15  people are telling me.
16    Q.  Who told you that?
17    A.  Gerard Julien-Suarez told me Sergeant McCollem
18  had come up and given him an incident report and told him
19  to look it up in the IMC system and he said it would be
20  interesting.
21    Q.  Do you know what conversation the Chief was
22  having with him when that came up?
23    A.  No.  I'm not exactly sure.
LEAVITT REPORTING, INC.

Page 98

1    Q.  Do you know when that conversation occurred?
2    A.  It was sometime, like, right before the union
3  elections in March of -- Not March.  February of 2014.
4    Q.  Did any of your other family members that
5  you're aware of have any interaction with Chief Majenski
6  prior to your coming on to the force?
7    A.  No.
8    Q.  What about the Deputy Chief, did you know the
9  Deputy Chief prior to your coming on to the force?
10    A.  No, I did not.
11    Q.  Do you know if any of your family members had
12  any interaction with the Deputy Chief prior to your
13  coming on to the force?
14    A.  No.
15    Q.  Did you ever file a grievance regarding having
16  to write fine citations versus written warnings?
17    MR. HIGHTOWER:  Objection to form.
18    A.  No.
19    Q.  Why not?
20    MR. HIGHTOWER:  Objection to form.
21    A.  At that point it was past the 30 days.
22    Q.  Have you ever filed a grievance after that
23  point about having to write more written warnings?
LEAVITT REPORTING, INC.

Page 99

1    A.  No.  Like I said, I believe it was illegal and
2  I reported it to Sergeant Carini, and then I reported it
3  to the attorney general's office twice, and then I
4  reported it to the town manager and then the town board
5  of selectmen.
6    Q.  But you never filed a grievance?
7    A.  No.
8    Q.  You're union president currently?
9    A.  Yes.
10    Q.  Is it your belief that you're still required to
11  follow an illegal order?
12    A.  Can you repeat the question?
13    Q.  Sure.  As you sit here today, is it your belief
14  you're still being required to follow an illegal order by
15  writing more money citations?
16    MR. HIGHTOWER:  Objection to form.
17    A.  That I am?
18    Q.  Yes.
19    A.  I'm court prosecutor.  I'm not even on the
20  road.
21    Q.  Prior to your becoming court prosecutor, is it
22  your belief, was it your belief ongoing after 2013 you
23  were still required to write more money citations?
LEAVITT REPORTING, INC.

Page 100

1    A.  I was -- I went to the shift in January, 2014
2  -- Not January -- March of 2014 with Sergeant Owings,
3  and, like I said, that Sergeant Owings told me that the
4  Lieutenant had come to him and requested that I write
5  33 percent issuance of money tickets over warnings.  So
6  it dropped down, it went from 50 percent to 33 percent.
7    Q.  Did you file a grievance based on that order?
8    A.  No, I did not.  I reported it as illegal again,
9  and then Sergeant Owings went in and had a conversation
10  with the Chief, the Deputy Chief, informing them of the
11  illegal order and that I wasn't going to follow it.
12    Q.  But you never filed a grievance based on having
13  to write fine citations.  Correct?
14    MR. HIGHTOWER:  Objection to form.
15    A.  No, I have not.
16    Q.  You're currently union president.  Correct?
17    A.  Yes.  Currently.
18    Q.  You became union president in, what, 2014?
19    A.  I believe it was the, I believe it was the
20  beginning of May.  Maybe end of April, 2014.  I'm not
21  even exactly sure of the date.
22    Q.  If you can turn to, they're attached to the
23  complaint, Exhibit 3.  Exhibit 3 contains four e-mails,
LEAVITT REPORTING, INC.

Page 101

1  as best I can tell. Is that correct?
2      A. Yes.
3      Q. The first e-mail, they're not necessarily in
4  order, is June 11, 2013, and that e-mail is to, appears
5  to be to all the officers from the Deputy Chief.
6  Correct?
7      A. Yes.
8      Q. The second e-mail, the next page, is dated
9  November 18, 2014, and is also from the Deputy Chief to
10  the officers. Is that correct?
11      A. Yes.
12      Q. The third e-mail is dated March 10th of 2014,
13  and that appears to be to Sergeant Owings from the Deputy
14  Chief. Correct?
15      A. Yes.
16      Q. And then the final e-mail is to you from the
17  Deputy Chief and it cc's other superior officers.
18  Correct?
19      A. Yes.
20      Q. Keep your finger on Exhibit 3, so when I tell
21  us to flip back, and go to Page 6, Paragraph 22.
22  Actually, I'm wrong. Page 5. I'm sorry. Paragraph 19.
23  It says, "Police officers were mandated to follow the

LEAVITT REPORTING, INC.

Page 102

1  Money Ticket Quota System or were to be punished. Deputy
2  Cutter would reward officers who followed the Money
3  Ticket Quota System by praising them and providing them
4  the overtime assignments where they can increase their
5  compensation and write money tickets." Then you attach
6  this Exhibit 3. Now, where in Exhibit 3 does Deputy
7  Chief say he's going to punish any police officer for not
8  following a Money Ticket Quota System?
9      A. I believe it's on the one that says to, it's
10  the one that was sent from Sergeant Gambino. So it was,
11  so the Deputy Chief says, "It may be mandated in the
12  future to address the traffic problem areas" down at the
13  bottom there. That it will come back up again.
14      Q. It says, "As stated, although I have no current
15  directive on money," and he uses the dollar sign,
16  "citations, it is part of your job and it may be mandated
17  in the future to address traffic problem areas." So
18  where in that statement or in this e-mail that's dated
19  June 11, 2013, is the Deputy Chief, first of all,
20  talking about a Money Ticket Quota System?
21      A. Right there. Mandated.
22      MR. HIGHTOWER: Which page are we on here?
23      MS. ECKER: The first e-mail, Exhibit 3.

LEAVITT REPORTING, INC.

Page 103

1      MR. HIGHTOWER: I have September -- I'm sorry.
2  I have printed on September 22nd. I see what you're
3  saying.
4      A. So it's written in here that he believes that
5  requesting a majority of citations, of money citations,
6  and that's part of the job and that it's going to be
7  mandated in the future. And mandated is obviously the
8  word used to mandate that officer's discretion with
9  writing more money tickets than warnings, which would
10  ultimately take the discretion away. It's not giving the
11  discretion to the officer to make that call on each stop.
12  Because an officer pulls over one car and they give them
13  a warning, that next car stop is going to have to be a
14  money ticket based on what the Deputy Chief is mandating
15  in this e-mail.
16      Q. I see the word "mandated" one time. It says,
17  "It is part of our job and it may be mandated in the
18  future." Is there anywhere in any of these e-mails that
19  is attached as Exhibit 3 that the Deputy Chief does
20  mandate it?
21      A. Mandated? So March 10, 2014, he's saying to --
22  Like I said, he sent to Sergeant Owings, he sent him
23  multiple e-mails about the officer's discretion and

LEAVITT REPORTING, INC.

Page 104

1  writing he wants to see more money citations, and he
2  began threatening Sergeant Owings with failure to
3  supervise because he wasn't getting the officers to write
4  more money citations. And Sergeant Owings had
5  conversations with me once, I was on that shift, in which
6  he said that, you know, he was being threatened to make
7  the officers write money citations in order to stay away
8  from failure to supervise.
9      Q. Do you see anywhere in the e-mails in Exhibit 3
10  that the Deputy Chief is mandating that officers write
11  money citations?
12      MR. HIGHTOWER: Objection. Form. The document
13  speaks for itself.
14      A. Obviously, the last e-mail says that he's
15  trying to get Officer Marquardt as well as Paige to write
16  money citations. I would say that's mandating them to
17  write money citations. Because then he's going to punish
18  the supervisors if they don't.
19      Q. Do you know the conversations that were going
20  on between the Deputy Chief and Sergeant Owings at the
21  time about Sergeant Owings' supervision of his officers
22  in general?
23      MR. HIGHTOWER: Objection to form.

LEAVITT REPORTING, INC.

Page 105

1    A.   From this?
2    Q.   From anything that you know.
3        MR. HIGHTOWER:  Objection to form.  Document
4   speaks for itself.
5    Q.   Do you know anything that was going on at the
6   time regarding conversations between the Deputy Chief and
7   Sergeant Owings that led to this e-mail being written on
8   March 10, 2014, that's part of your Exhibit 3 concerning
9   Sergeant Owings's lack of supervision of officers on his
10  shift?
11       MR. HIGHTOWER:  Objection.  Document speaks
12  itself.
13   Q.   I'm not talking about the documents.  I'm
14  asking anything you know.
15   A.   Sergeant Owings said that he was speaking with
16  the Deputy Chief because he kept saying for him to get
17  the percentages up on his officers based on money
18  citations to warnings.  Just how it had happened with me,
19  with the Lieutenant coming to him, asking for me to get a
20  33 percent issuance of money tickets versus warnings.
21  And he told me that the Deputy Chief was doing the same
22  thing with him as well on this with Officer Paige and
23  Officer Marquardt, and that he was being threatened with

LEAVITT REPORTING, INC.

Page 106

1   failure to supervise.
2    Q.   Do you know if there were other supervision
3   issues with Sergeant Owings at the time?
4    A.   No, I did not.
5    Q.   Did you ever ask him if there were other
6   supervision issues that he was having that the Deputy
7   Chief was talking to him about at the time?
8    A.   I did not see anything.  I think Sergeant
9   Owings is a good sergeant.
10   Q.   Did Sergeant Owings tell you anything that he
11  said to the Deputy Chief about not being able to
12  supervise his officers and them not doing what he asked
13  them to do?
14   A.   I know that he told the Deputy Chief it was
15  illegal, based off the conversations.  He went in there
16  and presented the Newton police case as well, told them,
17  listen, this is illegal, we can't do it.  And then he
18  came back and, you know, he went in there, he gave them
19  the Newton police case, spoke with the Chief as well as
20  the Deputy Chief, and at that time the Chief said, "Well,
21  if I can't order them to do traffic assignments, then I'm
22  going to put them in front of the schools, and the
23  officers can sit in front of the schools for two hours

LEAVITT REPORTING, INC.

Page 107

1   from six to eight a.m."
2    Q.   Were you part of that conversation?
3    A.   That's what Sergeant Owings informed me.
4    Q.   Did you ever hear the Chief ever tell anybody
5   that the officers were to sit in front of the school and
6   do nothing for two hours?
7    A.   I pulled over the school principal.
8    Q.   My specific question is this.  Did you ever
9   hear the Chief tell anybody that the officers were to sit
10  in front of the school during that assignment and do
11  nothing?
12   A.   I didn't hear it from my ears, but I heard it
13  through Sergeant Owings.
14   Q.   What did Sergeant Owings tell you the Chief
15  said?
16   A.   Sergeant Owings told me that the Chief said
17  after I conducted a motor vehicle stop and he got a call
18  from the Chief, he called me and he said, "Hey, he
19  doesn't want us doing traffic up there.  He wants you to
20  sit there and do nothing."
21   Q.   You never heard the Chief say that.  Correct?
22   A.   No.
23   Q.   Was it your understanding that you were

LEAVITT REPORTING, INC.

Page 108

1   supposed to be conducting traffic enforcement when you
2   were assigned to the schools?
3    A.   I said to Sergeant Owings, I said, "Listen,
4   there's cars going by me.  I'm going to pull them over
5   especially when I'm sitting in front of the school in a
6   marked cruiser.  I'm not going to sit there and watch a
7   car driving ten miles an hour over the speed limit down
8   the boulevard coming into school and not pull over a
9   car."  I was doing my job.  And then the Chief comes over
10  the radio and asks Sergeant Owings to call his cell
11  phone.  And then Sergeant Owings, from what he told me,
12  called the Chief, the Chief said, "Hey, I don't want them
13  doing traffic assignment up there.  I want them just
14  sitting there."  Then he calls me.  He said, "Don't pull
15  any cars over.  Just sit there."  He said, "If there's
16  something outrageous that happens, obviously, act, but
17  that's it."
18   Q.   What was your understanding of the purpose
19  behind the school assignment?
20   A.   My -- It felt like punishment.  I felt like a
21  dunce in the corner with the hat on.
22   Q.   Do you know that some of your fellow officers
23  liked the assignment?

LEAVITT REPORTING, INC.

Page 113

1   Q.  I'm talking about the -- So you're at the
2   school.  You have the school assignment March of 2014
3   until sometime until the end of school?
4   A.  Until I got off that shift.
5   Q.  When did you get off the shift?
6   A.  I got off the shift in July.  I believe I went
7   to the four to twelve shift.
8   Q.  So the school assignment lasted for the
9   midnight to eight shift from approximately March, 2014,
10  until the end of the school year?
11  A.  Yes.
12  Q.  Which makes sense, correct?  Why would you have
13  officers --
14  A.  That traffic assignment got moved from six to
15  eight to the Abington Centers.
16  Q.  I think we're misunderstanding each another.
17  You're telling me that you were assigned to sit up at
18  this school and do traffic enforcement, but to sit in
19  your cruiser and do nothing?
20  A.  Yes.
21  Q.  So you thought your assignment to the school in
22  March of 2014 was a traffic assignment?
23  A.  That's what we put it in the log as.  That's
                    LEAVITT REPORTING, INC.

Page 114

1   what it was called, I guess.  I don't know.  That's.
2   Q.  So you're telling me you sat up at the high
3   school from March, 2014, until you changed your shift
4   towards June of 2014, for two hours doing traffic
5   enforcement, but you were instructed not to do any
6   traffic enforcement?
7   A.  Like I said, I pulled over the school
8   principal, and then I got a call from my sergeant saying,
9   "Hey, don't do traffic enforcement up there unless
10  something outrageous happens in front of you.  Then do
11  it."  So I had to sit there in front of the school.
12  Q.  That's not my question.  My question is this.
13  From March, 2014, when you were assigned to the school,
14  until whenever you bid off that shift, you believe that
15  was a traffic enforcement assignment.  Correct?
16  A.  That's what it was called, yes, traffic
17  enforcement.
18  Q.  Did you believe you had any other
19  responsibilities during that assignment to the school?
20  A.  I had no other responsibilities but to sit
21  there because I got yelled at when I pulled over a car.
22  Q.  You didn't think some of the assignment was to
23  interact with the students and their parents?
                    LEAVITT REPORTING, INC.

Page 115

1   MR. HIGHTOWER:  Objection.  Asked and answered.
2   A.  No.
3   Q.  Do you know if any of the officers who had that
4   assignment actually did interact with students and
5   parents?
6   A.  Like I said, the school assignment, it started
7   in September -- in March of 2014, and then it was only my
8   midnight to eight shift that had to do it.  I explained
9   how I pulled over the car, I was trying to stop the
10  speeders there, and then I was told to sit there and do
11  nothing.
12  Then I filed my complaint with the attorney
13  general's office, my 118-page affidavit detailing the
14  Money Ticket Quota System.  I dropped it off with the
15  town manager, and immediately that day the Deputy Chief
16  sent an e-mail saying that all shifts would go back to
17  the school assignments and that they'd have to go back in
18  front of the school assignments.
19  Then I actually had people like Officer Gerard
20  Julien-Suarez, Sergeant Mark Kilgour, Officer Marquardt,
21  Officer Paige, who were actually angry at me because they
22  felt that because I dropped off the affidavit that we
23  were once again being retaliated, and it made me feel
                    LEAVITT REPORTING, INC.

Page 116

1   bad.
2   Q.  Officer, when did you drop off the affidavit,
3   this affidavit you're talking about, with the town
4   manager?
5   A.  I believe it was October.  It's written in
6   there.  I forget.  Sometime in October.
7   Q.  Of 2014?
8   A.  Yes.
9   Q.  So was there any other school assignment --
10  Prior to October 14th, is it your testimony the only
11  school assignment was the midnight to eight shift that
12  you were assigned to to sit up at the high school and do
13  traffic enforcement for two hours every day?
14  A.  Yes.  From what I can recall, that was the
15  two-hour traffic assignment at the high school.
16  Q.  Did you have any interaction with the principal
17  of the high school during your assignment?
18  A.  I did.
19  Q.  What interaction did you have?
20  A.  I pulled her over.  She was speeding.  I ended
21  up giving her a warning.  Then later on, in September or
22  October, I believe -- No.  Sometime after October, 2014,
23  when we were back up on the school assignment, and this
                    LEAVITT REPORTING, INC.

Page 117

1  time we were told we were allowed to leave the vehicle
2  and walk around and interact with the students, I went
3  into the principal, went into, like, the Abington office
4  in the middle of the Abington High School.  I was
5  speaking with Miss Kelleher and another female party
6  there.  I forget what job she does.  Then I saw the
7  principal who I know as Theresa Sullivan.  I don't know
8  what her new name is now.  She came out and goes, "Oh,
9  what are you doing out there?"  I was, like, "Oh, just
10  coming up here, you know, seeing the kids, all this."
11  She goes, "Oh, usually when you guys are up here it's
12  when you're being punished."
13        Q.  Who said that?
14        A.  The school principal.
15        Q.  Why did she think it was because you were being
16  punished?
17        A.  I didn't ask.
18        Q.  Did you believe it was punishment duty?
19        A.  I did not.
20        Q.  Why not?
21        A.  I attempted to go through the town by saying
22  that I was being harassed with multiple, multiple written
23  statements and documents and saying everything, and it
          LEAVITT REPORTING, INC.

Page 118

1  was left unanswered.
2        Q.  Have you ever filed a grievance on your own
3  behalf?
4        A.  I filed grievances on the union's behalf.
5        Q.  But anything that you have complained about?
6        MR. HIGHTOWER:  I'm sorry?
7        Q.  Have you ever filed grievances on anything that
8  you have complained about?  I know you filed for other
9  officers.
10        MR. HIGHTOWER:  I'm going to object to the
11  form.  But are you asking if he filed a grievance for
12  himself about things that he complained about?
13        MS. ECKER:  That's correct.
14        MR. HIGHTOWER:  So about your complaints,
15  things that you complained about, have you filed a
16  grievance about things you complained about, not
17  complaints by other officers.
18        A.  Prior to me complaining about it?
19        Q.  At any time.
20        A.  I think I filed -- I don't think I filed
21  grievances, but I can't really recall without looking at
22  what I wrote in my affidavit to the selectmen because I
23  know to the selectmen I wrote down some of the union
          LEAVITT REPORTING, INC.

Page 119

1  issues that we were having.
2        Q.  Going back, and I got sidetracked, I apologize,
3  to Exhibit 3 which is the four e-mails we spoke about.
4  Again, hold your finger there and turn back to Page 5 of
5  the complaint.  This is all Exhibit 1.  Paragraph 19.
6  You write in the second sentence, "Deputy Cutter would
7  reward officers who followed the Money Ticket Quota
8  System by praising them and providing them with overtime
9  assignments where they could increase their compensation
10  and write more money tickets."  Where in Exhibit 3 do you
11  see that Deputy Cutter rewarded officers who wrote more
12  money tickets?
13        A.  As you can see, it would be the e-mail dated,
14  that it was printed November 18th by me, sent from the
15  Deputy Chief to all the officers and sergeants, including
16  the Chief, and I believe the Lieutenant is in there as
17  well.  So it's the traffic enforcement efforts.
18        And he writes an e-mail saying, "I would like to say
19  a thank you to all the officers who are doing a good job
20  on traffic enforcement.  As I looked through some of the
21  statistical data, it reminds me of the job you are doing
22  to slow vehicles down."  And then he listed Officer
23  Sweeney, Officer Franey, Acting Sergeant Kilgour, Officer
          LEAVITT REPORTING, INC.

Page 120

1  Cutter, Officer Doherty, Officer Simmons, Officer
2  Kokoros, and Officer Davern.
3        And based, from what I saw, from the people who were
4  doing the traffic enforcement efforts, other than the
5  midnight to eight shift that I believe was doing the
6  school assignments at the time, I was the only officer
7  that wasn't included in that list.  So he was secluding
8  me from saying that, and all these other officers saw
9  that as well because it was, obviously, the e-mail was
10  sent to them.
11        In regards to the overtime assignments back in --
12        Q.  Let's stick with this e-mail a second.  So you
13  say that -- Is there something wrong with this e-mail
14  dated November 18, 2014, in your mind, where Deputy
15  Cutter is thanking officers for doing a good job in
16  traffic enforcement?
17        MR. HIGHTOWER:  Objection to form.
18        A.  He's thanking everybody but me and saying he's
19  using statistical data but not saying what it is.  I can
20  only sit there and.
21        Q.  So if he included the statistical data, do you
22  think there would be anything wrong with the e-mail?
23        A.  I wouldn't see why.  I mean.
          LEAVITT REPORTING, INC.

Page 117

1   time we were told we were allowed to leave the vehicle
2   and walk around and interact with the students, I went
3   into the principal, went into, like, the Abington office
4   in the middle of the Abington High School. I was
5   speaking with Miss Kelleher and another female party
6   there. I forget what job she does. Then I saw the
7   principal who I know as Theresa Sullivan. I don't know
8   what her new name is now. She came out and goes, "Oh,
9   what are you doing out there?" I was, like, "Oh, just
10  coming up here, you know, seeing the kids, all this."
11  She goes, "Oh, usually when you guys are up here it's
12  when you're being punished."
13      Q.  Who said that?
14      A.  The school principal.
15      Q.  Why did she think it was because you were being
16  punished?
17      A.  I didn't ask.
18      Q.  Did you believe it was punishment duty?
19      A.  I did not.
20      Q.  Why not?
21      A.  I attempted to go through the town by saying
22  that I was being harassed with multiple, multiple written
23  statements and documents and saying everything, and it
            LEAVITT REPORTING, INC.

Page 118

1   was left unanswered.
2       Q.  Have you ever filed a grievance on your own
3   behalf?
4       A.  I filed grievances on the union's behalf.
5       Q.  But anything that you have complained about?
6       MR. HIGHTOWER: I'm sorry?
7       Q.  Have you ever filed grievances on anything that
8   you have complained about? I know you filed for other
9   officers.
10      MR. HIGHTOWER: I'm going to object to the
11  form. But are you asking if he filed a grievance for
12  himself about things that he complained about?
13      MS. ECKER: That's correct.
14      MR. HIGHTOWER: So about your complaints,
15  things that you complained about, have you filed a
16  grievance about things you complained about, not
17  complaints by other officers.
18      A.  Prior to me complaining about it?
19      Q.  At any time.
20      A.  I think I filed -- I don't think I filed
21  grievances, but I can't really recall without looking at
22  what I wrote in my affidavit to the selectmen because I
23  know to the selectmen I wrote down some of the union
            LEAVITT REPORTING, INC.

Page 119

1   issues that we were having.
2       Q.  Going back, and I got sidetracked, I apologize,
3   to Exhibit 3 which is the four e-mails we spoke about.
4   Again, hold your finger there and turn back to Page 5 of
5   the complaint. This is all Exhibit 1. Paragraph 19.
6   You write in the second sentence, "Deputy Cutter would
7   reward officers who followed the Money Ticket Quota
8   System by praising them and providing them with overtime
9   assignments where they could increase their compensation
10  and write more money tickets." Where in Exhibit 3 do you
11  see that Deputy Cutter rewarded officers who wrote more
12  money tickets?
13      A.  As you can see, it would be the e-mail dated,
14  that it was printed November 18th by me, sent from the
15  Deputy Chief to all the officers and sergeants, including
16  the Chief, and I believe the Lieutenant is in there as
17  well. So it's the traffic enforcement efforts.
18      And he writes an e-mail saying, "I would like to say
19  a thank you to all the officers who are doing a good job
20  on traffic enforcement. As I looked through some of the
21  statistical data, it reminds me of the job you are doing
22  to slow vehicles down." And then he listed Officer
23  Sweeney, Officer Franey, Acting Sergeant Kilgour, Officer
            LEAVITT REPORTING, INC.

