UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13130-RGS

TOM DELANEY

v.

TOWN OF ABINGTON ET AL.

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 30, 2016

STEARNS, D.J.

Tom Delaney, a police officer in Abington, Massachusetts, brought this lawsuit against his employer, the Town of Abington, and the command staff of the Town's police department, namely Chief David Majenski, Deputy Chief Christopher Cutter, and Lieutenant Kevin Sullivan.  Delaney claims that, after he brought what he believed was an unlawful traffic ticketing policy promulgated by Chief Majenski to the attention of the Massachusetts Attorney General, he endured several acts of retaliation in violation of the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185(b).[1]  In

---

[1] Delaney also claims that he was punished by Chief Majenski and Deputy Chief Cutter because of his advocacy on behalf of the patrolmen's union (of which he served as vice-president and later president), an allegation that comes more in focus in the discussion of his federal and state civil rights claims.

addition to the whistleblower claim against the Town (Count I), Delaney alleges violations of the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11H (Count II), the federal Civil Rights Act, 42 U.S.C. § 1983 (Counts III and IV), and intentional infliction of emotional distress (Count V), against Majenski, Cutter, and (with the exception of Count IV) Sullivan. In due course, defendants moved for summary judgment. The court heard oral argument on the motion on September 13, 2016.

## BACKGROUND

The material facts viewed in the light most favorable to Delaney as the nonmoving party are as follows. Delaney was hired as a police officer by the Town in 2010. In May of 2013, Chief Majenski and Deputy Chief Cutter ordered a more aggressive approach to traffic enforcement, including an instruction to officers to issue more tickets, which carry a monetary penalty, in lieu of written warnings, which do not. Delaney believed that the order was at odds with the discretion over traffic ticketing given to patrol officers by Mass. Gen. Laws ch. 90C, § 3(A)(1), as interpreted by the Massachusetts Appeals Court in *Newton Police Association v. Police Chief of Newton*, 63 Mass. App. Ct. 697 (2005). At a roll call on May 29, 2013, Delaney complained about the new policy to his immediate supervisor, Sergeant Michael Carini, referencing the *Newton Police* case, and providing Carini

with a copy of the departmental rule explaining an officer's recourse when ordered to do an act he or she believes unlawful.

On June 11, 2013, Deputy Chief Cutter sent a departmental email thanking officers for their efforts in achieving an increase in the ratio of money citations to written warnings over the previous two weeks.  He emphasized that he had "only mandated an increase in $ tickets for these specific assignments [in May and June]" and that "mov[ing] forward I have no directive in regards to what you issue, however, I do feel an increase in money fines may correct driving behavior better than a majority of warnings." Defs.' Ex. 9, Dkt #51-2.

Despite the June 11, 2013 email, Delaney alleges that Chief Majenski and Deputy Chief Cutter continued to informally pressure officers to issue more money citations.  The issue flared again in March of 2014, when Delaney was approached by Sergeant Matthew Owings, who told him that he had been threatened with discipline because officers on his shift were issuing too few money citations.  Delaney and Owings discussed the *Newton Police* case, and Owings said that he would give a copy of the case to Deputy Chief Cutter.  According to Owings, he met with Chief Majenski and Deputy Chief Cutter to discuss the issue of officer ticketing discretion.  Following this meeting, all officers on Owings's midnight to 8 a.m. shift were reassigned to

morning guard duty at Abington High School and the Town's middle school. At some point in March, Delaney joined Owings's shift.  When Delaney entered on duty with Owings, Lieutenant Sullivan warned Owings that Delaney needed to issue more money citations or he would find himself in a desk job.

On April 7, 2014, Delaney personally delivered a written complaint to the Massachusetts Attorney General's office in Boston describing what he believed to be an illegal scheme to fill Town coffers by imposing traffic ticket quotas on the Town's officers.  That same day, Sergeant Carini, acting at the direction of Deputy Chief Cutter, ordered Delaney to reprogram the office fax machine.[2]  Also that day, Cutter emailed Owings to tell him that officers on his shift (including Delaney) would not receive credit toward their community policing requirement for serving the 6 a.m. - 8 a.m. school guard duty.