Page 120

1   Cutter, Officer Doherty, Officer Simmons, Officer
2   Kokoros, and Officer Davern.
3       And based, from what I saw, from the people who were
4   doing the traffic enforcement efforts, other than the
5   midnight to eight shift that I believe was doing the
6   school assignments at the time, I was the only officer
7   that wasn't included in that list. So he was secluding
8   me from saying that, and all these other officers saw
9   that as well because it was, obviously, the e-mail was
10  sent to them.
11      In regards to the overtime assignments back in --
12      Q.  Let's stick with this e-mail a second. So you
13  say that -- Is there something wrong with this e-mail
14  dated November 18, 2014, in your mind, where Deputy
15  Cutter is thanking officers for doing a good job in
16  traffic enforcement?
17      MR. HIGHTOWER: Objection to form.
18      A.  He's thanking everybody but me and saying he's
19  using statistical data but not saying what it is. I can
20  only sit there and.
21      Q.  So if he included the statistical data, do you
22  think there would be anything wrong with the e-mail?
23      A.  I wouldn't see why. I mean.
            LEAVITT REPORTING, INC.

Page 121

1    Q.   And then in the last sentence Deputy Chief
2   Cutter writes, "Please understand that I really do think
3   your enforcement efforts go a long way to make the
4   roadways safer for all of us, which is my ultimate goal,
5   and the discretion you exercise on every motor vehicle
6   stop is valued." Do you see that?
7    A.   I see it.
8    Q.   He's acknowledging your discretion.  Correct?
9    A.   That was the first time my discretion was
10   acknowledged since November 18th.  That's November 18th,
11   2014, after I filed the complaint with the selectmen, I
12   believe.
13    Q.   So you think that because the Deputy Chief
14   didn't use the word "discretion" in any of his prior
15   e-mails regarding traffic enforcement that somehow those
16   e-mails were unlawful?
17    A.   No.  What I'm saying is please understand that
18   you go a long way and the discretion you exercise, that's
19   the first time he said that, that discretion is valued.
20   Because in the past it wasn't valued.  It was set up in a
21   Money Ticket Quota System where it would be a certain
22   percentage of money tickets you had to issue.
23    Q.   Again, you never heard the Deputy Chief say
                    LEAVITT REPORTING, INC.

Page 122

1   anything about a particular percentage.  Correct?
2    MR. HIGHTOWER:  Objection to form.
3    A.   Not to me, no.
4    Q.   Now I interrupted you.  You said you were going
5   to show me in these e-mails about punishment.
6    A.   I think we already covered the punishment.
7    Q.   In these e-mails?  What was the punishment?
8    A.   You said, like, mandated.  I think you said the
9   overtime assignments.  That's what you asked me.
10    Q.   Let me rephrase, so we're not confused.  You
11   said the Deputy Chief would reward officers who followed
12   the Money Ticket Quota System by praising them and by
13   providing them overtime assignments where they could
14   increase their compensation and write tickets.  What
15   officers were provided more overtime assignments?
16    A.   It would be -- So on May, I believe it was
17   around May 29th when I was ordered to write more money
18   tickets than warnings, taking away the discretion, it was
19   Officer Kevin Cutter who was given an overtime traffic
20   assignment to go out and write money tickets only.  Then
21   Ronald Sweeney was also provided a traffic assignment as
22   well that same day.
23    Then, if I could go back to March, 2014, when
                    LEAVITT REPORTING, INC.

Page 123

1   myself, Officer Marquardt, and Officer Paige were ordered
2   to do the school assignments, the relief shift, that was
3   the midnight to eight, they weren't ordered to do the
4   school assignments.  In fact, at the end of their shift,
5   I believe, I believe it was Sergeant Cantalupo had spoke
6   with the Deputy Chief and the Deputy Chief informed him
7   that Officer Ronald Sweeney and Officer Mark Kilgour
8   could stay for overtime if they wanted to and write
9   tickets.  And they did stay for overtime and write money
10   -- and write tickets.
11    Q.   Were you ever offered overtime to write tickets
12   and turned it down?
13    A.   I was not.
14    Q.   Ever?
15    A.   Offered by who?
16    Q.   Anybody.
17    A.   There's tickets grants that are put up and
18   posted, and then you can sign your name on it.  But this
19   wasn't how those overtime traffic assignments were put
20   up.
21    Q.   How were they put up?
22    A.   Like I said, it was from the Deputy Chief that
23   started saying that, hey, that shift can stay and write
                    LEAVITT REPORTING, INC.

Page 124

1   money, and write tickets.
2    Q.   It was the whole shift that could stay?
3    A.   That shift was rewarded, like I said.  You're
4   rewarded with overtime while the other shift is punished.
5    Q.   Why do you think the Deputy Chief selected that
6   shift to conduct overtime in traffic enforcement?
7    A.   I'm not sure.
8    Q.   So why do you think it was a reward other than
9   it was available?
10    A.   I know Ronald Sweeney probably writes the most
11   money tickets, from what I've seen in the past.
12    Q.   Do you know if he makes the most traffic stops
13   as well?
14    A.   I don't.
15    Q.   Is there a correlation between the number of
16   fine citations issued and the a number of traffic stops a
17   patrol officer makes?
18    A.   A number?
19    Q.   Is there a correlation between the number of
20   traffic stops an individual officer makes and the number
21   of fine citations issued?
22    A.   Like, in a sheet or?  Are you referring to,
23   like, exhibits or anything?
                    LEAVITT REPORTING, INC.

Page 125

1    Q.  I'm not referring to an exhibit.  Do you have
2   an understanding that the more traffic stops an officer
3   makes the more fine citations they're going to issue?
4        MR. HIGHTOWER:  Objection to form.
5    A.  No.  Like I said, it's completely different on
6   each and every car stop.  You can't sit there and say
7   this officer is going to make this amount of tickets
8   based on how many stops.
9    Q.  If an officer makes a hundred car stops versus
10  an officer who makes ten car stops, do you think the
11  officer who makes a hundred car stops is going to be
12  writing more fine citations?
13       MR. HIGHTOWER:  Objection.
14   A.  They could write all warnings and then the
15  other officer could write all money tickets, because it's
16  their discretion to decide at the time of the stop
17  whether to write the citation, warning, or verbal
18  warning.
19   Q.  Do you think that it's wrong for the Deputy
20  Chief or the Chief to assign officers to conduct traffic
21  enforcement who have made more motor vehicle stops than
22  officers who have made fewer car stops during a
23  particular time period?

LEAVITT REPORTING, INC.

Page 126

1    A.  Do I think it's wrong?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Why?
5    A.  I'd say, well --
6    Q.  I'm not talking about fine citations.  Just
7   talking about stops.
8    A.  Because it could be doing the same thing with
9   an ethical issue, and you'd be sitting there saying that
10  the person who writes the more, pulls over more cars gets
11  the overtime and gets the pay.  Now that officer is
12  sitting there.  I've sat in locations for one hour and
13  haven't seen anything, but another officer comes there
14  and sits there for one hour, they don't see anything, now
15  they're thinking, I'm going to have to try to get that
16  overtime assignment and so I'm going to have to pull over
17  a car with a violation that I don't see.
18   Q.  Have you ever been ordered to pull over a car
19  where there's been no civil infraction or any type of
20  infraction?
21   A.  No, I have not.
22   Q.  The Chief has never told you to pull over a
23  motor vehicle when there is no infraction that you have

LEAVITT REPORTING, INC.

Page 127

1   seen.  Correct?
2    A.  Yes.
3    Q.  What location in Abington have you sat for an
4   hour where you have seen no infraction whatsoever of
5   motor vehicle laws?
6    A.  Multiple locations.  They would be denoted on,
7   like, community policing reports.
8    Q.  Can you think of any as you sit here today?
9    A.  I know the first day on Vernon Street I didn't
10  see a single speeder when I was sitting there.
11   Q.  How long did you sit there?
12   A.  One hour.
13   Q.  When you were up at the school and doing the
14  school assignment, who did you tell that you thought it
15  was punishment duty?
16   A.  Let's see.  I told Sergeant Owings, Officer
17  Marquardt, Officer Paige, as well as the Chief during our
18  meeting.
19   Q.  When did you have that meeting with the Chief?
20   A.  That meeting was sometime in, I think it was,
21  like, April 9th, according to the records, 2014.
22   Q.  And prior to your speaking with any of these --
23  Strike that.  Did any of those officers come to you prior

LEAVITT REPORTING, INC.

Page 128

1   to your telling them you thought it was punishment duty
2   to express to you they thought it was punishment duty to
3   be sitting in front of the school?
4    A.  Yes.
5    Q.  Who?
6    A.  Officer Paige, Officer Marquardt, Sergeant
7   Owings.
8    Q.  Who came to you first?
9    A.  I have no idea.  I think we were in roll call,
10  and it was, like, "What?"
11   Q.  Why did you guys not want to do the school
12  assignment?
13   A.  Well, there's only traffic up there from about
14  seven o'clock, well, I think 6:45 to 7:25.  So you're
15  sitting there looking at the geese in the field and
16  there's nobody else there from six o'clock until 6:45.
17  It's embarrassing.
18   Q.  Did you see teachers arriving at the school at
19  6:00, 6:30?
20   A.  Yeah.  Around 6:30 or 6:45.  But, like I said,
21  barely anybody, especially during rush hour when there's
22  cars on Route 18 and Route 139 and all these other
23  locations.

LEAVITT REPORTING, INC.

## Page 129

1    Q.  Did you ever object to doing traffic
2  enforcement other than at the school prior to the school
3  assignment?
4        MR. HIGHTOWER:  Objection to the form of the
5  question.
6    A.  I've never objected to doing traffic
7  enforcement or community policing, but I objected to,
8  obviously, the orders that were illegal that I presented
9  in my complaint.
10    Q.  When did you file your complaint with the
11  attorney general's office?
12    A.  I filed my complaint sometime, from what I
13  recall, there was, like, three days before my meeting
14  with the Chief.
15    Q.  March, 2014?
16    A.  It was sometime in, I believe, sometime around
17  March.  And, like I said, I just was able to figure out
18  my Harbor One bank statement which shows an April 8th
19  date at a Boston garage.
20    Q.  So you think April, 2014, is when you came up
21  to the attorney general's office?
22    A.  Yes.  End of March/maybe beginning of April.  I
23  think it's April 8th.
              LEAVITT REPORTING, INC.

## Page 130

1    Q.  When you filed with the attorney general's
2  office in April of 2014, did you give a copy of your
3  complaint to anyone in the town?
4    A.  No, I did not.
5    Q.  When is the first time you had any conversation
6  with the Chief about your filing with the attorney
7  general?
8    A.  When I was in this meeting with him, there was
9  a lot of circumstantial statements that he was making,
10  and the whole surrounding the meeting made it feel like
11  he knew what the complaint was and he knew that the
12  complaint had been up there.
13    Q.  Which meeting are we talking about?
14    A.  This would be the meeting three days, or it was
15  either three days or -- Within three days of when I filed
16  the complaint with the attorney general's office.
17    Q.  So in April, 2014, you met with the Chief?
18    A.  I believe it was -- From looking at that bank
19  statement, looks like it's April, 2014.
20    Q.  So the Chief's meeting was shortly thereafter?
21    A.  Yes.  Within, like, three days.
22    Q.  What made you think that the Chief knew you had
23  filed a complaint with the attorney general's office?
              LEAVITT REPORTING, INC.

## Page 131

1    A.  I had never gone into the Chief's office.  I
2  never had a discussion with him at, like, alone.  I've
3  never been called in there ever.  Even during my
4  interview, I think that was the only time I actually was
5  sitting in a room with him.
6        And I ended up going in there, and the first thing
7  he said to me was that, you know, "I don't think you have
8  the heart for giving money citations."  Then I explained
9  to him, I explained to him that I felt that it was
10  illegal that he was taking away the discretion.  And then
11  he explained to me that, he said that it was, oh, it was
12  a miscommunication and the Deputy Chief sent out some
13  crazy e-mails a while back, which I believe were the
14  e-mails I had given to the attorney general's office.
15  And he said, he said, "The Deputy Chief deleted those
16  e-mails.  I told him that that was crazy, that we
17  couldn't do that, and I got rid of them."  So.
18    Q.  What did you say in response to the Chief
19  saying that?
20    A.  I said, "Okay," and then I just wanted to leave
21  at that point.
22    Q.  Do you have any information that the Chief
23  actually did know about the attorney general's, your
              LEAVITT REPORTING, INC.

## Page 132

1  filing with the attorney general at that time?
2    A.  Based on that meeting, I'd say that, that he
3  definitely knew.
4    Q.  Just based on what you told me?
5    A.  Based on that and his demeanor of how he seemed
6  angry and how he made statements to me that some people
7  come against me, people have come against me and they may
8  win the battle but I always win the war.  And, obviously,
9  collated with all the statements of what I wrote in the
10  affidavit as well as including the e-mails, I got the
11  feeling and I knew that he knew about the complaint, that
12  I dropped it off.
13    Q.  Do you have any information that the Chief has
14  ever talked to anybody at the attorney general's office
15  about the complaint that you filed?
16    A.  I do not.
17    Q.  Do you have any information that the Deputy
18  Chief has ever talked to anybody in the attorney
19  general's office about the complaint you filed?
20    A.  Are we talking about the first complaint in
21  March?
22    Q.  Any complaint.
23    A.  Officer Gerard Julien-Suarez and Officer
              LEAVITT REPORTING, INC.

Page 133

1  Sweeney had a meeting with the Chief in which the Chief
2  showed some e-mail -- they described it as some piece of
3  paperwork from the attorney general's office that he held
4  up and he looked angry and he was holding it. I don't
5  know what it was, but he said that he, he made -- that
6  Officer Gerard said that he made reference to, you know,
7  this is from the attorney general's office, and put it on
8  his desk.
9       Q.  Did you ever see that piece of paper?
10      A.  I never saw that piece of paper.
11      Q.  Do you know what that piece of paper said?
12      A.  No.
13      Q.  Do you know if it was in any way related to you
14  and your complaint?
15      A.  I don't know.
16      Q.  Do you have any information that prior to your
17  dropping off a packet with Rick Lafond, the town manager,
18  that anyone in the town knew that you had filed a
19  complaint with the attorney general's office?
20      A.  Based off -- Which packet I dropped off with
21  Lafond?
22      Q.  Did you drop something off with Lafond in
23  October of 2014 or November of 2014?
            LEAVITT REPORTING, INC.

Page 134

1       A.  Yeah.  I dropped off the initial packet after I
2  went to the attorney general's office for the second time
3  when the complaint was lost.  I went up there and filed
4  it again, and I came down and gave it to Lafond.  I
5  explained to him, "Hey, listen, I've been being harassed.
6  I just want all this stuff to stop," like, that's it.
7  I've been trying to, you know, just get it to stop at
8  this point, and I gave it to him, and he said, "Oh,
9  okay." Then he walked away.
10      Q.  That was when?
11      A.  I believe it was in October of 2014.
12      Q.  So prior to your giving this material to Mr.
13  Lafond in October of 2014, do you have any information
14  that anyone in the town knew that you had filed a
15  complaint with the attorney general's office?
16          MR. HIGHTOWER:  Objection.  Asked and answered.
17      A.  Not from what I can recall.
18      Q.  Do you have any information prior to October,
19  2014, that anyone in the town had seen any documentation
20  that you had filed, including your affidavit, with the
21  attorney general's office?
22      A.  Not from what I can recall, no.
23      Q.  You spoke with individuals at the attorney
            LEAVITT REPORTING, INC.

Page 135

1  general's office, didn't you?
2       A.  Yes, I did.  Multiple.
3       Q.  When is the first time you spoke with an
4  individual at the attorney general's office?
5       A.  The first time I think I sent an anonymous
6  e-mail.  I sent it from my e-mail.  And I was trying to
7  send it anonymous just to get information on what would
8  happen in regards to a situation like this.  I didn't
9  even name Abington or anything.
10          Then I ended up, I got, what's it's called, I think
11  I got an e-mail back that was short.  They said sorry, we
12  just need more specific facts, or something like that,
13  and you can call.  And then I ended up calling the phone
14  line, and I documented it in my attorney general's office
15  packet statement, the 118-page affidavit, that I called
16  multiple times trying to get through.  They're actually
17  pretty hard to get a hold of.
18          I talked to Trooper Mahoney of the Mass. State
19  Police that is assigned up there.  I informed him of what
20  was going on.  He told me that I could either mail a
21  packet to him or I could just come to the attorney
22  general's office and drop off the complaint.  At that
23  point I then went up, I dropped off the complaint to John
            LEAVITT REPORTING, INC.

Page 136

1  Keating who works at the attorney general's office.
2       Q.  What is Mr. Keating's role at the A.G.'s
3  office?
4       A.  I think he's, like, insurance or something.
5  Insurance reporter or something.  Investigator, I think.
6  I'm not sure.
7       Q.  What did he tell you when you dropped it off?
8       A.  He told me that he would stay in touch and that
9  he would submit the form and the packet, and he
10  interviewed me, asked me some questions, and wrote my
11  name and address down and all this stuff.
12      Q.  Did this occur at One Ashburton here in Boston?
13      A.  Yes.
14      Q.  Did you have to schedule an appointment or was
15  he the walk-in on-duty investigator?
16      A.  I went in and talked to somebody at the door,
17  and they called him.
18      Q.  After you went up there, when is the next time
19  you heard from the attorney general's office?
20      A.  I sent multiple e-mails back and forth with
21  him.  I kept asking what was going on with it.  Because I
22  said to him, I said, you know, that I want to know what's
23  going on because I just dropped off a thing, report, in
            LEAVITT REPORTING, INC.

Page 137

1  something that I believe to be very illegal. I think
2  there was multiple e-mails back and forth. And what she
3  said was, "I have to check with the person who handles
4  the cases, and she's not back." And then it went back
5  and forth until June of 2014, where I got a phone call
6  from him. I also had multiple phone conversations with
7  him over the Ashburton Place cell phone which is, like,
8  (617) 000-0000. That's how it comes up.
9       Q. It's blocked. It's law enforcement.
10      A. Yeah, whatever that means. Well, our number
11 comes up, line 781 or something. So it comes up as
12 that. Then I got a call from his cell phone on June,
13 sometime in June, and he called me. He said that he's
14 never seen it before, but him and his boss just looked
15 through, and the 118-page affidavit that I dropped off
16 was gone and they couldn't find it.
17      Q. Who is the "he" you're talking about who called
18 you on the cell?
19      A. John Keating.
20      Q. What did you do?
21      A. So he told me that I could come back in and
22 drop the -- I dropped another affidavit. I said,
23 "Well, what happened?" He goes, "I've never seen this
            LEAVITT REPORTING, INC.

Page 138

1  before. I didn't think anything like this would happen."
2  He goes, "It was passed in," and he goes, "There's
3  nothing in the information or the system on anything of
4  you coming in here." And he told me that he wrote a
5  report and that it was gone and it wasn't in there
6  anymore.
7       Q. Did he tell you why he thought it wasn't in
8  there?
9       A. No. He just said, "I've never seen this
10 before, and, you know, it sounds like" -- He goes, "It
11 sounds like what it sounds like, and I believe that
12 somebody deleted it."
13      Q. Who do you think deleted a report that you
14 dropped off to the attorney general's office?
15      A. Somebody who knows Chief Majenski.
16      Q. Who?
17      A. I don't know. Somebody up there.
18      Q. Do you know if anyone knows Chief Majenski who
19 works for the attorney general's office?
20      MR. HIGHTOWER: Objection. Form of the
21 question.
22      A. I do not.
23      Q. Do you know how their reports are inputted into
            LEAVITT REPORTING, INC.

Page 139

1  the system at the attorney general's office?
2       A. I have no idea.
3       Q. Do you know what division you filed your report
4  with in the attorney general's office?
5       A. The criminal division.
6       Q. Any particular -- It's a criminal bureau. Do
7  you know if there's any particular division that you
8  dropped it off with?
9       A. What do you mean by division?
10      Q. Well, do you understand that there's a criminal
11 bureau and then different divisions?
12      A. Yeah. Well, they're public integrity unit is
13 what I was going for because, obviously, such things as
14 ordering officers to get more money citations than
15 warnings is a big public trust issue.
16      Q. Why is it a public trust issue?
17      A. Because the public doesn't expect us to have
18 quotas. Any reasonable person would say that.
19      Q. So you think any reasonable person, a motorist,
20 thinks that police officers don't have quotas in the
21 number of tickets they have to issue each month?
22      A. They know it's illegal.
23      Q. Who told you that who is a reasonable person?
            LEAVITT REPORTING, INC.

Page 140

1       A. Everybody that I've pretty much talked to.
2       Q. Do you know if the State Police have quotas
3  under certain grants of the number of tickets they have
4  to issue per month?
5       MR. HIGHTOWER: Objection.
6       A. I know the Click It Or Ticket assignment, they
7  have a certain amount of interactions. But if you look
8  at the E Ops website, and you look through the frequently
9  asked questions, you'll see it's not a quota and you
10 don't have to meet that certain amount of number of
11 tickets.
12      Q. So why do you think the public would have a
13 dispute with your having to write a certain number of
14 money tickets for those who have actually violated a
15 traffic law?
16      MR. HIGHTOWER: Objection. Form. Answer the
17 question.
18      A. It's not -- Well, it's in the law that the
19 officer has the discretion. The officer makes the
20 discretion. It's not his boss who says, hey, you need to
21 get this certain amount of money citations, which takes
22 away the discretion which is afforded by the law.
23      Q. Why do you think it loses public trust if
            LEAVITT REPORTING, INC.

Page 141

```
1    you're actually only issuing tickets to those who have
2    violated the law?
3        A.  Because the tickets come back to the town.
4    Some of the money from the civil fines come back to the
5    town.  If a Chief wants to look good or he wants to
6    impress the bosses, he says, hey, look at all the money I
7    made for the town and all these civil citations by taking
8    away the officer's discretion.
9        Q.  Has anyone in the public ever told you it's
10   violated their trust because of that?
11           MR. HIGHTOWER:  Objection.
12       A.  Nobody knew what is going on.
13       Q.  Do you know if anyone knows about the Money
14   Ticket Quota System currently in the general public?
15       A.  I couldn't speak for the whole general public
16   on how they respond to that.
17       Q.  Has any motorist ever said anything to you when
18   you have pulled someone over for a traffic violation that
19   you're only issuing me a ticket because you have a quota
20   system?
21       A.  Yes.
22       Q.  Who?
23       A.  I had, I'd say, like, ten people say it to me.
```
LEAVITT REPORTING, INC.

Page 142

```
1    I couldn't tell you what it was, but I know there was a
2    Channel 7, there was a Channel 7 reporter that I pulled
3    over at Summer Street and Washington Street.  I forget
4    what his name was.  And he told me, "Oh, thanks.  I hear
5    all this stuff with quotas and this."  And I was, like,
6    well -- I actually gave him a warning.  So.
7        Q.  When he said he hears all this stuff about
8    quotas, was he referring to Abington or was there an
9    issue in Boston around this time?
10       A.  He said "with you guys."  He said, "I hear all
11   this stuff with quotas with you guys."
12       Q.  Do you know if he even heard about your case?
13       A.  I think --
14           MR. HIGHTOWER:  Objection.  Asked and answered.
15       Q.  Do you know if he ever heard about your case?
16       A.  I don't think my case was out yet.  I think it
17   was just the attorney general's office statement that was
18   passed up, so I have no idea how he knew about it.
19       Q.  Do you know if there was an issue in Boston
20   concerning quotas around this time?
21       A.  I think it was before the Newton case.  I
22   looked up, like, a news article, and there was something
23   about they were going to try to do it, but the union
```
LEAVITT REPORTING, INC.