On April 9, 2014, Delaney was ordered to attend a meeting with Chief Majenski in his office.  According to Delaney, the Chief made a number of threatening comments, stating that Delaney was not cut out to be a police officer, that he lacked the heart to give out money citations, and that while

---

[2] Delaney believed this task demeaning of his status as a law enforcement officer.

the Chief's opponents might "win the battle," Majenski "always win[s] the war." Pl.'s Ex. 94, Dkt #69-11, at 9.  Majenski also implied that if Delaney began issuing money citations, he would be relieved of school guard duty. Delaney refused to issue more tickets, and in the summer of 2014, he transferred to the 4 p.m. - midnight shift. As a result of the shift change, he lost the pay differential received by officers assigned to the midnight - 8 a.m. shift.  He was also required to "work the desk" at the police headquarters one night out of every four along with the other three officers assigned to the evening shift.

On October 14, 2014, Delaney returned to the Attorney General's office to refile his complaint.  Later that day, he delivered a copy of the complaint to Richard LaFond, the Abington Town Manager.  Delaney alleges that the presentation of the complaint to LaFond triggered another round of recriminations.  Specifically, on October 16, 2014, after Delaney repeated a profanity uttered by a 911 caller over the police radio, his immediate supervisor, Sergeant Mark Kilgour, reprimanded him for cursing over the air.

On February 26, 2015, Delaney, in his capacity as president of the patrol officers' union, was present at a contentious meeting with Chief Majenski and Deputy Chief Cutter regarding labor-management issues.  At

one point, Cutter told Delaney that he needed to "be careful."  When Delaney repeated those words back to Cutter, the meeting was called to an abrupt halt by Chief Majenski.  Cutter emailed Delaney after the meeting, copying the department's shift supervisors, with a warning that Delaney's conduct at the meeting had bordered on insubordination and that a repetition could result in discipline.  On May 20, 2015, Chief Majenski emailed Delaney informing him that he would be reassigned to the local state district court to serve as the police prosecutor for Abington.[3]  Finally, in December of 2015, Delaney was suspended for two days without pay by Deputy Chief Cutter after he failed to appear on time for his shift, although he insists that he complied with departmental rules by giving prior notice of his late arrival, and that he had similarly complied with the department's regulations in two other instances of tardiness in July of 2015 cited by Cutter to justify the suspension.

## DISCUSSION

Summary judgment is appropriate when, upon examination of the record evidence in the light most favorable to the nonmoving party, there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary

---

[3] Designated police officers (whether or not lawyers admitted to the bar) are permitted under Massachusetts law to prosecute certain criminal cases in the Commonwealth's District Courts.  *See* Mass. R. Crim. P. 2(b)(13).

judgment must demonstrate to the court the absence of genuinely disputed material facts by reference to the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that task is accomplished, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). That showing must rely on significantly probative evidence drawn from "materials of evidentiary quality." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013).

**Count I: The Massachusetts Whistleblower Statute**

Delaney's claim that the Town violated the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185, rests on the assertion that Town officials retaliated against him after he complained to the Massachusetts Attorney General in April of 2014 about the ticketing enforcement policy. The Whistleblower Statute has a somewhat unusual structure. It protects from employer retaliation an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law." *Id.* § 185(b)(1). An employee may not bring a whistleblower claim on this basis, however, unless he "has [first] brought

the activity, policy or practice in violation of a law . . . to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice." *Id.* § 185(c)(1). This provision is interpreted to require that an employee give "unequivocal notice" of the questioned practice to the employer before taking the complaint to an outside authority. *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 73 (1st Cir. 2002).

The undisputed evidence, however, is that Delaney gave no written notice to the Town of his disagreement with the new ticketing policy before repairing to the Attorney General's office in April of 2014 (despite having had ten months from May and June of 2013 to do so). The most that Delaney offers is an instance at a May 29, 2013 roll call, when he claims to have verbally told Sergeant Carini of his objections to the ticketing directive and to have given Carini a copy of the department rule discussing obedience to perceived unlawful orders. No stretch of the imagination can transform an oral remonstration and a copy of a generic department rule into a "written notice" of an objectionable "policy or practice in violation of a law."

Delaney more or less concedes the point, but argues that he fits within the statutory exemption from the notice requirement provided for disclosures undertaken "for the purpose of providing evidence of what the

employee reasonably believes to be a crime."  Mass. Gen. Laws ch. 149, §
185(c)(2)(C).  Delaney states that he reasonably believed that the actions of
Chief Majenski and Deputy Chief Cutter violated the Massachusetts bribery
statute, Mass. Gen. Laws ch. 268A, § 2.  That statute forbids "corruptly"
giving "anything of value" to a public employee intended "to influence any
official act or any act within the official responsibility of such employee."  *Id.*
§ 2(a)(1).  It also bars a public official from seeking "anything of value for
himself or for any other person or entity in return for" an official act.  *Id.* §
2(b).