Page 143

```
1    spoke out about it and said, hey, you can't do this.
2        Q.  Has your union spoke up about it in a formal
3    way, what you call the Money Ticket Quota System?
4        A.  No, they have not.
5        Q.  Why not?
6        A.  I'm not sure.  I, like I said, informed Officer
7    Cantalupo.  At that point it was past the 30 days.
8        Q.  It continued on, correct, --
9        A.  Yes.
10       Q.  -- after you informed Officer Cantalupo?
11       A.  Yes.
12       Q.  You became union president.  Correct?
13       A.  Yes.  At the end of April.
14       Q.  Of 2014.  Correct?
15       A.  Yes.
16       Q.  And does this alleged Money Ticket Quota System
17   still go on?
18       A.  I don't see it as clear as this, but now I see
19   the, all the young kids, they saw what happened to me.
20   They saw me now get stuck in court prosecutor.  They know
21   I'm a police officer, I want to be on the road, and you,
22   know, they're going to write money tickets.  They feel
23   they have to write money tickets now so they're not
```
LEAVITT REPORTING, INC.

Page 144

```
1    talked to by the Chief or Deputy Chief and a certain
2    percentage of money tickets because that's what happened
3    in the past.
4        Q.  How do you know that they know what allegedly
5    happened to you?
6        A.  They talked to me about it.
7        Q.  Who specifically?
8        A.  Officer Michelle Franey, Officer Justin
9    Simmons, Officer Shannon Reeves, Officer James
10   Kalianiotis, Officer Joseph Davern.
11       Q.  Have they all talked to you individually?
12       A.  Yeah.
13       Q.  When did Officer Franey first speak with you
14   about any type of fine citation numbers issue?
15       A.  She said, she said something about Sergeant
16   McCollem was ordering her to write money ticket and was
17   continuously badgering her to write money tickets.
18       Q.  When?
19       A.  I think this was, was it, I think near the end
20   of 2014.  Maybe the summer of 2014.
21       Q.  What shift was she?
22       A.  Eight to four shift.
23       Q.  Did she tell you she was required to write a
```
LEAVITT REPORTING, INC.

Page 145

1  specific number or just do more traffic stops?
2      A.  She was ordered to get more money tickets.
3      Q.  What specifically was she ordered by whom to
4  do?
5      A.  Sergeant McCollem to get more money tickets.
6      Q.  What did he say to her?
7      A.  He keeps asking me to get more money tickets
8  and I don't want to.  I asked her if she wanted to file a
9  grievance.  She didn't want to because she didn't want to
10  cause any problems.
11      Q.  Has she ever been disciplined for not writing
12  money tickets?
13      A.  I don't believe so.
14      Q.  Has Sergeant McCollem ever told her a specific
15  number of money tickets she has to write?
16      MR. HIGHTOWER:  Objection to form.
17      A.  I couldn't speak for her.  I don't know.  She
18  told me she was ordered one time to write money tickets.
19      Q.  When was she ordered to do that?  Do you know?
20      A.  Sometime in 2014 to 2015.
21      Q.  So sometime during that year on how many
22  occasions was she ordered to write money tickets?
23      A.  I don't know.  I didn't ask her all these
         LEAVITT REPORTING, INC.

Page 146

1  questions.
2      Q.  What about Officer Reeves, when is the first
3  time you spoke with Officer Reeves about writing money
4  citations?
5      MR. HIGHTOWER:  Hold on for a second.  Could
6  you spell that?
7      THE WITNESS:  R E E V E S.
8      A.  You asked the question about who did I discuss
9  the case with, right?
10      Q.  No.  You said to me, I asked -- This started
11  off because I said does the alleged Money Ticket Quota
12  System continue since 2014.  You said in a different
13  form, or words to that effect.  Right?
14      A.  No.  I was explaining that the newer officers
15  see what happened to me with this, and then you asked me
16  who did I speak with with the newer officers.
17      Q.  How did they know what happened to you?
18      A.  Because everybody talks.  It's a small police
19  department.
20      Q.  What happened to you they would know about?
21      A.  I've been retaliated against because I said
22  that, I said that I wouldn't follow the Money Ticket
23  Quota System involving more money.
         LEAVITT REPORTING, INC.

Page 147

1      Q.  Have you told those officers that you wouldn't
2  follow the Money Ticket Quota System?
3      A.  They've come up to me and they said, you know,
4  "What was the deal with the Money Ticket Quota?"  Pretty
5  much all of them.  And I said, "Listen" -- I trained
6  Joseph Davern, I trained Officer Franey as field training
7  officer.  I explained to them.  I said, "Listen, you have
8  discretion on every stop.  I'm never going to tell you to
9  write a certain number of money tickets compared to a
10  certain amount of warnings or anything.  It's all your
11  discretion to write the civil citation, citation warning,
12  and the verbal.  Simple as that."  So.
13      Q.  Did you tell them that you were retaliated
14  against?
15      A.  Yes.
16      Q.  Why did you tell them that?
17      A.  Because I was being retaliated against.
18      Q.  What specifically did you tell Officer Reeves
19  about your being retaliated against?
20      A.  It wasn't like a full conversation like I'm
21  sitting here saying this, this, this, this.  I just said,
22  you know, that they took me out of the field training
23  officer position, stuck me as court prosecutor, took away
         LEAVITT REPORTING, INC.

Page 148

1  the detective-type overtime assignments, gave traffic
2  assignments to other officers, and other things.  I mean.
3      Q.  Are those officers you listed, Officer Franey,
4  Officer Reeves, they're newer officers?  Correct?
5      A.  Yes.
6      Q.  Why did you feel the need to tell them you had
7  been retaliated against when they're just starting in the
8  department?
9      MR. HIGHTOWER:  Objection.  Relevance.
10      A.  I didn't tell them.  They came up to me and
11  asked.
12      Q.  I think you just testified that you told them
13  that you were retaliated against.
14      A.  After.  You just said why did I feel the need.
15  Because they were asking.
16      Q.  So they asked you if you had been retaliated
17  against?
18      A.  No, not like that.  It's what's going on with
19  this, like, what happened.  I said, "Hey, listen, you
20  know, I ended up filing a complaint with the attorney
21  general's office, you know, and this."  The whole thing.
22  Like, I didn't -- I don't know how, exactly what I told
23  each person, but, like I said, I told them, "Hey, you see
         LEAVITT REPORTING, INC.

Page 149

1  what's going on.  You see that I'm getting stuck as court
2  prosecutor.  You see I'm getting stuck as -- I'm not in
3  any position where it's a successful career now at this
4  point."
5      Q.  When you say you're stuck as court prosecutor,
6  is the court prosecutor position considered a punishment
7  position in the Town of Abington Police Department?
8      A.  In my opinion, yes.
9      Q.  Do you know if anyone else in the Town of
10 Abington Police Department views the court prosecutor
11 position as punishment?
12     A.  Other people want it.  That's why I don't
13 understand why I have it.
14     Q.  Has anyone told you it's a bad position to
15 have?
16         MR. HIGHTOWER:  Objection.  Relevance.
17     A.  No.
18     Q.  It's a coveted position, isn't it?
19         MR. HIGHTOWER:  Objection to form.  Answer the
20 question.
21     A.  Yeah, because a lot of officers want weekends
22 off.  I'm actually, I don't like weekends off.  I like
23 working on the weekends.
              LEAVITT REPORTING, INC.

Page 150

1      Q.  The Chief told you if you didn't like it this
2  year, he would allow you to have another assignment next
3  year, didn't he?
4      A.  After I told him that I didn't want to, you
5  know, do the position.
6      Q.  Why don't you want to do the court prosecutor
7  position?
8      A.  Because I like, I want to be a police officer.
9  Completely takes me away from the job that I signed up
10 for at the Abington Police Department which was being a
11 police officer in uniform, on patrol, or doing detective-
12 type assignments or, you know, pulling cars over.  I
13 mean, pulling cars over.
14     Q.  So you believe one of the things you like to do
15 is pulling cars over when you're on patrol?
16     A.  Yeah.  I mean, I do traffic stops, I do
17 everything.  You go out there and you see a violation,
18 you pull them over, you do your investigations.  Most of
19 the fun of the job is doing the investigation.
20     Q.  When you were on patrol, did you ever develop
21 any drug investigations on your own?
22     A.  On patrol on my own?
23         MR. HIGHTOWER:  Objection.  Asked and answered.
              LEAVITT REPORTING, INC.

Page 151

1      Q.  Yes.
2      A.  No.  Oh, wait.  Drug investigations on my own?
3  Yeah, like I said, I pulled over that car.  I think I
4  already answered that one.
5      Q.  With the marijuana plant?
6      A.  The marijuana plant, the car I pulled over with
7  the drugs inside of the car.  There's probably some more.
8  I just don't have the records in front of me.
9      Q.  When you were assigned up to the schools, did
10 you ever develop any relationships that turned into drug
11 investigations?
12     A.  At the school?
13     Q.  Yes.
14     A.  No.
15     Q.  Do you know anyone else who has?  Any other
16 officers?
17     A.  Are you talking about the whole school thing or
18 the one where we're stuck inside the cars?
19     Q.  The whole school assignment, whether you're
20 stuck inside the cars or up at the school.
21     A.  The first time we were stuck inside the cars.
22 The second time around, you know, I talked with the kids
23 and teachers.  I didn't develop any drug informants.
              LEAVITT REPORTING, INC.

Page 152

1      Q.  Do you know if other officers have when they
2  were up at the school?
3      A.  I do not, no.
4         MS. ECKER:  How about if we take a break.
5         (Whereupon, at 12:42 p.m., the deposition
6  recessed for lunch and reconvened at 1:23 p.m.)
7              AFTERNOON SESSION
8         (Documents marked Exhibit Nos. 2, 3 and 4 for
9  Id.)
10     Q.  So I'm going to show you what has been marked
11 as Exhibit 2 and ask if you recognize this.
12     A.  Yes, I do.
13     Q.  What is this document that's marked as Exhibit
14 2?
15     A.  This would be the first couple pages of the 118
16 pages that I dropped off at the attorney general's office
17 on October 14, 2014.
18     Q.  So there's more to this than what I have here?
19     A.  There should have been about, like, 118 pages
20 full of, obviously, the e-mails and, e-mails and then
21 some other cases.  I think it was case law in there, and
22 then there was, I think, like, the news articles and
23 everything.
              LEAVITT REPORTING, INC.

Page 153

1   Q.  Was there anything else that was written by
2   you, though, that was in the package that's not here?
3   A.  No.  This is the only written affidavit that
4   was included in the 118 pages.
5   Q.  If you look at the last page of what is marked
6   as Exhibit 2, in the last paragraph it says, "On this
7   date, October 14, 2014, I, Thomas Delaney, have returned
8   to the attorney general's office to once again drop off
9   the information regarding this issue."  Was there a
10  filing before what's marked as Exhibit 2?  Since here you
11  put you're there once again.
12  A.  Yes.
13  Q.  Do I have what you filed previously or was it
14  the same statement?
15  A.  What I filed was the same exact statement with
16  the 118 pages attached, but it was a colored copy that
17  was in color, and it got lost, according to John Keating.
18  Because I remember paying for the printer ink and all the
19  photos were in color.
20  Q.  After you resubmitted this document that's
21  marked as Exhibit 2, did you ever hear again from the
22  attorney general's office?
23  A.  From Exhibit 2?
                LEAVITT REPORTING, INC.

Page 154

1   Q.  Yes.
2   A.  I stayed in contact with Trooper Jose Cuevres
3   of the, I believe it's, like, computer crimes.  He's the
4   person who I dropped this report off with, and I gave him
5   this copy as well as e-mails between myself and John
6   Keating, and then, obviously, the other stuff that I
7   spoke about.  At the time, I guess the recent attorney
8   general --
9   Q.  Maura Healey?
10  A.  Maura Healey, she's the new one, right?
11  Q.  Yes.
12  A.  The other one.
13  Q.  Martha Coakley.
14  A.  Martha Coakley was running for governor.  And
15  he called me before, I think it was in, I think the race
16  was in November or something, and he called me and he
17  said, "Hey, listen, you know, Martha Coakley has the
18  campaign going on and there's not really a lot of people
19  up in the building, so I'm going to have to get back to
20  you about the complaint, you know.  I submitted it and
21  it's been passed up to the public integrity division," I
22  believe, either public integrity division or unit is what
                LEAVITT REPORTING, INC.

Page 155

1   he said, "for investigation, and I'll stay in touch with
2   you and get back with you."
3   Q.  Have you ever heard back?
4   A.  I continuously called him on his cell phone,
5   and I didn't get any calls back.  And then I finally got
6   a call back, I think it was sometime in January.
7   Q.  Of this year?
8   A.  Yeah.  I'm not exactly sure of the date.
9   January of this year.  And he talked to me over the
10  phone, and he said that the head of the public integrity
11  unit, I forget what his name was, or the public integrity
12  division had reviewed everything in my case and he said
13  that the attorney general's office was not willing to
14  investigate at this time with what's going on in policing
15  right now.  Then there was a pause when I was speaking
16  with him.  I said, "Ah, so what does that mean?"  He
17  goes, "Well, with everything that's going on with
18  Ferguson and all the negativity that's surrounding
19  police, the attorney general's office is unwilling to
20  investigate your complaint."
21  Q.  Who said that to you?
22  A.  Trooper Jose Cuevres.
23  Q.  Like the Tequila?
                LEAVITT REPORTING, INC.

Page 156

1   A.  Yeah.
2   Q.  Is it spelled the same way?
3   A.  C U E V R E S.
4   Q.  Do you know if anyone from the attorney
5   general's office, including Trooper Cuevres, ever called
6   the Town of Abington to speak with them about your
7   complaint?
8   A.  I know that I dropped off, I informed the
9   Abington town manager, Lafond, of the complaint, that I
10  dropped it off with the attorney general's office, but I
11  am not aware that they did call.
12  Q.  When you dropped off the complaint with Rick
13  Lafond the first time, did you actually speak with Mr.
14  Lafond?
15  A.  Yes.
16  Q.  Where did that conversation occur?
17  A.  I walked in there, and he was at whatever the
18  desk is on the left.  I think it's, like, the secretary
19  or the treasurer, a desk or something.  And I saw him
20  standing there.  I said, "Mr. Lafond, can I speak with
21  you?"  Then he brought me into the room right off the
22  right of the front entrance door as you walk in.  I sat
23  and spoke with him.  I said, "Hey, listen, you know, I'm
                LEAVITT REPORTING, INC.

Page 157

1  being harassed over this ticket quota ever since I ended
2  up standing up and saying that it was wrong.  And I filed
3  a complaint with the attorney general's office, and they
4  lost it the first time.  And this time I'm just giving it
5  to you because the first time that I filed it I was
6  harassed after that, and I don't want to be threatened, I
7  don't want to be pulled into the Chief's office anymore."
8  And that was it.
9       Q.  When you told Mr. Lafond the first time you
10  filed it "I was harassed," did Mr. Lafond ask you whether
11  the Chief knew that you had filed the complaint with the
12  attorney general's office?
13      A.  I don't recall him asking me that.
14      Q.  Did Mr. Lafond ask you how you thought you were
15  being harassed during that conversation?
16      A.  No.  He seemed like, he seemed disgusted when I
17  was telling him.
18      Q.  Why do you say that?
19      A.  He just kind of looked at me and looked like,
20  "Oh, okay, okay."  Then he kind of -- He said, "All
21  right.  Well, I'll look this over," and walked out of the
22  room.
23      Q.  Do you know if he looked it over?

LEAVITT REPORTING, INC.

Page 158

1       A.  I don't know.  As he was walking out of the
2  room, he's like, "I hear rumors up there, and I, I, I
3  don't know," and then he walked away.  It was, like, the
4  ending.  There was no, like, conversation.  There was no,
5  like, dialog between, like, what he was going to do.  I
6  had no idea what he was going to.
7       Q.  How long did this meeting last with Mr.
8  Lafond?
9       A.  Two minutes.  Not even.
10      Q.  Did he ask you anything about what the attorney
11  general's office said?
12      A.  No.
13      Q.  So you just handed him the complaint?
14      A.  I handed him the complaint.  I explained it,
15  and I said that the document speaks for itself.  I said,
16  "Everything is in there."
17      Q.  What happened?  Did you speak with Mr. Lafond
18  again?
19      A.  After that I ended up going to the station for
20  my four to twelve shift, and when I walked in I was
21  approached by Officer Jacob Poulin.  Jake Poulin came up
22  to me and said the Chief had approached him and asked if
23  I was crazy in the head, and he said -- and Jake said to

LEAVITT REPORTING, INC.

Page 159

1  me, he said, "Why is he asking me this?  You know, what's
2  wrong?"  I was like, I was like, "Well, you know, the
3  complaint and stuff."  He said, "Yeah, you dropped
4  something off at town hall."  He called it Tunagate is
5  what he called it.  Because my nickname is Tuna, and I
6  guess he always comes up with nicknames for people.  And
7  he said, "Yeah, you dropped Tunagate off at town hall,
8  and, you know, I just want to make sure they're not going
9  to try to fire you because they think you're crazy in the
10  head or something."
11      Q.  Who said this to you?
12      A.  Jake Poulin.
13      Q.  Jake Poulin had talked to the Chief about it?
14      A.  He said that the Chief came up to him at about
15  3:30 that day, about an hour and-a-half after I spoke
16  with Lafond, and the Chief had come up to him and made
17  those statements.
18      Q.  At this time do you know if the Chief even knew
19  that you had a brain injury?
20      A.  Yes.  He did.
21      Q.  How?
22      A.  He knew I had a brain injury from when I spoke
23  with the Deputy Chief because the Deputy Chief told me he

LEAVITT REPORTING, INC.

Page 160

1  would inform the Chief and get back to me if there was
2  any issues.
3       Q.  Do you have any information that the Deputy
4  Chief did, in fact, inform the Chief about your brain
5  injury?
6       A.  From that conversation?
7       Q.  Yes.  Is that all you know, that the Deputy
8  Chief said he would?
9       A.  He's supposed to inform the Chief of those
10  things.
11      Q.  Do you know if he ever did?
12          MR. HIGHTOWER:  Objection to form.
13      A.  I expect he did because when we had our
14  conversation in March of -- Yeah, when we had a
15  conversation in March, he asked if everything was all
16  right with what happened to me in the military, with what
17  happened with my brain injury.
18      Q.  What did you tell him?
19      A.  I said everything was fine.
20      Q.  Did you tell him you were disabled as a result?
21          MR. HIGHTOWER:  Objection.
22      A.  I wasn't disabled as a result of my mild
23  traumatic brain injury yet.  The disability is through

LEAVITT REPORTING, INC.

Page 157

1  being harassed over this ticket quota ever since I ended
2  up standing up and saying that it was wrong. And I filed
3  a complaint with the attorney general's office, and they
4  lost it the first time. And this time I'm just giving it
5  to you because the first time that I filed it I was
6  harassed after that, and I don't want to be threatened, I
7  don't want to be pulled into the Chief's office anymore."
8  And that was it.
9      Q. When you told Mr. Lafond the first time you
10  filed it "I was harassed," did Mr. Lafond ask you whether
11  the Chief knew that you had filed the complaint with the
12  attorney general's office?
13      A. I don't recall him asking me that.
14      Q. Did Mr. Lafond ask you how you thought you were
15  being harassed during that conversation?
16      A. No. He seemed like, he seemed disgusted when I
17  was telling him.
18      Q. Why do you say that?
19      A. He just kind of looked at me and looked like,
20  "Oh, okay, okay." Then he kind of -- He said, "All
21  right. Well, I'll look this over," and walked out of the
22  room.
23      Q. Do you know if he looked it over?
                LEAVITT REPORTING, INC.

Page 158

1      A. I don't know. As he was walking out of the
2  room, he's like, "I hear rumors up there, and I, I, I
3  don't know," and then he walked away. It was, like, the
4  ending. There was no, like, conversation. There was no,
5  like, dialog between, like, what he was going to do. I
6  had no idea what he was going to.
7      Q. How long did this meeting last with Mr.
8  Lafond?
9      A. Two minutes. Not even.
10      Q. Did he ask you anything about what the attorney
11  general's office said?
12      A. No.
13      Q. So you just handed him the complaint?
14      A. I handed him the complaint. I explained it,
15  and I said that the document speaks for itself. I said,
16  "Everything is in there."
17      Q. What happened? Did you speak with Mr. Lafond
18  again?
19      A. After that I ended up going to the station for
20  my four to twelve shift, and when I walked in I was
21  approached by Officer Jacob Poulin. Jake Poulin came up
22  to me and said the Chief had approached him and asked if
23  I was crazy in the head, and he said -- and Jake said to
                LEAVITT REPORTING, INC.

Page 159

1  me, he said, "Why is he asking me this? You know, what's
2  wrong?" I was like, I was like, "Well, you know, the
3  complaint and stuff." He said, "Yeah, you dropped
4  something off at town hall." He called it Tunagate is
5  what he called it. Because my nickname is Tuna, and I
6  guess he always comes up with nicknames for people. And
7  he said, "Yeah, you dropped Tunagate off at town hall,
8  and, you know, I just want to make sure they're not going
9  to try to fire you because they think you're crazy in the
10  head or something."
11      Q. Who said this to you?
12      A. Jake Poulin.
13      Q. Jake Poulin had talked to the Chief about it?
14      A. He said that the Chief came up to him at about
15  3:30 that day, about an hour and-a-half after I spoke
16  with Lafond, and the Chief had come up to him and made
17  those statements.
18      Q. At this time do you know if the Chief even knew
19  that you had a brain injury?
20      A. Yes. He did.
21      Q. How?
22      A. He knew I had a brain injury from when I spoke
23  with the Deputy Chief because the Deputy Chief told me he
                LEAVITT REPORTING, INC.

Page 160

1  would inform the Chief and get back to me if there was
2  any issues.
3      Q. Do you have any information that the Deputy
4  Chief did, in fact, inform the Chief about your brain
5  injury?
6      A. From that conversation?
7      Q. Yes. Is that all you know, that the Deputy
8  Chief said he would?
9      A. He's supposed to inform the Chief of those
10  things.
11      Q. Do you know if he ever did?
12      MR. HIGHTOWER: Objection to form.
13      A. I expect he did because when we had our
14  conversation in March of -- Yeah, when we had a
15  conversation in March, he asked if everything was all
16  right with what happened to me in the military, with what
17  happened with my brain injury.
18      Q. What did you tell him?
19      A. I said everything was fine.
20      Q. Did you tell him you were disabled as a result?
21      MR. HIGHTOWER: Objection.
22      A. I wasn't disabled as a result of my mild
23  traumatic brain injury yet. The disability is through
                LEAVITT REPORTING, INC.