Delaney's bribery claim is pegged on two theories of equal
implausibility.  First, Delaney contends that two fellow officers who wrote an
increased number of money citations received extra overtime for traffic
enforcement duties, a "thing of value" given in exchange for an "official act."
Second, Delaney notes that Chief Majenski, at a meeting with the
department's supervising sergeants, explained that funds from money
citations were paid, in part, by the Town into a capped fund marked for police
department uses.  Thus, the ticketing directive, according to Delaney, could
be viewed as an attempt to influence an "official act" (the writing of traffic
tickets) to provide something "of value" (enhanced ticketing revenues) to an
"entity" (the police department).  No reasonable person could believe that

the payment of legitimately earned overtime could constitute a bribe, or that a factual explanation of a longstanding Town policy regarding the allocation of ticket revenues could amount to a culpable admission to a bribery scheme. Summary judgment is thus warranted for the Town on Count I.[4]

## Counts III and IV: Federal Civil Rights

Delaney asserts two claims under the Federal Civil Rights Act, 42 U.S.C. § 1983. The first, described in Count III, alleges that Chief Majenski, Deputy Chief Cutter, and Lieutenant Sullivan unlawfully retaliated against him after he complained about the ticketing policy to the Attorney General in April of 2014. The second claim, as set out in Count IV, charges Chief Majenski and Deputy Chief Cutter with intimidating Delaney in the exercise of his First Amendment rights to free speech, based on Cutter's email accusing Delaney of insubordination sent after the contentious February 26, 2015 meeting on union matters.

A three-step test governs the analysis of First Amendment retaliation claims pressed by public employees. At the first step, the court must

---

[4] After the hearing on the motion for summary judgment, the Massachusetts Appeals Court decided *Trychon v. Massachusetts Bay Transportation Authority*, 2016 WL 4796733 (Sept. 15, 2016). Counsel for Delaney notified the court of this decision. Although *Trychon* interprets the state whistleblower law, it has no bearing on this case, as it does not address the notice requirement of section 185(c).

determine whether the employee's speech was made as a citizen regarding a matter of public concern.  *Curran v. Cousins*, 509 F.3d 36, 44-45 (1st Cir. 2007).  At the second step, the court must consider whether the public employer had a sufficient justification for treating the employee differently from a member of the public.  *Id.* at 45.  The final question is whether the employee "can show that the protected expression was a substantial or motivating factor in [an] adverse employment decision."  *Id.*

The third element is the one most worthy of focus here.  This element examines not only whether the alleged retaliation is causally linked to the plaintiff's First Amendment activities, but also whether the allegedly retaliatory act amounted to an "adverse employment decision."  In their motion for summary judgment, defendants treat the analysis of this question as if it is coextensive with the analysis under federal employment discrimination statutes like Title VII.  The case law in this circuit is clear, however, that "the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII), and the Supreme Court has indicated that relatively minor events might give rise to liability."  *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004) (internal citation omitted).

The relevant question therefore is "whether the defendant's actions would deter a 'reasonably hardy individual[]' from exercising his constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (quoting *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc)).  Thus, conduct short of an actual or constructive discharge can support a § 1983 claim if it is "sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations." *Agosto-de-Feliciano*, 889 F.2d at 1217.  That chilling effect is likely to be present if, among other eventualities, the alleged adverse actions "result in a work situation 'unreasonably inferior' to the norm for the position." *Id.* at 1218.[5]

An "unreasonably inferior" finding is usually premised on a plaintiff's loss of perquisites or responsibilities typical to his or her position, such as a loss of job functions, *see Reyes-Orta v. P.R. Highway & Transp. Auth.*, 811

---

[5] The First Circuit has not been entirely consistent about whether the standard articulated in *Agosto-de-Feliciano* continues to apply.  *Compare Bergeron v. Cabral*, 560 F.3d 1, 8 (1st Cir. 2009) (declaring that "[t]he standard enunciated in *Agosto-de-Feliciano* survived" the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)), *abrogated on other grounds by Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009), *with Reyes-Orta v. P.R. Highway & Transp. Auth.*, 811 F.3d 67, 75 n.5 (1st Cir. 2016) (calling into question the continuing vitality of *Agosto-de-Feliciano*).  As will become clear, however, Delaney's claims would fail under any plausible standard.

F.3d 67, 76-77 (1st Cir. 2016), the "denial of 'special benefits and assignments' arising in the normal course of an employment," or "the denial of overtime opportunities," *Bergeron v. Cabral*, 560 F.3d 1, 8-9 (1st Cir. 2009) (quoting *Rivera-Jiménez*, 362 F.3d at 94), *abrogated on other grounds by Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Even small adjustments in the perquisites of a job, if part of a "campaign of informal harassment," can amount to adverse employment actions if collectively they have the requisite chilling effect. *Barton*, 632 F.3d at 29.