Page 161

1  the Veterans, the VA.
2      Q.  This meeting in March of 2014 when the Chief
3  asked you about if you were okay regarding your brain
4  injury, what did you tell him about the brain injury?
5      A.  I said I was fine.
6      Q.  Did you tell him any diagnoses?
7      A.  No.
8      Q.  Did he ask you?
9      A.  No.  He just said, you know, it was in the
10 context of is there any issues with your mild, with your
11 brain injury is how he worded it.  Is there any issues
12 with your brain injury, and, you know, are you okay.
13     Q.  After you spoke with Mr. Lafond the first time,
14 did you speak with him again about your complaint that
15 you filed with the attorney general's office?
16     A.  I never spoke with him in person, but I filed a
17 harassment -- According to the harassment policy at the
18 Abington Police Department, as well as I heard it was
19 adopted by the entire town, the harassment policy said
20 that you would report it to the town manager.  So once I
21 saw that, I wrote up, I believe it was, a two-page
22 affidavit, and then I gave him that affidavit saying that
23 I was still continuing to be harassed.

LEAVITT REPORTING, INC.

Page 162

1      Q.  How long after the first time did you give Mr.
2  Lafond this affidavit?
3      A.  I'm not exactly sure.  Within weeks at that
4  point.
5      Q.  Now, if you turn, this is not numbered so I'm
6  going to count, on Exhibit 2, one, two, three, four, five
7  pages in, and the sentence actually starts on the prior
8  page.  It says, "I later learned that Officer Cantalupo,
9  Sergeant Gambino, Chief Majenski, and the town manager,
10 John D'Agostino, held a meeting earlier in the year.  The
11 union earlier investigated that Chief Majenski and Deputy
12 Chief Cutter were working details at Gillette Stadium in
13 Foxborough for approximately a year in Abington Police
14 Department uniform."  Why did you include this in your
15 affidavit to the attorney general's office?
16     A.  So what happened was Richie Gambino and Todd
17 Kokoros, they were going to call for a vote of no
18 confidence on the Chief, and they were coming around to
19 officers and asking them whether or not they wanted to do
20 it.  And they ended up, what's it's called, they ended up
21 having the meeting and they didn't call for the vote of
22 no confidence.  Sergeant Kevin Sullivan at the time and
23 Officer Paul Januszewski at the time stood up and told

LEAVITT REPORTING, INC.

Page 163

1  Richie that he looked stressed out and told him he should
2  step down as vice president.
3      Speaking with Sergeant Gambino and Officer
4  Cantalupo, they said they felt influence and they didn't
5  want to call for that vote because they were nervous that
6  other people wouldn't vote the right way they were
7  supposed to, like, that they would not -- Not that they
8  were supposed to.  That they, what's it called, that they
9  felt uncomfortable actually voting because they were
10 nervous they would be retaliated against in the way that
11 they voted, which we've had issues at the police
12 department with that right now.
13     Todd Cantalupo informed me they had some news
14 article or something they had written, that some lady had
15 written, and they had brought it to the attention of the
16 Chief and D'Agostino and that a meeting had happened.
17 And then Richie Gambino had gone out, and then Todd
18 Cantalupo at this point was getting a transfer to West
19 Bridgewater.  And it seemed kind of odd that they were --
20 This was in March of 2013 when this meeting occurred.
21 And it seemed like, it seemed fishy.  So I put that in
22 there because I had the knowledge of it.
23     Q.  Did you think it was related in any way to what

LEAVITT REPORTING, INC.

Page 164

1  you were complaining about, this alleged Money Ticket
2  Quota System?
3      A.  Well, I didn't understand why Todd and
4  Cantalupo had gone and then, obviously, didn't want to
5  file a grievance on this situation involving the ticket
6  quota when I first spoke with him and I was trying to set
7  up the meeting with the union representative at the time.
8  So I put that in there because I believed there was
9  something that happened.  So that's why I wrote it in
10 there.
11     Q.  You continue on you, say, "Officer Cantalupo
12 informed me that during this meeting he was instructed by
13 Chief Majenski that he would be given a transfer to the
14 West Bridgewater Police Department if he could get
15 Officer Sue Manning to sign a release she would not sue
16 the town."  Who told you that?  Officer Cantalupo?
17     A.  Yes, he did.
18     Q.  Do you know if that ever happened?
19     A.  Todd said he tried to talk to Sue and Sue
20 wouldn't do it.  Sue said absolutely not because of how
21 she was treated.
22     Q.  Do you know if the Chief actually did say that
23 to Officer Cantalupo?

LEAVITT REPORTING, INC.

Page 181

1  during the election?
2      A.  On March, 2015?  Like I said, I think the
3  numbers, they speak for themselves based on who files
4  grievances and who does things.  I think the numbers came
5  back 13 votes for me and 7 for Officer Jacob Poulin who
6  was, who was running for the position as well.  And there
7  was a whole lot of talk of Officer Sweeney was running
8  around saying things would get worse if I went in as
9  union president.
10     Q.  This was the 2015 election?
11     A.  Yes.
12     Q.  And what was Officer Sweeney saying about that?
13     A.  Officer Sweeney was going to multiple people
14  who came up to me and told me that he had spoken with the
15  Chief and that he couldn't, and that the Chief couldn't
16  work with me and that things were only going to get
17  worse.  He also made statements to, that the Deputy Chief
18  had made statements to Officer Wayne Paige that our union
19  was weak, that if Officer Delaney got voted back in that
20  they would punch back.
21     Q.  This is after you had already been president
22  for a year.  Correct?
23     A.  Yes.

LEAVITT REPORTING, INC.

Page 182

1      Q.  Did Officer Sweeney tell you how many
2  conversations he had with the Chief about that?
3      A.  How many conversations?  Like -- I thought it
4  was just one.
5      Q.  It was one conversation?
6      A.  Yeah.
7      Q.  Did he tell you who was present during that
8  conversation?
9          MR. HIGHTOWER:  Can you just put Mr. Sweeney's
10 full name on the record?
11         THE WITNESS:  Ronald Sweeney.
12         MR. HIGHTOWER:  Thank you.
13     A.  You have to repeat the question.
14     Q.  You testified that Officer Sweeney told you
15 that Chief Majenski told him that the union was weak and
16 that the Chief couldn't work with you.  Is that correct?
17     A.  Yes.
18     Q.  My question was --
19     A.  He didn't say weak.  He said he couldn't work
20 with me and that things would get worse if I got voted
21 in.
22     Q.  Did Officer Sweeney tell you anything else
23 about the conversation?

LEAVITT REPORTING, INC.

Page 183

1      A.  No.  That was it.
2      Q.  Did Officer Sweeney tell you who was present
3  during the conversation other than the Chief and himself?
4      A.  No, he did not.
5      Q.  I believe you talked about comments that the
6  Deputy Chief had made.  Did he make any comments
7  regarding your being elected as union president in March
8  of 2015?
9      A.  Yes, he did.
10     Q.  Did the Deputy Chief say anything directly to
11 you?
12     A.  Oh, to me?  No.  He made statements to Officer
13 Wayne Paige.
14     Q.  Who told you about those statements?
15     A.  Officer Paige.
16     Q.  When did Officer Paige tell you about the
17 statements?
18     A.  Officer Paige told me about the statements.
19 What was it?  He wrote them down.  I didn't know exactly
20 what the statements were, but he told me that the Deputy
21 Chief and the Chief had come up to him and said that, you
22 know, they shouldn't vote for me.  I didn't ask the
23 context of the situation at that time because, in all

LEAVITT REPORTING, INC.

Page 184

1  honesty, I was hearing that multiple officers were going
2  in and having conversations, getting called in on shift
3  to have conversations with the Deputy Chief and the
4  Chief.  I was just trying to concentrate on just doing
5  the union president job and, you know, making sure I did
6  everything right.  I think for the first time I read
7  about it was when I got an affidavit from him because he
8  wanted to file an unfair labor practice on the basis that
9  he was retaliated against for voting for me for union
10 president.
11     Q.  This is Officer Paige?
12     A.  Yes.
13     Q.  What was the retaliation that Officer Paige was
14 alleging?
15     A.  Officer Paige was alleging that he had voted
16 for me and that because he voted for me that he was taken
17 out of his acting sergeant's position and replaced with
18 now Acting Sergeant Ronald Sweeney.
19     Q.  When did Officer Paige tell you this?
20     A.  Officer Paige told me this, he told me that he
21 was speaking with a lawyer at first and then -- I told
22 him, I was, like, "Listen, you know, once you get
23 everything together," I was just like, "let me know.  If

LEAVITT REPORTING, INC.

Page 185

1   you need to use the union, I'll talk to the lawyers and
2   we'll set up a meeting." He wrote up an affidavit. And
3   on the affidavit I saw some things that, you know,
4   startled me at that point, and it was the fact that
5   Officer Wayne Paige had written in there that Chief
6   Majenski had said to him that I had PTSD and I was crazy.
7   When I clearly don't have PTSD and I've never been
8   diagnosed with it.
9       Q.  Going back to the question now.  Officer Paige
10  claims he's been retaliated against because he voted for
11  you for union president.  Is that what you testified to?
12      A.  Yes.
13      Q.  When did Officer Paige write that?
14      A.  I think it was, like, September of this year.
15  Maybe around September of this year.
16      Q.  When did the retaliation occur?  Before or
17  after you filed your complaint that we are here to
18  discuss today?
19      A.  The retaliation occurred --
20      MR. HIGHTOWER:  Objection to form.  Answer if
21  you understand.
22      Q.  Did Officer Paige come to you prior to your
23  filing the lawsuit to tell you that he believed he was
LEAVITT REPORTING, INC.

Page 186

1   being retaliated against because the Chief knew that he
2   voted for you for union president?
3       A.  Yes.  And, like I said, in March, when he first
4   told me about -- He didn't tell me the exact context of
5   the conversation, but he had told me that he was going to
6   talk to a lawyer and he was going to try to figure out
7   what he wanted to do.
8       Q.  Prior to your filing the lawsuit in May of
9   2015, do you have any information that the Chief knew who
10  Officer Paige had voted for for union president in March
11  of 2015?
12      A.  Officer Wayne Paige told me that he felt that
13  the Chief knew, the Chief and Deputy Chief knew.
14      Q.  Why did he tell you he felt that Chief and
15  Deputy Chief knew?
16      A.  Because he said that when they said the stuff
17  against the union and against me, that he wasn't going to
18  change his vote and that.
19      Q.  Keep going.
20      A.  And that he wasn't going to change his vote and
21  he felt they knew that he had, that he supported what I
22  was, in my position as union president.
23      Q.  Officer Paige was an Acting Sergeant at the
LEAVITT REPORTING, INC.

Page 187

1   time.  Correct?
2       A.  Yes.
3       Q.  And do you know if the Deputy Chief and Chief
4   had issues with Officer Paige's supervision as Acting
5   Sergeant prior to January of 2015?
6       A.  Well, now, because we had -- I don't know if we
7   can discuss the unfair labor practice or what happened.
8       Q.  I'm asking what you know.
9       A.  What I know based off the unfair labor
10  practice.
11      Q.  When you filed your complaint in May of 2015,
12  did you know whether or not the Deputy Chief and the
13  Chief had issues with Officer Paige's supervision of
14  officers under his command when he was Acting Sergeant
15  prior to January of 2015?
16      A.  I mean, he was in that position.  I don't get
17  his disciplinary shared with me.  I'm a police officer.
18      Q.  Why do you think that the Chief and Deputy
19  Chief didn't have valid concerns about his role as a
20  supervisor?
21      A.  Because he was in that position, there was no
22  -- I didn't see him go into any training or anything,
23  retraining or being suspended or.  I mean, that stuff you
LEAVITT REPORTING, INC.

Page 188

1   would be able to see.
2       Q.  But you wouldn't know the conversations that
3   the Deputy Chief and Chief were having with him
4   concerning his performance as Acting Sergeant.  Correct?
5       MR. HIGHTOWER:  Objection to form.
6       A.  I don't recall if he ever told me anything
7   about -- I don't recall if he ever told me anything about
8   any discipline or any conversations involving his
9   performance.
10      Q.  Did you ask him?
11      A.  I'm not sure.
12      Q.  Do you know if the decision had been made to
13  remove Officer Paige as an Acting Sergeant prior to the
14  union vote in March of 2015?
15      A.  I don't know.
16      Q.  Who became Sergeant at the time?
17      A.  Ronald Sweeney.
18      Q.  Did you believe now Sergeant Sweeney was
19  qualified for the position?
20      A.  Qualified as?  Like, he deserved it over Wayne?
21      Q.  Yes.
22      A.  I'd say no.  I'd say Wayne, he was doing that
23  position.  I thought he was doing a great job.
LEAVITT REPORTING, INC.

Page 193

1          THE WITNESS: Shoveling.
2      Q.  At one point you guys were shoveling.  Correct?
3      A.  I was out front of the station shoveling, and
4  then Sergeant McCollem asked me to come back in and said
5  we're not allowed to shovel anymore.
6      Q.  What about other administrative duties?  Are
7  you asked to do things, like sign kids up for school
8  activities or things of that nature?
9      A.  If you're on, like, dispatch, like, you know,
10  kids come in, sometimes the Deputy Chief will say, "Hey,
11  pass these out if somebody is looking for it," if it's
12  involved in, like, the road race or the derby or
13  something.
14      Q.  What about laundry, who does the laundry in the
15  police department?
16      A.  It was usually the station officer who was
17  doing it.
18      Q.  That's a patrol officer.  Correct?
19      A.  Yeah, it's a patrol officer who is assigned to
20  the station.  Used to be Lisa Donlan who would usually do
21  that.
22      Q.  Now who does it?
23      A.  Usually we do it.
              LEAVITT REPORTING, INC.

Page 194

1      Q.  One of the officers.  Correct?
2      A.  Yes.
3      Q.  Who changes the paper in the copying machine?
4      A.  When it empties, we fill it up.
5      Q.  So this fax assignment, you said you were
6  assigned fax duty, how many times were you assigned fax
7  duty?
8      A.  That was the only time.
9      Q.  One time.  Correct?
10      A.  One time.
11      Q.  Did you put on your application to the Police
12  Department that you were proficient in the use of fax
13  machines?
14      A.  I think it was great proficiency using fax
15  machines.  What I meant was sending faxes, not the
16  internal programming of the fax machines as I was
17  requested to do.
18      Q.  And why do you object to someone asking you to
19  do the internal programming of the fax machine?
20      A.  It was because I had just, I had just gotten
21  back from the attorney general's office filing the
22  complaint, and I had the fax machine e-mail from, I
23  believe, Sergeant Carini.  And I asked him, I said to
              LEAVITT REPORTING, INC.

Page 195

1  Sergeant Carini, "What is this?"  Because I know Paul
2  Januszewski is the person who does the computer
3  assignments.  He does all the computer assignments and
4  sets up all the -- and Jacob Poulin, they set up all the
5  computers and do all this stuff, and he gets paid a lot
6  of money to stay after and do all these things, setting
7  up the program and everything, the computers, all this.
8  He's like the administrative guy or something.
9  Administrative tech, I think that was, like, his name.
10      And I was on Sergeant Owing's shift, and Sergeant
11  Carini was sending me an e-mail saying that I had to fax,
12  program the speed dial numbers on the fax machine, I had
13  to enter in each one, and they explained to me I had to
14  fax each one and have it faxed back to confirm the fax
15  numbers.  I was on the midnight to night shift, doing the
16  two hours of, what's it called, the two hours of
17  school assignment as well as all my reports as well as
18  one hour community policing assignment.  Then I had to do
19  this.
20      And I explained to him, I was, like, "Listen, I'll
21  need some overtime or something to be able to complete
22  the assignment.  I just can't do that.  We're already
23  busy on the shift, you know, doing all my patrolman
              LEAVITT REPORTING, INC.

Page 196

1  duties.  He was taking me away from that and wanted me to
2  program the fax machines with the speed dial numbers.  I
3  told him, I was like, "I don't have any training on that
4  at all, I don't know how to do it."  He didn't even know
5  how to do it, and there was some password he didn't even
6  know about, and he was telling me to do it.  He wasn't my
7  shift supervisor who I usually get the orders from
8  because Sergeant Owings was.
9      And I went up to him and I asked him.  I said, "I'm
10  kind of confused with this because I've never in my
11  entire career been asked to do the speed dial numbers on
12  the fax machine.  What's going on with this?  Why are you
13  picking me?"  He said, "I didn't pick you.  I didn't pick
14  you."  The Deputy Chief picked me.  Then he showed me an
15  e-mail, what he sent an e-mail to the Deputy Chief saying
16  that the -- He sent it to the Deputy Chief as well as
17  Paul Januszewski, and he said, "Officer Gentile informed
18  me that the fax numbers, the speed dial numbers on the
19  fax machine up front aren't programmed," or something to
20  that effect.  Then the Deputy responded back and said,
21  "Have Officer Delaney complete this."
22      Q.  You did complete it, correct?  You figured it
23  out?
              LEAVITT REPORTING, INC.

## Page 197

1      A.  After two months.

2      Q.  So it took you two months to program the fax?

3      A.  They had to give me the instructions as to how

4  to do it.  And after I sat there trying to do it, and I

5  was on my shift, on my already busy shift, sitting there

6  trying to program it with the instructions that I had to

7  sit there and read, I ended up figuring out that there

8  was a password and you couldn't even get into it.  Then

9  we finally got the password from the administrative tech

10  who had set up the machine before, which was his duties,

11  and he gets, what's it called, I think he gets, like,

12  $800 for a stipend for being an administrative -- not

13  administrative tech.  Some computer IT tech guy.  And

14  multiple amounts of overtime.  And he had the password

15  for the fax machine.

16      Q.  And it took you two months to figure out you

17  needed a password?

18      A.  It was Sergeant Carini.  He finally got the

19  password.  I think it was, like, I think I completed it,

20  like, May 30th or something.

21      Q.  So did you think that was related in any way to

22  your filing a complaint with the attorney general's

23  office?

LEAVITT REPORTING, INC.

## Page 198

1      A.  Absolutely.

2      Q.  How?

3      A.  It was not only the filing of the complaint

4  with the attorney general's office.  I believe it was

5  filing the complaint with Sergeant Owings as well as

6  telling Sergeant Carini the year before about the ticket

7  quota and telling Lieutenant Sullivan I wouldn't follow

8  the 33 percent issuance of money tickets after Sergeant

9  Owings ordered me to.

10      Q.  Other than this requesting that you program the

11  fax occurred after these incidents, do you have any other

12  information that you were assigned to do the fax machine

13  because you complained?

14      MR. HIGHTOWER:  Objection.  Asked and answered.

15      A.  It's all the timeline, and then the way

16  Sergeant Carini looked at me when he said that, "It

17  wasn't me, it wasn't me.  It was the Deputy Chief.  He

18  told me to have you do it."

19      Q.  Did Sergeant Carini ever tell you that the

20  Deputy Chief had you to do it because you filed

21  complaints?

22      A.  No.  But he showed me the e-mail in which, out

23  of all the officers in the Police Department, he chose me

LEAVITT REPORTING, INC.

## Page 199

1  to do it immediately following me reporting the illegal

2  activity.

3      Q.  Do you know if any of the other police officers

4  put on their applications for employment they were

5  proficient with the use of fax machines?

6      MR. HIGHTOWER:  Objection.  Relevance.

7      A.  I don't have any information regarding that.

8      Q.  So when you put that on your application, all

9  you meant was that you were able to fax documents?

10      A.  Yeah.  I'm good -- I can use computers, I can

11  send e-mails, do that.  I mean, even the Sergeant as well

12  as the IT tech, they, obviously, didn't know how to

13  program the fax machine.  Sergeant Carini got the

14  instructions, like, two weeks ago because I asked him how

15  to do it.  He didn't even know how to do it.

16      Q.  Who else did you think should be assigned to

17  program the fax machines, if it wasn't you?

18      A.  I believe it would be the IT tech, the IT

19  administrator, or whatever his name is.  Paul

20  Januszewski.

21      Q.  Are specific officers assigned to clean

22  cruisers?

23      MR. HIGHTOWER:  Objection.  Relevance.

LEAVITT REPORTING, INC.

## Page 200

1      A.  No.

2      Q.  Have you ever been assigned to clean a cruiser?

3      A.  It's a duty just to leave the cruiser -- It's

4  your duty when you leave to leave the cruiser cleaner

5  than you left it.  But, I mean, we can drive across to,

6  like, the car wash, and they drive through the car wash.

7  I'm not going to sit there cleaning the cruiser with my

8  hands.  I haven't seen anybody do that.

9      Q.  Did you lose any pay for having to program the

10  fax machine?

11      A.  No.  But it was demeaning.  Because it was sent

12  out to everybody that I programmed the fax machine, and

13  everybody knew that I had made complaints about the

14  ticket quota.  And I was, you know, I felt very demeaning

15  that I was a police officer who is held in a high

16  standard at the Abington Police Department and then all

17  of a sudden I was now doing the fax machine duty.

18      Q.  Did anyone say anything to you about that?

19      A.  Yeah.  We laughed about it.

20      Q.  Who is "we"?

21      A.  He's Wayne Paige came up to me and was, like,

22  "Wow, they're really doing that to ya?"  I was, like,

23  "Listen, I don't even know, I don't even know how to

LEAVITT REPORTING, INC.

Page 201

1  handle it." I mean, it was demeaning, it was very
2  demeaning. And Officer Wayne Paige, Officer Marquardt
3  who was on my shift, even Sergeant Owings had no idea why
4  it came from, you know, Sergeant Carini all of a sudden
5  from the Deputy Chief to me.
6      Q. Okay. Other than that one occasion, have you
7  ever been asked to do any other administrative task
8  within the Town of Abington Police Department?
9      A. Nothing I can recall in my head right now.
10     Q. Do you know other officers who have --
11     A. Programmed the fax machine?
12     Q. No. Done other administrative tasks, what you
13  would consider demeaning administrative tasks.
14         MR. HIGHTOWER: Objection. Relevance.
15     A. Well, there's certain positions in the Police
16  Department, like, there is an administrative officer who
17  works eight to four, that is Officer Jacob Poulin, he
18  does most of the administrative tasks at the Police
19  Department.
20     Q. What do his administrative tasks include?
21     A. I think it's everything, from ordering supplies
22  and -- I'm not even sure. Ordering supplies, and I've
23  seen him changing the front billboard, fixing the copier
              LEAVITT REPORTING, INC.

Page 202

1  machines, fixing, installing some computer stuff now at
2  this point. I saw him working with one of the computer
3  IT guys, Wayne Nolan. And he works on all that stuff.
4  So if we have an issue, we usually shoot him an e-mail,
5  hey, there's an issue with this, this, and he gets it
6  fixed.
7      Q. If you turn to Page 3 of what is marked as
8  Exhibit 4, your answer continues, and in the middle,
9  approximately in the middle you write, "The assignment at
10  the high school was an addition to the other work that
11  police officers were required to do on the midnight to
12  eight shift such as community policing, building checks,
13  investigations, accident reports, arrest reports,
14  incident reports, frequent checks and routine patrol, and
15  the fact that we were assigned to the Abington High
16  School and told to do nothing made it difficult to
17  complete other police officer work required by the
18  midnight to eight shift." My question is, is the
19  midnight to eight shift considered the quietest shift in
20  the Town of Abington Police Department?
21     A. No. I wouldn't say so because it's, it can
22  involve some serious calls. I would say on call volume,
23  yes, but not on -- You have some serious calls that
              LEAVITT REPORTING, INC.