In the first instance, Delaney's allegations raise a basic question of knowledge: whether Delaney can demonstrate that defendants knew of his undisclosed complaint to the Attorney General in April of 2014.  Delaney offers no direct evidence that defendants in fact had learned of the complaint, arguing only that "[Chief] Majenski somehow discovered that the AG Complaint was filed."  Opp'n at 27.  Delaney infers that Cutter and Majenski were aware of the complaint because of the allegedly retaliatory acts that took place in its aftermath — the assignment to program the fax machine, Cutter's email to Owings indicating that officers on his shift (including Delaney) would not receive community policing credit for the 6 a.m. - 8 a.m. guard duty at the Abington schools, and the confrontational meeting that took place

with Chief Majenski on April 9, 2014, where Majenski questioned Delaney's fitness to be a police officer given his reluctance to write traffic tickets.

Although causation (or pretext) can be inferred from evidence of timing, *see, e.g.*, *Davignon v. Hodgson*, 524 F.3d 91, 106-107 (1st Cir. 2008); *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 57 (1st Cir. 2003), Delaney points to no case where timing alone has been deemed a sufficient substitute for evidence showing that a defendant knew that the employee was engaged in covert First Amendment activity.  No other evidence supports this inference. Nor is there is any indication that a campaign of retaliation was ongoing in the period between Delaney's first trip to the Attorney General's office in April of 2014 and his second visit in October of 2014.  The only instance of retaliation Delaney identifies during this interval occurred in the summer of 2014, when Delaney was assigned to one night of desk duty each week after he moved to the 4 p.m. - midnight shift. The undisputed facts show (and Delaney concedes) that each officer on his shift was required to perform an identical night of desk duty because the Town did not employ civilian dispatchers to take citizens' calls.[6]

_____

[6] Moreover, there are strong reasons not to impute knowledge of Delaney's complaint to Chief Majenski based on the discussion at their meeting.  After all, Lieutenant Sullivan had already indicated to Owings in March of 2014 that Delaney's low rate of issuing money citations was an issue, and Delaney had just joined a shift with other officers who were

Defendants concede, however, that they learned of Delaney's complaint to the Attorney General in October of 2014, after he delivered a copy of the complaint to Town Manager LaFond.   Accepting Delaney's assertion that he presented the complaint to LaFond on October 14, the retaliatory actions Delaney claims took place in the following fourteen months are simply not of the kind or quality that would permit a reasonable jury to infer retaliation.   Rather, as will be seen, they are "so trivial that [they] would not deter an ordinary employee in the exercise of his or her First Amendment rights."   *Barton*, 632 F.3d at 29.

The only retaliatory event alleged in the immediate aftermath of the delivery of the complaint to LaFond in October of 2014 is an email from Kilgour to Delaney admonishing him for using profanity over the police public radio.   However, it is undisputed that the decision to reprimand Delaney was made solely by Kilgour, to whom no retaliatory motive is attributed.

The next alleged instance of retaliation occurred after the February 26, 2015 meeting with Chief Majenski and Deputy Chief Cutter over union matters.   Following the meeting, Cutter wrote an email to Delaney, copying

---

notoriously recalcitrant about issuing tickets.   The Chief also would have had strong incentives to have Delaney, as a leader in the patrolmen's union, fall in line with his enforcement objectives.

the supervising sergeants in the department, warning him against future insubordination.  Delaney asserts that this email was retaliation both for his complaint to the Attorney General and for his union advocacy, but this act could not reasonably be perceived as having a chilling effect on either score. The rebuke was exceedingly mild: Cutter took pains to emphasize that Delaney was "welcome to state [his] opinions and facts" and to disagree with management, but did not "have the right[] to be disrespectful when doing it."[7]  Defs.' Ex. 30, Dkt #51-3.  Although collective bargaining certainly falls within the ambit of the First Amendment, it is often conducted in an adversarial and heated manner, a fact of industrial life that would not come as a surprise (or intimidation) to an experienced union official (like Delaney). *Cf. McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) ("[N]ot every critical comment . . . made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights.").  Finally, to the extent that Delaney attempts to cast the exchange as an adverse employment action in response to his complaint

---

[7] The warning, coming after a meeting that Delaney agrees became contentious, is also hardly surprising in the context of a paramilitary organization, where discipline and respect for the chain of command is of unique importance.  *Cf. Jordan v. Carter*, 428 F.3d 67, 74 (1st Cir. 2005) (recognizing a heightened interest in ensuring discipline in police departments).

to the Attorney General, there is nothing to suggest that the email was anything other than a reaction to the heated temperature of the meeting. There is simply no evidence of a causal linkage between the email and Delaney's delivery of a copy of his complaint to the Town Manager some four and a half months earlier.