Page 203

1  happen on the midnight to eight shift.
2      Q. But on call volume, it is the quietest?
3      A. Yes. But you can get a call that lasts the
4  entire shift.
5      Q. Can you recall when you have had a call that
6  lasted the entire shift?
7      A. I know OUI's, operating under the influence of
8  alcohol, those reports take forever. Sometimes the four
9  to twelve shift will get a prisoner, and now we have to
10  sit down back at the police station and almost fob the
11  prisoner, almost like that key fob that you have. I know
12  they just had a recent incident with, I know the midnight
13  to eight shift with Sergeant Owings had one where some
14  guy had a machete and he was cutting up his girlfriend,
15  his ex-girlfriend and her new boyfriend. That stuff
16  takes pretty much the whole shift.
17     Q. When you were assigned to the high school when
18  you were working the midnight to eight shift, did you
19  ever tell anyone there were certain tasks you couldn't
20  perform on a specific shift because you had to sit at the
21  high school?
22     A. I told Sergeant Owings I was getting backed up
23  in reports and I had to complete some reports. He said,
              LEAVITT REPORTING, INC.

Page 204

1  "Well, we'll just have to keep moving on and hope I don't
2  get an e-mail from the Chief or Deputy Chief saying that
3  I had to finish some of the reports."
4      Q. Did you ever ask for overtime to complete the
5  reports?
6      A. I don't believe so.
7         MR. HIGHTOWER: Objection to relevance.
8      Q. Were you ever unable to do any building checks
9  as a result of your having to be up at the high school
10  that you reported to anybody?
11     A. Yeah. Because I had to do community policing
12  from, like, one to eight. The building checks, there's
13  no required set number, but, from what I've seen, they
14  want to see the building checks on there and at least be
15  able to, you know, patrol the town and check the
16  buildings and. If I was doing the community policing for
17  an hour and then I got a call, which, you know, whatever
18  call it was, all of a sudden it's four in the morning,
19  you're not driving around doing building checks when the
20  sun is coming up, and I would have to finish whatever
21  reports I had on that shift. From the community
22  policing, I might pull over a suspended license or an
23  unlicensed operator and would have to go back and type
              LEAVITT REPORTING, INC.

Page 209

1    A.  Yes, it was.
2    Q.  So the summer, it, obviously, doesn't make
3  sense to have anyone sit in front of the schools.
4  Correct?
5    A.  We didn't -- I think school opened in
6  September, and then we didn't end up going up there
7  until, I think it was, October 14th.  So school is
8  already in session for a month and-a-half.
9    Q.  Did anyone object to going up to the schools in
10  the fall of 2014?
11    A.  I believe nobody wanted to say anything because
12  they were, like I said, it came back to the point where
13  it looked like, hey, Delaney just went and filed this
14  attorney general's office complaint and then he went and
15  he told the town manager about it and reported the
16  illegal activity, and now here's the school assignment
17  again where we have to sit there for two hours.  Like I
18  said, it fills up the stress on the shift because you're
19  sitting there trying to do the building checks, you're
20  trying to do the arrest reports, you're trying to do the
21  incident reports, you're trying to do this.  It just
22  takes away from that, and you have to sit up there again.
23    Q.  So you relate everything, all assignments to

LEAVITT REPORTING, INC.

Page 210

1  the school to your filing the complaint.  Is that
2  correct?
3    A.  That was the first time in my career I saw it
4  since when it was instituted -- No.  It was from us
5  saying that, Sergeant Owings going in there and saying
6  that the Money Ticket Quota System was illegal, and that
7  is from me telling him to.
8    Q.  Do you know if prior to January of 2014 there
9  had ever been assignments up at the school before?
10    A.  We had one-hour traffic assignments which the,
11  I believe it was for the first four days of the opening
12  of school and that was it.
13    Q.  Are you aware prior to your coming on to the
14  Department that there used to be school assignments?
15    MR. HIGHTOWER:  Objection.  Relevance.
16    A.  No, I'm not.
17    Q.  Did you ever ask anybody about those school
18  assignments and whether they had been assigned to the
19  school before you complained?
20    MR. HIGHTOWER:  Objection.  Relevance.
21    A.  No, I did not.
22    Q.  Do you know if the principal or any school
23  superintendent requested the police presence at the high

LEAVITT REPORTING, INC.

Page 211

1  school?
2    A.  When I was up at the high school, Theresa
3  Sullivan came up to me and said that she believed, she
4  said, "Oh, the only reason you guys are up here is for
5  punishment."  She said that to me.  So that would be the
6  knowledge I would have.
7    Q.  So you're not aware, then, anyone from the
8  school requested the police presence.  Correct?
9    MR. HIGHTOWER:  Objection.  Asked and answered.
10    A.  I have no knowledge.
11    Q.  The Town of Abington Police Department doesn't
12  have a school resource officer, do they?
13    A.  No, they do not.
14    Q.  Do you know if it's been requested in the past?
15    A.  I know Lieutenant Sullivan put in, like, a
16  grant or something for two school resource officers.
17  That was, like, this, I think it was, like, June of this
18  year maybe.
19    Q.  Do you think it's a good idea to have officers
20  up at the school interacting with the students?
21    A.  Yeah.
22    Q.  Were you ever disciplined in any way for not
23  completing tasks on your shift, such as building checks,

LEAVITT REPORTING, INC.

Page 212

1  when you were assigned up to the school?
2    MR. HIGHTOWER:  Objection.  Form.
3    A.  No.  Just made the job difficult.  It was a
4  complete, you know, it was a change from me going up
5  there for two hours to, like I said, to do nothing and
6  traffic is only there between 6:30, like, 6:45 to 7:25.
7    Q.  How did it put any pressure on your job?
8    A.  Because -- What was it?  Those two hours, that
9  could have been time that I could have been sitting there
10  doing other investigations and completing that.  But then
11  I had to sit there and then come in that night, and I
12  would have to sit there and do my incident reports rather
13  than go out and do building checks or X, Y, Z.
14    Q.  Can you think of any investigations you were
15  unable to conduct or complete because you were sitting
16  at the high school for those few months?
17    A.  I can't recall exactly what incident report or
18  arrest report it would have been, but I'm sure the
19  records would be there.
20    Q.  You can't think of any today as you sit here?
21    A.  No, I can't.
22    Q.  It would be between the months of January,
23  2014, and June, 2014?

LEAVITT REPORTING, INC.

Page 213

1    A.  I believe -- No.  It would be March, March of
2  2014 to July of 2014.  When I was on the midnight to
3  eight shift and doing the school assignment, which then
4  turned into the two-hour sitting in the Centers
5  assignment which other shifts didn't have to do.
6    Q.  Do you know if anyone was disciplined on the
7  midnight to eight shift for not completing their duties
8  during that shift during the period of time that they
9  were sitting in front of the school?
10    MR. HIGHTOWER:  Objection to form.
11    A.  I'm not sure.
12    Q.  If you continue on Page 4, the second
13  paragraph, and it's continuing to answer the question.
14  "Additionally, I have been subject to adverse treatment
15  for complaining about the Money Ticket Quota System by
16  being assigned as a police prosecutor causing loss of
17  over time prospects, changes in my hours and other
18  patrolman responsibilities, ordered to perform desk duty,
19  the disclosure of false information regarding my medical
20  condition to co-workers, removing my discretion as a
21  Massachusetts police officer to freely issue warnings
22  instead of money tickets or vice-versa, pursuant to
23  General Laws, Chapter 90C, Section 3, making numerous
   LEAVITT REPORTING, INC.

Page 214

1  changes to the Abington Police practices, and also
2  removing my ability to utilize other police officers to
3  holdover to cover my shift."  So let's start with the
4  first one, the assignment to the police prosecutor
5  position.  How did you learn you were first assigned to
6  that position?
7    A.  I believe it was June of 2015.
8    Q.  Who told you?
9    A.  Officer Gerard Julien-Suarez.
10    Q.  Was he the court prosecutor at the time?
11    A.  Yes, he was.
12    Q.  What did he say to you?
13    A.  He came up to me and told me that the Chief was
14  going to place me as the court prosecutor.
15    Q.  Did you discuss that with the Chief after he
16  told you that?
17    A.  I believe I got an e-mail.  I think I had the
18  conversation with Gerard and then I got an e-mail.  And I
19  think the e-mail, I can't exactly remember what was in
20  the e-mail, but I did send the Chief saying that I was
21  declining the position, that I didn't want it.
22    Q.  Did you talk to the Chief about why he selected
23  you as the court prosecutor?
   LEAVITT REPORTING, INC.

Page 215

1    A.  Yes.
2    Q.  What did the Chief tell you?
3    A.  He told me that it was a supervisory role and
4  that, you know, that it was a high end job, and that he
5  was going to put me in there as it.
6    Q.  And have you lost any money as a result of
7  being the court prosecutor?
8    A.  Yes, I have.
9    Q.  How?
10    A.  Ever since I started at the Abington Police
11  Department, I always worked the four to twelve or
12  midnight to eight shift or the midnight to eight/four to
13  twelve split which gives me a $55 a week stipend.
14  Also --
15    Q.  Let me stop you.  Four to twelve, midnight to
16  eight, what's the difference in the shift pay?
17    A.  So four to twelve is a $52 a week shift
18  differential.  So you get $52 extra over any other
19  shifts, except for the mid midnight to eight which gets
20  $55.
21    Q.  So the difference between the four to twelve
22  and midnight to eight is only $4?
23    A.  Three dollars.
   LEAVITT REPORTING, INC.

Page 216

1    Q.  That's per month?
2    A.  Per week.
3    Q.  And you get a specific stipend in working as
4  the court prosecutor that you wouldn't get if you were
5  working those two shifts as a patrol officer?
6    A.  I believe you get an $800 stipend which
7  wouldn't equate to the amount that I would make on a four
8  to twelve or midnight to eight shift.
9    Q.  So if you're working -- I'll do the math
10  another time.  Do you also get more days off working as
11  the court prosecutor?
12    A.  You get holidays off as well and weekends off.
13    Q.  That you don't get as a patrol officer.
14  Correct?
15    MR. HIGHTOWER:  Objection.
16    A.  A patrol officer works four and two, and they
17  have more days off compared to the court prosecutor.  So
18  in order do that, they give six admin days to equal it
19  out with the amount of days off on the court prosecutor
20  position.
21    Q.  So you get six paid admin days, correct, --
22    A.  Yes.
23    Q.  -- to compensate --
   LEAVITT REPORTING, INC.

Page 217

1      A.  Yes.
2      Q.  -- that you wouldn't have gotten as the patrol
3  officer.  Correct?
4      A.  Yes.  Because a four and two schedule, you get
5  more, you get more days off within the year than a five
6  and two schedule.
7      Q.  Now, as the court prosecutor, you can also take
8  overtime.  Correct?
9      A.  Posted overtime, yes.
10      Q.  And so have you accepted the overtime that's
11  been posted that you have been eligible for since you
12  have been the court prosecutor?
13      A.  I have taken posted overtime.
14      Q.  Have you rejected posted overtime since you
15  have been court prosecutor?
16      A.  I believe I've -- You don't really reject it.
17  You kind of find somebody to cover the shift for you.
18      Q.  Have you done that?
19      A.  Yes.
20      Q.  Why?
21      A.  Because I wasn't able to work it, whether or
22  not it was a family engagement or I had a doctor's
23  appointment.
       LEAVITT REPORTING, INC.

Page 218

1      Q.  How much overtime are you claiming that you
2  have lost since you have been court prosecutor?
3      A.  Well, I mean, you didn't really get into it,
4  but because I'm court prosecutor, if you look back in the
5  records, you can see how many times I've gone to court.
6  And I get a lot of overtime from going to court to
7  testify in court cases.  And if I'm over at court, I'm
8  not getting that overtime.  So it's a position in which
9  you're losing the shift differential, you're losing the
10  overtime for the court, and you also can't -- Most of the
11  details that go on are on the eight to four, Monday
12  through Friday schedule, so you're unable to take details
13  to supplement your income.
14      Q.  Do you know if you've earned more overtime
15  since you have become court prosecutor as to the year
16  before?
17      A.  I'm not exactly sure.  I know I got heavy
18  raises from, what's it called, from our new contract we
19  just got, so.
20      Q.  What does that have to do with not earning
21  overtime?
22      A.  Sorry.  I thought.
23      Q.  I'm talking overtime money.  The amount you
       LEAVITT REPORTING, INC.

Page 219

1  earned in overtime since you have become court
2  prosecutor.
3      A.  I'm not sure.  I don't keep track of it.
4      Q.  As the court prosecutor, one of your
5  responsibilities is to sit in on clerk magistrate
6  hearings for tickets where motorists have appealed?
7      A.  Yes.
8      Q.  And is it your discretion to decide whether the
9  ticket is withdrawn?
10      A.  I always do, like, court decree and do whatever
11  the court decides.
12      Q.  Can you decide, though, in your discretion
13  whether to pull the ticket?
14      A.  I don't pull the ticket.  I let the clerk
15  always handle it.
16      Q.  Does a clerk ask you what you want to do when
17  you're sitting there?
18      A.  Yes, he does.
19      Q.  Do you always say, "Whatever you want to do,
20  Mr. Clerk?"
21      A.  Yeah.  I mean, I say that I don't have any
22  objection to what the clerk magistrate may say.
23      Q.  And do you have to check with anyone in the
       LEAVITT REPORTING, INC.

Page 220

1  department or is it your discretion whether to decide to
2  object to a clerk pulling the ticket or reducing the
3  fine?
4      A.  I haven't been spoke to about that, no.
5      Q.  Have you ever disagreed with the clerk reducing
6  a fine?
7      A.  No.  Like I said, it's -- I don't object to
8  whatever the court finds.
9      Q.  Have you ever requested on a motorist's behalf
10  that the fine be reduced?
11      A.  No.
12      Q.  In your position as court prosecutor, have you
13  ever requested that the ticket be withdrawn when it's at
14  a clerk magistrate's hearing?
15      A.  No, I have not.
16      Q.  Have you seen as court prosecutor any fine
17  citations that are being reviewed by the clerk magistrate
18  that you believe to be inappropriately issued?
19      A.  Yes.
20      Q.  How many?
21      A.  I believe, like, two, I think.  I can't really
22  recall.  One of them, the charge was incorrect and didn't
23  fit the elements of the crime.  And another one was a
       LEAVITT REPORTING, INC.

Page 221

1  lawyer that was issued a citation that the elements
2  didn't fit as well.
3      Q.  In your position as court prosecutor, what did
4  you do?
5      A.  I left it up to the clerk magistrate, but I
6  said -- obviously, I could see the concerns from what
7  he's saying.
8      Q.  Do you know who issued those two tickets?
9      A.  I believe it just recently happened.  It was
10  Sergeant McCollem, and I think it was, like, for impeded
11  operation or something like that.
12      Q.  Now, in this response you say you were ordered
13  to perform desk duty.  How is desk duty assigned in the
14  Town of Abington Police Department?
15      A.  The desk duty, from what I got, was usually
16  picked by whatever the officers wanted to do, from what I
17  was seeing at the beginning.  Now I've seen e-mails that
18  have shown that the Deputy Chief and the Chief are the
19  ones who assign that as well.
20      Q.  Desk duty is doing the dispatch.  Correct?
21      A.  Yes.
22      Q.  And because there's no civilian dispatcher in
23  the town.  Is that right?
                    LEAVITT REPORTING, INC.

Page 222

1      A.  Not right now, no.
2      Q.  And so on your initial shift, midnight to
3  eight, who was doing the dispatch?
4      A.  Which midnight?
5      Q.  When you first started at the Abington Police
6  Department, you worked midnight to eight?
7      A.  Four to twelve.  First two years.
8      Q.  Who was assigned to the desk duty?
9      A.  It was Officer Kevin Sullivan.
10      Q.  And do you know if Officer Kevin Sullivan
11  requested desk duty?
12      A.  I believe he wanted it, yes.
13      Q.  And then you switched shifts.  Correct?
14      A.  Then I went to --
15      MR. HIGHTOWER:  Objection to form.  Answer the
16  question.
17      A.  I went to the split shift, midnight to eight/
18  four to twelve.
19      Q.  Did you do desk duty then?
20      A.  I wasn't assigned to the desk, but I know there
21  was some nights where I was covered up in reports and I
22  said, "Do you mind if I go on the desk?"  I never liked
23  working the desk.  I like being on the road and being
                    LEAVITT REPORTING, INC.

Page 223

1  involved in whatever.  I didn't like having the other
2  officers out there because I was trained as the field
3  training officer, and some of these guys I trained, and I
4  liked being out there.  I was never assigned to it, but I
5  did take the desk a couple of times.
6      Q.  When were you first assigned the desk?
7      MR. HIGHTOWER:  Objection to form.
8      A.  I was first assigned the desk by, I believe it
9  was, Sergeant Mark Kilgour.
10      Q.  What shift were you on at the time?
11      A.  The four to twelve shift.
12      Q.  Had you just switched to that shift when you
13  were assigned the desk duty by Sergeant Kilgour?
14      MR. HIGHTOWER:  Objection to form.
15      A.  I had just switched from the midnight to eight
16  shift to the four to twelve shift.
17      Q.  Do you know if anyone on the four to twelve
18  shift that you had bid for had requested to do the desk?
19      A.  I know that -- I know Officer Franey liked the
20  desk, I know Officer Doherty liked the desk as well, and
21  I told them, I told them, "You guys can have it if you
22  want."
23      Q.  Do you know if they actually requested to do
                    LEAVITT REPORTING, INC.

Page 224

1  the desk every shift?
2      A.  I believe they told the Sergeants that,
3  whatever they wanted for the desk duty.  I said I didn't
4  want to be on the desk.
5      Q.  Do you know why Officer Franey was not assigned
6  to do the desk all four shifts?
7      A.  I am not sure.
8      Q.  But other officers were assigned to do the desk
9  in addition to you.  Correct?
10      A.  I was assigned by -- Sergeant Kilgour told me
11  that the Deputy Chief had informed him to place me on the
12  desk.
13      Q.  Were you placed on the desk all shifts?
14      A.  For one desk night.  And he told me, he said I
15  could pick it.
16      Q.  So one desk night out of, what, four?
17      A.  One out of four shifts, yeah.
18      Q.  Who did the other three?
19      A.  I'm not sure.  I believe it was Officer Franey
20  and Officer Doherty.
21      Q.  Why do you believe your being assigned to work
22  the desk in one of four nights was the result of you
23  having filed a complaint?
                    LEAVITT REPORTING, INC.

Page 225

1    A.  Well, placing me on the desk, it puts me --
2  Number one, I didn't like it, and everyone knew I liked
3  working the road.  Also, being on the desk, it takes away
4  from you getting the ability to, if you're on a shift and
5  then you end up going to an incident, or you make an
6  arrest and that arrest carries over, you get overtime.
7  If you're on the desk, you never get overtime because
8  you're stuck there.  You're not out there on the road
9  doing the duties of a police officer.
10    Q.  My question was, why do you believe your
11  assignment to the desk on the one out of four nights was
12  retaliation for a complaint you had filed?
13    A.  Because what I just said.
14    Q.  But the other three officers covered the other
15  nights.  Correct?
16    A.  Like I said, for some reason they like it.  I
17  didn't.
18    Q.  You don't think you should ever be assigned the
19  desk?
20    A.  That was the first time I was ever ordered to
21  be on the desk a set number of days.  All the other times
22  for the four years before that I never had an issue and I
23  was always on the road, other than when I chose to go on
                LEAVITT REPORTING, INC.

Page 226

1  the desk if we were sitting there, you know, hey, do you
2  mind if I can finish this report.
3    Q.  And on the other shifts you were on, there was
4  always someone who requested it on all four shifts.
5  Correct?
6    MR. HIGHTOWER:  Objection to the form.  Answer
7  if you can.
8    A.  I believe there was multiple people who
9  requested that.  Some people actually liked it, so.
10    Q.  Now, when you say that when you worked patrol
11  and you have to carry over cases, is that doing
12  investigation work that they carry over?
13    A.  Yeah.  There will be, like, obviously, if you
14  have an incident involving, like -- I can put it on,
15  like, a midnight to eight.  I had, I believe it was
16  around 7:00 p.m., the Abington Liquor Store got broken
17  into, and the suspect fled.  We ended up locking him up.
18  He ended up going to -- I had to stay to do the
19  investigation past my time, and I was getting overtime
20  for that.  I think I stayed for another, I don't know,
21  eight hours, I think, after that, or about eight hours,
22  entering property and then, obviously, doing the
23  investigation at BCI, photograph, and doing all that.
                LEAVITT REPORTING, INC.

Page 227

1  That is outside of the duties.  I would never have done
2  that if I was assigned to the desk.
3    Q.  So the other three nights you weren't assigned
4  to the desk when you were working four to twelve under
5  Sergeant Kilgour, how many times did you carry over
6  cases?
7    A.  I'm not exactly sure.  I mean, it would be in
8  the records.
9    Q.  You believe you earned overtime the other three
10  nights that you were working patrol and carrying over
11  cases?
12    A.  Yes.
13    MS. ECKER:  Let me take a break.
14    (Brief recess)
15    Q.  I am still on Page 4, going through this.  You
16  put in here, "Disclosure of false information regarding
17  medical conditions to co-workers."  What do you mean by
18  that?
19    A.  Well, what I meant by that was back in, I
20  believe it was, October 14th, I came in after filing my
21  statement with the attorney general as well as reporting
22  it to the town manager, I was working four to twelve that
23  night, and I came in and I was approached by Jacob
                LEAVITT REPORTING, INC.

Page 228

1  Poulin.  He told me that the Chief approached him and
2  told him I was crazy in the head.  I felt that he was,
3  obviously, saying to him, you know, because of my mild
4  traumatic brain injury and what he had gotten from the
5  Deputy Chief from his conversation was that he was saying
6  that I was crazy in the head because of that.
7    Also, the fact that he was going to Officer Wayne
8  Paige, as he wrote in his statement, had said that I was
9  suffering from posttraumatic stress disorder.
10    Q.  Did Officer Poulin tell you that the Chief told
11  him that you had a posttraumatic brain injury?
12    A.  He didn't say.
13    MR. HIGHTOWER:  Objection to the form.  Answer
14  if you understand.
15    A.  I don't believe he said traumatic brain injury.
16  But he came up, he said I was the crazy in the head, and
17  he asked if I was okay.  That's how he stated it to me.
18    Q.  Crazy in the head and asked if you were okay?
19    A.  Yeah.
20    Q.  Then Officer Paige, did he tell you
21  specifically what the Chief said about posttraumatic
22  stress?
23    A.  It's written in his affidavit.  But he told me
                LEAVITT REPORTING, INC.

Page 233

1    I can sit here and put two and two together.
2        Q.  Now, you continue on, "Recently, after the
3    filing of the complaint, I have been improperly
4    disciplined multiple times which I view as an attempt by
5    the defendants to terminate my employment."  When is the
6    first time that you have been disciplined or you were
7    disciplined after the filing of your complaint with the
8    attorney general's office?
9        MR. HIGHTOWER:  Objection to form.  Go ahead.
10       A.  Like I said, I believe I have been retaliated
11   against -- I believe all this is because I filed -- not
12   only stood up and said to Sergeant Carini I wouldn't
13   follow the order as well as filed the complaints and
14   stuff, but in regards to, in regards to that, I think my
15   whole complaint speaks for itself and that's how I feel
16   I've been disciplined.
17       Q.  Have you ever been given a verbal warning since
18   you have been employed by the Abington Police Department?
19       A.  Everything has been reduced to writing.  I
20   don't think there's been a verbal warning.
21       Q.  Have you ever been given a written warning
22   since you have been employed by the Abington Police
23   Department?

LEAVITT REPORTING, INC.

Page 234

1        A.  Yes, I have.
2        Q.  When is the first time you were given a written
3    warning?
4        A.  I believe the written warning was -- I can't
5    recall what the first one was, in all honesty.
6        Q.  How many written warnings have you received
7    since you have been employed by the Abington Police
8    Department?
9        A.  Up until May of 2015, I don't believe I
10   received one written warning, from what I can recall.
11   Then, after that, it seemed like I was, I got about four
12   or five, I think.
13       Q.  What's the first written warning that you
14   received that you recall?
15       A.  The first written warning that I recall was --
16   I'm trying to think what would be the first.  I think it
17   was in, I think it was in April.  I'm not sure if it was
18   the first one.  I can't remember.
19       Q.  You can tell me them out of order.  Why don't
20   you tell me all the written warnings you have received
21   since you have been employed by the Abington Police
22   Department.
23       A.  I was written up for insubordination, which I

LEAVITT REPORTING, INC.

Page 235

1    believe was false.  I was written up for failing to call
2    in sick prior to my shift starting, which I also believe
3    is false.  You're only talking about written warnings?
4        Q.  I'm only talking about written warnings.
5        A.  I was written up for not following an IOD claim
6    procedure after a Sergeant had told me what to do, and
7    then he later wrote me up about four months later.
8        MR. HIGHTOWER:  Deborah, can you just pardon me
9    for one second?  I have to step outside.
10       MS. ECKER:  Absolutely.
11       (Brief recess)
12       Q.  Continuing on on Page 4 -- We were talking
13   about the written warnings.  So you told me you were
14   written up for insubordination.  Do you remember the
15   incident?
16       A.  Yes, I do.
17       Q.  What was it?
18       A.  It was, I was acting as union president along
19   with our union vice president, Gerard Julien-Suarez.  And
20   we went in to file a grievance on a court time issue that
21   we had involving a court time issue, and we were going to
22   try and speak with the Chief about it.  And we went
23   inside there, we started talking about it.  And the Deputy

LEAVITT REPORTING, INC.

Page 236

1    Chief started bringing up some other grievances.  And I
2    was trying to keep it on track in regards to staying with
3    the grievance that we were in there speaking about
4    because, obviously, we had some other issues with other
5    pending grievances.  At that time the Deputy Chief said
6    to me, "You may want to be careful."  And I looked back
7    at him, I said, "You may want to be careful."
8        And then I got kicked out of the office and chased
9    out of there, as the Chief and Deputy Chief followed
10   myself and Officer Gerard out of the door.  And then the
11   Deputy Chief came up to me in my face, put his finger up
12   and said, "Consider this a warning for insubordination."
13   Then I got an e-mail in the form of a written warning
14   saying that he felt that I was being insubordinate to
15   him.  But he didn't write in there how I was being
16   insubordinate to him.
17       Q.  When you say you were kicked out of the office,
18   had the meeting ended?
19       A.  Yes.
20       Q.  How did they kick you out?
21       A.  The Chief said, "We're done.  We're done here
22   right now.  We're done."
23       Q.  Did you testify you were chased out of there?

LEAVITT REPORTING, INC.

Page 237

1    A.  Yes.
2    Q.  What do you mean chased out of the office?  And
3  I'm assuming you're talking about the Chief's office?
4    A.  They followed us out.  And just the demeanor of
5  how the Deputy Chief was walking as well as the Chief
6  behind us, I felt like we were getting chased out of the
7  office.
8    Q.  But the meeting had ended?
9    A.  We didn't finish the meeting.
10   Q.  Was it a union meeting or an official union
11  meeting you were in the office about?
12   A.  I was in there discussing a grievance as the
13  union president.
14   Q.  But it wasn't an official union meeting.
15  Correct?
16     MR. HIGHTOWER:  Objection.  Form.
17   A.  What do you mean by official union meeting?
18  Like all union members?
19   Q.  Are there some times you speak with the Chief
20  about union issues?
21   A.  It was part of the grievance procedure, and we
22  were outreaching to him to try to speak with him.
23   Q.  And who was in there with you was Officer

LEAVITT REPORTING, INC.

Page 238

1  Poulin?  I'm sorry.  Who was in there with you?
2    A.  Officer Gerard Julien-Suarez.
3    Q.  And did Officer Suarez ask you to leave with
4  him?  Did he pull you out of the meeting?
5    A.  I believe we were getting up and walking.
6  He's, like, "Let's just go.  Let's just go."  I'm, like,
7  "Hey, we want to sit here and discuss it."  And we just
8  turned and walked out.
9    Q.  Did you grieve these written warnings?
10   A.  I did not.
11   Q.  Why not?
12   A.  At that point I was just felt like I was
13  getting beat down.  And I think the written warning
14  speaks for itself where it says that -- There was no
15  insubordination, I wasn't calling him names or saying
16  anything.  I wasn't doing anything hostile towards him or
17  anything.  I was just repeating what he said back to me.
18   Q.  Did you -- I didn't mean to interrupt you.
19   A.  And he was repeating back what he said back to
20  me.  At that point I didn't even know what to do.
21   Q.  Did you think you were being disrespectful to
22  the Deputy Chief?
23   A.  Absolutely not.

LEAVITT REPORTING, INC.

Page 239

1    Q.  Do you think in your role as union president in
2  any of these meetings you still have to follow the chain
3  of command and be respectful to the Chief and Deputy
4  Chief?
5      MR. HIGHTOWER:  Objection to form.
6    A.  I'm respectful to every person I meet and talk
7  to.  And during these meetings, whenever you're sitting
8  there and talking any type of union business, what I've
9  been told and what I've read, based on stuff that was
10  presented, that was given to me by the International
11  Brotherhood of Police Officers, our union
12  representatives, you go in there and you sit, and you're
13  on the same level.  Because if there is that hierarchy,
14  then you're not going to get anything done.  And that's
15  how you're supposed to sit at the same level and sit down
16  there and discuss or bargain or talk about the
17  grievances.
18   Q.  Do you believe you have ever been disrespectful
19  to the Chief or Deputy Chief in any of those meetings?
20   A.  Absolutely not.
21   Q.  And you didn't grieve.  Correct?
22   A.  No, I did not.
23   Q.  At that point when you say you were so beat

LEAVITT REPORTING, INC.

Page 240

1  down, had you received any prior written warnings?
2      MR. HIGHTOWER:  Objection to form.
3    A.  Yes, I did.
4    Q.  What was your prior written warning?
5    A.  I received one from Sergeant McCollem for
6  insubordination.
7    Q.  What did Sergeant McCollem write you up for?
8  What was the incident?
9    A.  We were having -- I believe it was a union, I
10  believe it was a union nomination meeting where we have
11  nominations.  It was a union meeting at the Brockton VFW.
12  Sergeant McCollem had shown up late.  Then he started
13  arguing with Officer Julien-Suarez and the union
14  representative, Bill Chaisson, down to the point that he
15  was called -- I can't remember what he said to him, but
16  he called Bill some type of name.  And I told him, "Hey,
17  listen, you showed up late, you need to leave."
18   He ended up walking out.  As he was walking by me,
19  he said, he comes up to me and he points right at me, he
20  goes, "Everything you're doing is personal.  Every single
21  thing you're doing here is personal."  I'm, like -- I
22  didn't understand what he was saying.  I kind of got the
23  idea of what he was saying because I later found out that

LEAVITT REPORTING, INC.

Page 249

1    was saying it.
2       Q.  Was he yelling at you?
3       A.  He wasn't raising his voice, but he was saying
4    it in a demeaning tone, almost like how I just explained
5    it.
6       Q.  That it was a lot of work?
7       A.  He kept saying, "It's a lot of work.  It's a
8    lot of work."
9       Q.  Is it a lot of work?
10      A.  He's just looking at me and saying it.  It was
11   very intimidating, I should say.
12      Q.  Do you know if the SWAT team is a lot of work?
13      A.  I do know it's a lot of work.  I have some
14   friends who are on it.
15      Q.  Officer Davern eventually got it.  Correct?
16      A.  Officer -- I'm not sure.  But from what I
17   heard, yeah.
18      Q.  Do you believe there's anyone else who does not
19   support you as union president who as a result has gotten
20   any good assignments or favors from the Chief?
21         MR. HIGHTOWER:  Objection to form.  You can
22   answer it.
23      A.  I'd say Acting Sergeant Ronald Sweeney was
              LEAVITT REPORTING, INC.

Page 250

1    promoted to Acting Sergeant.
2       Q.  Let me ask another way.  Is there any one
3    example that you're aware of that does not support you as
4    union president who hasn't gotten any, favoritism in your
5    view, from the Chief or Deputy Chief?
6          MR. HIGHTOWER:  Objection to form.
7       A.  Who doesn't?
8       Q.  Who doesn't support you.
9          MR. HIGHTOWER:  Objection to form.  Answer if
10   you can.
11      Q.  Let me ask it another way.  You say there's a
12   group of officers --
13      A.  From who --
14      Q.  Let me ask the question.  There's a group of
15   officers who don't want to see you as union president.
16   Correct?
17      A.  Yes.
18      Q.  Who are those officers that you're aware of?
19      A.  That I'm aware of, from what I've heard through
20   multiple conversations with people, it's Officer Brian
21   Solimini, Acting Sergeant Ronald Sweeney, Officer Jacob
22   Poulin, Officer Kevin Cutter or Acting Sergeant Kevin
23   Cutter now.  Oh, Sergeant Shawn McCollem.  Those are the
              LEAVITT REPORTING, INC.

Page 251

1    only people that I'm aware of.
2       Q.  So that's five individuals.  You have already
3    talked to me about Sweeney and McCollem.  What about
4    Kevin Cutter, do you think that he's favored by the Chief
5    or Deputy Chief because he doesn't support you as union
6    presidents?
7       A.  I would say so.
8       Q.  Why?
9       A.  He was just promoted to Acting Sergeant after
10   he threatened another officer.
11      Q.  So you think that he was promoted simply
12   because he doesn't support you?
13      A.  Yes.
14      Q.  What do you base that on?
15      A.  I base that on what I see at the Abington
16   Police Department and how everything has been since I
17   filed this attorney general's office statement as well as
18   spoke out about the ticket quotas.  Ever since then, I
19   wasn't set up to succeed.  Officer Cutter was set up to
20   succeed.  He wrote up money tickets, and then he was
21   given all the time to do drug work and investigations.
22   He was given money to do buys.  He was given keys to all
23   the cars.  You actually have to -- Once he wrote all
              LEAVITT REPORTING, INC.

Page 252

1    those money tickets, you had to go through Kevin Cutter
2    to get the keys to the unmarked vehicle.
3       Q.  What do you think that had to do with how many
4    tickets he wrote?
5       A.  Because he followed the ticket quota.
6       Q.  Do you have any information, other than you
7    saying he followed a ticket quota, that Kevin Cutter was
8    rewarded because he followed it by being able to do more
9    drug investigations?
10      A.  Like I said, he was set up right from May of
11   2013 and on to make, you know, to be able to have this
12   overtime.  And, like I said, Todd Cantalupo was thinking
13   about filing a grievance.  He was doing all this
14   overtime.  He had the keys.  He had the, what's it
15   called, he had the office.  And, yeah, he was getting all
16   the tip line calls from his uncle, the Deputy Chief.
17      Q.  And you think that's all because he wrote money
18   citations?
19      A.  Yes.
20      Q.  Do you know how many drug investigations he
21   successfully completed since he has been in the Abington
22   Police Department?
23      A.  I consistently see it bringing it over to the
              LEAVITT REPORTING, INC.

Page 257

1  warnings so far for insubordination. Correct?
2  A.  Yes.
3  Q.  Did you appeal the second one that occurred in
4     the parking lot where you told, where you called Sergeant
5     McCollem Lieutenant?
6  A.  No, I did not.
7  Q.  You did not?
8  A.  No.
9  Q.  Did you lose any pay or any benefits as a
10    result of having those two written warnings?
11 A.  No.  But, like I said, whenever these written
12    warnings go out, they go out to all the Sergeants.  It's
13    seen by all of them.  It's embarrassing.
14 Q.  They were all present for the, right, at the
15    union meeting anyway?
16 A.  Not all.  Like I said, that happened in the
17    parking lot.  You asked me to say which people it was.
18    And I told you.
19 Q.  Now, do you know if it's standard procedure for
20    all discipline to go out to all superior officers?
21 A.  Other than the two written warnings, are there
22    any other, other than what you have told me about, are
23

LEAVITT REPORTING, INC.

---

Page 258

1  there any other written warnings you received?
2  A.  I received a written warning in July, I think
3     the end of July.
4  Q.  Of this year?
5  A.  Yep.
6  Q.  What was that written warning?
7  A.  I forget what the specific policy violations
8     were, but I remember it was at night, I was sick as
9     anything.  I was thinking about what was going on in
10    regards to everything at the Abington Police Department,
11    and I was very stressed out.  And I've had issues falling
12    asleep, and I ended up taking some Nyquil to fall asleep
13    because I was throwing up.  And I fell asleep at, like,
14    6:30.  I knew I was going to get about half an hour
15    sleep.  I thought I would be waking up at seven.  I
16    didn't hear my alarm.  I think I woke up at, I think it
17    was 8:17.  I saw that, I was supposed to be at shift at
18    eight.  I called the shift supervisor, Sergeant McCollem,
19    I said, "I'm sick as a dog, I can't make it in."  I
20    didn't think I was going to be able to -- I thought I was
21    going to be able to try to maybe, hopefully, wake up and
22    feel better, and I wasn't.
23    I was out for, I think for a whole week, and ended

LEAVITT REPORTING, INC.

---

Page 259

1  going to the -- Oh, no.  I think I was out Friday,
2  Saturday, Sunday, and then Monday and Tuesday, I believe.
3  I ended up going to the hospital, and they said that I
4  had, like, the flu, and there was also some issues, they
5  said that my stress could cause that, like, causes, like, your
6  immune system to go down and that's, like, why I was
7  catching the flu.
8  Q.  What hospital was that?
9  A.  Compass Medical in Middleborough.
10 Q.  Who was the provider that you saw?
11 A.  I was whoever was in the on-call room, the
12    emergency room there, wherever they have.
13 Q.  Was the flu going around at that time?
14 A.  Yeah, that's what they said.
15 Q.  So why were you given a written warning?
16 A.  I was given a written warning because I failed
17    to show up for my shift.
18 Q.  And did you think that written warning was
19    appropriate?
20 A.  I didn't think so because I was having a
21    medical emergency.
22 Q.  When was the shift in relation to when you
23    first called in?

LEAVITT REPORTING, INC.

---

Page 260

1  A.  It was at eight o'clock.
2  Q.  So when did you call in?
3  A.  8:17, I believe.
4  Q.  Did you grieve that written warning?
5  A.  I did not.
6  Q.  Why didn't you call in earlier?
7  A.  I was sick.
8  Q.  You were sick?
9  A.  Yeah, I was dying.  It was ridiculous.
10 Q.  Any other written warnings?  You've told me
11    three so far.
12 A.  I believe -- So I was sick on Friday, and then
13    I was sick on Monday and Tuesday.  And, according to the
14    contract, we're not allowed to work within 27 to 48 hours
15    of a shift if we call in sick.  And Lieutenant Sullivan,
16    because I don't recall it ever being posted, had posted
17    me a shift on Saturday night, that night it, I believe it
18    was, midnight to eight.  I ended up getting a written
19    warning for that same incident.  I can't remember who
20    wrote it, but I remember getting written.  I
21    Like I said, I was never notified of the shift.  I
22    came back, I even looked in the e-mails.  I didn't see
23    the e-mail inside of the computer system.  And I got

LEAVITT REPORTING, INC.

Page 261

1  written up for that as well.  I was sick as a dog.  I
2  came back from my sickness and I saw that the e-mails
3  weren't even sent that day.  I wasn't even talked to that
4  day.  It was a couple of days after the incident had
5  happened.  It was, like, four days after, I think.
6      Q.  How long prior to an overtime shift are they
7  posted?
8      A.  Eight hours.  They can be within eight hours.
9      Q.  Do you know when this overtime shift was posted
10  by Lieutenant Sullivan?
11      A.  I have no idea.
12      Q.  When an overtime shift is posted, you have to
13  accept or decline.  Correct?
14      A.  What do you mean by that?
15      Q.  When overtime is offered, right, it's posted?
16      A.  Yep.
17      Q.  And you accept or decline the overtime?
18      A.  You don't, like, say "I decline it."  You have
19  to, like, find your own fill to get somebody else to work
20  it if you don't want to work it.  Or you have to work it
21  if you can't find anybody to work it.
22      Q.  So let me see if I understand.  An overtime
23  assignment -- I'm not talking shift swaps.  They put out

LEAVITT REPORTING, INC.

Page 262

1  overtime, there are going to be X number of overtime
2  assignments.  Correct?
3      A.  Yes.
4      Q.  And so how does it work?  Who gets assigned to
5  the overtime?
6      A.  It's by seniority, and then he posts the shift,
7  whatever it is, like, vacation, sick day, personal day.
8      Q.  So if the top person on the list can't do it
9  for whatever reason or declines, how is the next person
10  supposed to know?
11      A.  They don't decline.  I don't really understand
12  the wording.
13      Q.  Tell me this.  What is the process for posting
14  and accepting overtime assignments in the Town of
15  Abington?
16      A.  The Lieutenant will post it on a shift, on a
17  shift sheet.  If he sees you're not going to be in or
18  that shift is kind of like close to whatever it is, he'll
19  give you a call and say, "Hey, just so you know, you have
20  a posted midnight to eight shift" or a posted four to
21  twelve, you know, all the way through that.  Or he'll
22  send an e-mail saying, hey, I posted, you know, he'll say
23  approved posted to Sergeant or posted to Officer Delaney

LEAVITT REPORTING, INC.

Page 263

1  or Officer Kokoros.  And that's the e-mail I'm referring
2  to.  I couldn't find that e-mail.
3      Q.  So you don't recall the Lieutenant ever
4  assigning you the shift?
5      A.  No.
6      Q.  And you didn't show up for the shift.  Correct?
7      A.  I was sick.  I couldn't because of the hours
8  and I didn't even know about it.  I didn't know about it
9  until I got back and got written up.
10      Q.  How do officers know about the shift -- If the
11  Lieutenant doesn't e-mail you, how do they know about it?
12      A.  He calls.
13      Q.  You don't recall him ever calling you about the
14  shift?
15      A.  I don't.
16      Q.  Why do you think the Lieutenant did that?
17      A.  I don't know.  To try to get me written up, I
18  guess, because I got -- That's another write-up, you
19  know, that was false.
20      Q.  Why would the Lieutenant want a shift to go
21  unfilled?
22      A.  It happens multiple times, I guess, with him
23  not filling them.

LEAVITT REPORTING, INC.

Page 264

1      Q.  Who has told you it has happened multiple
2  times?  Has he ever accused anyone else of not showing up
3  for a shift?
4      A.  I saw multiple people not show up for a shift.
5  We had an incident involving Sergeant Ronald Sweeney
6  where he didn't show up for a shift.
7      Q.  Does Officer Sweeney allege that the Lieutenant
8  never posted it?
9      A.  I'm not sure.
10      Q.  Any other written warnings you haven't told me
11  about?
12      A.  I can't recall any more than that.
13      Q.  Any suspensions since you have been employed by
14  the Town of Abington Police Department?
15      A.  Yes.
16          MR. HIGHTOWER:  Objection.
17      Q.  How many suspensions have you had?
18      A.  One suspension for two days.  That was just
19  recently.
20      Q.  That's a recent one?
21      A.  Yes.
22      Q.  What was that for?
23      A.  That was for failing to -- Neglect of duty.  I

LEAVITT REPORTING, INC.

Page 265

1 think it's failure to report and another policy. I don't
2 really recall what the other one was.
3    Q.  Did you fail to report to a shift?
4    A.  I woke up at eight. Like I said, I
5 was barely getting any sleep again, I had some issues
6 with that. And I ended up calling at 8:02. I called
7 Officer Marquardt, and I asked him to stay for me. He
8 said he was already on the road but he was going to swing
9 back to the station and cover for me. He ended up
10 swinging back around, coming back to the station.
11    I also called Gerard Julien-Suarez and Officer Wayne
12 Paige to see if they could cover for me. Gerard said he
13 was in roll call. I was, like, "Hi, I'm running a little
14 bit late, just trying to find somebody." He says, "I
15 think everybody left." Then Wayne was leaving. As Wayne
16 was leaving, he saw Officer Marquardt, and Wayne came
17 back in. Then Lieutenant Sullivan said that, said to
18 Wayne that he didn't have to stay because the court
19 prosecutor doesn't count as manpower. I think that was,
20 like, 8:15, and roll call was still commencing.
21    Q.  Why didn't you call your superior officer to
22 let him know you were going to be late?
23    A.  That's how I did it in the past, and I was
                    LEAVITT REPORTING, INC.

Page 266

1 trying to get somebody to cover me. I thought I had
2 somebody covering for me, just like we had the holdover
3 early release that I've done in the past, as the records
4 show.
5    Q.  What's the procedure for calling in late at the
6 Abington Police Department?
7    A.  If you're going to be late, you call the
8 dispatch and you just say I'm going to be late.
9    Q.  Did you call the dispatch in the recent
10 occasion?
11    A.  I did not. I called to try to get it covered
12 so I didn't have to have the Sergeant or the Lieutenant
13 have to deal with that. I could have the other officers
14 stay there for me for fifteen minutes, which it was going
15 to be fifteen minutes. But then I thought Officer Wayne
16 Paige was staying for me, and then he ended up not.
17    Q.  Did it turn out to be more than
18 fifteen minutes?
19    A.  Ended up to be -- I showed up at 8:30.
20    Q.  Is this the first time you had shown up late
21 without notifying a superior officer or finding someone
22 to cover you?
23    A.  It was the first time I had ever shown up late
                    LEAVITT REPORTING, INC.

Page 267

1 in my entire nine years in my law enforcement career.
2    Q.  There were other times that you didn't show up,
3 right? We already talked about the written warning,
4 correct, --
5       MR. HIGHTOWER: Objection.
6    Q.  -- the overtime?
7       MR. HIGHTOWER: To form.
8    A.  That wasn't me showing up late.
9    Q.  I know. But there were other times that you
10 didn't show up, though, for a shift?
11       MR. HIGHTOWER: Objection to form.
12    A.  I called in sick late. That's what, that's
13 what my understanding was, called in sick late.
14    Q.  Let me ask it a different way. When you didn't
15 show up for the overtime shift that you say Lieutenant
16 Sullivan never told you about, was the written warning
17 for you not showing up for duty?
18    A.  Yes. For the overtime, posted overtime shift.
19    Q.  Was there another occasion when you were given
20 a written warning for not showing up for duty?
21    A.  Yes, there was. The same incident on that same
22 sickness that I had explained.
23    Q.  And so the first time, the same incident --
                    LEAVITT REPORTING, INC.

Page 268

1 Were the written warnings given to you at the same time?
2    A.  I think they were at the -- They were sent at,
3 like, different times. I don't really recall. I just
4 remember reading over the Deputy Chief had given me a
5 copy of my suspension, and then that's when I recalled
6 it, and I said I remember that because I was sick that
7 day or I was sick in that time and I couldn't do it, and
8 I was never even notified of it, from what I can recall.
9       MS. ECKER: Let's go off the record for a
10 minute.
11       (Discussion off the record.)
12       MS. ECKER: We are suspending.
13       (Whereupon, at 3:52 p.m., the deposition was
14 suspended.)
15
16
17
18
19
20
21
22
23
                    LEAVITT REPORTING, INC.

**DELANEY VOLUME II**

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *

TOM DELANEY,                          *
        Plaintiff                     *

VS.                                   *   DOCKET NO.
                                      *   1:14cv-13130-RGS
THE TOWN OF ABINGTON, DAVID           *
MAJENSKI, CHRISTOPHER CUTTER,         *
and KEVIN SULLIVAN,                   *
        Defendants                    *

* * * * * * * * * * * * * * *

        VOLUME 2 OF THE DEPOSITION OF THOMAS DELANEY,
taken on behalf of the Defendants, pursuant to the
applicable provisions of the Massachusetts Rules of Civil
Procedure, before Ruth E. Hulke, CSR No. 114893 and
Notary Public for the Commonwealth of Massachusetts, at
Kopelman and Paige, P.C., 101 Arch Street, Boston,
Massachusetts, on Friday, March 25, 2016, commencing at
9:59 a.m.

APPEARANCES:

    DEBORAH L. ECKER, ESQ., of Kopelman and Paige, P.C.,
101 Arch Street, Boston, Massachusetts, 02110, on behalf
of the Defendants.

    JOHN J. HIGHTOWER, ESQ., 90 Pleasant Street, Suite
12, Randolph, Massachusetts, 02368, on behalf of the
Plaintiff.

ALSO PRESENT:  David Majenski
               Christopher Cutter
        LEAVITT REPORTING, INC.

## Page 2

WITNESS    DIRECT  CROSS  REDIRECT    RECROSS

Thomas Delaney  3


            E X H I B I T S

NUMBER                          PAGE

    6  Second Amended Complaint        3

    7  Package of documents            3

    8  Appeal to Board of Selectmen    22

    9  Rule 30: Deposition by Oral Examination  91


                LEAVITT REPORTING, INC.

## Page 3

            P R O C E E D I N G S

    (Documents premarked Exhibit Nos. 6 and 7 for
Id.)

    THOMAS DELANEY, having been previously
identified and sworn, testified as follows in answer to
direct interrogatories by Ms. Ecker:

    Q.  Good morning, Officer.

    A.  Good morning.

    Q.  We're here for the second day of your
deposition.  You understand you're still under oath?

    A.  Yes, I do.

    Q.  Prior to the two of you arriving, I had the
stenographer mark Exhibit 6.  I have a copy for your
attorney.  Do you recognize what's marked as Exhibit 6?

    A.  I do.

    Q.  What is it?

    A.  It is the Second Amended Complaint for this
case.

    Q.  You had the opportunity to review the factual
allegations in the Second Amended Complaint prior to
filing it?

    A.  Yes, I have.

    Q.  And they're all accurate?

                LEAVITT REPORTING, INC.

## Page 4

    A.  Yes.

    Q.  If you can take a look at Page 27, Exhibit 6.
Do you see that?

    A.  Yes, I do.

    Q.  In Count 3 of the complaint, you have brought a
First Amendment claim against all of the individual
defendants for what you say is the filing of the
Massachusetts attorney general's office complaint.  Is
that correct?

    A.  Yes.

    Q.  What did the Chief, Chief Majenski
specifically, do to violate your First Amendment rights
for your filing the report with the attorney general's
office?

        MR. HIGHTOWER:  Objection to form.  But go
ahead and answer if you understand.

    A.  Based off this section, he had changed, he
caused me to lose shift differentials, assigned me to
punishment duty.  He assigned me to a desk job.  He
violated my privacy by telling other officers that I had
PTSD, saying that I was crazy in the head.  He took away
my overtime assignments that I had previously been doing
before and was rewarding other officers who were not
                LEAVITT REPORTING, INC.

Page 45

1    A. I was.
2    Q. When?
3    A. On that night Wayne Paige had, Sergeant Wayne
4  Paige had called the Chief, told him of the incident, and
5  Sergeant Wayne Paige had told me that the Chief informed
6  him that he wanted him to call people to come in and
7  investigate, come and investigate it. Wayne said that he
8  tried calling some people, and he told me, "Hey, just
9  keep following up on it." And then I had gotten some
10  good leads by calling phone numbers that I actually
11  contacted Glamour Nails that night.
12    And then I ended up -- I believe I got all this
13  information, and then I came in -- One of the shifts, and
14  Ron Sweeney had come up to me and said that him and Kevin
15  Cutter were taking the case and I should give them
16  everything that I had. So I gave them everything that I
17  had, and then I went home at midnight that night. And I
18  was told by Ron Sweeney I was off the case and him and
19  Cutter were doing it.
20    And him and Kevin Cutter came in the next morning, I
21  believe they were on overtime from eight in the morning
22  until, I think they were there until four, and they were
23  working on the case, and they called in the victims and
                    LEAVITT REPORTING, INC.

Page 46

1  they reinterviewed them. And that morning I received
2  multiple voicemails from Ron Sweeney, Mark Kilgour and
3  Lieutenant Sullivan saying that, and Lieutenant Sullivan
4  even says on the voice mail that he had, that he didn't
5  know I was knee deep in the case and that he really
6  wanted me to come back and be on the case now.
7    MR. HIGHTOWER: Sorry to interrupt. He
8  actually has that voicemail.
9    MS. ECKER: You haven't produced it. If you
10  want to produce it.
11    MR. HIGHTOWER: We can't get it off, but if you
12  want to hear it. We can't get it off the phone. So I
13  forgot to mention that. We can listen to it now, but we
14  can't get it off the phone.
15    MS. ECKER: We're not going to listen to it
16  now.
17    A. I have three voicemails. One from Sweeney,
18  Kilgour, and Lieutenant Sullivan.
19    MR. HIGHTOWER: You don't want him to play it
20  so she can transcribe it?
21    MS. ECKER: No. I really do not.
22    Q. Do you know if Wayne Paige, in fact, did call
23  the Chief on Christmas Eve to tell him about the
                    LEAVITT REPORTING, INC.

Page 47

1  incident?
2    A. Yes. He told me that he did.
3    Q. Do you know if Wayne Paige was disciplined
4  because he didn't call the Chief that night?
5    A. I don't believe he was.
6    Q. You don't know all discipline in the
7  department. Correct?
8    A. I know most of it because I'm union president,
9  so.
10    Q. So if we produced a disciplinary report to you,
11  would that convince you?
12    A. Convince me? If I saw a report that was true,
13  yeah, then.
14    Q. But you weren't present when Wayne Paige called
15  the Chief. Correct?
16    A. He told me that he had to call the Chief, and
17  he stepped outside and he called him, and then he came
18  back and told me that he wanted him to call other people
19  in because he didn't want me investigating it, he wanted
20  other people investigating it.
21    Q. Subsequent to that, you continued to
22  investigate the case, right?
23    A. Yes.
                    LEAVITT REPORTING, INC.

Page 48

1    Q. And the Chief simply added investigators to the
2  case because it was a huge case for the Town of Abington.
3  Correct?
4    MR. HIGHTOWER: Objection.
5    A. And he took me off of it.
6    Q. When were you taken off of it?
7    MR. HIGHTOWER: Objection. I'm sorry. That's
8  fine. You can answer that question. Perfectly fine.
9    A. When I came back from my, I believe it was my
10  four to twelve shift, I believe it was my four to twelve
11  shift, Ron Sweeney was, I believe he was the dispatch
12  officer that night, and he asked me for everything that I
13  had. I gave it to him. I even told him how I thought it
14  was incredibly messed up that him and Kevin Cutter were
15  taking the case from me and I had done all this work and
16  I had done everything, I put a lot of effort into it. A
17  lot of effort.
18    They took it, and in the morning they came in, they
19  started working it, and they couldn't get anywhere with
20  it. They told Lieutenant Sullivan that, hey, we don't
21  want to work on this, we want Delaney here.
22    Q. Did you work a double on Christmas?
23    A. I worked two doubles, I believe, during the
                    LEAVITT REPORTING, INC.

Page 49

1  Christmas time period, yes.
2      Q.  So your shift was until midnight.  Correct?
3  Your second shift or your --
4      A.  I don't want to -- I know it's in the logs.
5  You guys would have the logs.  It would be in there.  But
6  I know I worked two doubles and then everybody came back
7  from Christmas, and Ron Sweeney and Kevin Cutter had the
8  case that I was working on the entire time.
9      Q.  Did the Chief ever tell you that you were off
10  the investigation?
11      A.  He never came to me and said that.
12      Q.  Did the Deputy Chief ever tell you you were off
13  the investigation?
14      A.  No.
15      Q.  Did the Lieutenant ever tell you you were off
16  the investigation?
17      A.  Well, he says it in the voicemail that he
18  wanted me back, because they had taken me off the
19  investigation.  In fact, he wanted -- I believe there was
20  some statement that the Chief had made to Wayne Paige
21  saying he wanted seasoned officers on the shift, which I
22  have one more year on from Kevin Cutter.
23      Q.  What about the other officer who was
LEAVITT REPORTING, INC.

Page 50

1  investigating, how many years does he have over you?
2      A.  I believe I'm next in line underneath him, but
3  he had worked at Hull PD which he had left.  He had
4  transferred from Hull PD to Abington.
5      Q.  Prior to the incident, Glamour Nails, had you
6  ever investigated a similar type case?
7      A.  I investigated multiple cases.
8      Q.  I said, had you ever investigated prior to the
9  Glamour Nails incident a similar type case?
10      MR. HIGHTOWER:  Objection to the form.
11      A.  Assault and battery.
12      MR. HIGHTOWER:  Hold on.  Objection to form.
13      A.  I investigated multiple assault and batteries
14  where people had been injured.
15      Q.  Have you ever investigated to this day an
16  assault and battery similar to Glamour Nails where
17  individuals have been tied up and pistol whipped?
18      A.  Not exactly like that.
19      Q.  Have you ever investigated up until today an
20  assault and battery where gangs were involved?
21      A.  Gangs were involved?
22      Q.  Yes.
23      A.  We didn't know if there gangs involved at that
LEAVITT REPORTING, INC.

Page 51

1  time.
2      Q.  When did you find out that gangs were involved?
3      A.  We found out that gangs were involved once I
4  got my suspect.
5      Q.  To this day, other than Glamour Nails, have you
6  ever investigated anything regarding gangs in the Town of
7  Abington?
8      A.  No.
9      Q.  Subsequent to Christmas Eve, you continued to
10  investigate the Glamour Nail incident.  Correct?
11      A.  After I was asked to finally come back on to
12  it, yes.
13      Q.  When you say finally, what was the gap, in your
14  mind, between when the Chief allegedly took you off and
15  put you back on?
16      A.  I believe it was about two days.
17      Q.  Two days?
18      A.  Yes.
19      Q.  Were you working those two days?
20      A.  I think -- I know when I came in I gave, I
21  think I was working four to twelve that night.  So I had
22  given it to him.  And I even voiced my displeasure in how
23  undermaning and, you know, everyone saw that it
LEAVITT REPORTING, INC.

Page 52

1  happened.  And everybody knew that I had a great suspect,
2  too.
3      Q.  When you say four to twelve, you left the shift
4  when you turned it over to Sweeney, correct, your shift
5  was done?
6      MR. HIGHTOWER:  Objection.  Actually, withdraw
7  the objection.
8      Q.  Isn't that right?
9      A.  Like I said, I can't recall exactly the
10  specifics.  But I'm saying I think, I believe I was
11  coming in for the four to twelve and Ron Sweeney was on
12  dispatch.  I know Ron Sweeney was sitting on dispatch,
13  working some shift.  So he might have been working eight
14  to four.  Wasn't that midnight to eight.
15      Q.  Do you recall working the next two days that
16  you were on shift?
17      A.  Recall working?  The next two days in what
18  context?  You're kind of confusing me without showing me
19  the record.
20      Q.  I want to know from your memory.  You testified
21  about a minute ago there was a two-day gap between when
22  the Chief took you off the investigation, Christmas Eve,
23  and then when the Lieutenant put you back on.
LEAVITT REPORTING, INC.

Page 53

1    A.  Yes.
2    Q.  Did you work during those two days?  Were you
3  scheduled to work?
4    A.  I don't recall.  I just know that when, from
5  when Wayne told me until I came back, that was it.  I
6  didn't get any -- What's it called?  During my shift I
7  sat there and I did everything I possibly could to
8  investigate that case to the point that I got a suspect.
9    Q.  Now, you have claimed damages in this case.  If
10  you take a look at Exhibit 1, which I'm going to show
11  you, that was marked at the first day of the deposition,
12  it is a civil action cover sheet to your complaint that
13  we already discussed last time.  In there, in the cover
14  sheet, there's a million dollars in damages.  Do you see
15  that?
16    A.  Yes, I do.
17    Q.  You break out $500,000 in lost wages.  Correct?
18    MR. HIGHTOWER:  Objection.  Form, as to him
19  breaking it out.
20    A.  Yes.
21    Q.  Are you claiming $500,000 in lost wages in this
22  case?
23    A.  Yes, I am.
              LEAVITT REPORTING, INC.

Page 54

1    Q.  Have you missed any time from work as a result
2  of anything that you allege occurred?
3    A.  Yes, I have.  Multiple.
4    Q.  How many days have you missed?
5    A.  I couldn't even put my finger on it.  Just
6  days.  I mean, just yesterday I couldn't even go to work,
7  I was just so stressed out from everything and him, just
8  having to go to work and work with the Chief as well as
9  the Deputy Chief.  And I've used multiple sick days
10  because of stress, anxiety, and I've been unable to
11  sleep.  It's been horrible.
12    Q.  Other than the two-day suspension the Deputy
13  Chief gave you on December 9th, 2015, have you been
14  suspended from work?
15    A.  That was the only time that I was suspended.
16    Q.  Have the Deputy Chief, the Chief or the
17  Lieutenant ever told you not to come in one day that
18  you're alleging you missed wages that you should have
19  been paid?
20    MR. HIGHTOWER:  Objection to form.
21    A.  They called me and told me not to come in?
22    Q.  Yes.
23    A.  No.
              LEAVITT REPORTING, INC.

Page 55

1    Q.  So the only wages you're claiming, other than
2  the two-day suspension we can get into, are days that you
3  say you were out because you were too stressed to come to
4  work?
5    MR. HIGHTOWER:  Objection to form.
6    A.  Yes.  Because everything that's in here, all
7  the retaliation.  I tried to go to the board of
8  selectmen, I tried to go to the town manager, I tried to
9  go to the attorney general's office, and I tried to go to
10  Sergeant Carini, my supervisor.  I tried to resolve it in
11  every way whatsoever, and it seems like nobody even took
12  the effort to try to corroborate statements, tried to
13  speak with anybody at all in any way whatsoever.
14    Q.  Have you ever taken a day off for this alleged
15  stress that you weren't been sick time?
16    A.  Day off?  I don't understand the question.
17    Q.  You say you missed days because of your stress
18  over this case, right?
19    A.  Yes.
20    Q.  Have all those days been paid out of your sick
21  time?
22    A.  Yes, they have.
23    Q.  Have you had to miss any days of work other
              LEAVITT REPORTING, INC.

Page 56

1  than the two-day suspension on December 9th, 2015, that
2  were not paid?
3    MR. HIGHTOWER:  Objection.  Well, withdrawn.
4    A.  Repeat the question.
5    Q.  Have you ever been absent from work since you
6  have been at the Town of Abington Police Department other
7  than the two-day suspension and have not been paid for
8  your absences?
9    A.  No, I have not.
10    Q.  How much do you earn a year?
11    A.  It's approximately, it looks like, seventy
12  thousand dollars a year.
13    Q.  Can you tell me how many days you have been out
14  that you're alleging you couldn't go to work because of
15  all the stress as a result of the allegations in your
16  complaint?
17    A.  I do not know the exact amount of days, but
18  just yesterday I went, you know, I've been speaking with
19  a psychiatrist, and I started speaking with the
20  psychiatrist ever since I filed the complaint with the
21  attorney general's office and got called in by the Chief
22  and threatened.  Now, every day I have to show up to
23  work, and it's just horrible, and now I'm not even a
              LEAVITT REPORTING, INC.

Page 58

1   and he'd rather put me in there.

2       Q.    Do you think that officer will consider it

3   punishment duty?

4       A.    Looks like he wants it, so.

5       Q.    Have you known any officer who has been put in

6   the court prosecutor position who has considered it

7   punishment duty?

8       A.    Officer Jake Poulin told me he didn't like it

9   and he wanted to leave and he -- In fact, he didn't even

10  want to cover my days off.  He told me that he doesn't

11  cover my days off and Gerard and Stephen Marquardt should

12  be the ones doing it.

13      Q.    That's covering your days off, not permanently

14  in the position?

15      A.    Covering if I was sick or whatever, to have

16  somebody at least go over to court and sit there and

17  handle cases.

18      Q.    You're able to do overtime as the court

19  prosecutor.  Correct?

20          MR. HIGHTOWER:  Objection.

21      A.    Yes.  Posted overtime.

22      Q.    And you have taken some of those posted

23  overtimes.  Correct?

LEAVITT REPORTING, INC.

Page 57

1   police officer anymore. I actually just sit inside a
2   little office and enter paperwork into a computer.
3       Q.  You're talking about the court prosecutor
4   position?
5       A.  Yes.
6       Q.  Others in the department think that's a great
7   position?
8       A.  Some.
9       Q.  You carry your badge. Correct?
10      A.  Some officers, like I think Sergeant Carini,
11  told me he would love it. I told him take it. I was,
12  like, "Take it. Take it because the Chief thinks I'm the
13  only one that can do it."
14      Q.  The Chief recently asked if you wanted to
15  continue, correct, in the court prosecutor's position?
16      A.  Yes.
17      Q.  You declined. Correct?
18      A.  Because I feel like my year of punishment is
19  over.
20      Q.  Do you know who he's putting in as court
21  prosecutor?
22      A.  Officer Alex Kokoros, hopefully, because he had
23  done it before, and the Chief wouldn't put him in there

LEAVITT REPORTING, INC.

Page 58

1   and he'd rather put me in there.
2       Q.  Do you think that officer will consider it
3   punishment duty?
4       A.  Looks like he wants it, so.
5       Q.  Have you known any officer who has been put in
6   the court prosecutor position who has considered it
7   punishment duty?
8       A.  Officer Jake Poulin told me he didn't like it
9   and he wanted to leave and he -- In fact, he didn't even
10  want to cover my days off. He told me that he doesn't
11  cover my days off and Gerard and Stephen Marquardt should
12  be the ones doing it.
13      Q.  That's covering your days off, not permanently
14  in the position?
15      A.  Covering if I was sick or whatever, to have
16  somebody at least go over to court and sit there and
17  handle cases.
18      Q.  You're able to do overtime as the court
19  prosecutor. Correct?
20          MR. HIGHTOWER: Objection.
21      A.  Yes. Posted overtime.
22      Q.  And you have taken some of those posted
23  overtimes. Correct?

LEAVITT REPORTING, INC.

Page 59

1       A.  Yes.
2       Q.  You have also declined some of the posted
3   overtimes that you have been available for. Correct?
4       A.  Well, if I declined them, I wasn't available
5   for them. So.
6       Q.  So is your testimony that any times since you
7   have been employed with the Department that you have
8   declined overtime means you aren't available?
9       A.  That's why I probably didn't take the overtime.
10  I would take the overtime if I could do it. If I
11  couldn't do it because I had doctors' appointments or
12  whatever at this point, or even, you know, with this
13  litigation, or even just the union president stuff,
14  having to do that.
15      Q.  But the overtime has been made available to
16  you?
17          MR. HIGHTOWER: Objection to form.
18      A.  Posted overtime, yes. Like I said, the
19  detective-type work overtime assignments are different as
20  compared to the posted overtime assignments. Because the
21  posted overtime assignments are fair and equitable to
22  each and every officer, the way it's posted by seniority.
23      Q.  But you say the officers requesting overtime to

LEAVITT REPORTING, INC.

Page 60

1   do detective-type work is not equitable to all the
2   officers?
3           MR. HIGHTOWER: Objection to form.
4       A.  It is not.
5       Q.  Is that only unfair to you or all of the
6   officers who don't get the overtime for detective-type
7   work?
8           MR. HIGHTOWER: Objection to form. Answer the
9   question.
10      A.  At this point I've seen other officers even
11  being involved with doing those type of assignments, like
12  Officer Michelle Franey, Officer Justin Simmons, Officer
13  Joe Davern.
14      Q.  You think it's unfair they've gotten overtime
15  to investigate cases?
16      A.  Unfair for them?
17      Q.  Yes.
18      A.  No. I believe that I was doing my job and I
19  was being given it before I spoke out about the ticket
20  quota, and now I don't get any of that. I'm never called
21  in for anything, and now I'm just stuck in a little
22  cubicle entering paperwork.
23      Q.  At the time you are out on the road either

LEAVITT REPORTING, INC.

## Page 61

1  covering someone else's shift or doing overtime, have you
2  developed any type of investigatory work that you have
3  requested that the Deputy Chief provide you with overtime
4  to continue on?
5       MR. HIGHTOWER: Objection to form.
6       A.  I've never requested anything from the Deputy
7  Chief.  And I believe Officer Kevin Cutter actually
8  explained it with stuff that you get on your shift, if
9  you get something that needs to be done, like a report or
10 an arrest, you stay for the overtime, and it's the
11 Sergeant that does that.
12      Q.  Since you have been the court prosecutor, you
13 have been offered shift swaps, haven't you?
14      A.  You mean holdover early release or shift swaps?
15      Q.  Shift swaps.
16      A.  I don't believe I've done any shift swaps yet
17 with any officers, except for just recently with Officer
18 Ryan Doherty.  I think that was my first one ever.
19      Q.  Have you been offered shift swaps that you
20 haven't taken?
21      A.  No.
22      Q.  During the shift swap, you can develop
23 investigatory-type work.  Correct?
             LEAVITT REPORTING, INC.

## Page 62

1       MR. HIGHTOWER: Objection to form.
2       A.  During the shift swap?  If you're out on the
3  road and you're doing all your duties, but, like I said,
4  you're doing duties such as, like everything the
5  patrolman, answering calls, going to do building checks,
6  doing community policing.
7       Q.  That's what you would be doing --
8       A.  Patrolling the town.
9       Q.  That's what you would be doing if you were
10 patrolling the town if you were not a court prosecutor,
11 correct, it's no different?
12      MR. HIGHTOWER: Objection.
13      A.  If I were --
14      Q.  If you were not the court prosecutor and you
15 were on patrol, you could develop cases that you needed
16 to investigate and request overtime to do so.  Correct?
17      A.  Yes.  Correct.
18      Q.  As the court prosecutor, when you cover
19 someone's shift or do overtime and you're on patrol, you
20 can do the same thing.  Correct?
21      MR. HIGHTOWER: Objection to form.
22      A.  You could get -- Yes.  Yeah, you drive around
23 town being a police officer, that's what you do.  That's
             LEAVITT REPORTING, INC.

## Page 63

1  what I had been doing and still do to this day.
2       Q.  You have done that as court prosecutor when you
3  have covered overtime and shift swaps?
4       A.  I don't believe I have done any shift swaps
5  with anything since I've been court prosecutor.
6       Q.  What about when you've come back from court and
7  gone on patrol?
8       A.  I don't go on patrol.  I sit inside my office
9  and I type -- It's a very hard job entering paperwork,
10 getting prepped for the next cases for the next day,
11 returning phone calls from attorneys, returning phone
12 calls from victims, returning phone calls from witnesses,
13 setting up clerk's hearings.  Complete opposite duties of
14 a patrolman.  Complete opposite.
15      Q.  What time do you get back from court?
16      A.  I'd say average around one o'clock.  Sometimes
17 I've been back at, like, 2:30.
18      Q.  So you still have until four o'clock until your
19 shift is over?
20      A.  I just explained what I do when I come back.  I
21 have to sit there and prep for the next day's cases.
22      Q.  Is it your testimony every day when you come
23 back from court it takes you three hours to do the
             LEAVITT REPORTING, INC.

## Page 64

1  paperwork and prepare for the next day instead of going
2  out on patrol?
3       A.  Yes.
4       Q.  Do you know if prior court prosecutors have
5  been able to go out on patrol?
6       A.  Go out on patrol?
7       Q.  Yes.  When they come back from court.
8       A.  I know some court officers, like Paul
9  Januszewski, had come in even early at seven o'clock.  I
10 think he was working, like, a seven to three shift.
11      Q.  And he's been on patrol.  Correct?
12      A.  And other court prosecutors, based on what
13 occurred in October -- In October, I've had to take on
14 extra duties because of clerk's hearings now.  Whenever a
15 misdemeanor is done over at Brockton District Court, if
16 it's not a motor vehicle misdemeanor, the person
17 automatically gets a clerk's hearing, put in for a
18 summons.  So now, although motor vehicle crimes, somebody
19 can send in the citation and request a hearing, and
20 that's what it is.  But with other misdemeanors, which
21 are summonses, they automatically go to clerk's hearings
22 now starting in October.
23      I believe Judge Bernard had made a ruling in which,
             LEAVITT REPORTING, INC.

Page 73

1    A.  Absolutely not.  I refused to take any type of
2  medication.
3    Q.  Did she recommend any medication to treat
4  depression?
5    A.  No, she did not.
6    Q.  Did she recommend any medication to treat
7  anxiety?
8    A.  No, she did not.
9    Q.  Have you been going to her consistently for the
10  last two years?
11    A.  I've gone on and off because I had, I got put
12  on the eight to four shift, so it's been really hard for
13  me to actually go see her because she's there from eight
14  to 4:30, and to get appointments at the end of the day is
15  a very hard thing to do.  And I remember, I think I was
16  going weekly to her at the beginning a bunch of times,
17  and then I had gone and seen her when things had gotten
18  bad.  I just got so depressed that to the point when I'd
19  come home from work that I'd lay there.
20    Q.  Did you ever request to be able to take any
21  type of leave to be able to treat with her?
22    A.  No, I did not.
23    Q.  Why not?
                LEAVITT REPORTING, INC.

Page 74

1    A.  Because I didn't want to take -- It would have
2  been non-paid leave, and I don't want to do that.  I
3  can't afford that in my life.  I need to work to be able
4  to make money.
5    Q.  You're aware that the town has a family medical
6  leave policy?
7    A.  Yes.
8    Q.  And you're aware you could have been paid for
9  the time, if you requested it, out of your sick leave?
10    MR. HIGHTOWER:  Objection.  Form.
11    A.  I'm not aware of that.
12    Q.  Does the union contract provide you with the
13  ability to go to doctors' appointments and be paid?
14    MR. HIGHTOWER:  Objection to form.
15    Can we go off the record for a second?
16    (Discussion off the record.)
17    Q.  Are you aware that there is a provision in the
18  union contract that allows for officers to take emergency
19  sick time for doctors' appointments?
20    A.  Yes.  And I have done that.
21    Q.  On how many occasions?
22    A.  Just yesterday.
23    Q.  Why hadn't you done it before to go treat with
                LEAVITT REPORTING, INC.

Page 75

1  Miss Sanford?
2    A.  I believe I have done it before, but I can't
3  recall each and every time that I went.  That wasn't -- I
4  wasn't sitting there thinking of that.  I was sitting
5  there actually going to try to get help just speaking
6  with her.
7    Q.  Did you ever request to be able to take leave
8  to go treat with Miss Sanford?
9    A.  No.  I couldn't afford it because, if I did
10  that, if I took sick time, I'd never be able to work
11  posted overtime shifts or get any overtime, and I,
12  unfortunately, would fall behind on my bills, and my life
13  would even get worse than what it was from this.
14    Q.  So is it your testimony that if you asked for
15  sick time you would be giving up overtime?
16    A.  Yes.  Because you're not allowed to work
17  overtime within, I think it's a 24-hour period.  And
18  then, once you go past five days in a year, it's, like,
19  48 hours.
20    Q.  So by not taking this sick time, you have been
21  able to work overtime?
22    A.  Posted overtime shifts.
23    Q.  How often did you treat with Miss Sanford?
                LEAVITT REPORTING, INC.

Page 76

1    A.  Like I said, it was, it wasn't, it wasn't exact
2  routine.  At the beginning, it was weekly.  And then I'd
3  get bad news, and I'd just, I wouldn't want to go see
4  her, and I'd be stuck in my house, not wanting to do
5  anything, not having any enjoyment in my life whatsoever.
6  And then I ended up -- I'd hit a wall, and I'd be, like,
7  I got to go talk to her again, and I'd go and see her.
8    Q.  What bad things do you recall happened that you
9  went to go see Miss Sanford?
10    A.  It would be pretty much everything in this
11  complaint, whatever day it was, me getting stuck as court
12  prosecutor, the day I found out about that, everything
13  with the suspension, everything with the, any type of
14  write-up that was just false and wrong.
15    Q.  Have you treated with anyone else for
16  depression?
17    A.  I have not.
18    Q.  Have you treated with any other medical
19  provider for anything that you claim is as a result of
20  your lawsuit?
21    A.  No.  Just Susan Sanford.
22    Q.  When you say you have loss of enjoyment of your
23  life, what do you mean by that?
                LEAVITT REPORTING, INC.

Page 77

1    A.  I'd get home from work and just -- Well, even
2  before going into work, I knew what I'd be going into and
3  I had the target on my back, just as other officers
4  testified at their depositions they had targets on their
5  back.  Every day I'd just be going around nervous and
6  getting written up for false things and being treated
7  completely different and disciplined, compared to other
8  officers who get written warnings for serious incidences
9  involving threats, involving rapes, involving other
10 things, getting drunk in town.  And here I am, just being
11 shunned out of the Abington Police Department, I should
12 say.
13    Q.  Who is shunning you out of the Abington Police
14 Department?
15    A.  The Chief and the Deputy Chief and Lieutenant.
16    Q.  What has the Lieutenant done to shun you out of
17 the Abington Police Department?
18    A.  Like I say, he took away the over -- There was
19 detective overtime assignments.  He gave them to Kevin
20 Cutter and gave them to Ron Sweeney and, you know,
21 involved in the entire command staff coming after me.
22    Q.  Do you have a tuna fishing business?
23    A.  Not a business.
                      LEAVITT REPORTING, INC.

Page 78

1    Q.  You enjoy tuna fishing?
2    A.  Yes.
3    Q.  How often do you go fishing?
4    A.  I used to go about 70, 80 times a year.
5    Q.  In 2013 did you go 70 to 80 times a year?
6    A.  I did not.
7    Q.  Why not?
8    A.  Just all this stuff started happening, and I
9  just ended up not wanting to.  I just -- I think that --
10 From 2010, 2011, 2012, I used to go religiously once a
11 week.  I used to go every single day, and it was great.
12 Then 2013, it just minisculed down to there.  Then 2014,
13 it went down even further.  Then 2015, I got put in as
14 court prosecutor.  And I personally, I don't like fishing
15 on the weekends because fishing on the weekends is you're
16 dealing with all the boat ramp traffic.  I was trailering
17 my boat at that time.  I only went once last year.  One
18 time.
19    Q.  Is it your testimony that you haven't been
20 fishing because of the allegations contained in your
21 lawsuit?
22    A.  I -- You just asked me the question why was I
23 losing enjoyment of life.  Yes, that's what is going on.
                      LEAVITT REPORTING, INC.

Page 79

1  I'm depressed, and I have to go into work every day
2  having to deal with everything that's been going on here.
3    Q.  Have you been able to afford to put your boat
4  in the water in the last year?
5    A.  In the last year?
6    Q.  Yes.
7    A.  With this going on, no.  I had to pay for this
8  lawsuit.
9    Q.  What about in 2014, could you afford to put
10 your boat in the water back then?
11    A.  2014, I went fishing, like, a couple of times.
12 Like I said, it was less than what I had been doing
13 before.
14    Q.  How much does it cost you every time you go
15 fishing to put that boat in the water?
16    A.  I don't know.  Probably, like, 300, 400, 500
17 dollars.  It all depends on what type of fish you're
18 going for.  Sometimes I'll go out for 24, 48 hours at a
19 time.  Sometimes I'll go out for eight hours at a time.
20 It all depends on the species of fish.
21    Q.  So the length of time, obviously, you're out on
22 the water it's more expensive.  Correct?
23    A.  Yes.  But it's not just me paying for it.  All
                      LEAVITT REPORTING, INC.

Page 80

1  my friends pitch in so we can all go and enjoy it.  We
2  all do that.
3    Q.  Anything other than fishing that you've stopped
4  doing you allege because of the allegations in your
5  complaint?
6    A.  Sometimes I don't sleep at night, so I'll end
7  up just passing out two days later and falling asleep.
8  And my friends have told me, like, you know, they
9  constantly call me, and I never return phone calls.  And,
10 I mean, I don't know, it's just everything, everything
11 has just been horrible, horrible ever since this.
12    Because I started my life out of high school, I went
13 into the Marines.  I got back from the Marines, and I was
14 a 19-year old being a Plymouth County correctional
15 officer, which was a great job for me to come out and get
16 that.  Every single time in my life I've been moving
17 forward and doing better and better things and having
18 better things in my life.
19    From the Plymouth County correctional facility, then
20 I got, I went to Iraq.  And then I came back and I got
21 the job as an Abington police officer.  And for the first
22 three years until 2013, everything was good.  Or
23 two years.  Until 2013 everything was good and I felt
                      LEAVITT REPORTING, INC.

Page 81

1  like I was, I was moving forward.  And now I just feel
2  like I got pushed back and I literally got shoved into a
3  closet, which is the office with the court prosecutor.
4     Q.  You do not like the office?
5     A.  I don't like sitting in an office.  Absolutely
6  not.
7     Q.  Are you the only officer as court prosecutor
8  who gets an office?
9     A.  Well, that office was told -- I was actually
10  sitting there and Sergeant O'Keefe had walked by me, and
11  he said to me, he goes, "Oh, wow, they put you in the
12  sweat box.  What did you do wrong?  He actually made that
13  comment to me.  Because Sergeant O'Keefe had been in
14  there and had some issues where it was being hot, but I
15  keep the door open.
16     The other court prosecutors have had -- Like, I know
17  Gerard Julien Suarez -- There's actually a door in the
18  police station that says Court Prosecutor on it.  The one
19  I'm actually stuck in actually says Lieutenant.  The
20  court prosecutor one actually has windows, all this
21  stuff.  It's a big, big office.  You get to sit there
22  next to Jake Poulin and they joke all day.  They even
23  have a big sign that says No Drama up there, which is
LEAVITT REPORTING, INC.

Page 82

1  pretty funny.
2     Q.  The office you're in was a lieutenant's office?
3     A.  It was the sweat box.  It was Sergeant
4  O'Keefe's office before.  Paul Januszewski had kept a
5  bunch of stuff, camera supplies and stuff in there.
6     Q.  The office that you're in, was that near roll
7  call?
8     A.  It's in the hallway off of that.  Connects to
9  roll call.
10     Q.  So everyone walks by you when they go to roll
11  call?
12     A.  Walks by me when they go to roll call?  No.
13  Not when they go to roll call.  If they want to go check
14  the posted list, the posted list is right there in the
15  hallway.
16     Q.  You can talk to all your fellow officers.
17  Correct?
18     MR. HIGHTOWER:  Objection.  Form.  Actually,
19  there's no objection to that.
20     A.  Not really.  Because I'm in an office and I'm
21  sitting there and I'm buried inside a computer with
22  multiple stacks of paper, entering it.
23     Q.  Is it your testimony no one stops by and chats
LEAVITT REPORTING, INC.

Page 83

1  with you when you're sitting in the office?
2     A.  Yeah, people walk by and talk to me, but it's
3  not like I'm -- I'm sitting there in a little, enclosed
4  space smaller than this room right here.  Half the size.
5  I would say half the size of this room.
6     Q.  Have any of your fellow officers shunned you in
7  any way?
8     MR. HIGHTOWER:  Do you understand the question?
9     A.  What do you mean by shunned?
10     Q.  Well, I believe you testified that the command
11  staff, Chief Majenski, Deputy Chief Cutter and Lieutenant
12  Sullivan, have shunned you.  Correct?
13     A.  Yes.
14     Q.  Have any patrol officers shunned you?
15     A.  Like I said, all these changes to the union
16  stuff was a direct effect to make me look like a bad
17  union president.
18     Q.  The changes that you have spoken about, they
19  all occurred in 2014?
20     A.  Immediately after I filed the attorney
21  general's office with Town Manager Lafond as well as the
22  attorney general's office the second time.
23     Q.  It's my understanding you were reelected as
LEAVITT REPORTING, INC.

Page 84

1  union president in 2015?
2     A.  Yes, I was.
3     Q.  That election is all of your fellow officers.
4  Correct?
5     A.  Yes.
6     Q.  Prior to your becoming the president of the
7  union, you were vice president.  Correct?
8     A.  Yes, I was.
9     Q.  When did you become vice president of the
10  union?
11     A.  I do not recall.  I really don't recall the
12  exact time because it wasn't exactly an election.  I
13  think it was just -- I know there was some e-mails.  I
14  think Barry Garrity had seconded the nomination for me
15  being union vice president because Richie Gambino stepped
16  down because he was too stressed out.
17     Q.  When you became union vice president, was
18  Officer Cantalupo still president?
19     A.  Yes, he was.
20     Q.  And did Officer Cantalupo step down from his
21  position as union president at some point?
22     A.  He stepped down, I believe, I think it was the
23  beginning of April, 2014, which was right after I told --
LEAVITT REPORTING, INC.

Page 85

1  I told him how I was filing with the attorney general's
2  office complaint, and he told me he was getting a
3  transfer to West Bridgewater and he was leaving. So he
4  was going to actually step down as union president.
5      Q. Did he step down prior to your filing the
6  attorney general's complaint?
7      A. I believe so. Yes. Well, at least he told me
8  that he was stepping down. I don't know if he actually
9  said it to everybody else.
10     Q. Officer Cantalupo did transfer. Correct?
11     A. Yes, he did.
12     Q. You have testified about a meeting with the
13 Chief on April 9th, 2014. Correct?
14     A. Yes.
15     Q. Do you recall discussing a social media policy
16 with the Chief during that meeting?
17     A. That was not the social media policy meeting.
18 The social media meeting was on April 30th, the very
19 first day I was union president. Because I remember them
20 saying to me I should not wait until the last minute
21 because the social media policy had come out on April 1st
22 and that I had 30 days to file a grievance over it, or
23 whatever it was. And they said you shouldn't wait until
LEAVITT REPORTING, INC.

Page 86

1  the last minute, but, you know, we'll sit here and we'll
2  have a discussion with you.
3      MR. HIGHTOWER: I'm going to interject at this
4  point. So this is coming up on the seven hours of the
5  deposition that you have. And so we started at
6  ten o'clock promptly the last time we were here, and we
7  ended at eight minutes to four, we had a 45-minute lunch.
8  Today we started a little bit before ten. We've gone an
9  hour and 45 minutes, which is seven hours.
10     MS. ECKER: Are you suspending?
11     MR. HIGHTOWER: You're out of time.
12     MS. ECKER: Are you going to instruct him not
13 to answer questions?
14     MR. HIGHTOWER: You're out of time.
15     MS. ECKER: Are you going to instruct him --
16     MR. HIGHTOWER: I don't have to. But I'm going
17 to mark the ruling, and I'm going to --
18     MS. ECKER: Are you going to stop the
19 deposition?
20     MR. HIGHTOWER: I'm going to advise you that
21 the rule says you have to get a court order to go over
22 seven hours. You have had seven hours. We spent a lot
23 of time on the first day going over union events, and I
LEAVITT REPORTING, INC.

Page 87

1  don't see how this is going any more out of that
2  direction today. So --
3      MS. ECKER: My question to you, Mr. Hightower,
4  --
5      MR. HIGHTOWER: Your time is up.
6      MS. ECKER: -- it's a yes or no, are you going
7  to stop the deposition?
8      MR. HIGHTOWER: What I'm going to ask you,
9  number one, because you're out of time, so --
10     MS. ECKER: Yes or no? Then let me put a
11 statement on the record for you.
12     MR. HIGHTOWER: You're out of time. I'm trying
13 to help you out.
14     MS. ECKER: I don't need your help.
15     MR. HIGHTOWER: You have a stack of documents
16 over there. How much time did you plan on using today
17 with a witness coming in at two o'clock, knowing you have
18 seven hours of deposition time? I want to see what we're
19 doing here.
20     MS. ECKER: Mr. Hightower, I have been
21 practicing I won't even tell you how long, and it's
22 always a courtesy to tell someone prior to the start of
23 the deposition if they are, in fact, going to enforce a
LEAVITT REPORTING, INC.

Page 88

1  rule because, as you know, since I know you have been
2  practicing a number of years, that is what happens. You
3  only need a court order if someone objects. That being
4  said, did you count in the times that you took breaks
5  with your client, that you requested he be allowed to
6  review documents? You didn't.
7      MR. HIGHTOWER: That's the deposition time.
8      MS. ECKER: No, you did not. It's the same for
9  the first day. So what my question to you is, are you
10 going to stop the deposition? If you are, I will file
11 the appropriate motion with the court, and I will request
12 for costs and sanctions.
13     MR. HIGHTOWER: Okay. I'm advising my client
14 and you as well that you have gone over the seven hours,
15 you have to file a motion. You have not tried to tell
16 me, even though I have invited you to, how much
17 additional time you would need. You're going over
18 repetitive, cumulative union issues that are not relevant
19 to the case.
20     With that being said, you know what the rule
21 is, I have marked the rule, I have asked you to tell me
22 an estimate of what you have. You have your VA
23 documents. You haven't even questioned him about those.
LEAVITT REPORTING, INC.

Page 89

1   That's why we suspended the deposition the last time.
2       MS. ECKER: That's not why we suspended.
3       MR. HIGHTOWER: Well, you've had seven hours.
4       MS. ECKER: Are you going to stop or? If
5   you're going to stop, I'll put a statement on the record.
6       MR. HIGHTOWER: We're going to stop, and you're
7   going to have to apply to the judge for an additional
8   amount of time over seven hours.
9       MS. ECKER: Okay.
10      MR. HIGHTOWER: I think that's appropriate.
11  That's what the rule says.
12      MS. ECKER: I'm going to object. I will look
13  at the transcript. I have never not been given the
14  courtesy in my, oh, my gosh, I have been practicing way
15  too long, you should have said something at the
16  beginning. You're well aware that the next witness is
17  scheduled at two o'clock. You brought my witnesses back.
18  You have taken ten depositions in this case.
19      MR. HIGHTOWER: I have never gone over
20  seven hours. I still have to complete another
21  deposition.
22      MS. ECKER: Please give me the courtesy of
23  letting me finish my statement.
         LEAVITT REPORTING, INC.

Page 90

1       MR. HIGHTOWER: Go ahead.
2       MS. ECKER: So, Attorney Hightower is not
3   giving the attorney the courtesy of continuing the
4   deposition so that she can complete it, gave me no
5   advance notice. There have been multiple breaks, there
6   have been multiple pauses, there have been multiple
7   requests by Attorney Hightower to his client to review
8   documents when I have asked questions about what he knows
9   as he sits here today.
10      We will stop because I never force anybody to
11  continue, but I will be filing a motion with the court.
12  I will ask for costs and I will ask for sanctions.
13      MR. HIGHTOWER: Okay. Attorney Hightower's
14  position is as follows. The rule is pretty clear. I
15  have marked the rule and I have given it to counsel. If
16  she wants to go over seven hours, she has to apply for
17  the order.
18      Attorney Hightower hasn't exceeded seven hours
19  in any of his depositions that he's taken so far in the
20  case. The majority of the time spent on breaks have been
21  for Counsel Ecker to confer with her clients.
22      I have calculated in the lunch break that we
23  took at the last deposition. We started today at
         LEAVITT REPORTING, INC.

Page 91

1   ten o'clock, we've gone an hour and forty-five minutes
2   today. We have had seven hours of deposition testimony
3   of Mr. Delaney. I have asked Counsel Ecker, who has
4   about a foot of documents in front of her right now, how
5   much time she would have. She would not indulge me
6   whatsoever.
7       So, with that being said, I'm requesting she
8   apply for good cause to the court to go in excess of the
9   seven-hour deposition limit that is provided for under
10  the Rules of Civil Procedure.
11      MS. ECKER: All right. One more statement. If
12  I say to you I'm going to be ready by two o'clock, so
13  will you let the deposition go forward?
14      MR. HIGHTOWER: I already stated my position.
15      MS. ECKER: We will be back at two clock.
16  We're going to stay in the conference room. We'll be
17  back at two.
18      MR. HIGHTOWER: Thank you very much.
19      (Document marked Exhibit No. 9 for Id.)
20      (Whereupon, at 11:50 a.m., the deposition was
21  adjourned.)
22
23
         LEAVITT REPORTING, INC.

Page 92

1   I,            , do hereby certify that I have
2   read the foregoing transcript of my testimony, and
3   further certify that said transcript is a true and
4   accurate record of said testimony.
5   SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS
6       DAY OF            , 2016.
7
8
9       THOMAS DELANEY
10
11  COMMONWEALTH OF MASSACHUSETTS)
12  COUNTY OF            )
13      I,            , a Notary Public
14  within and for the Commonwealth of Massachusetts, do
15  hereby certify that on the   day of            ,
16  2016, there personally appeared before me the within
17  named deponent who read and subscribed the foregoing
18  deposition and made such corrections, if any, recorded
19  herein before me.
20
21      NOTARY PUBLIC
22  My Commission Expires:
23
         LEAVITT REPORTING, INC.

Page 93

1   COMMONWEALTH OF MASSACHUSETTS
    PLYMOUTH, SS.
2

3       I, Ruth E. Hulke, a Notary Public in and for the
    Commonwealth of Massachusetts, do hereby certify there
    came before me on the 25th of March, 2016, the person
4   hereinbefore named and that he was previously identified
    and sworn to testify to his knowledge concerning the
5   matters in controversy in this cause; that he was
    thereupon examined under oath, and that the foregoing
6   transcript is a true record of the testimony given by the
    witness.
7

8       I further certify that I am neither attorney nor
    counsel for, nor related to or employed by any of the
9   parties to the action in which this deposition was taken;
    and, further, that I am not a relative or employee of any
10  attorney or counsel employed in this case, nor am I
11  financially interested in this action.
        IN WITNESS THEREOF, I have hereunto set my hand and
12  affixed my seal this      day of          ,
    2016.
13

14      RUTH E. HULKE, NOTARY PUBLIC
        Certified Shorthand Reporter No. 114893
15      My Commission Expires: October 1, 2021

16

17  PLEASE NOTE:
        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
18  NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
    UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
19  CERTIFYING REPORTER.
20
21
22
23

        LEAVITT REPORTING, INC.