Delaney next argues that Chief Majenski's decision to move him to the court prosecutor's slot in May of 2015 amounted to an adverse employment action. Delaney claims that in this role, he lost opportunities for investigative overtime pay often made available to patrol officers to complete investigations of crimes encountered during their shifts. That may be true to a degree, although the new position came with substantial other benefits — regular 8 a.m. - 4 p.m. weekday hours, no weekend or holiday shifts, an additional stipend, and extra days off — making it in the eyes of many officers a plum assignment. While Delaney may have preferred patrol duty, an employee's subjective disappointment at an employer's otherwise reasonable employment decision usually does not amount to an adverse employment action, *see Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996), and there is no reason to deviate from that settled rule in this context.

The only remaining allegedly retaliatory act occurred in December of 2015, when Deputy Chief Cutter suspended Delaney for two days without pay

after he arrived late for his shift.   Conspicuously absent, however, is any suggestion of a relationship between the suspension and Delaney's ticketing complaint to the Attorney General.   To the contrary, in his opposition to the motion for summary judgment, Delaney attributes the December suspension to conversations he had had several days prior with state prosecutors on a wholly unrelated matter.[8]   In any event, showing a causal connection between the refiling of the ticketing complaint and the suspension would be particularly difficult given the nearly fourteen month gap that now separated the two events.   *See, e.g., González-Droz v. González-Colón*, 660 F.3d 1, 16-17 (1st Cir. 2011) (interval of fourteen months between speech and alleged retaliation could not support inference of causation).

In sum, given the paucity of affirmative evidence of a speech-chilling adverse employment action in response to Delaney's First Amendment

---

[8] Delaney also makes passing references to two written warnings he received from different sergeants reprimanding him for missing posted shifts near the end of July of 2015.   Although Delaney asserts that these reprimands were unwarranted, he does not argue that they amounted to adverse employment actions on their own.   Instead, Delaney suggests that these incidents were deviations from department protocol or were pretextual efforts to sully his disciplinary record.   Neither theory is supported by the record evidence cited to the court.   *See* Pl.'s Statement of Disputed Facts, Dkt #62, ¶ 156.

activities, defendants are entitled to summary judgment on Counts III and IV.[9]

## Count II: Massachusetts Civil Rights Act

Delaney's claims under the MCRA, Mass. Gen. Laws ch. 12, § 11H, lodged against Chief Majenski, Deputy Chief Cutter, and Lieutenant Sullivan, rely on the same allegations that underlie his federal civil rights and whistleblower claims.  The MCRA bars interference "with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or . . . of the commonwealth" by means of "threats, intimidation or coercion."  *Id.*  The MCRA is a remedial statute that may only be invoked to vindicate the violation of a right secured by state or federal law.  *See Perkins v. Commonwealth*, 52 Mass. App. Ct. 175, 181 (2001).  Given the court's determination that defendants are entitled to summary judgment on the federal § 1983 and whistleblower claims, it follows that there is no violation of state or federal law on which to ground an MCRA claim.  *See McGunigle v. City of Quincy*, 2016 WL 4570420, at *9 (1st Cir. Aug. 31, 2016).

---

[9] Delaney's briefs and statements of facts gesture at a host of other petty squabbles within the department.  He has not articulated the slightest connection between any of them and his complaint, so they receive no mention here.

## Count V: Intentional Infliction of Emotional Distress

Finally, Delaney asserts a common-law claim for intentional infliction of emotional distress against all three individual defendants. Under Massachusetts law, Delaney is required to demonstrate that the defendants (1) "intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Polay v. McMahon*, 468 Mass. 379, 385 (2014). In order for conduct to be extreme and outrageous, it is not enough "that the defendant . . . has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,'" but the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roman v. Trs. of Tufts Coll.*, 461 Mass. 707, 718 (2012) (quoting *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987)). This is a stiff test, and Delaney's allegations of policy disagreements, personality conflicts, and exchanges of strong words and petty insults fall well short of a passing grade.

ORDER

For the foregoing reasons, the motion of the individual defendants and the Town of Abington for summary judgment is <u>ALLOWED</u> as to all counts. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE